UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | |
|---|---|
| EVERGREEN EQUITY TRUST<br>200 Berkeley Street<br>Boston, Massachusetts 02116;<br><br>EVERGREEN SELECT EQUITY TRUST<br>200 Berkeley Street<br>Boston, Massachusetts 02116;<br><br>EVERGREEN VARIABLE ANNUITY TRUST,<br>200 Berkeley Street<br>Boston, Massachusetts 02116; and<br><br>EVERGREEN INTERNATIONAL TRUST,<br>200 Berkeley Street<br>Boston, Massachusetts 02116,<br><br>        Plaintiffs,<br><br>  v.<br><br>FEDERAL NATIONAL MORTGAGE ASSOCIATION,<br>FRANKLIN D. RAINES, TIMOTHY HOWARD,<br>LEANNE G. SPENCER, THOMAS P. GERRITY, ANNE<br>M. MULCAHY, FREDERICK V. MALEK, TAYLOR C.<br>SEGUE, III, WILLIAM R. HARVEY, JOE PICKETT,<br>VICTOR H. ASHE, STEPHEN B. ASHLEY, MOLLY H.<br>BORDONARO, KENNETH M. DUBERSTEIN, JAMIE<br>S. GORELICK, MANUEL J. JUSTIZ, ANN<br>KOROLOGOS, DONALD B. MARRON, DANIEL H.<br>MUDD, H. PATRICK SWYGERT, LESLIE RAHL, and<br>JOHN DOE,<br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br><br>Civil Action No.<br><br>_____<br><br><br>Jury Trial Demanded |

## COMPLAINT

GRANT & EISENHOFER P.A.
Stuart M. Grant (D.C. Bar # 450895)
Chase Manhattan Centre
1201 N. Market St.
Wilmington, DE 19801
(302) 622-7000
(302) 622-7100 (facsimile)
Attorneys for Plaintiffs

# TABLE OF CONTENTS

**Page**

I. NATURE OF THE ACTION ...................................................................................1

II. JURISDICTION AND VENUE .............................................................................3

III. THE PARTIES ........................................................................................................4

    A.    Plaintiffs .........................................................................................................4

    B.    Defendants .....................................................................................................5

        1.    Fannie Mae ........................................................................................5

        2.    Officer Defendants ...........................................................................7

        3.    Audit Committee Defendants ...........................................................8

        4.    Director Defendants ........................................................................10

        5.    John Doe ..........................................................................................13

IV. DEFENDANTS' FRAUDULENT SCHEME ........................................................13

    A.    Overview ......................................................................................................13

    B.    The Genesis of Fannie Mae's Accounting Fraud ........................................16

        1.    Fannie Mae's Compensation Policies Encouraged And Led
            To Accounting Fraud .......................................................................16

        2.    Defendants Needed To Portray Stability In The Company's
            Earnings In Order To Maintain The Benefits Of
            Government Sponsorship ..................................................................20

        3.    The Fate Of Freddie Mac Loomed Large Over The Fannie
            Mae Defendants ...............................................................................23

    C.    Defendants' Violations of Pertinent SEC Regulations .........................26

    D.    Defendants' Violations of GAAP ........................................................27

        1.    Fannie Mae's Improper Accounting for Deferred Price
            Adjustments ......................................................................................29

2.  Fannie Mae's Improper Accounting For Derivative Transactions and Hedging Activities ........................................ 33

3.  Fannie Mae's Improper Classification of Loans Purchased From Lenders ....................................................... 39

4.  Fannie Mae's Failure To Record Asset Impairments On Guaranty Fees Violated GAAP ............................... 42

5.  Fannie Mae's Improper Accounting for Dollar-Roll Repurchase Agreements ........................................ 43

6.  Fannie Mae's Accounting For Insurance In Violation of GAAP ........................................................... 44

7.  Fannie Mae's Failure to Consolidate Results of Qualified Special Purpose Entities in Violation of FIN No. 46, Consolidation of Variable Interest Entities, an Interpretation of Accounting Research Bulletin (ARB) 51 ...................... 46

8.  Improper Timing of Recognition of Certain Income and Expense Amounts ........................................ 46

9.  Improper Accounting for Investments in Low-Income Housing Tax Credit Partnerships ........................... 47

V.     THE DEFENDANTS IGNORED WHISTLEBLOWERS ............................................... 48

VI.    THE FANNIE MAE DEFENDANTS MAINTAINED DEFICIENT INTERNAL CONTROLS ................................................................. 54

VII.   DEFENDANTS' FALSE AND MISLEADING STATEMENTS ................................... 61

A.   Raines' December 15, 2000 Speech .................................................... 62

B.   The 2000 Annual Report ................................................................ 63

C.   The April 17, 2001 Press Release .................................................... 65

D.   The 2001 Proxy ............................................................................ 66

E.   The July 17, 2001 Press Release ..................................................... 67

F.   The October 15, 2001 Press Release ................................................ 68

G.   The January 14, 2002 Press Release ................................................ 69

H.   The February 11, 2002 Credit Suisse First Boston Financial Services Conference ......................................................... 72

I.      The 2001 Annual Report ...................................................................... 73

J.      The April 15, 2002 Press Release ......................................................... 75

K.      The June 5, 2002 Sanford Bernstein Strategic Decisions
        Conference ........................................................................................... 77

L.      The July 15, 2002 Press Release ........................................................... 79

M.      The July 15, 2002 Conference Call ....................................................... 80

N.      The October 15, 2002 Press Release ..................................................... 81

O.      The January 15, 2003 Press Release ..................................................... 83

P.      The January 15, 2003 Conference Call ................................................. 85

Q.      The 2002 Annual Report ...................................................................... 86

R.      The 2002 10-K ..................................................................................... 89

S.      The Registration Statement ................................................................. 92

T.      April 15, 2003 8-K ............................................................................... 92

U.      The 2003 Proxy ................................................................................... 93

V.      The May 2003 10-Q ............................................................................. 95

W.      The June 17, 2003 Interview ............................................................... 97

X.      The July 15, 2003 8-K ......................................................................... 98

Y.      The July 15, 2003 Conference Call ...................................................... 98

Z.      The July 30, 2003 Conference Call .................................................... 100

AA.     The July 30, 2003 News Conference ................................................... 103

BB.     The August 2003 Form 10-Q .............................................................. 103

CC.     The October 16, 2003 8-K .................................................................. 106

DD.     The November 2003 10-Q .................................................................. 107

EE.     The January 21, 2004 8-K .................................................................. 109

FF.     The January 21, 2004 Conference Call ............................................... 110

GG.     The 2003 10-K ................................................................................... 110

      HH.    The 2004 Proxy ................................................................................113

      II.     The 2003 Annual Report ...............................................................113

      JJ.     The April 19, 2004 Press Release ..................................................114

      KK.   The May 2004 10-Q .......................................................................115

      LL.    The July 21, 2004 Press Release ...................................................117

      MM.  The August 2004 10-Q ...................................................................118

VIII.   FALSITY OF DEFENDANTS' STATEMENTS CONCERNING FANNIE MAE .....120

IX.     PLAINTIFFS' RELIANCE ON DEFENDANTS' FALSE STATEMENTS .................124

X.      THE TRUTH BEGINS TO EMERGE, CAUSING PLAINTIFFS TO INCUR LOSSES ......................................................................................................125

XI.     THE OFFICER DEFENDANTS' SCIENTER .............................................141

XII.    THE AUDIT COMMITTEE DEFENDANTS' SCIENTER ..........................145

XIII.   INAPPLICABILITY OF THE STATUTORY SAFE HARBOR .................153

XIV.   APPLICABILITY OF PRESUMPTION OF RELIANCE:  FRAUD ON THE MARKET ...................................................................................................154

XV.    LOSS CAUSATION ................................................................................155

XVI.   TOLLING OF THE STATUTE OF LIMITATIONS ..................................156

COUNT I Violations of Section 10(b) of the Exchange Act and Subsections (a), (b), and (c) of Rule 10b-5 Promulgated Thereunder (Against Defendants Fannie Mae, the Officer Defendants, and the Audit Committee Defendants (the "10b-5 Defendants")) ...............................................................................................157

COUNT II (Violation of Section 10(b) of the Exchange Act and Subsections (a) and (c) of Rule 10b-5 Promulgated Thereunder) (Against Defendant Doe) ..............159

COUNT III Violation of Section 18 of the Exchange Act (Against All Defendants Except Doe) ..........................................................................................................160

COUNT IV For Violations of Section 20(a) of the Exchange Act (Against the Individual Defendants) ....................................................................................................162

COUNT V Violation Of Section 11 Of The Securities Act (Against Fannie Mae, Raines, Ashe, Ashley, Bordonaro, Duberstein, Gerrity, Gorelick, Harvey, Justiz, Korologos, Malek, Marron, Mudd, Mulcahy, Pickett, Segue, and Swygert ("the Section 11 Defendants")) ............................................................................................ 164

COUNT VI Control Person Liability Pursuant to Section 15 Of the Securities Act (Against Raines, Howard, Spencer, Gerrity, Harvey, Mulcahy, Segue, and Malek (the "Section 15 Defendants")) ....................................................................................... 165

COUNT VII Violation Of Section 20A Of The Exchange Act (Against Raines, Howard, and Spencer) ........................................................................................................... 167

COUNT VIII Common Law Fraud (Against Defendants Fannie Mae, the Officer Defendants, and the Audit Committee Defendants) ........................................................ 168

COUNT IX Negligent Misrepresentation (Against All Defendants Except Doe) ..................... 170

COUNT X (Aiding and Abetting Common Law Fraud) (Against Doe) ..................................... 171

COUNT XI Claim Pursuant To Mass. Gen. Laws Ch. 93A § 11 for Violation of Mass. Gen. Laws Ch. 93A § 2 (Against All Defendants Except Doe) ...................................... 173

JURY DEMAND ........................................................................................................................ 174

PRAYER FOR RELIEF ............................................................................................................ 174

Plaintiffs, by their undersigned counsel, make this complaint upon personal knowledge as to themselves and their own acts, and upon information and belief as to all other matters, based upon the investigation by their counsel, which has included review and analysis of: annual reports and publicly filed documents of the Federal National Mortgage Association ("Fannie Mae" or the "Company"); press releases; news articles; analysts' statements; conference call transcripts; transcripts/scripts from speeches and remarks given by the defendants; testimony before the House Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises; and reports and statements issued by the Office of Federal Housing Enterprise Oversight, including but not limited to those discussed herein. Plaintiffs make the following allegations against Fannie Mae, Franklin D. Raines, Timothy Howard, Leanne G. Spencer, Daniel H. Mudd, Thomas P. Gerrity, Anne M. Mulcahy, Frederick V. Malek, Taylor C. Segue, III, William R. Harvey, Joe Pickett, Victor H. Ashe, Stephen B. Ashley, Molly H. Bordonaro, Kenneth M. Duberstein, Jamie S. Gorelick, Manuel J. Justiz, Ann Korologos, Donald B. Marron, H. Patrick Swygert, Leslie Rahl, and "John Doe" (an insurance company whose identity is presently unknown to Plaintiffs but can be ascertained through discovery) (collectively, "Defendants"). Based on the foregoing, Plaintiffs believe that substantial additional evidentiary support exists for the allegations herein, which Plaintiffs will find after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.    This action arises out of a scandal of tremendous proportions, involving billions of dollars, at Fannie Mae. On September 22, 2004, Fannie Mae disclosed that the Office of Federal Housing Enterprise Oversight ("OFHEO") had issued a report (the "Report") finding that Fannie Mae had systematically manipulated its earnings in order to minimize fluctuations (thus understating risk) and to meet compensation targets for senior executives. After the close of

trading that day, OFHEO released its detailed 198-page Report to the public. The Report, which was based upon OFHEO's review of over 200,000 documents and e-mails, as well as interviews and sworn testimony from numerous current and former Fannie Mae employees, concluded that Fannie Mae's management had (a) violated generally accepted accounting principles ("GAAP") in accounting for derivative transactions and hedging activities; (b) violated GAAP in accounting for amortization of purchase premiums and discounts and other deferred charges; (c) failed to ensure adequate internal controls; (d) deferred expenses to achieve bonus compensation targets; and (e) maintained a corporate culture that emphasized earnings stability at the expense of accurate financial disclosures.

2.      In the Report, OFHEO stated in bold print: "The matters detailed in this report are serious and raise concerns regarding the validity of previously reported financial results, the adequacy of regulatory capital, the quality of management supervision, and the overall safety and soundness of [Fannie Mae]." In the cover letter to the Fannie Mae Board of Directors (the "Board") which accompanied the Report, OFHEO further stated that its findings "cannot be explained as mere differences in interpretation of accounting principles" but instead involved "clear instances in which management sought to misapply and ignore accounting principles for the purposes of meeting investment analyst expectations; reducing volatility in reported earnings; and enabling fragmented process and systems, and an ineffective controls environment to exist."

3.      A formal SEC investigation and a criminal probe by the United States Justice Department followed close on the heels of the release of the OFHEO Report, as did a significant drop in Fannie Mae's stock price, from $75.65 on September 21, 2004, to $70.69 following the Company's announcement of September 22, 2004, to $67.15 on September 23, 2004 following the public release of the OFHEO Report, to $63.40 on September 30, 2004. This represents a

decline in market capitalization of over $11.85 billion during the 9 days following the initial disclosure.

4.      Unfortunately, the revelations of September 2004 were only the tip of the iceberg. Since that time, the Company and its new management have been engaged in the process of trying to clean up the Company's books, and as recently as September 28, 2005, it was disclosed that new accounting errors had been uncovered as a result of that process. Fannie Mae has acknowledged that its previously-filed financial statements for the periods from January 2001 through the second quarter of 2004 are false and must be restated, and has estimated that the restatement will have an approximate $12 billion impact on the Company's financial statements. However, no restatement has yet been issued, and the Company has stated that it does not expect to issue one until 2006, because its new management has yet to unravel all of the fraudulent accounting. Fannie Mae's stock is now trading in the $50 range, and the Company has lost over $25 billion in market capitalization since September 21, 2004.

5.      Plaintiffs are institutional investors that collectively purchased over $415 million in Fannie Mae common stock between January 17, 2001 and September 28, 2005 (the "Loss Period"), in reliance on financial information and disclosures which, unbeknownst to Plaintiffs, were materially false and misleading. Plaintiffs collectively lost over $48 million as a result of their purchases of these securities and their decline in value following the revelation of the falsity of the financial information upon which they were based.

## II.    JURISDICTION AND VENUE

6.      The claims herein arise under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) and Rule 10b-5, 17 C.F.R. 240.10b-5, promulgated thereunder; Section 18 of the Exchange Act, 15 U.S.C. § 78r; Section 20(a) of the

Exchange Act, 15 U.S.C. § 78t(a); Section 20A of the Exchange Act, 15 U.S.C. § 78t-1; Massachusetts General Laws Chapter 93A §§ 2 and 11; and common law.

7.     In connection with the acts, conduct, and course of conduct alleged in the Complaint, the Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mails and interstate telephone communications.

8.     This Court has jurisdiction over this matter and over the Defendants pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; pursuant to 28 U.S.C. §§ 1331 and 1337(a); and pursuant to principles of supplemental jurisdiction, 28 U.S.C. § 1367.

9.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa; and 28 U.S.C. § 1391(b).  The Company's principal place of business is located in this District, and many of the acts alleged herein, including the preparation and dissemination of false and misleading statements to the investing public, occurred in substantial part in this District.

## III.    THE PARTIES

### A.    Plaintiffs

10.     Plaintiff Evergreen Equity Trust is a Delaware statutory trust with its principal place of business at 200 Berkeley Street, Boston, Massachusetts 02116.

11.     Plaintiff Evergreen Select Equity Trust is a Delaware statutory trust with its principal place of business at 200 Berkeley Street, Boston, Massachusetts 02116.

12.     Plaintiff Evergreen Variable Annuity Trust is a Delaware statutory trust with its principal place of business at 200 Berkeley Street, Boston, Massachusetts 02116.

13.     Plaintiff Evergreen International Trust is a Delaware statutory trust with its principal place of business at 200 Berkeley Street, Boston, Massachusetts 02116.

14.    Plaintiffs Evergreen Equity Trust, Evergreen Select Equity Trust, Evergreen Variable Annuity Trust, and Evergreen International Trust (collectively, "Plaintiffs") purchased approximately 5.9 million shares[1] of Fannie Mae stock, for a total purchase price of over $415 million, between January 15, 2001 and September 28, 2005, in reliance on false and misleading statements by the defendants with respect to Fannie Mae's financial results and financial condition.

### B.    Defendants

#### 1.    Fannie Mae

15.    Defendant Federal National Mortgage Association, also known as Fannie Mae, is the nation's largest source of funds for mortgage lenders, providing resources for its customers to make additional mortgage loans or investments in mortgage-related securities.  Fannie Mae operates primarily in the secondary mortgage market by purchasing mortgages and mortgage-related securities from primary market institutions.

16.    Fannie Mae was established in 1938 under Title III of the National Housing Act as a U.S. government entity.  In 1968, pursuant to the Federal National Mortgage Association Charter Act, 12 U.S.C. § 1716, *et. seq.* (the "Charter Act"), it became a shareholder-owned company, although it continues to operate under a federal charter.  The Charter Act provides that Fannie Mae will continue until dissolved by an act of Congress.  Fannie Mae is exempt from taxation by states, counties, municipalities, or local taxing authorities, except for taxation on its real property.  In addition, Fannie Mae is entitled by statute to conduct its business without regard to any qualification or similar statutes in any state, the District of Columbia, the Commonwealth of Puerto Rico, or any territories of the United States.  Fannie Mae's common stock is traded on the New York Stock Exchange under the symbol "FNM."

---

[1]    This figure is adjusted for stock splits.

17.    As a federally chartered corporation, Fannie Mae is subject to Congressional legislation and oversight and is regulated for various purposes by HUD, OFHEO, and the U.S. Department of Treasury, to the extent authorized by statute, as well as the SEC. On April 30, 2003, regulations promulgated by OFHEO went into effect which require Fannie Mae to file with the SEC all reports, proxy statements, and forms that are required to be filed under Sections 14(a) and (c) of the Exchange Act and the rules and regulations under those sections and requiring Fannie Mae's directors and officers to file all reports and forms that are required to be filed under Section 16 of the Exchange Act and the rules and regulations thereunder.

18.    Federal law establishes minimum capital and risk-based capital requirements for Fannie Mae. OFHEO, an independent office within HUD, is responsible for ensuring that Fannie Mae is adequately capitalized under both of these standards. To satisfy the minimum capital standard, Fannie Mae's core capital must equal or exceed the minimum capital and a lower "critical" capital requirement. Core capital is defined by OFHEO as the stated value of common stock, the stated value of outstanding noncumulative perpetual preferred stock, paid-in capital, and retained earnings, less treasury stock. Minimum capital is the sum of 2.5% of on-balance sheet assets, 0.45% of outstanding mortgage-backed securities ("MBS"), and 0.45% of adjusted off-balance sheet obligations. Equivalent critical capital levels are set at 1.25%, 0.25%, and 0.25%, respectively.

19.    To meet the risk-based capital requirements, Fannie Mae's total capital (*i.e.*, the sum of core capital and the total allowance for loan losses and guaranty liability for MBS, less the specific loss allowance), must exceed a certain threshold. That threshold is established by a risk-based capital stress test (implemented on September 13, 2002), which requires Fannie Mae to hold enough capital to withstand a severe 10-year stress period, characterized by extreme

interest-rate movements and credit losses occurring simultaneously, plus 30% of that amount for management and operations risk.

### 2.    **Officer Defendants**

20.    Defendant Franklin D. Raines ("Raines") was Chairman of the Board and Chief Executive Officer ("CEO") of Fannie Mae from January 1999 until December 21, 2004, and was Chairman of the Board and Chief Executive Officer-Designate of Fannie Mae from May 1998 to December 1998.    In addition, at all relevant times Raines was Chairman of the Executive Committee of Fannie Mae's Board, a committee that has all the authority of the Board during interim periods between Board meetings, with certain limited exceptions set forth in the Company's bylaws.    Previously, Raines was Vice Chairman of the Board of Fannie Mae from September 1991 to September 1996.    From 1996 to 1998, he was the Director of the U.S. Office of Management and Budget ("OMB"), with responsibility for overseeing the preparation of the Federal government's budget.    Before joining Fannie Mae in 1991, Raines was a partner with the Wall Street investment banking firm of Lazard Freres & Co., which he joined in 1979.    Raines signed Fannie Mae's Form 10-K filings for 2002 and 2003.    In addition, Raines signed certifications attesting to the accuracy of the financial and other information in those Form 10-K filings and in the Form 10-Q filings for the quarterly periods ending March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004, and June 30, 2004, which certifications were appended to the Company's Form 10-K and 10-Q filings for the respective periods.

21.    Defendant Timothy Howard ("Howard") joined Fannie Mae in 1982, and was the Company's Chief Financial Officer ("CFO") from February 1990 until his resignation effective December 21, 2004.    As CFO, Howard had responsibility for the Company's financial reporting and accounting.    Howard was also Vice Chairman of the Board and a director of Fannie Mae from May 2003 until January 31, 2005.    Howard signed Fannie Mae's annual reports for 2000

and 2001 and its Form 10-K filings for 2002 and 2003. In addition, Howard signed certifications attesting to the accuracy of the financial and other information in those Form 10-K filings and in the Form 10-Q filings for the quarterly periods ending March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004, and June 30, 2004, which certifications were appended to the Company's Form 10-K and 10-Q filings for the respective periods.

22.    Defendant Leanne G. Spencer ("Spencer") was Senior Vice President and Controller of Fannie Mae from November 1998 until January 31, 2005. Prior to that, from June 1993 to November 1998, she served as Vice President of Financial Reporting. As the Company's Controller during the entire time period during which the Company perpetrated its accounting fraud, Spencer had the responsibility and authority to formulate and approve Fannie Mae's accounting policies. Spencer signed Fannie Mae's annual reports for 2000 and 2001, its Form 10-K filings for 2002 and 2003, and its Form 10-Q filings for the quarterly periods ended March 31, 2003, June 30, 2003, September 30, 2003, March 31, 2004, and June 30, 2004. Spencer resigned her positions with the Company in January 2005, after the SEC had concluded that Fannie Mae's accounting policies violated GAAP. She continues to serve as Special Advisor to the Company until January 31, 2006.

23.    Defendants Raines, Howard, and Spencer are hereinafter referred to as the "Officer Defendants."

### 3.    Audit Committee Defendants

24.    Defendant Thomas P. Gerrity ("Gerrity") has been a director of Fannie Mae since 1991, Chairman of its Audit Committee (the "Audit Committee") since at least 1998, and a member of its Executive Committee and Nominating and Corporate Governance Committee since at least 2000. Gerrity is a Professor of Management and former Dean at The Wharton

School of Business, and Director of the Wharton Electronic Business Initiative. Gerrity signed Fannie Mae's Form 10-K filings for 2002 and 2003.

25.    Defendant Anne M. Mulcahy ("Mulcahy") has been a director of Fannie Mae since 2000, a member of its Audit Committee since 2001, a member of its Executive Committee since 2002, a member of its Compensation Committee since at least 2000, and Chairman of its Compensation Committee since 2002. She was also a member of the Board's Assets and Liabilities Policy Committee in at least 2000. Mulcahey has been designated by the Board as an "audit committee financial expert" under the rules and regulations of the SEC. Mulcahy also serves as Chairman and Chief Executive Officer of Xerox Corporation, and as a director of Target Corporation. Mulcahy signed Fannie Mae's Form 10-K filings for 2002 and 2003.

26.    Defendant Frederick V. Malek ("Malek") has been a director of Fannie Mae and a member of its Audit Committee and Assets and Liabilities Policy Committee since 2002. Malek has been designated by the Board as an "audit committee financial expert" under the rules and regulations of the SEC. Malek is the Chairman of Thayer Capital Partners, a private equity investment firm. Malek signed Fannie Mae's Form 10-K filings for 2002 and 2003. On November 8, 2005, Malek announced that he would retire from the Board effective December 31, 2005.

27.    Defendant Taylor C. Segue, III ("Segue") was a director of Fannie Mae and a member of its Audit Committee from 2001 until May 25, 2004, a member of its Assets and Liabilities Policy Committee in 2001 and 2002, and a member of its Compensation Committee from 2003 until May 25, 2004. Since June 2002, Segue has been a member of the law firm of Howard and Howard, a firm that has represented and continues to represent Fannie Mae's

auditor, KPMG LLP ("KPMG"), in connection with, *inter alia*, the defense of securities class action litigation.  Segue signed Fannie Mae's Form 10-K filings for 2002 and 2003.

28.    Defendant William R. Harvey ("Harvey") was a director of Fannie Mae and a member of its Audit Committee from 2001 until May 25, 2004.  Harvey is the President of Hampton University and owner of the Pepsi-Cola Bottling Company of Houghton, Michigan. Harvey signed Fannie Mae's Form 10-K filings for 2002 and 2003.

29.    Defendant Joe Pickett ("Pickett") has been a director of Fannie Mae since 1996, a member of its Audit Committee since 2003, and a member of its Compensation Committee since 2002.  Pickett was a member of the Board's Executive Committee in at least 2001-2002, and a member of its and Assets and Liabilities Policy Committee in at least 2001.  Pickett was Chairman and Chief Executive Officer of HomeSide International, Inc. from 1996 until 2001, and of HomeSide Lending, Inc. from 1990 to 1999.  Pickett signed Fannie Mae's Form 10-K filings for 2002 and 2003.

30.    Defendants Gerrity, Mulcahy, Malek, Segue, Harvey and Pickett are hereinafter referred to as the "Audit Committee Defendants."

### 4.    Director Defendants

31.    Defendant Victor H. Ashe ("Ashe") was a director of Fannie Mae and a member of its Assets and Liabilities Policy Committee from 2001 until May 25, 2004.  Ashe signed Fannie Mae's Form 10-K filings for 2002 and 2003.

32.    Defendant Stephen B. Ashley ("Ashley") has been a director of Fannie Mae since 1995, and a member of its Nominating and Corporate Governance Committee since at least 2000.  On December 21, 2004, Ashley became Chairman of the Company's Board.  Ashley signed Fannie Mae's Form 10-K filings for 2002 and 2003.

33.    Defendant Molly H. Bordonaro ("Bordonaro") was a director of Fannie Mae and a member of its Assets and Liabilities Policy Committee from 2001 until May 25, 2004. Bordonoaro signed Fannie Mae's Form 10-K filings for 2002 and 2003.

34.    Defendant Kenneth M. Duberstein ("Duberstein") has been a director of Fannie Mae since 1998 and has served as Chairman of its Assets and Liabilities Policy Committee and a member of its Executive Committee since at least 2000. Duberstein is Chairman and Chief Executive Officer of The Duberstein Group, Inc., a strategic planning and consulting company that has provided services to the Company since 1991. Duberstein signed Fannie Mae's Form 10-K filings for 2002 and 2003.

35.    Defendant Jamie S. Gorelick ("Gorelick") was a director and Vice Chair of the Board of Fannie Mae (an executive officer position) from 1997 until May 20, 2003. Gorelick signed Fannie Mae's Form 10-K filing for 2002.

36.    Defendant Manuel J. Justiz ("Justiz") was a director of Fannie Mae and a member of its Assets and Liabilities Policy Committee from 2001 until May 25, 2004. Justiz signed Fannie Mae's Form 10-K filings for 2002 and 2003.

37.    Defendant Ann Korologos ("Korologos") has been a director of Fannie Mae since 1994, a member of its Compensation and Nominating and Corporate Governance Committees since at least 2000, and a member of its Executive Committee since 2001. Korologos signed Fannie Mae's Form 10-K filings for 2002 and 2003.

38.    Defendant Donald B. Marron ("Marron") has been a director of Fannie Mae and a member of its Nominating and Assets and Liabilities Policies Committee since 2001. Marron was formerly the President and Chief Executive Officer of Paine Webber Group, Inc. (prior to its merger with UBS AG), and Chairman of UBS America from the time of the UBS-Paine Webber

merger until September 2003. Marron signed Fannie Mae's Form 10-K filings for 2002 and 2003.

39.     Defendant Daniel H. Mudd ("Mudd") was Vice Chairman of the Board, a director, and Chief Operating Officer of Fannie Mae from February 2000 until December 21, 2004, when he was appointed as the Company's interim CEO. Mudd signed Fannie Mae's Form 10-K filings for 2002 and 2003.

40.     Defendant H. Patrick Swygert ("Swygert") has been a director of Fannie Mae and a member of its Assets and Liabilities Policy Committee since 2000. Swygert is President of Howard University and a director of Hartford Financial Services Group, Inc. and United Technologies Corporation. His son is an employee of Fannie Mae. Swygert signed Fannie Mae's Form 10-K filings for 2002 and 2003.

41.     Defendant Leslie Rahl ("Rahl") has been a director of Fannie Mae and a member of its Assets and Liabilities Policy Committee since February 2004. She is the founder and has been President of Capital Market Risk Advisors, Inc., a financial advisory firm specializing in risk management, hedge funds, and capital market strategy since 1994. Previously, she spent 19 years at Citibank, including nine years as Vice President and Division Head, Derivatives Group-North America. Rahl signed Fannie Mae's Form 10-K filing for 2003.

42.     Defendants Ashe, Ashley, Bordonaro, Duberstein, Gorelick, Justiz, Korologos, Marron, Mudd, Swygert and Rahl, together with the Audit Committee Defendants, are hereinafter referred to as the "Director Defendants."

43.     The Officer Defendants and the Director Defendants are sometimes collectively referred to herein as the "Individual Defendants."

### 5.    John Doe

44.    Defendant John Doe ("Doe") is an insurance company that sold at least one "finite insurance" policy to Fannie Mae which, as discussed in Fannie Mae's Form 12b-25 filing with the SEC dated November 10, 2005, did not transfer sufficient risk to the insurer to qualify as insurance.    In collusion with Fannie Mae, Doe disguised its product as legitimate finite insurance, when it was actually only a loan to Fannie Mae which Fannie Mae improperly accounted for as insurance in order to mask known losses.    The identity of Doe has not been publicly disclosed, and is not known to Plaintiffs, but can be ascertained through discovery.

## IV.    DEFENDANTS' FRAUDULENT SCHEME

### A.    Overview

45.    During the Loss Period, Fannie Mae and the Officer Defendants (at times together referred to as "the Fannie Mae Defendants") engaged in a fraudulent scheme and course of conduct by implementing and executing company-wide accounting policies which blatantly violated GAAP.    In this manner, the Company created the illusion that it was meeting its overly aggressive earnings targets, and the Officer Defendants earned astronomical bonus compensation for purportedly hitting those targets.    These Defendants, along with the Director Defendants (who approved and signed the SEC filings and other documents containing Fannie Mae's financial results), publicly misrepresented the Company's reported earnings by more than $12 billion, a figure which may increase as the Company's ongoing internal investigation continues. As of today, investors still have not been provided with truthful financial information for any time period since 2000.    In terms of sheer dollar amounts, the fraud at Fannie Mae is second only to WorldCom.

46.    The Defendants' motives for the fraud were simple:    (1) to achieve earnings targets which triggered the Officer Defendants' entitlement to lucrative bonuses, and (2) to mask

volatile earnings in order to reassure the market of Fannie Mae's soundness and to reassure the government that Fannie Mae was worthy of all the perks it received as a government-sponsored enterprise, including a low cost of capital, a line of credit from the Treasury, and exemption from state and local taxes. By engaging in a variety of improper and unsupported accounting practices, Fannie Mae was able to report financial results that met the expectations of investment analysts, reduced volatility in reported earnings, secured the government's continued confidence in the enterprise, and allowed the Officer Defendants to collect lucrative, undeserved bonus compensation.

47.    In numerous public statements, the Company's top executives -- Howard (CFO), Raines (Chairman and CEO), and Spencer (Controller) -- presented Fannie Mae to Plaintiffs and other investors as a conservative, stable, and safe investment. They boasted of Fannie Mae's steady quarter-over-quarter earnings increases, even in times of market volatility. In reality, Fannie Mae had developed strained applications of GAAP and systematically manipulated its earnings to falsely portray this image, thereby understating its risk and artificially inflating its stock price. The Officer Defendants prepared financial statements that materially misrepresented Fannie Mae's financial results and condition, while the Director Defendants -- including the Audit Committee Defendants who were specifically charged with overseeing the audit and financial reporting process -- turned a blind eye to the fraud and approved the issuance and dissemination of the false financial statements to unsuspecting investors.

48.    The fraud continued unabated until September 22, 2004, when Fannie Mae was forced to publicly disclose that OFHEO had uncovered significant problems with Fannie Mae's accounting. OFHEO issued an exhaustive, derisive report finding that the Company had violated many basic accounting principles, including Statement of Financial Accounting Standards No.

91 ("SFAS 91") and Statement of Financial Accounting Standards No. 133 ("SFAS 133"), due to intentional manipulation of GAAP principles and a lack of adequate internal controls.    In his testimony before Congress on October 6, 2004 regarding OFHEO's findings, OFHEO Director Armando Falcon, Jr. ("Falcon") described the Company's "pervasive and willful misapplication of [GAAP]" which "cannot be dismissed as mere differences of interpretation in accounting rules. Fannie Mae understood the rules and simply chose not to follow them."

49.    On December 15, 2004, the SEC's Office of the Chief Accountant informed Fannie Mae of its conclusion that "from 2001 to mid-2004, Fannie Mae's accounting practices did not comply in material respects with the accounting requirements in Statement Nos. 91 and 133," and ordered the Company to restate its financial results to "eliminate the use of hedge accounting." Fannie Mae reported this in a Form 8-K filed on December 16, 2004.

50.    On December 22, 2004, Fannie Mae announced that its previously issued financial statements should not be relied upon, and that the Company would restate its financial statements for 2001 through mid-2004.  As such, Fannie Mae has admitted that its financial statements issued for each of these periods were false and that the net overstatements of income were material.  GAAP (APB No. 20) provides that financial statements should only be restated in limited circumstances; that is, when there is a change in a reporting entity, there is a change in accounting principles used, or to correct an error in previously issued financial statements. Fannie Mae's planned restatements are not due to a change in reporting entity or a change in accounting principles, but rather to correct errors in previously issued financial statements, rendering those statements materially false.  The Company has publicly stated that it expects the magnitude of the restatement to be in the $12 billion range.

51.    Fannie Mae is now mired in a massive restatement process, which it has stated it will not complete until the second half of 2006.  During the course of the restatement process, Fannie Mae's new management has uncovered additional accounting problems not addressed in the original OFHEO Report, which have been disclosed in various public filings, including a Form 8-K filed on February 23, 2005 and a Form 12b-25 filed November 10, 2005.  On April 6, 2005, Falcon testified before the House Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises regarding some of the new accounting problems found at Fannie Mae, noting: "As with previous accounting problem we have uncovered, they reflect Fannie Mae's tendency toward overly aggressive interpretation of GAAP, or in certain instances – when compliance with GAAP would negatively affect the company – *a willful disregard of accounting rules* . . . They also reflect situations where Fannie Mae's accounting policies actually do comply with GAAP, but enterprise personnel have failed to follow those policies."

52.    After exposing the rampant fraud, OFHEO characterized Fannie Mae as severely undercapitalized.  Fannie Mae has been forced to take extreme measures to restore its capital shortfall, including conducting a $5 billion private offering and cutting its common stock dividend in half.

### B.    The Genesis of Fannie Mae's Accounting Fraud

#### 1.    Fannie Mae's Compensation Policies Encouraged And Led To Accounting Fraud

53.    In 1993, Fannie Mae initiated a tactical shift in its compensation philosophy by basing 100 percent of its executives' cash bonuses exclusively on corporate performance.  The Company set a range of bonus opportunity for top managers of four or more times their base pay if Fannie Mae hit its 12-month EPS targets.

54.    In addition to salary and cash bonuses, Fannie Mae's executives receive variable long-term incentive stock awards. Officers at the senior vice president level and above received half of the value of their annual variable long-term incentive award in the form of performance shares and half in the form of stock options. The performance share awards were based 50% upon the achievement of financial goals tied to growth in EPS, and 50% upon the achievement of certain non-financial goals.

55.    Fannie Mae's compensation policies – which were reviewed and approved each year by the Compensation Committee of the Board – created a strong incentive for the Company's executives to manipulate its financial reporting to create the appearance that the EPS targets had been met, even when they really had not. Moreover, despite the Company's focus on pay-for-performance compensation and the risks that it created, Fannie Mae's Compensation Committee never implemented a policy that mandated the return of bonus compensation if the Company's earnings were later determined to be misstated.

56.    By rewarding the Officer Defendants for reporting ever-higher earnings without requiring the return of bonus compensation if earnings turned out to be misstated, Fannie Mae's compensation policy provided perverse incentives to inflate earnings. Not surprisingly, the Officer Defendants took all measures necessary – including adopting fraudulent accounting practices - to meet the ambitious financial goals that were set for them.

57.    At least as early as 1998, the Officer Defendants began to implement policies that flouted GAAP in order to meet compensation targets. In 1998, a drop in interest rates in the third quarter motivated millions of homeowners to prepay their existing mortgages and refinance them at lower rates. If accounted for under GAAP, this would have adversely affected Fannie Mae's

bottom line since SFAS 91 requires a company to record an immediate upward adjustment to interest expense if actual prepayments exceed the company's projections.

58.    At the end of 1998, Fannie Mae's amortization models showed that an estimated expense of $400 million had been incurred which, consistent with the constant effective yield calculation under GAAP (SFAS 91), should have been immediately recognized as an adjustment to income expense.  If that adjustment were recorded in full, however, the Company would not meet the minimum EPS target necessary for its executives to receive bonuses that year.  So, the Company decided to recognize only $200 million of the expense in 1998, and to amortize the remaining $200 million over a period of several years – a practice dubbed "catch-up" within Fannie Mae – in plain violation of SFAS 91.  KPMG identified this deferral as an "audit difference" during its audit of Fannie Mae's 1998 financial statements, and reported it to the Audit Committee as an item as to which KPMG disagreed with the Company's accounting.  The Audit Committee did nothing to ensure that the full amount was not recorded as it should have been.

59.    By deferring $200 million in expenses from 1998 to future years, the Company reported just enough EPS (down to the penny) to trigger the maximum bonuses for its executives.  Fannie Mae awarded a total of $27 million in bonus compensation in connection with its 1998 financial results, including $1,109,589 to Raines and $493,750 to Howard.  OFHEO expressly found that it was Howard who improperly amortized the $200 million expense in 1998 so that Fannie Mae could hit its prescribed EPS target, and that no bonuses would have been triggered if the proper accounting had been applied.

60.    As noted below, from 1999 throughout their tenure at Fannie Mae, Raines and Howard continued to receive lucrative compensation and ever-increasing cash bonuses:

| YEAR | BASE SALARY | BONUS | OTHER ANNUAL COMPENSATION[2] | Total Annual Compensation | STOCK OPTIONS[3] |
|---|---|---|---|---|---|
| Franklin D. Raines | | | | | |
| 1999 | $945,000 | $1,890,000 | $35,007 | $2,870,007.00 | 373,500 |
| 2000 | $992,250 | $2,480, 625 | $23,635 | $3,496,510.00 | 421,358 |
| 2001 | $992,250 | $3,125,650 | $20,519 | $4,138,419 | 277,335 |
| 2002 | $992,250 | $3,300,000 | $163,923 | $4,456,173.00 | 311,731 |
| 2003 | $992,250 | $4,180,365 | $237,246 | $5,409,861.00 | 135,020 |
| J. Timothy Howard | | | | | |
| 1999 | $414,800 | $518,500 | $6,009 | $939,309.00 | 47,300 |
| 2000 | $435,540 | $544,425 | $16,996 | $996,961.00 | 72,570 |
| 2001 | $463,315 | $694,983 | $10,853 | $1,169,151.00 | 75,617 |
| 2002 | $498,614 | $781,250 | $1,169 | $1,281,033.00 | 81,661 |
| 2003 | $645,865 | $1,176,145 | $858 | $1,822,868.00 | 112,968 |

61.     The Officer Defendants' receipt of bonuses and stock options in 1999-2003 was, as in 1998, due in large part to the use of improper accounting methods to manipulate the Company's financial results. For example, in 2002 the Committee awarded Raines $4,456,173 in cash compensation and 311,731 stock options based upon, *inter alia*, "record financial results;" "record-breaking business volumes;" "near record low credit losses;" and "strong portfolio margin performance and interest-rate risk management." In its Report, OFHEO determined that most of these achievements were made possible only by the Officer Defendants' deliberate departure from GAAP.

---

[2]    Annual Compensation includes, among other things, tax advice, financial planning services, transportation, and relocation costs.
[3]    Options vest 25 percent "per year beginning on the first anniversary of the grant date." Options expire 10 years after the grant date. 2004 Proxy at 26 n.1.

> 2.    **Defendants Needed To Portray Stability In The Company's Earnings In Order To Maintain The Benefits Of Government Sponsorship**

62.    The Fannie Mae Defendants had another motive for fraudulently misrepresenting Fannie Mae's financial results: the desire to portray Fannie Mae as a consistent generator of stable and growing earnings in order to maintain the enviable perquisites the Company enjoyed as a quasi-government entity, and to maintain the confidence of Wall Street. Unlike its competitors, the Company enjoyed a low cost of capital, a line of credit from the Treasury, and exemption from state and local taxes. As such, private companies could not compete, and the Fannie Mae Defendants could expect to enjoy escalating profits, along with the concomitantly escalating compensation packages described above.

63.    Concealing its GAAP violations and maintaining the illusion of stability in earnings and sound financial policies, procedures, and internal controls was crucial to Fannie Mae's survival, since the Company was facing increased criticism concerning the unfairness of its governmental subsidies, its burgeoning size, and the prospect of a multi-billion dollar taxpayer bailout should the Company collapse.

64.    Together, Fannie Mae and The Federal Home Loan Mortgage Corporation ("Freddie Mac") own approximately a trillion and a half dollars in assets. This exceeds the gross domestic product of every country but Japan, Germany, and the United States. Their combined debt – also measured in the trillions – is poised to outpace that of the United States federal government. The Economist called Fannie Mae and Freddie Mac "arguably the most worrying concentrations of risk in the global financial system."

65.    According to its critics, Fannie Mae's primary objective is not – as it maintains – helping millions of Americans fulfill their dreams of becoming homeowners. Instead, critics point to the fact that the mortgages and mortgage-backed securities which Fannie Mae owns

have grown ten-fold over the past 15 years only because the Company's implicit government backing allows it to borrow money at below-market rates and invest it at market rates. This spread between the Company's borrowing costs and its profit motives undermines Fannie Mae's public mission to provide affordable mortgages; eliminates competition; is subsidized by taxpayers; and enriches its executives more than anyone else.

66.    Fannie Mae's status as a government-sponsored corporation also gave it an edge when it came to attracting investors, many of whom invested their money with Fannie Mae assuming that they would be repaid by the federal government should the housing market tumble and the Company collapse.

67.    Fannie Mae preserves its special quasi-government status, in part, by spending million of dollars each year on an influential team of Washington lobbyists. Notwithstanding Fannie Mae's powerful lobbying arm, in recent years the Company's many detractors have included (but are by no means limited to) several governmental agencies and influential private and public sector individuals. These critics have concluded that the implied backing of Fannie Mae by the federal government – which includes permanent access to a line of credit, exemption from state and local taxes, and exemption from disclosure and registration rules – represented unjustified taxpayer subsidies.

68.    For instance, the Congressional Budget Office ("CBO") has determined that governmental subsidies to Fannie Mae and Freddie Mac are worth at least $11 billion per year, and for every $3 of the subsidy that the company passes on to homeowners, it keeps almost another $2. In other words, taxpayers are subsidizing billions of dollars of Fannie's profits each year.

69.    Federal Reserve Chief Alan Greenspan ("Greenspan") and the Treasury Department have endorsed the CBO's findings. Noted economist Bert Ely stated: "This is worse than $600 toilet seats." These and other critics would endorse the full privatization of Fannie Mae and would end, or significantly curtail, the Company's government subsidies.

70.    Indeed, in 2000 and many times over the past several years, Greenspan has publicly complained that Fannie Mae's federal subsidies are not warranted, and that its size places taxpayers and the Company's bondholders at significant risk should the Company fail.

71.    In June 2000, the Competitive Enterprise Institute's President Fred Smith testified before the House Sub-Committee on Capital Markets. He advocated complete market regulation on the grounds that "privatizing the profit side of the ledger while socializing the loss side" would eventually lead to a debacle resembling the S&L crisis in the 1980s.

72.    Despite Fannie Mae's detractors, its voracious lobbying ensured that the Company maintained sufficient support in Congress to avoid losing its special status. With Fannie Mae under such intense scrutiny, however, the Defendants knew that Fannie Mae risked losing its Congressional supporters if it reported volatile earnings, since that would suggest its vulnerability to market changes and the risk of a taxpayer-funded bail out should the Company fail. Thus, it was critical to Fannie Mae's continued governmental support that it portray consistently stable, pristine earnings, which gave no fodder to its critics' argument that taxpayers would one day have to foot the bill for a bail-out.

73.    Motivated by their desire to maintain the charade of stable earnings, Fannie Mae and the Officer Defendants cultivated an unhealthy atmosphere at the Company, where adherence to GAAP-violative accounting policies and practices designed to smooth earnings was encouraged – even mandated. As described more fully below, Fannie Mae and the Officer

Defendants distorted key GAAP provisions such as SFAS 91 and SFAS 133 in order to suit their dishonest objectives. To the same end, they silenced or ignored complaints voiced by employees who understood the Company's misinterpretations of GAAP, and rewarded those who towed the line.

74. In his written testimony submitted to the U.S. House of Representatives Subcommittee on Capital Markets, Insurance and Governmental Sponsored Enterprises in connection with their October 6, 2004 hearing on the OFHEO Report, Roger Barnes ("Barnes"), the Company's former manager of Financial Accounting, described the culture in the Controllers' Division at Fannie Mae as follows:

> The atmosphere and culture, particularly within the Controllers' division, is one of intimidation, restraint of dissenting opinions, and pressure to be part of the "Team" giving Chairman Franklin Raines and Vice Chairman Tim Howard the numbers the Office of the Chairman desired to please the markets. Employees like myself who refused to go along with this agenda were ostracized and subjected to retaliation.

75. Notwithstanding their public certifications in SEC filings and other public statements to the contrary, the Officer Defendants failed to maintain anything resembling effective internal accounting controls. This practice had contributed to their success in closely controlling all accounting policies and procedures at Fannie Mae and ensuring the accomplishment of their objective – presenting the government and investors with stable earnings even in the face of interest rate volatility.

### 3. The Fate Of Freddie Mac Loomed Large Over The Fannie Mae Defendants

76. Fannie Mae's maintenance of the illusion of stability assumed heightened significance after OFHEO's investigation of Freddie Mac, which began in 2000 and concluded in 2003, exposed massive accounting fraud and GAAP violations which were very similar to those

that existed at Fannie Mae. Moreover, the fact that Freddie Mac made significant concessions to OFHEO and the SEC in December 2003, which led to the ruination of several of that company's officers - including its CEO and CFO - surely inspired the Officer Defendants to conceal their ongoing fraud at all costs.

77.    On November 23, 2003, following the release of OFHEO's findings regarding Freddie Mac, Freddie Mac announced that it had misstated profits by $5 billion over three years (2000 through 2002), and that it would restate its 2000, 2001 and 2002 financial statements. In a consent decree that Freddie Mac entered into with OFHEO, it admitted to violating GAAP in order to hide the fact that its financials were highly volatile and subject to significant fluctuations.

78.    Freddie Mac's fraud was strikingly similar to the fraud that OFHEO later uncovered at Fannie Mae, and included:

- Lack of adequate internal accounting controls and personnel expertise;
- Failure to adhere to GAAP, including SFAS 133, by engaging in a complex series of sham transactions designed to make the Company's earnings seem much more stable than they actually were;
- Using improper accounting techniques to smooth earnings by lowering earnings results in good times and inflating results when business conditions deteriorated;
- Providing investigators with altered records to conceal improper accounting techniques; and
- Creating "cookie jar" reserves to boost earnings and mask losses.

79.    As at Fannie Mae, Freddie Mac's CEO, Leland Brendsel ("Brendsel"), and its CFO, Vaughn Clarke ("Clarke"), and other executives orchestrated the scheme and were awarded millions of dollars in bonuses for meeting analysts' earnings expectations and maintaining the faith of the federal government.

80.    The fate of Freddie Mac's CEO, CFO and other officers surely alarmed the Officer Defendants and particularly Raines and Howard. On June 6, 2003, Brendsel and Clarke both "retired" from Freddie Mac. On December 18, 2003, OFHEO filed Notices of Charges against both men and against Freddie Mac which demanded, among things, that Freddie Mac retroactively reclassify their resignations as terminations for cause (thereby depriving them of generous severance packages) and that the two return their bonuses received in fiscal years 2000 and 2001 to Freddie Mac. Freddie Mac complied, and collected more than $33 million from Brendsel and nearly $4 million from Clarke.

81.    Like Brendsel and Clarke, Raines and Howard stood to lose significant benefits if they were terminated "for cause." According to Raines' employment contract which was in effect until shortly before the release of the OFHEO Report regarding Fannie Mae, if his employment was terminated other than "for cause," he would receive yearly pension payments of $1.4 million for life. The Company also owed him $8.7 million in deferred compensation. Raines held vested options for 1.6 million shares of stock, plus options for 368,800 shares for which he became eligible for upon retirement. In addition, Raines' severance package provided a life insurance benefit of $5 million until age 60, with a benefit of $2.5 million thereafter.

82.    Howard's employment contract made him eligible for $36,071 in monthly pension payments and deferred compensation of $4 million. Howard held vested options for 481,600 shares. He was also eligible for $84,000 in salary through January 2005. In addition, Howard's severance package provided a life insurance benefit of $2 million until 2009 and a benefit of $1 million indefinitely thereafter.

83.    Given the Officer Defendants' strong motivations to conceal the fraud at Fannie Mae, and to avoid being terminated "for cause," it is not surprising that on July 31, 2003 Raines

conducted a two-hour conference call with analysts during which he made every effort to distinguish Fannie Mae's accounting policies and procedures from those at Freddie Mac. In particular, Raines focused on Fannie Mae's purported compliance with SFAS 133 and the Company's purportedly fine internal control systems. It may have been for naught, however, because OFHEO eventually discovered the truth, and in the days before OFHEO's scathing Report was issued, Fannie Mae rewrote Raines' and Howard's employment contracts to allow their severance payments to be withheld if they were fired for "fraudulent actions."

### C.    Defendants' Violations of Pertinent SEC Regulations

84.    The SEC regulates statements by companies "that can reasonably be expected to reach investors and the trading markets, whoever the intended primary audience." SEC Release No. 33-6504, 3 Fed. Sec. L. Rep. (CCH) ¶ 23,120 at 17,095-3, 17 C.F.R. § 241.20560 (Jan. 13, 1984).

85.    The SEC requires that public companies prepare their financial statements in accordance with GAAP. As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1).

86.    In Accounting Series Release 173, the SEC reiterated the duty to present a true representation of a company's operations:

> [I]t is important that the overall impression created by the financial statements be consistent with the business realities of the company's financial position and operations.

87.    Defendants have violated Accounting Series Release 173 and SEC Rule 4-01(a) of SEC Resolution S-X by filing financial statements with the SEC for the years 2002 and 2003 (including interim quarterly periods) which were not prepared in accordance with GAAP, and which create an impression that is inconsistent with the business realities of Fannie Mae's

financial position and operations. Because those financial statements do not comply with GAAP, they are presumptively misleading.

### D.    Defendants' Violations of GAAP

88.    GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. GAAP principles are the official standards accepted by the SEC and promulgated in part by the American Institute of Certified Public Accountants ("AICPA"). With the SEC's permission (Accounting Series Release 150), the AICPA established its GAAP principles through three successor groups: the Committee on Accounting Procedure; the Accounting Principles Board (the "APB"), and the Financial Accounting Standards Board (the "FASB").

89.    The financial statements that were issued by Fannie Mae for at least the years 2001, 2002, and 2003, and 2004 (including the related quarterly periods) and for the quarters ended March 31, 2004 and June 30, 2004, did not fairly and accurately represent the Company's financial position and operations because they violated the following principles of GAAP:

- That financial reporting should provide information that is useful to present and potential investors and creditors in making rational investment, credit and similar decisions (Financial Accounting Standards Board Statements Statement of Concepts "CON" No. 1, ¶ 34);

- That financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources (CON No. 1, ¶ 40);

- That financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibilities to owners for the use of enterprise resources entrusted to it – to the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (CON No. 1, ¶ 50);

- That financial reporting should be reliable in that it represents what it purports to represent -- that information should be reliable as well as relevant is a central principle of accounting (CON No. 2, ¶¶ 58-59);

- That information is complete and nothing is left out that may be necessary to insure that it validly represents underlying events and conditions (CON No. 2, ¶¶ 79,80);

- That conservatism be used as a prudent reaction in uncertainty to try to ensure that uncertainties and risk inherent in business situations are adequately considered (CON No. 2, ¶¶ 95, 97);

- That revenues and gains generally should not be recognized until realized or realizable, and revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues (CON No. 5, ¶ 83); and

- That the costs of services be matched with, *i.e.*, recognized contemporaneously with, the recognition of revenues that resulted from the same transactions (CON No. 6, ¶ 145).

90.    More specifically, the above-referenced financial statements were materially false and misleading because the Fannie Mae Defendants engaged in a fraudulent scheme to manipulate the Company's reported financial results through at least the following accounting practices which directly violated specific GAAP provisions:

- Accounting for deferred price adjustments in violation of SFAS 91;

- Accounting for derivative transactions and hedging activities in violation of SFAS 133;

- Accounting for investments in mortgage-backed securities in violation of SFAS 115;

- Improperly classifying all loans intended to be securitized as "held-for-investment" in order to avoid recording changes in valuation allowances on the Company's income statement, in violation of SFAS 65;

- Accounting for dollar-roll repurchase agreements in violation of SFAS 140;

- Failing to record asset impairments on guaranty fees, in violation of SFAS 115;

- Improperly accounting for finite insurance policies, in violation of SFAS 5;

28

- Failure to consolidate the financial results of Qualified Special Purpose Entities on Fannie Mae's financial statements, in violation of FIN No. 46;

- Recognizing income and expenses in the incorrect accounting periods; and

- Accounting for investments in qualified low-income housing tax credit partnerships in violation of GAAP.

91.    These GAAP violations are discussed in greater detail below.

### 1.    Fannie Mae's Improper Accounting for Deferred Price Adjustments

92.    SFAS No. 91, *Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases*, is the GAAP provision that establishes the method of accounting for nonrefundable fees and costs associated with lending, committing to lend, or purchasing a loan or group of loans.  The provisions of this Statement apply to all types of loans, including debt securities, as well as to all types of lenders (including banks, thrift institutions, insurance companies, mortgage bankers, and other financial and nonfinancial institutions).

93.    SFAS 91 requires that purchases of loans and investments in mortgage-backed securities be recorded at the purchase price net of any premiums, discounts, and other deferred purchase and guarantee fee price adjustments.  All premiums, discounts, and other deferred purchase and guarantee fee price adjustments are required to be recognized as adjustments to income using the effective yield method. The effective yield method requires a company to estimate a constant effective yield for loans and investments in mortgage-backed securities each time its financial results are reported.  In doing so, the company determines the anticipated rate of prepayment for the loans and securities.  If new information causes the period of amortization to change, a retrospective adjustment must be recorded currently into income, and the prospective amortization rate must change to reflect the new estimated amortization period.

94.    In a large mortgage portfolio such as Fannie Mae's, the amortization of price adjustments can lead to significant volatility in earnings because SFAS No. 91 requires that adjustments be recorded into income when the estimated amortization period changes. This is significant because the amount of the adjustment is a cumulative life-to-date amount, based on the difference between what the amortization would be based on the previous estimated lives and what the amortization should be based on current estimated lives of the underlying loans and securities.  In addition, the estimated life of a mortgage loan or mortgage-backed security fluctuates constantly due to changes in interest rates, forecasts for prepayments and other factors.

95.    In its Report dated September 17, 2004, OFHEO found that Fannie Mae management began in early 1999 to formulate accounting policies to manage the amortization of deferred price adjustments.  Many of the policies that were considered, and those that were ultimately adopted in December 2000, were contrary to GAAP and "were designed to provide earnings flexibility and minimize earnings volatility."  OFHEO found that this effort "was directed and overseen by … Howard," with "active involvement" by Spencer, and that it followed a consistent theme:  an effort to avoid recognizing estimated income or expense below certain thresholds; and to defer the recognition of income or expenses that exceeded those thresholds, over several years or to more advantageous reporting periods.

96.    The deferral of $200 million of estimated expenses from 1998 to future years was an example of how the Officer Defendants deferred the recognition of expenses in order to manage earnings and meet EPS targets for bonuses.  According to the testimony of the OFHEO Director, "the 1998 violation was not a singular event; it represented the start of a continuous effort to artificially guarantee success in meeting targets."  Another means by which the Officer Defendants did this was by improperly delaying the recognition of income to create "cookie jar"

reserves that they could dip into later when they needed to increase the Company's reported income in order to suit their own interests – *e.g.*, to smooth earnings or to meet EPS targets associated with executive bonuses.

97.    OFHEO concluded that Fannie Mae's accounting for the amortization of purchase premiums and discounts on securities and loans as well as the amortization of other deferred charges was not in accordance with GAAP.  Specifically, Fannie Mae's method of recording adjustments for the difference between the cumulative life-to-date amortization and what the amortization should be did not comply with the requirements of SFAS 91.

98.    The SEC and OFHEO both found that Fannie Mae violated SFAS 91 by failing to timely adjust the recorded amounts of loans as a result of changes in the speed of prepayments. Indeed, in Fannie Mae's Form NT-10-Q filed on November 15, 2004, the Company admitted that the methodologies used to calculate the required adjustment for balance sheet dates in 2001 and 2002 were not in accordance with GAAP.

99.    The SEC and OFHEO also determined that Fannie Mae violated SFAS No. 91 by establishing policies that allowed the Company to only recognize adjustments to the loans if the adjustments exceeded Company-developed materiality thresholds.  This allowed Fannie Mae to avoid making adjustments that otherwise were required under SFAS 91.

100.    OFHEO reported the following additional violations of SFAS 91:

• Use of discretionary "on-top" adjustments to the financial statements solely for the purpose of minimizing volatility and achieving desired financial results. During the second and third quarters of 2003, on-top adjustments were recorded which, after adjusting for the effect of income taxes, allowed Fannie Mae to meet, or come very close to meeting, analysts' estimates.  Such "on-top" adjustments violated SFAS No. 91, since GAAP requires that all adjustments to the premium and discount amortization be made currently through the income statement in order to maintain the constant effective yield.  The "on-top" adjustments were catch-up entries designed to compensate for prior differences that were not properly adjusted for in accordance with SFAS No. 91.  In addition, the use of

these adjustments was a direct violation of SEC Staff Accounting Bulletin (SAB) No. 99, *Materiality*, which states that investors generally would regard as significant a management practice to over- or under-state earnings up to an amount just short of a percentage threshold in order to "manage" earnings, and that investors presumably also would regard this as a significant accounting practice which, in essence, rendered all earnings figures subject to a management-directed margin of misstatement.

- Accumulation of reconciliation differences and errors as "phantom assets and liabilities," which were then amortized over a conventional 30-year mortgage life as opposed to being immediately corrected as required by SFAS 91, enabling the Officer Defendants to reduce earnings volatility by shifting income or expense from one accounting period to others. Amortizing errors over an extended period is also a violation of Accounting Principles Board Opinion (APB) No. 20, *Accounting Changes*, which requires the correction through restatement of the periods affected by the error.

- Development and use of estimation methods that were inconsistently applied to retrospective and prospective amortization, and selection of factors and market rate assumptions in order to achieve desired accounting results.

- Development of modeling capabilities to iteratively generate and evaluate estimates under varying assumptions in order to obtain the desired outcomes. OFHEO's investigation showed that Fannie Mae ran models of different scenarios of the amortization of premiums and their prospective effect on earnings, instead of determining the appropriate factors pursuant to SFAS 91.

- Maintenance of inadequate written procedures and documentation for amortization processes and systems, thereby impeding regulatory oversight.

101. According to OFHEO, Spencer – who was responsible for what accounting policies were actually adopted in her role as Controller – admitted to OFHEO that Fannie Mae engaged in earnings management under the guise of compliance with SFAS 91. In March 1999, Spencer sent Howard a memorandum in which she recommended an accounting policy whereby expense or income would be recognized over multiple reporting periods. Thereafter, Howard, along with Spencer, crafted Fannie Mae's accounting policy for SFAS 91 and permitted the "on top" adjustments to be made to the Company's financial statements.

102. According to OFHEO, Spencer confirmed that it was management's practice to make "on top" adjustments because of the Company's asymmetric exposure so that Fannie Mae

would achieve its desired earnings results.  Howard has admitted that he "made the judgment" that the Company should smooth out some of the volatility that would result from a strict application of SFAS 91.

103.    Jonathan Boyle, Senior Vice President of Financial Standards at Fannie Mae, who reported to Spencer and was one of the people whom Spencer relied upon to inform her whether Fannie Mae was complying with GAAP, told OFHEO that Fannie Mae's SFAS 91 policy did not comport with GAAP.

104.    As a result of the disclosure of GAAP violations relating to SFAS 91, it is apparent that Fannie Mae made repeated materially false representations within their annual and quarterly filings during 2000, 2001, 2002, 2003, and 2004 (including the related quarterly periods).  In the financial statements to the Company's annual and quarterly filings during that period, Fannie Mae misstated certain balances due to intentional errors relating to the assumptions it used in estimating the amortization rates of premiums and discounts on securities and loans.  On the balance sheet, the Company misstated mortgage related securities, loans (held for investment) and total assets.  On the income statement, the Company misstated interest income (mortgage and non-mortgage), interest expense, net income, and earnings per share (basic and diluted).

### 2.    Fannie Mae's Improper Accounting For Derivative Transactions and Hedging Activities

105.    On January 1, 2001, Fannie Mae adopted SFAS No. 133, *Accounting for Derivative Instruments and Hedging*.  This Statement requires that all freestanding and certain embedded derivatives be carried as assets or liabilities on the balance sheet at fair value.  Unless a derivative is designated as a hedge and qualifies for hedge accounting under SFAS 133, it must be "marked to market" each accounting period, with changes in its fair value recognized as gains

or losses in current earnings. This creates the potential for significant volatility in earnings for companies like Fannie Mae that are heavy participants in derivatives.

106. Hedge accounting under SFAS 133, when applicable, tends to reduce volatility of earnings because it allows for matching of the earnings effect of a derivative and its underlying hedged transaction.

107. In order for a derivative to qualify for hedge accounting:

- The derivative must be designated as a hedge;

- The hedged item must be exposed to the risk of changes in interest rates;

- The derivative contract must effectively reduce the Company's exposure to changes in interest rates; and

- There must be a high correlation between changes in the fair value of the contract to the hedged item, in that it must be probable that changes in the fair value of the contract will substantially offset changes in the interest rate on the hedged item.

108. An ongoing assessment must be made of the correlation between changes in the fair value of the derivative contract and the hedged item. If the high correlation has not been achieved, hedge accounting ceases and gains or losses must be reported as part of current earnings.

109. In addition to requiring an ongoing assessment, SFAS 133 requires formal documentation at the inception of a contract in order to qualify as a hedge, including identification of the hedging instrument, the hedged item, the nature of the risk being hedged, how the hedging instrument's effectiveness in offsetting the exposure to changes in the hedged item's fair value attributable to the hedged risk will be assessed, and how the designated hedging relationship is consistent with the established risk management practices.

110. The OFHEO Special Examination and the SEC both determined that Fannie Mae repeatedly violated SFAS 133. According to the SEC, Fannie Mae's methodology of assessing,

measuring and documenting hedge ineffectiveness was inadequate and not in compliance with the requirements of the Statement. The SEC stated: "Fannie Mae internally developed its own unique methodology to assess whether hedge accounting was appropriate. Fannie Mae's methodology, however, did not qualify for hedge accounting because of deficiencies in its application of [SFAS] 133." As a result, the SEC ordered Fannie Mae to restate its 2001 to mid-2004 financial statements to totally eliminate the use of hedge accounting.

111.    OFHEO determined that Fannie Mae implemented SFAS 133 in a manner that placed minimizing earnings volatility and maintaining simplicity of operations above compliance with GAAP. OFHEO's findings included the following:

- Fannie Mae failed to maintain the documentation required under SFAS 133;

- Fannie Mae failed to perform the required assessment and recording of hedge effectiveness, and failed to determine the ineffective portion of hedge relationships;

- Fannie Mae adopted an assumption that the vast majority of its hedging relationships were "perfectly effective" – *i.e.*, that the risk and the hedge were perfectly matched -- even though many of the hedges did not qualify as perfectly effective;

- Fannie Mae improperly assumed that re-designated derivatives were perfectly effective upon re-designation, even though the derivatives did not have a zero fair value;

- Fannie Mae inappropriately accounted for offsetting derivatives from the adoption of SFAS 133 in 2001 to the end of 2003. Fannie Mae often entered into offsetting swaps rather than terminating an existing swap. The original swap and the offsetting swap were incorrectly treated as a perfect cash flow hedge, with the change in fair value recorded in Accumulated Other Comprehensive Income ("AOCI") instead of being recorded currently to earnings. AOCI represents changes in stockholders' equity that are not recorded in the income statement. At Fannie Mae, this included unrealized gains and losses on cash flow derivative hedges and on securities available for sale;

- Fannie Mae used an erroneous methodology to account for changes in the time value and intrinsic value components of purchased interest rate caps from the inception of SFAS 133 through the third quarter of 2002. In November 2002, Fannie Mae corrected its methodology and applied it prospectively, but failed to

evaluate the errors in the previously reported results for restatement, in violation of APB No. 20, *Accounting Changes*. Fannie Mae's 2002 Form 10-K incorrectly described this as a refinement of methodology rather than as a correction of an error; and

- Fannie Mae improperly applied the "short-cut method" whereby: (1) receive-fixed swaptions (an option to enter into an interest rate swap) hedging the fair value of debt were incorrectly accounted for as perfect hedges; (2) the effectiveness of callable swaps hedging discount notes was determined without regard to option values in the derivative; (3) hedges of anticipated debt issuances were assumed perfectly effective based upon a duration comparison which is not part of SFAS 133; (4) swaps with non-zero values at inception were incorrectly treated as perfectly effective; (5) Fannie Mae improperly permitted up to a seven day mismatch on reset dates between the hedged item and the swap in cash flow hedges; and (6) Fannie Mae improperly permitted up to a 90 day mismatch of maturity dates between the hedged item and the swap in fair value hedges.

112.    As a result of the numerous violations of SFAS 133 by the Company as discussed above, Fannie Mae was not entitled to use hedge accounting, and it significantly misstated its financial statements for 2001 and all subsequent periods. Fannie Mae admitted to these GAAP violations in its Form 12b-25 filed on November 10, 2005, as follows:

> Fannie Mae misapplied hedge accounting under Financial Accounting Standard No. 133, *Accounting for Derivative Instruments and Hedging Activities*, for certain of its derivatives, and as a result of this error expects to record an estimated net cumulative after-tax loss of approximately $8.4 billion as of December 31, 2004, excluding the impact of mortgage commitments. This estimated loss is subject to change as a result of other accounting issues under review.

113.    In addition to the requirement to account for derivatives in accordance with SFAS 133, effective July 1, 2003, Fannie Mae adopted SFAS No. 149, *Amendment of Statement 133 on Derivative Instruments and Hedging Activities*, which amends and clarifies certain aspects of SFAS 133. SFAS 149 applies to Fannie Mae's mortgage loan purchase commitments entered into or modified after June 30, 2003, and commitments to purchase and sell when-issued mortgage securities entered into after and outstanding at June 30, 2003.

114.   Following the adoption of SFAS 149, Fannie Mae was required to account for the majority of commitments to purchase mortgage loans and to purchase or sell mortgage-related securities as derivatives. The Company was required to record commitments to purchase or sell mortgage loans or mortgage-related securities on the balance sheet at fair value, and to record changes in the fair value either in AOCI or earnings, depending on the hedge designation and related accounting treatment. When the commitment ultimately settles, the purchased loans and securities are to be recorded on the balance sheet at fair value.

115.   Fannie Mae improperly applied cash flow hedge accounting to its commitments to purchase mortgage loans. To qualify for cash flow hedge accounting, SFAS 133 requires that the forecasted transactions be probable of occurring. In determining whether a particular forecasted transaction was probable of occurring, Defendants made assumptions based on the statistical percentage of all forecasted transactions in the prior 12-month period that had actually occurred. As long as 75% of the forecasted transactions had actually occurred in the prior 12 months, the Company applied cash flow hedge accounting to 100% of its new purchase and sale commitments. OFHEO found there to be insufficient justification for the application of cash flow hedge accounting to these transactions.

116.   In its Form 12b-25 filed on November 10, 2005, Fannie Mae admitted misapplying cash flow hedge criteria in accounting for its mortgage commitments. According to the filing, the Company estimates that the net cumulative amount of after-tax losses relating to mortgage commitments deferred in AOCI was approximately $2.4 billion as of December 31, 2004.

117.   The net losses related to SFAS 133 violations date back to their initial implementation in 2001. The net losses related to the SFAS 149 violations will affect periods

after the SFAS 149 implementation effective July 1, 2003.  As a result of these disclosed restatement estimates, it is clear that Fannie Mae repeatedly and materially misstated certain amounts within its annual and quarterly financial statements, including:

    (1)    Balance Sheet:

        a.    Derivatives in gain positions, total assets, senior debt, derivatives in loss positions, total liabilities, AOCI, and total stockholders' equity due to the misapplied hedge accounting under SFAS 133;

        b.    Loans (held for investment), mortgage related securities, total assets, AOCI, and total stockholders' equity due to the misapplied cash flow hedge accounting criteria for mortgage commitments under SFAS 149;

    (2)    Income Statement:

        a.    Interest income-mortgage portfolio, interest expense, purchased options expenses, net income and earnings per share (basic and diluted) due to the misapplied hedge accounting under SFAS 133;

        b.    Interest income-mortgage portfolio, net income and earnings per share (basic and diluted) due to the misapplied cash flow hedge accounting criteria for mortgage commitments under SFAS 149;

    (3)    Statement of Cash Flows

        a.    Net income, purchased options expense within net cash provided by operating activities, and net payments to purchase or settle hedge instruments within net cash provided by financing activities, due to the misapplied hedge accounting under SFAS 133; and

        b.    Net income, purchased options expense within net cash provided by operating activities, and net payments to purchase or settle hedge instruments within net cash provided by financing activities, due to the misapplied cash flow hedge accounting criteria for mortgage commitments under SFAS 149.

    118.    In its Form 12b-25 filed on November 10, 2005, the Company stated that it "expect[s] that the impact of the misapplication of derivative accounting rules will be material to Fannie Mae's previously reported financial results for many, if not all, periods . . . "  While these violations have yet to be quantified by Fannie Mae, it was reported that violations of SFAS

149 alone, for just one year, could cause Fannie Mae to decrease its earnings by nearly $2.4 billion, bringing Fannie Mae's total earnings restatement to approximately $12 billion.

119.    As Fannie Mae's CFO who was responsible for Fannie Mae's financial statements and public filings with the SEC, Howard authored Fannie Mae's accounting policies, often with Spencer. Howard admitted to OFHEO that he was responsible for adopting and implementing the Company's SFAS 133 policy. Spencer was a co-author of that policy.

120.    Boyles, another co-author of the Company's SFAS 133 accounting policy, told OFHEO that "[w]e [had] several known departures from GAAP in our adoption of [SFAS 133]." Spencer, when questioned about Fannie Mae's hedge accounting policy, told OFHEO that the policy was tailored to "how Fannie Mae's business runs, and [we] made a judgment" on how SFAS 133 would be applied at Fannie Mae, which Spencer termed the "practical application" of GAAP. In other words, Spencer and Howard knew that Fannie Mae did not apply SFAS 133, and manipulated Fannie Mae's accounting policy to suit their own purposes. Moreover, this departure from GAAP was not disclosed, but rather was deliberately hidden. Howard has conceded the truth of OFHEO's accusations that Fannie Mae's goals when implementing SFAS 133 were "minimizing earnings volatility, leveraging existing systems, keep operating earnings simple . . . "

121.    By accounting for hedge and derivative in violation of SFAS 133 and 149, the Officer Defendants not only smoothed earnings, but were able to maximize their compensation by hitting EPS targets for their bonus compensation.

### 3.    Fannie Mae's Improper Classification of Loans Purchased From Lenders

122.    Fannie Mae purchases mortgage loans from lenders, which it then either securitizes or retains as investments in its mortgage portfolio. The loans retained in the portfolio

are classified as held-for-investment pursuant to Fannie Mae's policies. The mortgage loans that are securitized are either sold to a third party or held in its portfolio.

123.    Under SFAS 65, mortgage loans or mortgage-backed securities which are held-for-investment should be reported at amortized cost in the financial statements, while loans and securities which are held-for-sale should be reported at the lower of cost or market value. The amount by which the cost of a held-for-sale loan exceeds its market value is supposed to be accounted for as a valuation allowance, and changes in valuation allowances should be included in the determination of net income for the period in which the change occurs. SFAS 65 also provides that loans should be designated as held-for-investment only if the entity has the intent and ability to hold the loans for the foreseeable future or until maturity.

124.    Fannie Mae followed a long-standing practice of improperly recording all loans intended to be securitized, including those it intended to sell, as held-for-investment. This practice was the result of a faulty computer system that had been in existence since 1983 but was not detected or corrected until a systems upgrade in 2004. Thus, faulty misclassifications of loans had continued for 21 years. As a result, Fannie Mae recorded loans that were held-for-sale on its books at amortized cost rather than at the lower of cost or market value. When those mortgage loans were later securitized and sold, the loans were taken off the books and gains or losses were recorded on the sale.

125.    OFHEO has directed Fannie Mae to re-classify and properly record those loans which do not qualify as held-for-investment. Additionally, OFHEO has stated that "[t]he fact that Fannie Mae operated a faulty and inaccurate system for more than two decades reveals serious system weaknesses."

126.    Fannie Mae also violated SFAS 115 in connection with its accounting for mortgage loans which it purchased and securitized.  Pursuant to SFAS 115, mortgage-backed securities are to be designated as either held-to-maturity or available-for-sale at the time they are acquired, and any subsequent reclassification should be accounted for as a transfer from one class to another at fair value.  Fannie Mae violated SFAS 115 by re-designating the securities in its portfolio for accounting purposes at the end of the month in which they were acquired.  This "Intra-Month Re-Designation" ("IMRD") process allowed the Company to wait until the end of the month to decide whether to sell or hold the securities, and to base its designation of the securities on gains or losses occurring after the trade date, or upon further analysis of the underlying collateral.  In fact, the Company referred to this process internally as "keep the best; sell the rest" because it enabled the Company to retain the high quality loans in its investment portfolio, while using the lower quality loans to fulfill matched buy and sell trades.

127.    OFHEO found that Fannie Mae's IMRD process not only violated GAAP, but "stands in stark contrast to the company's denials of engaging in 'cherry picking' when the matter was reviewed by a 2003 Task Force on Mortgage Backed Securities Disclosure."

128.    As disclosed in its Form 12b-25 filings dated May 11, 2005 and November 10, 2005, Fannie Mae has admitted that it violated SFAS 115.  As stated in the May 11, 2005 Form 12b-25:

> Fannie Mae employed an operational practice that, upon review, was determined to result in securities being transferred from the held-to-maturity category to available-for-sale, which generally is not permitted under [SFAS] 115. As a result, for accounting purposes Fannie Mae must reclassify all securities previously classified as held-to-maturity into the available-for-sale category and discontinue use of the held-to-maturity category until two years after the last transaction giving rise to this error. Fannie Mae will reclassify the securities for each restated period and record all unrealized gains and losses, net of taxes, at each reporting period

to shareholders' equity, specifically through AOCI. AOCI will vary substantially from period to period as a result of this reclassification, primarily due to changes in interest rates.

129.    As part of its ongoing accounting review, Fannie Mae is also evaluating whether a portion of the securities in its portfolio should be reclassified as "trading." To the extent that securities are classified as trading, unrealized gains and losses on those securities for each period will have to be recorded as a component of earnings.

130.    As a result of these GAAP violations, Fannie Mae repeatedly made material misstatements within its annual and quarterly financial statements. On the balance sheet, the Company misstated the value of its mortgage related securities, non-mortgage related securities, total assets, accumulated other comprehensive income and total stockholders' equity. On the income statement, the Company misstated interest income, interest expense, net income and earnings per share (basic and diluted) to the extent any misclassified debt and equity securities are reclassified as "trading."

### 4.    Fannie Mae's Failure To Record Asset Impairments On Guaranty Fees Violated GAAP

131.    In its Form 12b-25 filed on November 10, 2005, Fannie Mae disclosed that, as part of its restatement, it anticipates recording asset impairments relating to certain guaranty assets that result from the "buy-up" of guaranty fees in connection with certain Fannie Mae mortgage-backed security issuances. In certain transactions, Fannie Mae received upfront cash payments to adjust the coupon rates so they were in increments of whole or half a point, which tend to be more easily traded. When Fannie Mae engages in these buy-up transactions, it increases its guaranty assets by the amount of the buy-up and recognizes income over the expected life of the mortgage-backed securities. Fannie Mae did not periodically assess these buy-ups for impairment, as was required by SFAS 115.

5.    **Fannie Mae's Improper Accounting for Dollar-Roll**
      **Repurchase Agreements**

132.    The Company's February 23, 2005 Form 8-K describes "dollar-roll repurchase agreements" pursuant to which the Company sells mortgage-backed securities and agrees to repurchase the same or substantially similar securities at a later date.

133.    Under SFAS No. 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishments of Liabilities*, dollar-roll repurchase agreements should be accounted for as sales of the underlying mortgage-backed securities, unless certain conditions are met. If those conditions are met – *i.e.*, if the Company is entitled and obligated to repurchase the same or substantially the same transactions before the securities mature, and if the Company effectively retains control of the transferred securities – then the transaction may be accounted for as a secured lending transaction. Under Statement of Position ("SOP") No. 90-3, redelivered securities are not deemed "substantially similar" unless the underlying collateral for the securities has similar remaining weighted average maturities ("WAM") that result in approximately the same market yield.

134.    Fannie Mae accounted for all of its dollar-roll repurchase agreements as secured lending transactions, rather than as sales. Although it had internally-developed tests for determining whether securities were "substantially" similar for purposes of SFAS 140, it never performed those tests until 2003, and even then it only compared the securities' WAM and failed to consider market yields. As a consequence, Fannie Mae accounted for dollar-roll repurchase agreements as secured lending transactions when they should have been treated as sales.

135.    As a result of these GAAP violations, Fannie Mae repeatedly made material misstatements within its annual and quarterly financial statements. Among other things, on the balance sheet the Company misstated the value of its mortgage-related securities, accumulated

other comprehensive income and total stockholders' equity, and on its income statement, the Company misstated net income and earnings per share (basic and diluted).

### 6. Fannie Mae's Accounting For Insurance In Violation of GAAP

136.    In its Form 12b-25 filed on November 10, 2005, Fannie Mae admitted that one of its mortgage insurance policies "did not transfer sufficient underlying risk of economic loss to the insurer, and therefore does not qualify for accounting as insurance." This policy is a "finite insurance" policy like those the SEC and New York Attorney General Eliot Spitzer have been investigating to determine whether they actually transfer risk to the insurers or are sold to companies to help them smooth earnings or hide losses. Fannie Mae purchased this and other finite insurance policies for the purpose of hiding known losses, thereby increasing its reported earnings.

137.    When used properly, finite insurance allows insurers or corporations to spread their risk of loss on an asset or business over time and to other insurers willing to take on more risk in exchange for premiums. But for a policy to be considered true insurance, it must involve the transfer of some risk to the party receiving the premiums. If the insurer agrees to return the premiums paid at a later date, the policy resembles a loan, not insurance, and runs afoul of accounting rules if it is accounted for as insurance.

138.    At the time the above-referenced insurance policy (from an undisclosed company hereafter referred to as "Doe") was originated, Fannie Mae paid a premium of approximately $35 million to insure the Company's losses within a portfolio, up to an aggregate of approximately $39 million. At the time the policy was purchased, the Company either had already incurred, or knew there was a high probability that it would incur, $39 million in losses on the portfolio covered by the policy. The premium was amortized at approximately $13.5 million in each of 2002 and 2003 and approximately $8 million in 2004, while

approximately $39 million of payments under the policy were largely received over a three-year period, principally in 2003 and 2004.

139.    Defendant Doe knew that Fannie Mae needed to spread its losses in order to manage earnings, which is the essence of finite insurance policies and what makes them attractive to Doe's customers.  Doe also knew that since Fannie Mae's premium payments were equal to the value of Doe's "insurance coverage," there was no risk transfer and therefore Fannie Mae received nothing of value from Doe and the transaction should have been treated as a loan for accounting purposes.  Doe knew or recklessly disregarded that it was merely loaning money to Fannie Mae but that Fannie Mae was fraudulently recording its transactions with Doe in the Company's financials as "insurance" premium payments to Doe in violation of GAAP.  Doe participated in the fraud because it found the sale of such illegally structured finite insurance policies to be extremely lucrative, far more profitable than ordinary insurance premiums.

140.    The Company has determined that it will restate its previously issued financial statements as a result of its accounting for insurance policies in violation of SFAS No. 5, *Accounting for Contingencies*, which states:

> To the extent that an insurance contract or reinsurance contract does not, despite its form, provide for indemnification of the insured or the ceding company by the insurer or reinsurer against loss or liability, the premium paid less the amount of the premium to be retained by the insurer or reinsurer shall be accounted for as a deposit by the insured or the ceding company.  Those contracts may be structured in various ways, but if, regardless of form, their substance is that all or part of the premium paid by the insured or the ceding company is a deposit, it shall be accounted for as such.

141.    The effect of the restatement will be to record the premium paid as a deposit, net of recoveries from the policy, and to recognize credit losses with no reduction for any recoveries resulting from the insurance policy.  According to Fannie Mae's disclosure in the Form 8-K, the

restatement relating to accounting for this policy will impact reported earnings for 2002, 2003 and 2004.

> **7.  Fannie Mae's Failure to Consolidate Results of Qualified Special Purpose Entities in Violation of FIN No. 46, Consolidation of Variable Interest Entities, an Interpretation of Accounting Research Bulletin (ARB) 51**

142.  Fannie Mae uses Qualified Special Purpose Entities ("QSPEs") to issue mortgage-backed securities.  Under FIN 46, *Consolidation of Variable Interest Entities*, an entity that has the unilateral ability to liquidate or change a QSPE must consolidate that QSPE's financial results on the entity's own financial statements.

143.  Fannie Mae's accounting policy defines the unilateral ability to liquidate a QSPE as ownership of 100 percent of the pool of mortgage-backed securities.  In many instances, Fannie Mae owned 100% of the mortgage-backed securities issued by a QSPE.  To avoid consolidating the QSPE's financial results on the Company's financial results, however, the Company would sell 1% of the securities to a third party.  In his testimony before Congress, OFHEO director Armando Falcon stated:  "We do not believe that Fannie Mae's actions constitute a sufficient relinquishment of ownership to counter the presumption that it retains the unilateral ability to liquidate, and therefore must consolidate under FIN 46."

144.  Thus, Fannie Mae's failure to consolidate the results of QSPEs on its financial statements was a violation of GAAP.

> **8.  Improper Timing of Recognition of Certain Income and Expense Amounts**

145.  Fannie Mae recognized interest expense on short-term debt instruments and interest income on certain liquid investments in a monthly ratable manner, whereby the interest income was recognized equally over the estimated life of the instruments, rather than pursuant to

the contractual accrual convention, which would be more volatile because the borrowers generally have the right to repay these floating rate notes at any time. This practice had the effect of smoothing certain income and expense amounts, and was in violation of GAAP. In addition, OFHEO has questioned whether Fannie Mae appropriately deferred recognizing the financial impact of implementing new systems or correcting estimation methodologies.

### 9.    Improper Accounting for Investments in Low-Income Housing Tax Credit Partnerships

146.    Fannie Mae owns limited partnership investments in a number of qualified low-income housing tax credit ("LIHTC") partnerships. According to the Company's November 10, 2005 Form 12b-25, Fannie Mae violated GAAP in its accounting for these partnership interests in several ways.

147.    The Company violated SOP No. 78-9, Accounting for Investments in Real Estate Ventures, and Emerging Issues Task Force (EITF) No. 94-1, Accounting for Tax Benefits Resulting from Investments in Affordable Housing Projects, by improperly using the effective yield method instead of the equity method of accounting.

148.    EITF No. 94-1 provides guidance on accounting for investments in limited partnerships which operate qualified affordable housing projects. According to the EITF, SOP 78-9 generally requires use of the equity method of accounting for limited partnership investments – not the effective yield method – unless the limited partner's interest is so minor that the partner has virtually no influence over partnership operating and financial policies.

149.    Fannie Mae's interests in these limited partnerships were not minor and did not qualify for the effective yield method, yet that is the method it used. In this way, it amortized the initial cost of its investment over the period that the tax credits were allocated to the Company.

This improper accounting is consistent with the "income smoothing" violations detailed previously.

150.    The Company's November 10, 2005 Form 12b-25 concedes that restating these investments using the equity method will affect the timing of the recognition of its losses during the restatement period, and will result in more variability from period to period.

151.    Fannie Mae also incorrectly accounted for its LIHTC investments by recording certain of them on an "as funded" basis rather than at the committed amounts, as required by GAAP. According to the November 10, 2005 Form 12b-25, Fannie Mae's restatement of the committed amounts will force it to record equal amounts to both assets and liabilities related to these investments.

## V.    THE DEFENDANTS IGNORED WHISTLEBLOWERS

152.    On September 6, 2004, Roger Barnes ("Barnes"), the former Manager of Financial Accounting, Deferred Assets in Fannie Mae's Controller Division, submitted written testimony to the United States House of Representatives for their October 2004 hearing on the OFHEO Report. Barnes was one of the few employees in the Controller's Division who was a CPA and had a Masters Degree in Business Administration. (Neither Howard nor Spencer were CPAs).

153.    In his testimony, Barnes described in detail management's knowledge of and active participation in or approval of the accounting improprieties and GAAP violations which had rendered Fannie Mae's financial statement materially misleading for at least four years, and which he had tried unsuccessfully to stop. He stated:

> Fannie Mae espouses a policy of adherence to good corporate governance, emphasizing the importance of integrity…. The reality, however, is far different…. The atmosphere and culture, particularly within the Controller's Division, is one of intimidation, restraint of dissenting opinions, and pressure to be part of the

'Team,' giving Chairman Franklin Raines and Vice Chairman Tim Howard the numbers the Office of the Chairman desired to please the markets. Employees like myself who refused to go along with this agenda were ostracized and subjected to retaliation.... [Fannie Mae is] plagued by a corporate culture that uses threats, intimidation, and reprisal, to create an atmosphere where even those employees with great integrity . . . who rightfully feel duty-bound to report improprieties and irregularities . . . cannot risk doing so, fearing the retaliation they know will follow.

*     *     *

Indeed, the culture in the Controller's division was such that many employees knew or suspected that the Company was regularly engaging in improper income management, and it became a joke that the Controller's division could produce any income statement that the Company wanted.

154.    Barnes testified that, beginning in 1999 and every year thereafter, he "repeatedly alerted Fannie Mae management to improper accounting practices, including the fact that the Company's Amortization Integration Modeling System ("AIMS") used inaccurate methods that violated Generally Accepted Accounting Principles ("GAAP"), in particularly [SFAS] 91." He stated that he had "repeatedly advised management that it appeared that the AIMS had been designed and employed to manipulate the level of income reported by Fannie Mae in its earnings statement and/or other public filings, which would constitute fraudulent conduct that violates federal law."

155.    In 2000, when Barnes continued to raise concerns about AIMS with Jeffrey Juliane (another manager in the Controller's division), Janet Pennewell (Senior Vice President, Controllers' Division) and Mary Lewers (Director of Financial Accounting, and Barnes' direct supervisor), they dismissed his concerns and told him that AIMS was established "to accomplish the objective set by Leanne Spencer ... and Tim Howard ... which was to reduce the Company's earnings volatility."

156.    Barnes testified that on January 4, 2001, he was advised by Mr. Juliane that:

> [T]he rapid fall of [interest] rates had led senior management to consider adjusting the "on-tops" – a term the Controller's division used to refer to manual journal entries that could be used to adjust arbitrarily the Company's income as the books were closed each month. Senior management had stated that "on-tops" could be used to reflect a desired amount of income for December 2000, which would maintain margin and net interest income levels. Mr. Juliane added that if the Company decided not to make "on tops" adjustments, he would produce modeling runs to support the desired income results. *Mr. Juliane indicated that he was prepared to generate any results desired by Ms. Spencer and Mr. Howard* through the modeling process. I was extremely troubled by what was clearly improper income management and asked Mr. Juliane if management agreed with this approach, which seemed to violate GAAP. *Mr. Juliane told me that the Company's management embraced this approach.*

(Emphasis added).

157.    Barnes testified that in June 2001, he discovered that the Company's management had posted a $10 million "on-top" entry in order to increase the Company's reported income and meet the earnings and margin goals previously set by senior management. According to Barnes, "even if the Company did not actually meet the goals set by management, the use of the 'on tops' adjustments allowed Fannie Mae to make it appear that it had met those goals in the relevant time period."

158.    In November 2001, Barnes learned that management had requested a change in an amortization factor which resulted in a $100 million boost to the Company's interest income. He saw this as "concrete evidence that the AIMS system … produced grossly inaccurate and unreliable results" and informed his supervisor that "the integrity of the AIMS system was seriously compromised." No corrective action was taken, and management approved the factor change.

159.    In September 2002, Barnes raised his concerns formally in a memo to Raines and Howard, detailing the serious accounting and financial improprieties of which Barnes was aware. The concerns that Barnes raised included matters which OFHEO later found to have significantly contributed to the fraud, including flaws in the modeling of amortization factors, significant internal control deficiencies in AIMS, and insufficient segregation of duties and responsibilities among Fannie Mae employees.    Among other things, the memo indicated:    that income was being routinely misstated; that income was being managed to meet the Company's desired objectives; that "on-top" adjustments were being used to manage income and margin calculations; that a miscellaneous balance sheet account was being used to shift income to periods other than when it was received; that reconciliation differences from systems were being input as future deferrals instead of current income and expenses; that the Controller's division was intentionally limiting the AIMS system capabilities so it would not provide audit trails for modeling; and that the division was using negative factors in amortization and allowing amortization to exceed 100%.    The memo further indicated that the problems with amortization of purchased discount and premium were so severe that "the possible impact reache[d] hundreds of millions of dollars and possibly affects the integrity of the current financial statements and those [the Company] will issue after beginning compliance with SEC reporting in 2003."    The Officer Defendants ignored the warnings in order to continue to perpetrate the fraud.

160.    In his testimony, Barnes indicated that Spencer was not only aware of accounting manipulations, but was very conscious of the need to prevent their discovery:

> On January 2, 2003, Ms. Lewers informed me that Ms. Spencer and Ms. Pennewell had decided that a more than $20 million correction to Fannie Mae's income would not be posted because of a concern that the correction would be noticed and questioned by the Company's Internal Audit division. ... In an effort to control the information conveyed to the internal auditors about the

Company's use of "on-top" accounts, Ms. Lewers instructed me not to volunteer any information about these adjustments, and not to discuss the "on-top" accounting unless specifically asked. Ms. Lewers also reminded me of Ms. Spencer's standing instruction that lower-level staff were not to speak with the Internal Audit division under any circumstances.

161.    In late July and early August 2003, Barnes brought his concerns about financial fraud at Fannie Mae to the attention of the Company's internal audit department and "provided [them] a wealth of materials documenting the pervasive and systematic nature of the accounting abuses about which [he] had repeatedly complained." He also alerted them, during an August 4, 2003 meeting, to a recent manual change in a factor in the Company's amortization system that had resulted in a transfer of $6.5 million in amortization expense from future periods to the third quarter of 2003. The result was to increase the quarter's income by $6.5 million, the very amount by which the Company's net interest income for July 2003 had fallen short of management's projections. Barnes alleged that the change was made for the purpose of making the numbers in the system "agree" with forecasted figures.

162.    On August 5, 2003, Barnes gave Spencer a copy of the detailed memorandum which he had provided to the internal audit division, outlining the ways in which Fannie Mae was violating GAAP, and providing 60 specific examples of such misconduct from the period ended June 30, 2003. The recipients of the memorandum, including Spencer, convened a meeting with Barnes and berated him for providing that information to Fannie Mae's internal audit division.

163.    In response to Barnes' report, Fannie Mae's internal audit staff performed a perfunctory investigation into the manual factor change that had led to the $6.5 million transfer of amortization expense. They concluded that the factor change was not supported by documentation, but they failed to reach a conclusion about whether the change was valid because

the modeling group did not respond to information requests and the internal audit staff did not pursue the matter. Barnes testified that "this was not surprising given the climate at Fannie Mae – a climate in which inquiries by the [Internal] Audit division were stonewalled and drowned out by the convoluted and deceptive explanations of managers who were determined to meet executive management's goal to depict stable and growing earnings regardless of the economic realities."

164.    A meeting was held on August 8, 2003, which was attended by the managers in the Controller's office (including Barnes) and members of the Company's internal audit staff. Barnes testified that the purpose of the meeting appeared to him to be "to determine how to justify the improper practices [he] had identified so that Mr. Raines could certify Fannie Mae's financial statements by an August 15, 2003 deadline." Mr. Juliane provided a complex and contradictory explanation for the accounting issues raised by Barnes, which the internal audit division accepted. No further action was taken.

165.    The concerns which had been raised by Barnes were communicated to the Audit Committee in an August 14, 2003 presentation by Sam Rajappa of the internal audit department. On that same day, the Audit Committee and full Board approved, and the Company filed, its Form 10-Q for the quarter ended June 30, 2003.

166.    Barnes' concerns about SFAS 91 and SFAS 133 should have raised a red flag for the Officer Defendants and the Audit Committee Defendants as to Fannie Mae's overall accounting polices and practices. Barnes raised additional red flags about the lack of internal controls at Fannie Mae, which undermined Fannie Mae's accounting policies and procedures as a whole.

167.    Instead of adequately investigating Barnes' concerns, the Audit Committee shrugged them off and the Officer Defendants and other management at Fannie Mae retaliated against Barnes. Barnes was repeatedly excluded from meetings and passed over for promotions in an effort to silence him. He explained the reaction of Richard Stawarz (Fannie Mae's Director of Financial Planning), to whom Barnes also directed his concerns, as follows:

> Mr. Stawarz agreed that there were significant problems, but told me that in Fannie Mae's corporate climate, a climate in which employees actually joked about improper income management because it was such a regular occurrence, and a climate in which employee morale suffered because management offered promotions, bonuses and perks only to employees who supported management's improper goals, I should not raise my concerns....

## VI.    THE FANNIE MAE DEFENDANTS MAINTAINED DEFICIENT INTERNAL CONTROLS

168.    In its report, OFHEO found that Fannie Mae's violations of GAAP and the fraud committed by the Officer Defendants were facilitated by serious internal control deficiencies. In describing Fannie Mae's violations of SFAS 91 and SFAS 133, the OFHEO Report explained:

> The problems relating to these accounting areas differ in their specifics, but they have emerged from a culture and environment that made these problems possible. Characteristics of this culture include:
>
> - management's desire to portray Fannie Mae as a consistent generator of stable and growing earnings;
>
> - a dysfunctional and ineffective process for developing accounting policies;
>
> - an operating environment that tolerated weak or non-existent internal controls;
>
> - key person dependencies and poor segregation of duties;
>
> - incomplete and ineffective reviews by the Office of Auditing;

- an inordinate concentration of responsibility vested with the Chief Financial Officer; and

- an executive compensation structure that rewarded management for meeting goals tied to earnings-per-share, a metric subject to manipulation by management.

(Emphasis added).

169.    The OFHEO Report identified the following internal control deficiencies, among others, as having undermined the process of amortization of deferred price adjustments to such a grave extent that the material accuracy of that amortization could not be reasonably assured:

a.    Insufficient segregation of duties and key person dependencies, including the fact that, beginning in July 2003, Jeff Juliane had responsibility for both the modeling and accounting for amortization.  The Company's internal audit department raised concerns about this during the August 8, 2003 meeting, while discussing Barnes' allegation that Juliane was involved in making amortization factor adjustments to cause actual amortization to more closely align with forecasts – an allegation that indicated that the failure to segregate these modeling and accounting functions was not merely a theoretical problem, but was resulting in actual manipulation of the Company's financial results.  Yet, nothing was done to address those concerns, even though they were brought to the attention of the Officer Defendants and the Audit Committee.

b.    Company management was using its amortization modeling system to produce desired results.  After the close of each quarter and year, the Controller's office would process multiple sensitivity runs, using varying scenarios in terms of rates, prepayment speeds, prospective catch-up adjustments, and other parameters, to see what each scenario would produce as the amount of "catch-up."  There was no legitimate business purpose for these multiple runs.  Moreover, even if the runs were necessary, they could have been conducted well

before the close of an accounting period because they were based on information from prior periods. Management processed these runs for the sole purpose of manipulating the Company's financial results by identifying (and then adopting) the set of assumptions that best suited their desire to achieve a particular outcome.

        c.    There were significant differences between the balances reflected in the Company's amortization system and in the systems that were the source of the information to be used in the amortization system. When reconciling the two systems, management made manual adjustments to the catch-up sensitivity analysis which were not always adequately supported, and were sometimes inconsistently treated.

        d.    The Company's amortization system (AIMS) produced illogical and anomalous results, including amortization factors that were negative (which would cause a premium or discount to increase over time) or greater than one (which could cause a premium to amortize beyond the original balance and become a discount). These anomalies, which were well known within the Fannie Mae Controller's division, made it virtually impossible to correlate amortization results to actual performance of the underlying loans/securities. Moreover, OFHEO found that certain of the factor anomalies represented errors and may also constitute departures from GAAP.

    170.    OFHEO also "identified critical resource shortages and lack of technical accounting expertise within the Controller's Department which resulted in key person dependencies" and found that a "lack of proper segregation of duties exists within [the] Controller's Department which has created an environment that is not conducive for developing safe and sound financial reporting practices." For example, OFHEO found:

- A lack of technical accounting expertise and a shortage of resources within the Controller's division, where accounting policies were recommended (by Jonathan Boyles of the Financial Standards Group), approved (by Spencer, who was not a C.P.A.), and purportedly enforced (by Howard, also not a C.P.A.);

- A "circular" accounting policy development structure, where the Financial Standards group essentially developed and also approved accounting policies by virtue of Spencer's reliance on the Financial Standards Group (due to her lack of expertise regarding GAAP);

- A Vice President for Financial Accounting, Mary Lewers, who lacked sufficient knowledge of GAAP to adequately perform her duties;

- A wide range of functions that fell within Howard's purview of responsibility, several of which potentially impaired his independence;

- That the Senior Vice-President of Financial Reporting, Janet Pennewell, had responsibility not only for financial reporting, but also for forecasting income for business planning purposes, which created a conflict of interest and undermined the integrity of the financial reporting process because she had the ability to affect the amount of reported income in order to achieve forecasted results;

- That a single individual, Jeff Juliane, was responsible for modeling, reporting, and accounting for amortization of deferred price adjustments, and thus there was no independent check on those processes;

- That Sam Rajappa, the head of the Company's internal audit department, reported to Howard instead of independently reporting to the Audit Committee, and that Howard participated in Rajappa's performance evaluations and in setting his compensation; and

- That Sam Rajappa was the Company's Controller before becoming the head of the internal audit function, a fact that impaired his independence because he was auditing his own work.

171.    OFHEO explicitly found that "Howard failed to provide adequate oversight to key control and reporting functions within Fannie Mae" and that the Controller's Department, over which Howard had direct responsibility, "does not possess the skills required to ensure that Fannie Mae has appropriate accounting policies, the resources to appropriately implement such

policies, nor an effective system of internal controls." In sum, the Controller's Department, for which Howard and Spencer were directly responsible, was in a state of disarray.

172.   Other internal control deficiencies identified by OFHEO included:

- The failure to document hedging activity as required by SFAS 133, demonstrating "a poor control framework" and constituting "a significant safety and soundness problem";

- A process of accounting policy development that lends itself to the formation of aggressive and non-GAAP-compliant policies;

- A lack of formally documented accounting policy development procedures;

- The absence of a centralized database of all Fannie Mae accounting policies;

- The inability of the Company's portfolio accounting system (known as STATS) to reliably perform the calculations fundamental to properly account for the Company's portfolio, including: estimating amortization of deferred price adjustments in accordance with SFAS 91, marking the mortgage-backed securities portfolio to market, accounting for dollar-roll repurchase agreements; accounting for mortgage revenue bonds, or accounting for interest-only strips pursuant to EITF Issue No. 99-20;

- The use of a faulty and inaccurate system for designating mortgage loans as held-for-investment or held-for-sale, and the failure to detect or correct the problem for 21 years;

- Over-reliance on end-user applications such as spreadsheets; and

- The insufficiency of controls surrounding database modifications, which led to a widespread practice of low-level employees overwriting and changing database records at the direction of management (referred to internally as "DB mods,") with no documentation or independent approvals.

173.   The lack of internal controls over Fannie Mae's accounting revealed by OFHEO fostered an environment in which Fannie Mae and the Officer Defendants were able to, and did, smooth earnings volatility and distort financial results through accounting manipulations and fraudulent transactions.

174.    As detailed below, Raines and Howard specifically represented to investors that Fannie Mae's internal controls were solid.  Raines and Howard stated that they had personally investigated the Company's internal disclosure controls.  Both certified in SEC filings that they were responsible for "establishing and maintaining disclosure controls and procedures;" that they had "designed such disclosure controls and procedures or caused [the same] to be designed under [their] supervision;" and that having evaluated the effectiveness of the Company's disclosure controls and procedures, both concluded that its disclosure controls and procedures were effective during the applicable period.  These representations were materially false because Raines and Howard knew of these serious, unresolved internal control problems at Fannie Mae.

175.    The Audit Committee is culpable for ignoring the serious internal controls issues at Fannie Mae.  The written charters adopted by the Director Defendants in 2000 (the "2000 Charter") (attached to the Company's proxy statement dated April 2, 2001) and in 2002, (the "2002 Charter") (attached to the Company's proxy statement dated April 17, 2003), charged the Audit Committee with, among other things:

- "Monitoring the integrity of the corporation's financial statements and the independence and performance of its internal .... auditors ...";

- Reviewing the Company's "major risks and risk management processes, including the quality and effectiveness of internal controls";

- Reviewing the creation and administration of financial controls;

- Reviewing the performance of Fannie Mae's internal audit functions;

- Reviewing and discussing with management, the head of the internal audit department, and the outside auditor the adequacy and effectiveness of the Company's internal controls and disclosure controls;

- Overseeing and discussing the internal auditing activities and performance;

- Obtaining periodic reports from the head of the internal audit department regarding internal audit findings and the Company's progress in remedying material control deficiencies; and

- Establishing procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls, or auditing matters.

176. The Audit Committee was informed of Barnes' concerns regarding the integrity of Fannie Mae's accounting and financial reporting in August 2003. Had the Audit Committee Defendants adequately discharged these duties, they would have known about all of Fannie Mae's grievously deficient and/or nonexistent internal controls and should have acted to correct them. Instead, the Audit Committee Defendants sat passively by as severe problems with internal controls led to the material misstatements of the Company's financial statements.

177. Fannie Mae has now agreed to implement sweeping reforms to remove the widespread internal control deficiencies described in the OFHEO Report, in effect admitting that its internal controls were inadequate. In its December 28, 2004 Form 8-K, Fannie Mae announced that its audit firm, KPMG, had notified the Company of "material weaknesses" in internal controls over financial reporting.

178. On March 7, 2005, Fannie Mae and OFHEO entered into a Supplemental Agreement to, as Fannie Mae stated, "address events that have occurred since September 27, 2004, including concerns at OFHEO with internal controls and resolution of other organizational problems . . .." Fannie Mae, by signing the Agreement, admitted that it engaged in improper accounting and had inadequate internal controls, as the agreement requires Fannie Mae to, among other things:

- Implement controls surrounding accounting ledger journal entries including policies that prohibit the falsification of signatures;

- Develop and implement a plan to address deficiencies in the portfolio accounting systems;

- Adopt internal controls that limit the ability of personnel to overwrite database records supporting the general ledger;

- Separate the positions of Chairman and CEO;

- • Review legal and regulatory compliance structures; and

- • Create an Office of Compliance and Ethics at Fannie Mae to review internal complaints.

179.    On April 6, 2005, Armando Falcon, Jr. ("Falcon"), the Director of OFHEO, testified before the Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises about the effect of poor internal controls on the accounting fraud that OFHEO had uncovered at Fannie Mae. He testified that "lapses in internal controls, even though we often speak of them after the accounting issues, I think, are just as, if not more, serious than the accounting problems."

180.    Among other things, Falcon expressed alarm concerning an instance in which Fannie Mae's practically nonexistent internal controls caused an employee to change an accounting formula which resulted in the improper reporting of one billion dollars. He stated that "with proper internal controls, one employee could not go and make those changes without a couple of layers of verification before changes like that are made."

181.    Falcon also testified that signatures were falsified on Fannie Mae accounting documents that were used to support executives' entitlement to bonuses.

## VII.    DEFENDANTS' FALSE AND MISLEADING STATEMENTS

182.    As a result of Fannie Mae's fraudulent accounting scheme and internal control deficiencies, every financial statement and earnings announcement issued by Fannie Mae from at least 2000 through the second quarter of 2004 was materially false and misleading. Defendants' dissemination of these and other false and misleading statements as set forth below caused the artificial inflation of Fannie Mae stock. When the truth about Fannie Mae's unlawful scheme was finally disclosed, investors lost billions of dollars as the price of Fannie Mae's shares declined in response to those disclosures.

A.    **Raines' December 15, 2000 Speech**

183.    Fannie Mae's ability to convince the investing public that it was a conservative, safe and stable investment was a critical component to the success of the scheme described above.    In furtherance of this scheme, Fannie Mae executives regularly trumpeted the Company's soundness.    For example, during a speech at the Brookings Institution in Washington, D.C. on December 15, 2000, Raines touted Fannie Mae's financial strength, stating:

> What we have now is an unparalleled, multi-layered approach to safeguarding our financial strength, an overlapping system with fail-safe redundancies.  As a result, Fannie Mae is not only one of the financially strongest companies in the world [sic].  Our safety and soundness regime is unmatched by any financial institution in the world, a new global standard if you will.
>
> If every financial company had Fannie Mae's regime of capital standards, regulatory supervision and market transparency, we could all be a lot more confident in the stability of the financial system going forward.  We invite—we encourage—all financial supervisors, policy makers, and industry participants to take a close, fresh look at Fannie Mae's cutting-edge safety and soundness regime.

184.    These and similar public statements made by Fannie Mae executives were materially false and misleading because Fannie Mae's "cutting-edge safety and soundness regime" was, in reality, mere smoke and mirrors.  Rather than "safeguarding [the Company's] financial strength" with a "system [of] fail-safe redundancies," Defendants perpetrated a massive accounting fraud which was made possible by seriously deficient internal controls, as alleged herein.

B.    **The 2000 Annual Report**[4]

185.    On or about March 15, 2001, Fannie Mae issued its Annual Report to its investors for the year ended December 31, 2000 (the "2000 Annual Report"). In the 2000 Annual Report, Fannie Mae portrayed itself as a conservative, stable and safe investment. For example, in his letter to shareholders that was contained in the 2000 Annual Report, Raines stated:

> In 2000, Fannie Mae enhanced our record of providing stability to the entire financial system.
>
> \*        \*        \*
>
> . . . Fannie Mae has consistently delivered exceptional financial performance through a wide range of credit and interest-rate environments. *Indeed, our 14 years of steady earnings growth demonstrates that Fannie Mae defies the conventional wisdom that financial company earnings are always sensitive to changes in the economy or interest rates. Fannie Mae's management of credit and interest rate risk contributes stability to the global financial system. We are a systemic 'shock absorber,' which keeps low-cost capital circulating between investors and home buyers no matter what economic conditions prevail.*

2000 Annual Report at 4 (emphasis added).

186.    The 2000 Annual Report contained financial statements for 2000, which indicated that Fannie Mae had generated earnings of $4.48 billion for the year, representing an increase of $536 million over 1999, and that it had total taxable-equivalent revenues of $7.825 billion, total assets of $675.072 billion, and total liabilities of $654.234 billion. The 2000 Annual Report stated that Fannie Mae had posted its 14th consecutive year of record earnings, and that its EPS had increased 15% to $4.29 per share in 2000, keeping Fannie Mae on track to reach its five-year goal of doubling EPS by 2003.

---

[4]    "Although debt, equity and mortgage-related securities that Fannie Mae issues are exempt from SEC registration, [Fannie Mae] announced a voluntary initiative to register [its] common stock under Section 12(g) of the Securities Exchange Act of 1934. [Fannie Mae's] common stock registration became effective on March 31, 2003." http://www.fanniemae.com/faq/231001y.jhtml?p=FAQ. Fannie Mae did not file its financial results with the Securities and Exchange Commission until December 31, 2002, when it began to voluntarily file its results.

187.    In a letter to shareholders which was contained in the 2000 Annual Report,

Howard and Spencer stated:

> The management of Fannie Mae is responsible for the preparation,
> integrity, and fair presentation of the accompanying financial
> statements and other information appearing elsewhere in this
> report. In our opinion, the financial statements have been prepared
> in conformity with accounting principles generally accepted in the
> United States of America appropriate in the circumstances, and the
> other financial information in this report is consistent with such
> statements.
>
> *       *       *
>
> The management of Fannie Mae is also responsible for
> maintaining internal control over financial reporting that provides
> reasonable assurance that transactions are executed in accordance
> with appropriate authorization, permits preparation of financial
> statements in conformity with accounting principles generally
> accepted in the United States of America, and establishes
> accountability for the assets of the corporation.
>
> Internal control over financial reporting includes controls for the
> execution, documentation, and recording of transactions, and an
> organizational structure that provides an effective segregation of
> duties and responsibilities. Fannie Mae has an internal Office of
> Auditing whose responsibilities include monitoring compliance
> with established controls and evaluating the corporation's internal
> controls over financial reporting. Organizationally, the internal
> Office of Auditing is independent of the activities it reviews.
>
> *       *       *
>
> Management recognizes that there are inherent limitations in the
> effectiveness of any internal control environment. However,
> management believes that, as of December 31, 2000, Fannie Mae's
> internal control environment, as described herein, provided
> reasonable assurance as to the integrity and reliability of the
> financial statements and related financial information.

2000 Annual Report at 66.

188.    The 2000 Annual Report was reviewed and approved prior to its dissemination by

Raines, Howard, Spencer, Mudd, Gorelick, Korologos, Mulcahy, Ashley, Duberstein, Gerrity,

Pickett and Swygert. In addition, the document was prepared in substantial part by, and contains signatures of, Raines, Howard and Spencer. All of these Defendants knew, or recklessly disregarded, that the foregoing statements, as well as the financial statements (including notes) in the 2000 Annual Report were materially false and misleading for the reasons set forth below in Section VIII, Falsity of Defendants' Statements Concerning Fannie Mae.

### C.    The April 17, 2001 Press Release

189.    On April 17, 2001, the Individual Defendants caused Fannie Mae to issue a press release announcing its financial results for the first quarter of 2001 (the "April 17, 2001 Press Release"). In the April 17, 2001 Press Release, Fannie Mae reported net income of $1.238 billion and diluted EPS of $1.20 for the first quarter of 2003.

190.    In the April 17, 2001 Press Release, Fannie Mae announced that it had implemented SFAS 133 on January 1, 2001, stating:

> Fannie Mae adopted SFAS 133, Accounting for Derivative Instruments and Hedging Activities, on January 1, 2001. SFAS 133 requires that Fannie Mae mark to market only its purchased options and none of its option-based debt or the mortgage investments it hedges with purchased options. At adoption, the mark-to-market of the time value of the purchased options that the company uses as a substitute for callable debt resulted in a cumulative gain of $258.3 million, or $167.9 million after tax. The change in the market value of Fannie Mae's purchased options during the first quarter of 2001 was a loss of $237.6 million. This amount includes $64.1 million in option cost amortization that formerly was included in net interest income.
>
> SFAS 133 also requires that the company record certain derivatives, primarily interest rate swaps it uses as substitutes for non-callable debt, on the balance sheet at their fair values, with an offsetting entry recorded in a separate component of stockholders' equity called other comprehensive income. At implementation on January 1, 2001, Fannie Mae recorded a $3.9 billion reduction in the other comprehensive income component of stockholders'

equity. This amount was a reduction of $5.7 billion, or 0.9 percent of the net mortgage balance, at March 31, 2001. Other comprehensive income is not a component of core capital. At March 31, 2001 Fannie Mae's core capital was $21.5 billion.

191.    Defendants knew, or recklessly disregarded, that these statements were materially false and misleading for the reasons set forth in Section VIII, Falsity of Defendants' Statements Concerning Fannie Mae.

192.    In addition, Defendant Howard stated in the April 17, 2001 Press Release that the "growth in Fannie Mae's business and the increase in its net interest margin in the first quarter of 2001 had given the company excellent earnings momentum." Further, Howard stated: "With our first quarter results we now expect growth in operating EPS for 2001 to be above the 14.9 percent growth rate required to double our EPS in the five years ending 2003." Defendants knew, or recklessly disregarded, that this statement was materially false and misleading because, as set forth above, the Company's purported growth in EPS was not based on the strength of Fannie Mae's first quarter results but, rather, on the fraudulent accounting scheme described herein.

**D.    The 2001 Proxy**

193.    On or about April 19, 2001, Fannie Mae mailed its proxy statement dated April 2, 2001 and accompanying form of proxy (the "2001 Proxy") to its shareholders. Fannie Mae again portrayed itself as a solid performer and "superior" investment, stating:

> The corporation met the[] stringent corporate performance measures [needed to be achieved for executives to receive bonuses] in 2000. During the year, management continued to demonstrate an exceptional ability to turn steady business growth into consistently high growth in earnings per share. *Fannie Mae achieved its fourteenth consecutive year of record earnings and established new records of financial performance by once again achieving the double-digit operating earnings per share growth that the corporation has posted over a decade, a record only four other companies in the S&P 500 have the possibility of matching.*

> *Over these fourteen years, Fannie Mae has been able to grow its earnings consistently in a wide range of interest rate and credit environments.*
>
> *         *         *
>
> *Fannie Mae has continued to be a superior investment opportunity*, with 2000 yet another extraordinary year following a decade of consistent double-digit growth in operating EPS.

2001 Proxy at 10-11 (emphasis added).

194.    In addition, Fannie Mae again described itself as financially sound, noting: "Under Mr. Raines' guidance, Fannie Mae set a new global standard for financial institution safety and soundness protections." 2001 Proxy at 11.

195.    The 2001 Proxy was reviewed and approved by, and issued in the name of, Fannie Mae's Board which, at the time, included Raines, Ashley, Duberstein, Gerrity, Gorelick, Korologos, Mudd, Mulcahy, Pickett and Swygert. All of these Defendants knew, or recklessly disregarded, that the foregoing statements in the 2001 Proxy were materially false and misleading because Fannie Mae's purported "new records of financial performance" and "double-digit operating earnings per share growth" were only achieved as a result of accounting fraud and misapplication of GAAP, as alleged herein.

### E.    The July 17, 2001 Press Release

196.    On July 17, 2001, the Individual Defendants caused Fannie Mae to issue a press release announcing its results for the second quarter of 2001 (the "July 17, 2001 Press Release"). In the July 17, 2001 Press Release, Fannie Mae reported net income of $1.314 billion and EPS of $1.27 for the second quarter of 2003.

197.    Commenting on Fannie Mae's performance, Defendant Raines stated: "With very strong business and revenue growth and well contained credit losses, Fannie Mae is extremely

well-positioned to continue to play a critical role in providing mortgage credit to the economy,

*while extending our enviable record of superior financial performance.*" (emphasis added).

198. Fannie Mae again stated that it had adopted SFAS 133 on January 1, 2001, noting:

> Fannie Mae adopted Financial Accounting Standard No. 133 (SFAS 133), *Accounting for Derivative Instruments and Hedging Activities,* on January 1, 2001. SFAS 133 requires that Fannie Mae mark to market only its purchased options and none of its option-based debt or the mortgage investments it hedges with purchased options. At adoption, the mark-to-market of the time value of the purchased options that the company uses as a substitute for callable debt resulted in a cumulative gain of $258.3 million, or $167.9 million after tax. The change in the market value of Fannie Mae's purchased options during the second quarter of 2001 was a net gain of $35.4 million. This amount includes $100.1 million in option cost amortization that formerly was included in net interest income.
>
> SFAS 133 also requires that the company record certain derivatives, primarily interest rate swaps it uses as substitutes for non-callable debt, on the balance sheet at their fair values, with an offsetting entry recorded in a separate component of stockholders' equity called other comprehensive income, or OCI. At June 30, 2001, the OCI component of stockholders' equity included a $3.7 billion reduction, or 0.6 percent of the net mortgage balance. The comparable reduction to OCI was $5.7 billion at March 31, 2001. Other comprehensive income is not a component of core capital.

199. Defendants knew, or recklessly disregarded, that the foregoing statements were materially false and misleading for the reasons set forth below in Section VIII, Falsity of Defendants' Statements Concerning Fannie Mae.

**F.    The October 15, 2001 Press Release**

200. On October 15, 2001, the Individual Defendants caused Fannie Mae to issue a press release announcing its results for the third quarter of 2001 (the "October 15, 2001 Press Release"). In the October 15, 2001 Press Release, Fannie Mae reported net income of $1.377 billion and EPS of $1.33 for the third quarter of 2001.

201.    Fannie Mae again announced that it had implemented SFAS 133 on January 1,

2001, stating:

> Financial Accounting Standard No. 133 (SFAS 133), *Accounting for Derivative Instruments and Hedging Activities* requires that Fannie Mae mark to market only its purchased options and none of its option-based debt or the mortgage investments it hedges with purchased options.  The change in the market value of Fannie Mae's purchased options during the third quarter of 2001 was a net loss of $413.1 million.  This amount includes $186.9 million in option cost amortization that formerly was included in net interest income and is currently included in adjusted net interest income.
>
> SFAS 133 also requires that the company record certain derivatives, primarily interest rate swaps it uses as substitutes for non-callable debt, on the balance sheet at their fair values, with an offsetting entry recorded in a separate component of stockholders' equity called other comprehensive income, or OCI.  At September 30, 2001, the OCI component of stockholders' equity included a $10.6 billion reduction, or 1.5 percent of the net mortgage balance. The comparable reduction to OCI was $3.7 billion at June 30, 2001 and $5.7 billion at March 31, 2001.  Other comprehensive income is not a component of core capital.

202.    Defendants knew, or recklessly disregarded, that the foregoing statements were

materially false and misleading for the reasons set forth below in Section VIII, Falsity of

Defendants' Statements Concerning Fannie Mae.

## G.    The January 14, 2002 Press Release

203.    On January 14, 2002, the Individual Defendants caused Fannie Mae to issue a

press release announcing its results for the fiscal year ended December 31, 2001 and for the

fourth quarter of 2001 (the "January 14, 2002 Press Release").  In the January 14, 2002 Press

Release, Fannie Mae reported net income of $5.367 billion and EPS of $5.20 for 2001.  Further,

Fannie Mae reported net income of $1.438 billion and EPS of $1.40 for the fourth quarter of

2001.  These figures were materially false and misleading as a result of the Company's non-

compliance with GAAP, as more fully set forth below with respect to the publication of the Company's financial statements for these periods in its 2001 Annual Report.

204.    Defendant Raines praised the Company's performance, stating that 2001 "was an extraordinary year for Fannie Mae in every respect." Further, Raines stated that "the company's exceptional financial performance was likely to continue in 2002" and that "Fannie Mae's performance in 2001 and prospects for 2002 ma[d]e it very likely that the company would achieve the goal it set in May 1999 of doubling earnings per share between 1998 and 2003." Raines noted: "At the time we set this goal . . . few expected us to attain it. Not only are we very likely to, we will do so without increasing our risk profile, and with unwavering focus on our housing mission." These statements were materially false and misleading because the Company's "exceptional financial performance" in 2001 was merely an illusion created by the Defendants' accounting fraud, and Raines had no reasonable basis for his statement that the Company's performance in 2001 made it likely that the Company's EPS would double between 1998 and 2003.

205.    With respect to SFAS 133, the January 14, 2002 Press Release stated:

> During 2001 Fannie Mae adopted Financial Accounting Standard No. 133 (SFAS 133), *Accounting for Derivative Instruments and Hedging Activities*. SFAS 133 resulted in changes to accounting presentations on both the company's income statement and balance sheet.

> SFAS 133 requires that Fannie Mae mark to market on its income statement the changes in the time value of its purchased options... The change in the time value of Fannie Mae's purchased options during 2001 was a net loss of $37.4 million. This amount includes $590.1 million in option cost amortization expense that formerly was included in net interest income and is currently included in adjusted net interest income. The company recorded a cumulative gain of $258.3 million, or $167.9 million after tax upon adoption of SFAS 133 on January 1, 2001.

At December 31, 2001 the notional balance of Fannie Mae's purchased options - consisting of pay-fixed interest rate swaptions, receive-fixed interest rate swaptions, and interest rate caps - totaled $219.9 billion. At December 31, 2000 the notional balance of Fannie Mae's purchased options was $82.5 billion.

SFAS 133 also requires that the company record any change in the fair values of certain derivatives, primarily interest rate swaps it uses as substitutes for non-callable debt, on the balance sheet in a separate component of stockholders' equity called other comprehensive income, or OCI. SFAS 133 does not require non-callable debt to be marked to market. At December 31, 2001, the OCI component of stockholders' equity included a $7.4 billion reduction, or 1.0 percent of the net mortgage balance, from the marking to market of derivatives. The comparable reductions to OCI were $10.6 billion at September 30, 2001 and $3.7 billion at June 30, 2001. Other comprehensive income is not a component of core capital.

At December 31, 2001 Fannie Mae had $281.8 billion in interest rate swaps that were marked to market through other comprehensive income. The company had $202.5 billion in comparable derivatives.

206.   Defendants knew, or recklessly disregarded, that these statements regarding the

Company's derivatives were materially false and misleading because, as set forth more fully

above:

a.   Defendants applied accounting methods and practices that did not comply with SFAS 133 to the Company's derivative transactions and hedging activities;

b.   The Company did not properly document its hedging activity as required by SFAS 133; and

c.   The Company's balance sheet accounts for derivatives in gain positions, total assets, senior debt, derivatives in loss positions, total liabilities, accumulated other comprehensive income, and total stockholders' equity; the Company's income statement line items for interest income (mortgage portfolio), interest expense, purchased options expenses, net income and earnings per share (basic and diluted); and the line items on the Company's statement of cash flows for net income, purchased options expense within net cash provided by operating activities and net payments to purchase or settle hedge instruments within net cash provided by

71

financing activities, were misstated as a result of Defendants' misapplication of hedge accounting under SFAS 133.

**H.    The February 11, 2002 Credit Suisse First Boston Financial Services Conference**

207.    On February 11, 2002, Howard spoke at the Credit Suisse First Boston Financial Services Conference in Dana Point, California on the topic of "the investment case for Fannie Mae." This conference was attended by numerous institutional investors and securities analysts who published research reports on Fannie Mae. Howard's remarks were also published on Fannie Mae's website.

208.    Howard touted Fannie Mae's track record of consistent performance, its ability to continue to grow EPS in the face of interest rate volatility, and its corporate disclosure practices. Specifically, Howard stated:

> First, we have a superior record of earnings performance.
>
> In a world of promises, performance matters. We are coming off an outstanding year in 2001 - during which we posted growth in operating earnings per share of 21 percent, well above the expectation for our growth at the beginning of the year. We also have an enviable long-term track record. We are one of only three companies in the Standard and Poor's 500 to achieve double-digit growth in operating EPS for each of the past 15 years.
>
> Second, we have excellent prospects for long-term growth.
>
> *        *        *
>
> Third, we have just two primary business risks, which we manage uniquely well.
>
> Our two main risks are interest rate and credit risk. We have unmatched tools and a highly disciplined set of processes for managing these risks. As a consequence, our earnings are little affected by movements in interest rates or changes in the economic environment.
>
> Fourth, we are closely aligned with the country's policy priorities.

72

. . . [W]ith the collapse of Enron putting financial statement transparency and disclosure under sharper focus, Fannie Mae is a model for corporate disclosure practices.

Finally, Fannie Mae shares offer compelling value . . .

209.    Howard knew, or recklessly disregarded, that these statements were materially false and misleading because, as set forth more fully above, Fannie Mae's 2001 financial results were artificially inflated by the fraudulent accounting scheme described herein. Additionally, the reason Fannie Mae's reported earnings were "little affected by movements in interest rates or changes in the economic environment" was not that the Company had "unmatched tools and a highly disciplined set of processes for managing these risks," but rather that the Company was using improper income-smoothing techniques and engaging in other accounting practices that violated GAAP. Further, far from being a "model for corporate disclosure practices," Fannie Mae frequently made materially false and misleading statements in its corporate disclosures as set forth above.

**I.    The 2001 Annual Report**

210.    On or about March 19, 2002, Fannie Mae issued its Annual Report to its investors for the year ended December 31, 2001 (the "2001 Annual Report"). The 2001 Annual Report contained financial statements for 2001, which reported operating earnings of $5.367 billion and operating EPS of $5.20 for the year. Fannie Mae attributed its increase in earnings to its "strong portfolio and net interest margin growth." *Id.* In addition, Fannie Mae reported total taxable-equivalent revenues of $10.187 billion, total assets of $799.791 billion and total liabilities of $781.673 billion.

211.    In addition to trumpeting its purportedly "exceptional operational and financial results" it posted in 2001 (2001 Annual Report at 22), Fannie Mae again touted itself as a model of corporate governance. In his letter to shareholders, Raines stated:

[I]n 2001, Fannie Mae set an important new standard for corporate best practices by implementing the strongest transparency and disclosure practices of any large financial institution in the country. At a time when the market, shareholders, policy makers, and the public are seeking — and deserve — additional assurance and confidence in their public companies, *Fannie Mae is a model for openness, transparency, regulatory oversight, capital protections, and market discipline.*

2001 Annual Report at 2-3 (emphasis added).

212.     In their letter to shareholders as part of the 2001 Annual Report, Howard and

Spencer stated:

The management of Fannie Mae is responsible for the preparation, integrity, and fair presentation of the accompanying financial statements and other information appearing elsewhere in this report. In our opinion, the financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America appropriate in the circumstances, and the other financial information in this report is consistent with such statements.

*         *         *

The management of Fannie Mae is also responsible for maintaining internal control over financial reporting that provides reasonable assurance that transactions are executed in accordance with appropriate authorization, permits preparation of financial statements in conformity with accounting principles generally accepted in the United States of America, and establishes accountability for the assets of the corporation.

Internal control over financial reporting includes controls for the execution, documentation, and recording of transactions, and an organizational structure that provides an effective segregation of duties and responsibilities. Fannie Mae has an internal Office of Auditing whose responsibilities include monitoring compliance with established controls and evaluating the corporation's internal controls over financial reporting. Organizationally, the internal Office of Auditing is independent of the activities it reviews.

*         *         *

Management recognizes that there are inherent limitations in the effectiveness of any internal control environment. However,

> management believes that, as of December 31, 2001, Fannie Mae's internal control environment, as described herein, provided reasonable assurance as to the integrity and reliability of the financial statements and related financial information.

2001 Annual Report at 73.

213.    The 2001 Annual Report was reviewed and approved prior to its dissemination by Raines, Howard, Spencer, Mudd, Gorelick, Ashe, Ashley, Bordonaro, Duberstein, Gerrity, Harvey, Justiz, Korologos, Marron, Mulcahy, Pickett, Segue, and Swygert. In addition, the document was prepared in substantial part by, and contains signatures of, Raines, Howard, and Spencer. All of these Defendants knew, or recklessly disregarded, that the foregoing statements, as well as the financial statements (including notes) in the 2001 Annual Report were materially false and misleading for the reasons set forth below in Section VIII, Falsity of Defendants' Statements Concerning Fannie Mae.

### J.    The April 15, 2002 Press Release

214.    On April 15, 2002, the Individual Defendants caused Fannie Mae to issue a press release announcing its results for the first quarter of 2002 (the "April 15, 2002 Press Release"). In the April 15, 2002 Press Release, Fannie Mae reported net income of $1.519 billion and EPS of $1.48 for the first quarter of 2002.

215.    Defendant Raines again praised the Company's performance, stating: "Continued strong growth in top-line revenues enabled Fannie Mae to report its 57th consecutive quarterly increase in operating earnings per share during the first quarter of 2002. This is a performance record few other companies can match."

216.    Defendants knew, or recklessly disregarded, that these statements were materially false and misleading for the reasons set forth below in Section VIII, Falsity of Defendants' Statements Concerning Fannie Mae.

217. In addition, Fannie Mae made the following disclosures concerning its use of derivatives and SFAS 133:

> Fannie Mae's primary use of derivative instruments is as a substitute for noncallable and callable debt issued in the cash markets. Fannie Mae uses derivatives to help match the cash flow characteristics of its debt with those of its mortgages to reduce the interest rate risk in its portfolio.

> Fannie Mae accounts for its derivatives under Financial Accounting Standard No. 133 (FAS 133), *Accounting for Derivative Instruments and Hedging Activities*. The company implemented this standard, which resulted in changes to accounting presentations on both the company's income statement and balance sheet, on January 1, 2001.

> FAS 133 requires that Fannie Mae mark to market on its income statement the changes in the time value of its purchased options -- interest rate swaptions and interest rate caps -- although it does not permit the company to mark to market its options embedded in debt or mortgage investments. The mark to market of Fannie Mae's purchased options during the first quarter of 2002 resulted in a net loss of $787.2 million compared with a net gain of $577.9 million in the fourth quarter of 2001. The large change in the time value of Fannie Mae's purchased options between the fourth quarter of 2001 and the first quarter of 2002 was primarily the result of a significant change in interest rate volatility, which affected the time value of all options. Purchased options expense in the first quarter of 2002 includes $310.2 million in amortization of the cost to purchase these options, which was included in net interest income prior to the adoption of [SFAS] 133 and currently is included in adjusted net interest income and in operating earnings.

> At March 31, 2002 the notional balance of Fannie Mae's purchased options totaled $238 billion. At December 31, 2001 the notional balance of Fannie Mae's purchased options was $220 billion.

> FAS 133 also requires that the company record any change in the fair values of certain derivatives, primarily interest rate swaps it uses as substitutes for noncallable debt, on the balance sheet in a separate component of stockholders' equity called accumulated other comprehensive income, or AOCI. For these ' types of transactions, [SFAS] 133 does not require or permit noncallable debt to be marked to market. At March 31, 2002, the AOCI component of stockholders' equity included a $4.8 billion

reduction, or 0.7 percent of the net mortgage balance, from the marking to market of these derivatives, down from $7.4 billion at December 31, 2001. Accumulated other comprehensive income is not a component of core capital.

At March 31, 2002 Fannie Mae had $290 billion in interest rate swaps that were marked to market through accumulated other comprehensive income.  The company had $282 billion in comparable derivatives at December 31, 2001.

218.    Defendants knew, or recklessly disregarded, that these statements regarding derivatives were materially false and misleading because, as set forth more fully above, Fannie Mae did not properly apply hedge accounting in accordance with SFAS 133.

**K.    The June 5, 2002 Sanford Bernstein Strategic Decisions Conference**

219.    On June 5, 2002, Raines spoke at the Sanford Bernstein Strategic Decisions Conference in New York City.  This Conference was attended by numerous institutional investors and securities analysts who published research reports on Fannie Mae.  Raines' remarks were published on Fannie Mae's website.

220.    At this Conference, Raines described Fannie Mae as a company that could be counted on "to do the right thing," stating:

> Today I want to talk to you about four topics that often come up when we meet with investors—performance, growth, risk, and the policy issues in Washington.  As you will see, our approach to these matters has a common thread that draws them together. *They all demonstrate that you can count on Fannie Mae to do the right thing.*
>
> Reliability is always important.  But in times like these when there is so much uncertainty and even disappointment in the market, having an investment you can count on becomes especially valuable.  So let me touch on four areas that illustrate our reliability, starting with performance.
>
> **Fannie Mae's Performance**
>
> What I mean by performance is that we set big goals, and then we meet them.

Some companies have had grand ambitions and failed. *Some have achieved their goals with smoke and mirrors.* Some have even gone back and adjusted their promises to match their performance.

*   *   *

**Fannie Mae's Growth**

*   *   *

Let's talk about interest rates. The fact is that interest rates have gone up and rates have gone down and we've still produced record earnings. Again, that's our disciplined credit risk management at work.

*   *   *

**Fannie Mae and Policy Issues**

*   *   *

[O]ur disclosures now meet or exceed SEC requirements in all material respects, and without disrupting the housing finance system. And we're working with our regulator and others to make sure that our disclosures are the best in class.

*   *   *

**Conclusion**

*   *   *

*We operate with obsessive safety.*

221. Raines knew, or recklessly disregarded, that these statements were materially false and misleading because Defendants, far from following through on Fannie Mae's purported commitment to "do the right thing" and "operate with obsessive safety," perpetrated the fraudulent accounting scheme described herein. To the extent Fannie Mae met its performance goals, it did so only through the type of "smoke and mirrors" that Raines attributed only to other companies. Further, Fannie Mae's reporting of record earnings despite interest rate fluctuations

78

was not the result of "disciplined credit risk management," but rather of the use of improper income-smoothing techniques and other accounting practices that violated GAAP.

**L.    The July 15, 2002 Press Release**

222.    On July 15, 2002, the Individual Defendants caused Fannie Mae to issue a press release announcing its results for the second quarter of 2002 (the "July 15, 2002 Press Release"). In the July 15, 2002 Press Release, Fannie Mae reported net income of $1.573 billion and EPS of $1.55 for the second quarter of 2002.

223.    Raines again praised Fannie Mae's consistent performance, stating: "Strong business volumes, a rising net interest margin, and a continued low level of credit losses enabled Fannie Mae to report its 58th consecutive quarterly increase in operating earnings per share during the second quarter of 2002." Further, Raines stated: "Th[e] initial application of the OFHEO risk-based standard confirms that Fannie Mae is managing its business risks with exceptional discipline and prudence."

224.    Fannie Mae made the following statements concerning its use of derivatives and its application of SFAS 133:

> Fannie Mae primarily uses derivative instruments as substitutes for noncallable and callable debt issued in the cash markets to help match the cash flow characteristics of its debt with those of its mortgages and reduce the interest rate risk in its portfolio. Fannie Mae accounts for its derivatives under Financial Accounting Standard No. 133 ([SFAS] 133), *Accounting for Derivative Instruments and Hedging Activities*, which was adopted on January 1, 2001....

> [SFAS] 133 requires that Fannie Mae mark to market on its income statement the changes in the time value of its purchased options -- interest rate swaptions and interest rate caps -- although it does not permit the company to mark to market its options embedded in debt or mortgage investments. The mark to market of Fannie Mae's purchased options during the second quarter of 2002 resulted in a net unrealized loss of $498.2 million. Purchased options expense in the second quarter of 2002 includes $330.4

million in amortization of the cost to purchase these options, which was included in net interest income prior to the adoption of [SFAS] 133 and currently is included in adjusted net interest income and in operating earnings.

[SFAS] 133 also requires that the company record any change in the fair values of certain derivatives, primarily interest rate swaps it uses as substitutes for noncallable debt, on the balance sheet in accumulated other comprehensive income (AOCI), which is a separate component of stockholders' equity. For these types of transactions, [SFAS] 133 does not require or permit noncallable debt to be marked to market. At June 30, 2002, the AOCI component of stockholders' equity included a reduction of $9.5 billion, or 1.3 percent of the net mortgage balance, from the marking to market of these derivatives, up from a reduction of $4.8 billion at March 31, 2002. Accumulated other comprehensive income is not a component of core capital.

At June 30, 2002, the notional balance of Fannie Mae purchased options totaled $251 billion compared with $238 billion at March 31, 2002. Fannie Mae also had $305 billion in interest rate swaps that were marked to market through accumulated other comprehensive income at June 30, 2002. The company had $290 billion in comparable swaps at March 31, 2002.

225.    Defendants knew, or recklessly disregarded, that the foregoing statements were materially false and misleading for the reasons set forth below in Section VIII, Falsity of Defendants' Statements Concerning Fannie Mae.

### M.    The July 15, 2002 Conference Call

226.    On July 15, 2002, Raines and Howard presided over a conference call to discuss Fannie Mae's earnings for the second quarter of 2002 (the "July 15, 2002 Conference Call"). Conference call participants included numerous sell-side securities analysts, including representatives of Raymond James & Associates, Prudential Securities, Salomon Smith Barney, Banc of America Securities, Lehman Brothers, Goldman Sachs, Bear Stearns, UBS, T. Rowe Price, and Wachovia.

227.   Howard praised Fannie Mae's corporate disclosures, asserting that "our corporate disclosures are among the most thorough, clear and frequent of any company in America." Howard knew, or recklessly disregarded, that this statement was materially false and misleading because, as set forth at length above, Fannie Mae's disclosures in its 2000 Annual Report, 2001 Annual Report, 2001 Proxy, April 17, 2001 Press Release, July 17, 2001 Press Release, October 15, 2001 Press Release, January 14, 2002 Press Release, April 15, 2002 Press Release, and July 15, 2002 Press Release were materially false and misleading.

228.   Raines also discussed Fannie Mae's compensation structure, noting, "[W]e use a mix of cash and stock and options, and try to have a balance so that *we don't have people focused on simply moving one number in order to enhance their compensation*." (emphasis added).   Raines knew, or recklessly disregarded, that this statement was materially false and misleading because Defendants could (and did) manipulate the Company's recording of expenses to achieve a target level of EPS that would ensure they received the maximum possible bonuses.

### N.   The October 15, 2002 Press Release

229.   On October 15, 2002, the Individual Defendants caused Fannie Mae to issue a press release announcing its results for the third quarter of 2002 (the "October 15, 2002 Press Release").   In the October 15, 2002 Press Release, Fannie Mae reported net income of $1.631 billion and EPS of $1.62 for the third quarter of 2002.

230.   Fannie Mae made the following statements concerning its use of derivatives and its compliance with SFAS 133:

> Fannie Mae primarily uses derivative instruments as substitutes for noncallable and callable debt issued in the cash markets to help match the cash flow characteristics of its debt with those of its mortgages and reduce the interest rate risk in its portfolio. Fannie Mae accounts for its derivatives under [SFAS] 133, Accounting for

Derivative Instruments and Hedging Activities, which was adopted on January 1, 2001. The implementation of this standard resulted in significant accounting presentation changes to both the company's income statement and balance sheet.

[SFAS] 133 requires that Fannie Mae mark to market on its income statement the changes in the time value, but not the total value, of its purchased options -- interest rate swaptions and interest rate caps. The mark to market of the time value of Fannie Mae's purchased options during the third quarter of 2002 resulted in a net unrealized loss of $1.378 billion, which is reported on the purchased option expense line of the income statement. Purchased options expense in the third quarter of 2002 includes $399.2 million in amortization expense, which was included in net interest income prior to the adoption of [SFAS] 133 and currently is included in adjusted net interest income and in operating earnings. This amortization expense represents the straight-line amortization of the up-front premium paid to purchase the options.

The unrealized loss in the time value component of purchased options in the third quarter was driven by the significant change in interest rates during that quarter, partially offset by an increase in interest rate volatility. This unrealized loss in time value was more than offset by an increase in the intrinsic value of the purchased options, which is not reflected on the income statement. Because Fannie Mae holds options to maturity or exercise, the mark-to-market losses in time value will never be realized. The total purchased option expense recorded over the life of the options will be equal to the amortization expense.

[SFAS] 133 also requires that the company record any change in the fair values of certain derivatives, primarily interest rate swaps it uses as substitutes for noncallable debt, on the balance sheet in accumulated other comprehensive income (AOCI), which is a separate component of stockholders' equity. For these types of transactions, [SFAS] 133 does not require or permit noncallable debt to be marked to market. At September 30, 2002, the AOCI component of stockholders' equity included a reduction of $16.5 billion, or 2.2 percent of the net mortgage balance, from the marking to market of these derivatives, compared with a reduction of $9.5 billion at June 30, 2002. Partially offsetting the reduction in AOCI from the mark to market of derivatives was a $5.0 billion unrealized gain on the available-for-sale securities portfolio. Accumulated other comprehensive income is not a component of core capital.

231.    Defendants knew, or recklessly disregarded, that the foregoing statements were materially false and misleading for the reasons set forth below in Section VIII, Falsity of Defendants' Statements Concerning Fannie Mae.

232.    In addition, Defendant Raines stated in the October 15, 2002 Press Release that "[v]ery strong volumes and stable-to-increasing business margins enabled Fannie Mae to produce another record quarter of operating earnings per share." Defendant Raines knew, or recklessly disregarded, that this statement was materially false and misleading because Fannie Mae's "record quarter of operating earnings per share" was not due to "[v]ery strong volumes and stable-to-increasing business margins" but, rather, to the fraudulent accounting scheme described herein.

**O.    The January 15, 2003 Press Release**

233.    On January 15, 2003 the Individual Defendants caused Fannie Mae to issue a press release announcing its results for the fourth quarter of 2002 and the fiscal year ended December 31, 2002 (the "January 15, 2003 Press Release"). In the January 15, 2003 Press Release, Fannie Mae reported net income of $4.619 billion and EPS of $4.53 for 2002. In addition, Fannie Mae reported net income of $952 million and EPS of $0.94 for the fourth quarter of 2002. These figures were materially false and misleading for the reasons set forth below with respect to Fannie Mae's publication of its financial statements for these periods in its 2002 Annual Report.

234.    Fannie Mae made the following statements concerning its use of derivatives and its purported compliance with SFAS 133:

> Fannie Mae primarily uses derivative instruments as substitutes for noncallable and callable debt issued in the cash markets to help match the cash flow characteristics of its debt with those of its mortgages and reduce the interest rate risk in its portfolio. Fannie Mae accounts for its derivatives under [SFAS] 133, which was

adopted on January 1, 2001. The implementation of this standard resulted in significant accounting presentation changes to both the company's income statement and balance sheet.

[SFAS] 133 requires that Fannie Mae mark to market on its income statement the changes in the time value, but not the total value, of its purchased options -- interest rate swaptions and interest rate caps. The mark-to-market of the time value of Fannie Mae's purchased options during 2002 resulted in a net mark-to-market loss of $4.545 billion, which is reported on the purchased option expense line of the income statement. Purchased option expense in 2002 includes $1.814 billion in amortization expense, which was included in net interest income prior to the adoption of [SFAS] 133 and currently is included in adjusted net interest income and in operating net income. This amortization expense represents the straight-line amortization of the up-front premium paid to purchase the options over the expected life of the options.

[SFAS] 133 also requires that the company record any change in the fair values of certain derivatives, primarily interest rate swaps it uses as substitutes for noncallable debt, on the balance sheet in accumulated other comprehensive income (AOCI), which is a separate component of stockholders' equity. For these types of transactions [SFAS] 133 does not require or permit noncallable debt to be marked to market. At December 31, 2002, the AOCI component of stockholders' equity included a reduction of $16.3 billion, or 2.0 percent of the net mortgage balance, from the marking to market of these derivatives. The comparable reductions to AOCI were $16.5 billion at September 30, 2002 and $9.5 billion at June 30, 2002. Partially offsetting the reduction in AOCI from the mark to market of derivatives was a $4.5 billion mark-to-market gain on the available-for-sale securities portfolio. Accumulated other comprehensive income is not a component of core capital.

235.    Defendants knew, or recklessly disregarded, that these statements regarding derivatives were materially false and misleading because, as set forth more fully above, Defendants had applied accounting methods and practices that did not comply with SFAS 133 to the Company's derivative transactions and hedging activities.

236.    Further, Raines again praised the Company's results, stating: "In an extremely difficult business environment that affected virtually every company in America, Fannie Mae's

operating results in 2002 were among the best in the company's history." Further, Raines stated that "Fannie Mae's disciplined risk management in the fast-growing market of residential mortgage finance has enabled us to achieve a record of growth and consistency of earnings over the past decade and a half that is without equal in financial services." Defendant Raines knew, or recklessly disregarded, that these statements were materially false and misleading because, as set forth above, Fannie Mae achieved the "record of growth" that was purportedly "without equal" not as a result of its "disciplined risk management" but, rather, as a result of the fraudulent accounting scheme described herein.

**P.    The January 15, 2003 Conference Call**

237.    On    January 15, 2003, Defendants Howard and Spencer presided over a conference call to discuss Fannie Mae's earnings for the fourth quarter of 2002 (the "January 15, 2003 Conference Call").    Conference call participants included numerous sell-side securities analysts, including representatives of JP Morgan, Sanford Bernstein, Bear Stearns, Lehman Brothers, Raymond James & Associates, UBS, Wachovia, Neuberger Berman, Goldman Sachs and Sandler O'Neil.

238.    During the call, Howard praised Fannie Mae's performance, stating:

> We came into 2002 with high expectations for ourselves.  After all the challenges and uncertainties presented in the economy, the financial markets, and corporate America, we ended the year not only meeting those expectations, but exceeding them.

> *    *    *

> The last two years saw exceptional growth in operating EPS of over 21% each year.

239.    Further, Howard touted Fannie Mae's risk management practices, attributing Fannie Mae's consistent growth in EPS to its fastidious adherence to sound risk management standards:

85

We have, for the past dozen years or so, followed risk management strategies consistent with the attainment of our objective of low risk growth. Low risk growth is exactly what it sounds like, growth but only if it can be obtained consistent with well defined, conservatively set risk parameters. Those risk parameters come first, but the internally-set guidelines are our statutory risk-based capital standard. We take our risk guidelines very seriously, and our financial results show it. We have a decade and a half record of earnings growth and consistency that would not have been possible without strict adherence to very conservative risk standards.

*        *        *

Given the rigor of our risk based capital standard, our objective from the time it was first described in statute has been to have asset liability structure and an approach to underwriting and reinsuring credit risk that would enable us to pass the risk base[d] capital test with a comfortable cushion. . . . Because of the rigor of the standard, we believe that investors, policy makers and others can be assured that we're operating at an exceptionally high level of safety as long as our risk base[d] capital is less than core capital. We think we have struck the right balance between disciplined risk management and the potential for long-term earnings growth.

240.    Howard knew, or recklessly disregarded, that these statements were materially false and misleading because, as set forth at length above, Fannie Mae's "decade and a half record of earnings growth and consistency" was not due to its "strict adherence to very conservative risk standards," but, rather, to the fraudulent accounting scheme described herein. Moreover, Fannie Mae had not "struck the right balance between disciplined risk management and the potential for long-term earnings growth," but, rather, was a ticking time bomb destined to explode under the weight of its fraudulent accounting scheme.

Q.    **The 2002 Annual Report**

241.    On or about March 19, 2003, Fannie Mae issued its Annual Report to its investors for the year ended December 31, 2002 (the "2002 Annual Report"). The 2002 Annual Report contained financial statements for 2002, which reflected net income of $4.619 billion; diluted

EPS of $4.53; total taxable-equivalent revenues of $11.896 billion; total assets of $887.515 billion; and total liabilities of $871.227 billion.

242. Fannie Mae again touted its stability and its purportedly conservative business model:

> Fannie Mae produced this record year in spite of a weak economy and volatile markets for a very simple reason: Our business is structured and managed to maintain disciplined growth and to keep expanding homeownership in America throughout all economic conditions, both good and challenging.
>
> \*    \*    \*
>
> Fannie Mae's growth . . . is "disciplined," meaning that we put a premium on stable financial performance and consistent return to investors under all economic conditions. The result has been extraordinarily low volatility and high stability in core business earnings growth for 16 years in a row. The fact that 2002 was an exceptional year for Fannie Mae in spite of the slow economy and unusually volatile interest rates is a testament to our disciplined growth model.

2002 Annual Report at 3.

243. In his letter to shareholders which was contained in the 2002 Annual Report, Raines stressed the importance of corporate accountability, stating:

> As Chairman and CEO, I am personally responsible for ensuring that Fannie Mae operates in an effective, ethical manner that produces long-term value for shareholders. . . . Also, it is my duty to ensure that I know how Fannie Mae earns income and the risks we are undertaking in the course of business. Indeed, before it was required of us, Fannie Mae announced that our CEO and Chief Financial Officer would sign and certify as to the honesty and accuracy of our financial statements, and we have a rigorous review process to ensure that.
>
> As a CEO, one of the most offensive things about the corporate scandals that emerged recently was to hear the CEOs claim that they did not know, they could not know, and they could not be

expected to know about the activities that brought down their companies.

*Id.* at 6.

244. Further, in their letter to shareholders, as in past years, Howard and Spencer

stated:

> The management of Fannie Mae is responsible for the preparation, integrity, and fair presentation of the accompanying financial statements and other information appearing elsewhere in this report. In our opinion, the financial statements have been prepared in conformity with accounting principles generally accepted in the United States of America appropriate in the circumstances, and the other financial information in this report is consistent with such statements.

> \*    \*    \*

> The management of Fannie Mae is also responsible for maintaining internal control over financial reporting that provides reasonable assurance that transactions are executed in accordance with appropriate authorization, permits preparation of financial statements in conformity with accounting principles generally accepted in the United States of America, and establishes accountability for the assets of the corporation.

> Internal control over financial reporting includes controls for the execution, documentation, and recording of transactions, and an organizational structure that provides an effective segregation of duties and responsibilities. Fannie Mae has an internal Office of Auditing whose responsibilities include monitoring compliance with established controls and evaluating the corporation's internal controls over financial reporting. Organizationally, the internal Office of Auditing is independent of the activities it reviews.

> \*    \*    \*

> Management recognizes that there are inherent limitations in the effectiveness of any internal control environment. However, management believes that, as of December 31, 2002, Fannie Mae's internal control environment, as described herein, provided reasonable assurance as to the integrity and reliability of the financial statements and related financial information.

2002 Annual Report at 122.

245.   The 2002 Annual Report was reviewed and approved by Raines, Howard, Spencer, Mudd, Gorelick, Ashe, Ashley, Bordonaro, Duberstein, Gerrity, Harvey, Justiz, Korologos, Malek, Marron, Mulcahy, Pickett, Segue, and Swygert. The document was prepared in substantial part by, and contains signatures of, Raines, Howard and Spencer. All of these Defendants knew, or recklessly disregarded, that the foregoing statements, as well as the financial statements (including notes), in the 2002 Annual Report were materially false and misleading for the reasons set forth below in Section VIII, Falsity of Defendants' Statements Concerning Fannie Mae.

**R.    The 2002 10-K**

246.   On March 31, 2003, Fannie Mae filed its first annual report on Form 10-K with the SEC, for the year ended December 31, 2002 (the "2002 10-K"). Like the 2002 Annual Report, the 2002 10-K reported net income of $4.619 billion; EPS of $4.53; total taxable-equivalent revenues of $11.896 billion; total assets of $887.515 billion; and total liabilities of $871.227 billion. Fannie Mae stated that its reported results were based on GAAP, which include the effects of SFAS 133.

247.   The 2002 10-K contained the same financial statements as the 2002 Annual Report. Those statements were materially false and misleading for the reasons set forth above with respect to the 2002 Annual Report.

248.   Defendants Raines, Howard, Spencer, Ashe, Ashley, Bordonaro, Duberstein, Gerrity, Gorelick, Harvey, Justiz, Korologos, Malek, Marron, Mudd, Mulcahy, Pickett, Segue, and Swygert signed the 2002 10-K.

249.   Further, Defendants Raines and Howard each signed certifications in their capacities as CEO and CFO, respectively (the "2002 10-K Certifications"), stating the following:

1.  I have reviewed this annual report on Form 10-K of Fannie Mae (formally, the Federal National Mortgage Association);

2.  Based on my knowledge, *this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the periods presented in this annual report*;

3.  Based on my knowledge, *the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report*;

4.  The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures    . . . for the registrant and have:

    a.  *designed such controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;*

    b.  *evaluated the effectiveness of the registrant's disclosure controls and procedures* as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and

    c.  presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.  The registrant's other certifying officers and I *have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors . . . :*

    a.  *all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data* and have identified for the registrant's auditors any material weaknesses in internal controls; and

    b.  *any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and*

90

6.      The registrant's other certifying officers and I have indicated in this annual report whether there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

(emphasis added).

250.    Raines and Howard knew, or recklessly disregarded, that because the 2002 10-K was materially false and misleading as alleged above, the statements in the 2002 10-K Certifications that the "report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" were also materially false and misleading.

251.    Further, Raines and Howard knew, or recklessly disregarded, that because Fannie Mae did not comply with GAAP, as set forth above, the statements in the 2002 10-K Certifications that "the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report," were also materially false and misleading.

252.    In addition, Raines and Howard knew, or recklessly disregarded, that because Fannie Mae had not established an adequate internal controls system to ensure that accounting policies were appropriately developed, implemented and reviewed, and/or to ensure the accuracy of the Company's financial reporting as set forth above, the statements contained in paragraphs 4, 5 and 6 of the 2002 10-K Certifications, as set forth above, were also materially false and misleading.

### S.    The Registration Statement

253.    Fannie Mae filed its General Form for Registration of Securities Pursuant to Section 12(b) or (g) of the Securities Exchange Act of 1934 on Form 10 with the SEC on March 31, 2003.  Raines signed the Registration Statement.

254.    Fannie Mae incorporated the 2002 10-K by reference and attached it as an exhibit to the Registration Statement.  Accordingly, the Registration Statement was materially false and misleading because the 2002 10-K was materially false and misleading.

### T.    April 15, 2003 8-K

255.    On April 14, 2003, the Individual Defendants caused Fannie Mae to issue a press release announcing its financial results for the quarter ended March 31, 2003 (the "April 14, 2003 Press Release"), which was filed with the SEC on April 15, 2003 as an exhibit to a Form 8-K signed by Spencer (the "April 15, 2003 8-K").

256.    In the April 14, 2003 Press Release, Fannie Mae reported net income of $1.941 billion and diluted EPS of $1.93 for the first quarter of 2003.  Further, Fannie Mae stated that its reported results were based on GAAP, which include the effects of SFAS 133.

257.    Defendants knew, or recklessly disregarded, that the foregoing statements were materially false and misleading for the reasons set forth below in Section VIII, Falsity of Defendants' Statements Concerning Fannie Mae.

258.    In the press release, Raines continued to portray Fannie Mae as a conservative and stable investment, stating that "Fannie Mae recorded extremely strong and balanced growth during the first quarter of 2003, continuing a record of financial performance that few other companies have matched."  These statements were materially false and misleading because Fannie Mae's "record of financial performance" and growth during the first quarter of 2003 were only achieved through accounting fraud.

U.  **The 2003 Proxy**

259.  Fannie Mae filed its definitive proxy for 2003 on Form 14A with the SEC on April 17, 2003 (the "2003 Proxy").  The 2003 Definitive Proxy, which was mailed to stockholders on or about April 14, 2003, was reviewed and approved by, and issued under the name of, the Board.  At that time, the Board consisted of Raines, Mudd, Ashe, Ashley, Bordonaro, Duberstein, Gerrity, Harvey, Justiz, Korologos, Malek, Marron, Pickett, Segue and Swygert.

260.  Fannie Mae stated the following with regard to its compensation philosophy:

> Because of the scope and complexity of Fannie Mae's activities and the importance of its mission, it is imperative that the corporation always be in a position to attract and retain the best possible talent.  To this end, Fannie Mae's Board of Directors has adopted a compensation policy designed to help the corporation compete with other large, sophisticated financial services companies for the talent Fannie Mae needs.
>
> In formulating and implementing Fannie Mae's compensation philosophy, the Board of Directors, through its Compensation Committee, also has carefully considered its statutory obligations under the Fannie Mae Charter Act (the "Charter Act").  The Charter Act states that the Board of Directors shall pay its executive officers compensation which the Board determines to be "reasonable and comparable with compensation for employment in other similar businesses (including other publicly held financial institutions or major financial services corporations) involving similar duties and responsibilities."  Moreover, the Charter Act requires that "a significant portion of potential compensation of all executive officers . . . of [Fannie Mae] shall be based on the performance of [Fannie Mae]."  *The Compensation Committee has based its compensation philosophy on these statutory requirements and has established review processes to ensure that this philosophy is implemented rigorously and carefully.*
>
> Accordingly, the central tenets of Fannie Mae's compensation philosophy are pay for performance and comparability.  Pay for performance is reflected strongly in the structure of Fannie Mae's compensation programs.  It is the core principle underlying the programs.  Other than base salary, all major elements of Fannie Mae's compensation program for the most senior members of the

executive officer group are tied to annual and long-term performance goals . . .

The company's executive compensation program has three primary tools: base salary, an annual bonus award, and variable long-term incentive stock awards. The program ties a large portion of each officer's total compensation to performance over different time periods. To achieve a balanced result, Fannie Mae's pay for performance approach provides a cash payment for achieving annual financial goals and stock based awards for medium and long-term performance generating increases in shareholder returns. This program is expressly designed not to put too much reliance on any one form of compensation . . .

Annual Incentive Plan. *The Annual Incentive Plan puts a portion of each executive officer's annual compensation at risk.* Financial goals established by the Board at the beginning of the year and achievement against these goals determine the funding of the bonus pool from which the actual bonuses are paid. *For 2002, the corporate financial goal was an aggressive earnings per share ("EPS") growth measure that Fannie Mae exceeded.*

2003 Definitive Proxy at 16-17 (emphasis added).

261. Defendants knew, or recklessly disregarded, that these statements were materially false and misleading. While Defendants claimed that Fannie Mae had "established review processes to ensure" that its compensation philosophy was "implemented rigorously and carefully," Defendants, as set forth more fully above, in reality manipulated the Company's recording of expenses to achieve EPS that would ensure its executives received the maximum possible bonuses. Moreover, a portion of each executive's annual compensation was never truly "at risk" because, as set forth at length above, Defendants could (and did) manipulate the Company's recording of expenses to achieve EPS that would ensure they received the maximum possible bonuses. Additionally, the statement that Fannie Mae exceeded its EPS goal for 2002 was materially false and misleading because Fannie Mae "exceeded" that goal only by manipulating its accounting in violation of GAAP.

94

V.    **The May 2003 10-Q**

262.    On May 15, 2003, Fannie Mae filed its Form 10-Q for the quarter ended March 31, 2003 with the SEC (the "May 2003 10-Q"), signed by Howard and Spencer. The May 2003 10-Q contained the Company's financial statements for the first quarter of 2003, reporting quarterly net income of $1.941, diluted EPS of $1.93, total revenue of $4.029 billion, total assets of $913.264 billion, and total liabilities of $895.360 billion. Fannie Mae stated that its reported results were based on GAAP, which include the effects of SFAS 133.

263.    Defendants knew, or recklessly disregarded, that the May 2003 10-Q and the financial statements contained therein were materially false and misleading for the reasons set forth below in Section VIII, Falsity of Defendants' Statements Concerning Fannie Mae.

264.    Further, the May 2003 10-Q contained certifications signed by Defendants Raines and Howard in their capacities as CEO and CFO, respectively (the "May 2003 10-Q Certifications"), stating the following:

1.    I have reviewed this quarterly report on Form 10-Q of Fannie Mae (formally, the Federal National Mortgage Association);

2.    Based on my knowledge, *this quarterly report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the periods presented in this quarterly report*;

3.    Based on my knowledge, *the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report*;

4.    The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures . . . for the registrant and we have:

a.    *designed such controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others*

> *within those entities, particularly during the period in which this quarterly report is being prepared;*
>
> b.  *evaluated the effectiveness of the registrant's disclosure controls and procedures* as of a date within 90 days prior to the filing date of this quarterly report (the "Evaluation Date"); and
>
> c.  presented in this quarterly report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;
>
> 5.  The registrant's other certifying officers and I *have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions)*:
>
> a.  *all significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data* and have identified for the registrant's auditors any material weaknesses in internal controls; and
>
> b.  *any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls;* and
>
> 6.  The registrant's other certifying officers and I have indicated in this quarterly report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

(emphasis added).

265. Raines and Howard knew, or recklessly disregarded, that because the May 2003 10-Q was materially false and misleading as alleged above, the statements in the May 2003 10-Q Certifications that the "report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" were also materially false and misleading.

96

266.    Further, Raines and Howard knew, or recklessly disregarded, that because Fannie Mae did not comply with GAAP, as set forth above, the statements in the May 2003   10-Q Certifications that "the financial statements, and other financial information included in this quarterly report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this quarterly report," were also materially false and misleading.

267.    In addition, Raines and Howard knew, or recklessly disregarded, that because Fannie Mae had not established an adequate internal controls system to ensure that accounting policies were appropriately developed, implemented and reviewed, or to ensure the accuracy of the Company's financial reporting, as set forth above, the statements contained in paragraphs 4, 5 and 6 of the May 2003 10-Q Certifications, as set forth above, were also materially false and misleading.

**W.    The June 17, 2003 Interview**

268.    As reported in *Business Week,* Raines gave an interview to Senior Writer Paula Dwyer on June 17, 2003 during which he discussed the Freddie Mac scandal (the "June 17, 2003 Interview"). *Frank Raines Takes On The Critics; Fannie CEO says its accounting practices aren't Freddie's,* Newsweek, June 30, 2003. Raines attempted to distinguish Fannie Mae from Freddie Mac, stating, "I don't know that much about how Freddie operates. But when it came to accounting for our derivatives, we spent millions of dollars on internal systems (and) we maintain strict control over what kind of derivatives can be used and our accounting for them. Everyone who has looked at it, from our external auditors to our regulators, found that we are doing this in a state-of-the-art way.  We are compulsive about managing risk."

269.    Raines knew, or recklessly disregarded, that these statements were materially false and misleading because, despite Fannie Mae's alleged "compuls[ion] about managing risk"

97

and its alleged "state-of-the art" accounting for derivative transactions, as set forth more fully above, the Company's accounting for its derivative transactions did not comply with GAAP.

### X.    The July 15, 2003 8-K

270.    On July 15, 2003, the Individual Defendants caused Fannie Mae to issue a press release announcing its results for the second quarter of 2003 (the "July 15, 2003 Press Release"). The July 15, 2003 Press Release was filed with the SEC on July 15, 2003 as an exhibit to a Form 8-K (the "July 15, 2003 8-K"), signed by Spencer.

271.    In the July 15, 2003 Press Release, Fannie Mae reported net income of $1.102 billion and diluted EPS of $1.09 for the second quarter of 2003. In addition, Fannie Mae stated that its reported results were based on GAAP, which include the effects of SFAS 133.

272.    Raines continued to portray Fannie Mae as a conservative and stable investment, stating, "Financial discipline is at the core of Fannie Mae's business. Our intent in updating our risk management strategies, and making them explicit to investors and policymakers, is to make as clear as possible that as we continue to carry out our housing mission in a growing mortgage market *our commitment to financial safety and soundness will be absolute.*" (emphasis added).

273.    Defendants knew, or recklessly disregarded, that these statements and the Company's reported financial results were materially false and misleading for the reasons set forth below in Section VIII, Falsity of Defendants' Statements Concerning Fannie Mae.

### Y.    The July 15, 2003 Conference Call

274.    On July 15, 2003, Howard presided over a conference call to discuss Fannie Mae's earnings for the second quarter of 2003 (the "July 15, 2003 Conference Call"). Conference call participants included numerous sell-side securities analysts, including representatives of Bear Stearns, Lehman Brothers, Morgan Stanley and Banc of America Securities.

275.    During the July 15, 2003 Conference Call, Howard boasted of Fannie Mae's achievements, noting:

> [L]ast quarter we posted another extremely strong set of financial results, once again, demonstrating our balance and disciplined strategies for growth.
>
> Our core earnings per share in the second quarter were $1.86, 20% above the second quarter of 2002. This means that for eight of the last nine quarters, our core EPS has been 20% or more above the comparable period the previous year.

276.    Defendant Howard knew, or recklessly disregarded, that these statements were materially false and misleading because, as set forth more fully above, Fannie Mae's "strong set of financial results," rather than "demonstrating [the Company's] balance and disciplined strategies for growth," was based on the fraudulent accounting scheme described herein. Further, the Company's reported EPS was materially overstated as a result of that scheme.

277.    Defendant Howard continued falsely to portray Fannie Mae as a safe investment, stating:

> Fannie Mae has a track record of exceptional risk management in the past and we now have set forth an even more ambitious public commitment to superior risk management going forward. Furthermore, we intend to maintain very high stand-alone credit ratings and *the goal we've set to have our long-term earnings growth be more stable than the median double A or triple A company should make our earnings dramatically more stable than the typical S&P 500 company overall.*
>
> *All of which makes for a very straightforward investment proposition.* A company that is likely to produce above average earnings growth with significantly lower than average uncertainty, and to do so with much higher than average credit quality, may before too much longer, be accorded a multiple that's considerably higher than half of what's bestowed on a typical S&P 500 company today.

(emphasis added).

278.    Defendant Howard knew, or recklessly disregarded, that these statements were materially false and misleading because, as set forth more fully above, he intended to create the illusion of "long-term earnings growth [which was] more stable than . . . the typical S&P 500 company overall" through the fraudulent accounting scheme described herein.    Moreover, Defendant Howard knew, or recklessly disregarded, that Fannie Mae was not a "straightforward investment proposition" but, rather, a house of cards built on the fraudulent accounting scheme described herein.

**Z.    The July 30, 2003 Conference Call**

279.    On July 30, 2003, Raines presided over a two-hour conference call with stock market analysts to discuss accounting irregularities that had been discovered at Freddie Mac (the "July 30, 2003 Conference Call").    Raines used the July 30, 2003 Conference Call to further his agenda of bolstering Fannie Mae's reputation, falsely representing that the Company had not engaged in improper accounting practices similar to those uncovered at Freddie Mac.

280.    At the outset of the Call, Raines indicated that Fannie Mae had no apprehension concerning OFHEO's investigation of Fannie Mae, stating:

> We welcome the review by OFHEO, because we have a great deal of confidence in our application of appropriate accounting principles.  And having just gone through the process of registering with the SEC, we have the benefit of having third parties look at our accounting policies and ask us detailed questions about them.  Out external auditor, KPMG, has always treated us as though we were an SEC registrant, and has applied those standards throughout history.  So we feel quite comfortable with our accounting policies.

281.    Further, Raines represented that Fannie Mae "[did] not have any of the same issues" and [had] not had any of the same transactions" that OFHEO found problematic at Freddie Mac.  Moreover, Raines stated that Fannie Mae, presumably in contrast to Freddie Mac, had "applied quite conservative accounting principles."

282.    In addition, Raines chastised Freddie Mac for attempting to use SFAS 133 to smooth its earnings and falsely represented that Fannie Mae had engaged in no such impropriety. Raines stated: "[T]hat was the decision that Freddie Mac made to not simply adopt SFAS 133, but then to try to influence the impact of SFAS 133 on [Freddie Mac's] earnings. *I can tell you that at Fannie Mae we took no steps whatsoever to try to ameliorate the impact of SFAS 133. In fact we did just the opposite.*" (emphasis added).

283.    In support of his assertion that Fannie Mae endeavored to comply with SFAS 133, Raines stated: "We spent millions of dollars on new systems, hired new people, made sure our people were up on this very complicated accounting standard, so that they could apply it appropriately."

284.    Raines knew, or recklessly disregarded, that these statements were materially false and misleading because, as set forth more fully above and on page 84 and note 225 of the OFHEO Report, Fannie Mae's explicit policy in applying SFAS 133 was to minimize earnings volatility, leverage existing systems, and keep operating earnings simple. In fact, Fannie Mae did not properly apply SFAS 133, as alleged herein and as set forth in the OFHEO Report.

285.    In response to an audience member's question as to whether Fannie Mae had ever "used any accounting practices . . . that [had] either distorted [its] financial presentations or that might appear questionable if known to the public," Raines stated:

> With regard to Fannie Mae, *the question of the appropriateness of our accounting is something I'm quite focused on.* Because as an SEC registrant, I am required every quarter to personally certify that I believe that the financial statements that we provided and the information we provide with those financial statements fairly represents our financial condition. So I, every quarter, put my name on the line saying that these statements represent our financial results.

(emphasis added).

286.    In addition, during the July 30, 2003 Conference Call, one analyst asked Raines if "Fannie Mae used any accounting judgment that either its employees or its auditors considered debatable[.]" Raines categorically denied that Fannie Mae had made any "debatable" accounting judgments, stating:

> *The answer to that is clearly no. We have not. If we had, I would have violated the law in certifying our financial results. If we had, our auditors would be obligated to publicly do something about that.* So I do not think there is any question on that, of our taking any steps to subvert accounting. And I think that is an important thing to get across.

(emphasis added).

287.    Raines knew, or recklessly disregarded, that these statements were materially false and misleading. In fact, Raines had received a memorandum from Roger Barnes, Fannie Mae's Manager of Financial Accounting, almost a year earlier advising Raines of "serious financial improprieties" at Fannie Mae and warning that "the possible impact reaches hundreds of millions of dollars and possibly affects the integrity of current financial statements and those we will issue after beginning compliance with SEC reporting in 2003." Raines thus knew that at least one employee had considered Fannie Mae's accounting judgments to be "debatable," yet denied that such questions had been raised.

288.    Raines knew, or recklessly disregarded, that the statements made during the July 30, 2003 Conference Call regarding Fannie Mae's accounting practices in general (and its application of SFAS 133 in particular) were materially false and misleading because, as set forth more fully above, Fannie Mae's accounting practices violated GAAP in numerous respects as set forth more fully below in Section VIII, Falsity of Defendants' Statements Concerning Fannie Mae.

### AA.    The July 30, 2003 News Conference

289.    As reported in the *Washington Post* on July 31, 2003, Raines defended Fannie Mae's accounting practices in the wake of the Freddie Mac scandal during a news conference on July 30, 2003.   David H. Hilzenrath, *Fannie Mae Defends its Reputation; CEO Decries Confusion With Freddie Mac Woes*, Washington Post, July 31, 2003, at E1.   Raines is quoted as having stated, "I've jokingly said to friends that I now know what the definition of collateral damage is, and we have suffered a lot of that, I think unfairly . . . *Unlike Freddie Mac, we didn't do any of those things*." (emphasis added).   Further, Raines is quoted as having stated that Fannie Mae had "*not undertaken any transactions to distort our true financial condition*." (emphasis added).

290.    Raines knew, or recklessly disregarded, that these statements were materially false and misleading because Fannie Mae, despite his efforts to distinguish the Company from Freddie Mac, had undertaken transactions and used inappropriate accounting methods to distort its true financial condition, just as Freddie Mac had done.

### BB.    The August 2003 Form 10-Q

291.    On August 14, 2003, Fannie Mae filed its quarterly report for the quarter ended June 30, 2003 with the SEC on Form 10-Q (the "August 2003 10-Q").   Howard and Spencer signed the August 2003 10-Q.

292.    The August 2003 10-Q contained the Company's quarterly financial statements, reporting second quarter net income of $1.102 billion, diluted EPS of $1.09, total quarterly revenues of $4.365 billion, total assets of $923.795 billion, and total liabilities of $906.43 billion. Fannie Mae stated that its reported results were based on GAAP, which include the effects of SFAS 133.

293.    Defendants knew, or recklessly disregarded, that the August 2003 10-Q and the financial statements contained therein were materially false and misleading for the reasons set forth below in Section VIII, Falsity of Defendants' Statements Concerning Fannie Mae.

294.    The August 2003 10-Q also contained certifications signed by Defendants Raines and Howard in their capacities as CEO and CFO, respectively (the "August 2003 10-Q Certifications"), stating:

1.    I have reviewed this quarterly report on Form 10-Q of Fannie Mae (formally, the Federal National Mortgage Association);

2.    Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;*

3.    Based on my knowledge, the financial statements, and other financial information included in this report, *fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;*

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures . . . for the registrant and have:

a.    *designed such controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;*

*                *                *

c.    *evaluated the effectiveness of the registrant's disclosure controls and procedures* and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the

registrant's most recent fiscal quarter that has materially affected or is likely to materially affect, the registrant's control over internal control over financial reporting; and

5.    The registrant's other certifying officer and I have *disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors . . . :*

a.    *all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information*; and

b.    any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(emphasis added).

295.    Raines and Howard knew, or recklessly disregarded, that because the August 2003 10-Q was materially false and misleading as alleged above, the statements in the August 2003 10-Q Certifications that the "report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" were also materially false and misleading.

296.    Further, Raines and Howard knew, or recklessly disregarded, that because Fannie Mae did not comply with GAAP, as set forth above, the statements in the August 2003 10-Q Certifications that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report," were also materially false and misleading.

297.    In addition, Raines and Howard knew, or recklessly disregarded, that because Fannie Mae had not established an internal controls system to ensure that accounting policies

were appropriately developed and reviewed, as set forth above, the statements contained in paragraphs 4 and 5 of the August 2003 10-Q Certifications, as set forth above, were also materially false and misleading.

### CC.    The October 16, 2003 8-K

298.    On October 16, 2003, the Individual Defendants caused Fannie Mae to issue a press release announcing its results for the third quarter of 2003 (the "October 16, 2003 Press Release"). The October 16, 2003 Press Release was filed with the SEC on the same date as an exhibit to a Form 8-K (the "October 16, 2003 8-K"), signed by Spencer.

299.    In the October 16, 2003 Press Release, Fannie Mae reported net income of $2.666 billion and diluted EPS of $2.69 for the first quarter of 2003.

300.    Raines noted that Fannie Mae's disciplined growth strategies enabled it to succeed despite volatility in the fixed income markets, stating:

> Fannie Mae delivered outstanding financial results in the third quarter, driven by record business volume and portfolio growth. In a quarter marked by historic levels of volatility in the fixed income markets, our company continued to benefit from the disciplined strategies for growth that have resulted in consistently strong financial performance through a wide range of economic and financial environments.

301.    Defendants knew, or recklessly disregarded, that these statements were materially false and misleading because Fannie Mae's results were not based on its "disciplined strategies for growth," but, rather, on the fraudulent accounting scheme described herein.

302.    Moreover, Defendants knew, or recklessly disregarded, that the statements concerning the results for the third quarter 2003 as announced in the October 16, 2003 Press Release were materially false and misleading for the reasons set forth below in Section VIII, Falsity of Defendants' Statements Concerning Fannie Mae.

**DD.**    **The November 2003 10-Q**

303.    On November 14, 2003, Fannie Mae filed its quarterly report for the quarter ended September 30, 2003 with the SEC on Form 10-Q (the "November 2003 10-Q"). Howard and Spencer signed the November 2003 10-Q.

304.    The November 2003 10-Q contained the Company's quarterly financial statements for the third quarter of 2003, reporting quarterly net income of $2.666 billion, diluted EPS of $2.69, total quarterly revenues of $4.206 billion, total assets of $1.019171 trillion, and total liabilities of $1.001647 trillion. Fannie Mae stated that its reported results were based on GAAP, which include the effects of SFAS 133.

305.    Defendants knew, or recklessly disregarded, that the November 2003 Form 10-Q was materially false and misleading for the reasons set forth below in Section VIII, Falsity of Defendants' Statements Concerning Fannie Mae.

306.    Further, the November 2003 10-Q contained certifications signed by Defendants Raines and Howard (the "November 2003 10-Q Certifications"), stating the following:

> 1.    I have reviewed this quarterly report on Form 10-Q of Fannie Mae (formally, the Federal National Mortgage Association);
>
> 2.    Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report*;
>
> 3.    Based on my knowledge, the financial statements, and other financial information included in this report, *fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report*;
>
> 4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures . . . for the registrant and have:

a.  *designed such controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;*

\*    \*    \*

c.  *evaluated the effectiveness of the registrant's disclosure controls and procedures* and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

d.  disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected or is likely to materially affect, the registrant's control over internal control over financial reporting; and

5.  The registrant's other certifying officer and I have *disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors . . . :*

a.  *all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information*; and

b.  any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(emphasis added).

307.    Raines and Howard knew, or recklessly disregarded, that because the November 2003 10-Q was materially false and misleading as alleged above, the statements in the November 2003 10-Q Certifications that the "report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" were also materially false and misleading.

308.    Further, Raines and Howard knew, or recklessly disregarded, that because Fannie Mae did not comply with GAAP, as set forth above, the statements in the November 2003 10-Q Certifications that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report," were also materially false and misleading.

309.    Further, Raines and Howard knew or recklessly disregarded, that because Fannie Mae had not established an internal controls system to ensure that accounting policies were appropriately developed and reviewed, as set forth above, the statements contained in paragraphs 4 and 5 of the November 2003 10-Q Certifications, as set forth above, were also materially false and misleading.

### EE.    The January 21, 2004 8-K

310.    On January 21, 2004, the Individual Defendants caused Fannie Mae to issue a press release announcing its results for the fourth quarter of 2003 (the "January 21, 2004 Press Release"). The January 21, 2004 Press Release was filed with the SEC on the same date as an exhibit to a Form 8-K (the "January 21, 2004 8-K"), signed by Spencer.

311.    In the January 21, 2004 Press Release, Fannie Mae reported net income of $7.905 billion and diluted EPS of $7.91 for the fourth quarter of 2003. Further, Fannie Mae stated that its reported results were based on GAAP, which include the effects of SFAS 133.

312.    Defendants knew, or recklessly disregarded, that these statements were materially false and misleading for the reasons set forth below in Section VIII, Falsity of Defendants' Statements Concerning Fannie Mae.

**FF.    The January 21, 2004 Conference Call**

313.    Defendants Howard and Spencer presided over a conference call on January 21, 2004 to discuss Fannie Mae's earnings for the fourth quarter of 2003 (the "January 21, 2004 Conference Call"). Conference call participants included numerous sell-side securities analysts, including representatives of Prudential Securities, UBS, Credit Suisse First Boston, Lehman Brothers, Salomon Smith Barney, Bear Stearns and Piper Jaffray.

314.    Howard and Spencer continued to portray Fannie Mae as safe, financially sound, and in compliance with all relevant accounting standards. Howard stated that "[r]isk management continued to be a strength for us last year and we expect it will be a strength again this year." Spencer, in response to a question regarding the OFHEO investigation, stated that "we're very comfortable with our accounting."

315.    Howard and Spencer knew, or recklessly disregarded, that these statements were materially false and misleading because, despite their asserted confidence in Fannie Mae's risk management and accounting practices, the Company was engaged in numerous GAAP violations which caused its reported financial results to be materially inflated, as alleged herein.

**GG.    The 2003 10-K**

316.    On March 15, 2004, Fannie Mae filed its 10-K for the fiscal year ended December 31, 2003 (the "2003 10-K"), which was signed by Defendants Raines, Howard, Spencer, Ashe, Ashley, Bordonaro, Duberstein, Gerrity, Harvey, Justiz, Korologos, Malek, Marron, Mudd, Mulcahy, Pickett, Rahl, Segue, and Swygert.

317.    The 2003 10-K contained financial statements of Fannie Mae for 2003, reflecting net income of $7.905 billion; diluted EPS of $7.91; total revenue of $16.417 billion; total assets of $1.009569 trillion; and total liabilities of $987.196 billion. Further, Fannie Mae reported that, in 2003, its core net interest income grew by almost 20% to $10.5 billion; its guarantee fee

income rose 32.8% to $2.4 billion; and its core capital rose to $34.4 billion. Fannie Mae stated that its reported results were based on GAAP, which include the effects of SFAS 133.

318.    Defendants knew, or recklessly disregarded, that the foregoing statements and the financial statements in the 2003 10-K were materially false and misleading for the reasons set forth below in Section VIII, Falsity of Defendants' Statements Concerning Fannie Mae.

319.    Further, the 2003 10-K contained certifications signed by Defendants Raines and Howard in their capacities as CEO and CFO, respectively (the "2003 10-K Certifications"), stating:

1.    I have reviewed this annual report on Form 10-K of Fannie Mae (formally, the Federal National Mortgage Association);

2.    Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;*

3.    Based on my knowledge, the financial statements, and other financial information included in this annual report, *fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;*

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures . . . for the registrant and have:

a.    *designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;*

b.    *evaluated the effectiveness of the registrant's disclosure controls and procedures* and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

        c.     disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.     The registrant's other certifying officer and I have *disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors . . .:*

        a.     *all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and*

        b.     any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(emphasis added).

320.    Raines and Howard knew, or recklessly disregarded, that because the 2003 10-K was materially false and misleading as alleged above, the statements in the 2003 10-K Certifications that the "report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" were also materially false and misleading.

321.    Further, Raines and Howard knew, or recklessly disregarded, that because Fannie Mae did not comply with GAAP, as set forth above, the statements in the 2003 10-K Certifications that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report," were also materially false and misleading.

322.    Further, Raines and Howard knew, or recklessly disregarded, that because Fannie Mae had not established an internal controls system to ensure that accounting policies were appropriately developed and reviewed, as set forth above, the statements contained in paragraphs 4 and 5 of the 2003 10-K Certifications, as set forth above, were also materially false and misleading.

**HH.    The 2004 Proxy**

323.    Fannie Mae filed its definitive proxy for 2004 on Form 14A with the SEC on April 23, 2004 (the "2004 Proxy"). With respect to its corporate governance philosophy, Fannie Mae stated:

> Fannie Mae continually strives to attain best-in-class corporate governance and transparency. Fannie Mae puts a premium on upholding corporate governance principles of openness, integrity, responsibility and accountability, and believes that such principles are essential to the success and efficient operation of our business and the accomplishment of our mission.

2004 Proxy at 4.

324.    Defendants knew, or recklessly disregarded, that these statements were materially false and misleading because, as set forth more fully above and despite Fannie Mae's purported commitment to attaining "best-in-class corporate governance and transparency," Defendants were engaged in a pervasive, ongoing scheme of accounting fraud which had caused all of the Company's financial disclosures since at least 2001 to be materially false.

**II.    The 2003 Annual Report**

325.    On April 26, 2004, Fannie Mae issued its Annual Report to its investors (the "2003 Annual Report"). The 2003 Annual Report contained the same year-end financial statements as the 2003 10-K, which were materially false and misleading for the same reasons as discussed above with respect to the 2003 10-K.

326.    In addition, the 2003 Annual Report acknowledged "a series of computational errors in [its] application of new accounting rules for mortgage purchase commitments found in [its] October quarterly earnings press release." 2003 Annual Report at 5. Fannie Mae praised itself for having "promptly announced and corrected" the error, and to reassure investors that similar accounting mistakes would not be made in the future, Raines stated that "Fannie Mae *strives to make our accounting systems 100 percent error free*" and that it "continuously review[s] and update[s] [its] processes and procedures so that [it] can *meet and exceed the high standards of transparency and accuracy that [its] investors expect and deserve*." 2003 Annual Report at 5 (emphasis added). These statements were materially false and misleading, in light of the numerous GAAP violations which were ongoing at Fannie Mae and which were causing its reported financial results to be materially inflated.

327.    In the 2003 Annual Report, Fannie Mae again touted itself as a stable and conservative company. Raines stated: "Fannie Mae places a high premium on strong and consistent financial performance under all market conditions. The fact that we have been able to deliver strong results in both of the past two years, despite a soft economy and historic levels of interest rate volatility, is a testament to our disciplined growth model." 2003 Annual Report at 9. This statement was materially false and misleading because Fannie Mae's results in the past two years, rather than being a "testament to [its] disciplined growth model," were a product of the fraudulent accounting scheme described herein.

**JJ.    The April 19, 2004 Press Release**

328.    On April 19, 2004, the Individual Defendants caused Fannie Mae to issue a press release announcing its results for the first quarter of 2004 (the "April 19, 2004 Press Release"). The April 19, 2004 Press Release was filed with the SEC on the same date as an exhibit to a Form 8-K (the "April 19, 2004 8-K"), signed by Spencer.

329.    In the April 19, 2004 Press Release, Fannie Mae reported net income of $1.899 billion and diluted EPS of $1.90 for the first quarter of 2004. Further, Fannie Mae stated that its reported results were based on GAAP, which include the effects of SFAS 133.

330.    Defendants knew, or recklessly disregarded, that these statements were materially false and misleading for the reasons set forth below in Section VIII, Falsity of Defendants' Statements Concerning Fannie Mae.

### KK.    The May 2004 10-Q

331.    On May 10, 2004, Fannie Mae filed its quarterly report for the quarter ended March 31, 2004 with the SEC on Form 10-Q (the "May 2004 10-Q"). Howard and Spencer signed the May 2004 10-Q.

332.    The May 2004 10-Q contained the Company's financial statements for the first quarter of 2004, reporting first quarter net income of $1.899 billion, diluted EPS of $1.90, total revenues of $3.935 billion, total assets of $995.268 billion, and total liabilities of $974.463 billion. Fannie Mae stated that its reported results were based on GAAP, which include the effects of SFAS 133.

333.    Defendants knew, or recklessly disregarded, that the May 2004 10-Q and the financial statements contained therein were materially false and misleading, for the reasons discussed above with respect to the April 19, 2004 Press Release.

334.    Further, the May 2004 10-Q contained certifications signed by Defendants Raines and Howard in their capacities as CEO and CFO, respectively (the "May 2004 10-Q Certifications"), stating:

> 1.    I have reviewed this quarterly report on Form 10-Q of Fannie Mae (formally, the Federal National Mortgage Association);
>
> 2.    Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to*

*make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;*

3.    Based on my knowledge, the financial statements, and other financial information included in this annual report, *fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;*

4.    The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures . . . for the registrant and have:

    a.    *designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;*

    b.    *evaluated the effectiveness of the registrant's disclosure controls and procedures* and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    c.    disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.    The registrant's other certifying officer and I have *disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors . . .:*

    a.    *all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information;* and

    b.    any fraud, whether or not material, that involves management or other employees who have a significant·role in the registrant's internal control over financial reporting.

(emphasis added).

335.    Raines and Howard knew, or recklessly disregarded, that because the May 2004 10-Q was materially false and misleading as alleged above, the statements in the May 2004 10-Q Certifications that the "report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" were also materially false and misleading.

336.    Further, Raines and Howard knew, or recklessly disregarded, that because Fannie Mae did not comply with GAAP, as set forth above, the statements in the May 2004 10-Q Certifications that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report," were also materially false and misleading.

337.    In addition, Raines and Howard knew, or recklessly disregarded, that because Fannie Mae had not established an internal controls system to ensure that accounting policies were appropriately developed and reviewed, as set forth above, the statements contained in paragraphs 4 and 5 of the May 2004 10-Q Certifications, as set forth above, were also materially false and misleading.

**LL.    The July 21, 2004 Press Release**

338.    On July 21, 2004, the Individual Defendants caused Fannie Mae to issue a press release announcing its results for the second quarter of 2004 (the "July 21, 2004 Press Release"). The July 21, 2004 Press Release was filed on the same date as an exhibit to the Form 8-K, signed by Spencer.

339.    In the July 21, 2004 Press Release, Fannie Mae reported net income of $1.112 billion and diluted EPS of $1.10 for the second quarter of 2004. Fannie Mae stated that its reported results were based on GAAP, which include the effects of SFAS 133.

340.    Defendants knew, or recklessly disregarded, that these statements were materially false and misleading for the reasons set forth below in Section VIII, Falsity of Defendants' Statements Concerning Fannie Mae.

### MM.    The August 2004 10-Q

341.    On August 9, 2004, Fannie Mae filed its quarterly report for the quarter ended June 30, 2004 with the SEC on Form 10-Q (the "August 2004 10-Q"). Howard and Spencer signed the August 2004 10-Q.

342.    The August 2004 10-Q contained the Company's financial statements for the second quarter of 2004, reporting first quarter net income of $1.112 billion, diluted EPS of $1.10, total quarterly revenues of $3.6 billion, total assets of $989.341 billion, and total liabilities of $963.220 billion. Fannie Mae stated that its reported results were based on GAAP, which include the effects of SFAS 133.

343.    Defendants knew, or recklessly disregarded, that the August 2004 10-Q and the financial statements contained therein were materially false and misleading, for the reasons discussed above with respect to the July 21, 2004 Press Release.

344.    Further, the August 2004 10-Q contained certifications signed by Defendants Raines and Howard in their capacities as CEO and CFO, respectively (the "August 2004 10-Q Certifications"), stating:

> 1.    I have reviewed this quarterly report on Form 10-Q of Fannie Mae (formally, the Federal National Mortgage Association);
>
> 2.    Based on my knowledge, *this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to*

118

*make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;*

3.      Based on my knowledge, the financial statements, and other financial information included in this annual report, *fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;*

4.      The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures . . . for the registrant and have:

    a.      *designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;*

    b.      *evaluated the effectiveness of the registrant's disclosure controls and procedures* and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    c.      disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.      The registrant's other certifying officer and I have *disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors . . .:*

    a.      *all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information;* and

    b.      any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

(emphasis added).

119

345.    Raines and Howard knew, or recklessly disregarded, that because the August 2004 10-Q was materially false and misleading as alleged above, the statements in the August 2004 10-Q Certifications that the "report does not contain any untrue statement of material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report" were also materially false and misleading.

346.    Further, Raines and Howard knew, or recklessly disregarded, that because Fannie Mae did not comply with GAAP, as set forth above, the statements in the August 2004 10-Q Certifications that "the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report," were also materially false and misleading.

347.    In addition, Raines and Howard knew or recklessly disregarded, that because Fannie Mae had not established an internal controls system to ensure that accounting policies were appropriately developed and reviewed, as set forth above, the statements contained in paragraphs 4 and 5 of the August 2004 10-Q Certifications, as set forth above, were also materially false and misleading.

## VIII.    FALSITY OF DEFENDANTS' STATEMENTS CONCERNING FANNIE MAE

348.    Each of the statements identified in the foregoing Section VII, Defendants' False and Misleading Statements, including the financial statements contained in the Registration Statement and in all of the Company's Annual Reports and Forms 10-Q and 10-K during the Loss Period, were materially false and misleading because, *inter alia*:

        a.    The Company's earnings were misstated as a result of Defendants' deliberate misapplication of GAAP to minimize earnings fluctuations and conceal risk;

b.    Fannie Mae's financial statements did "present fairly, in all material respects," the Company's financial condition and results in conformity with GAAP;

c.    The Company's balance sheet accounts for mortgage related securities, loans (held for investment) and total assets, and the Company's income statement line items for interest income (mortgage and non-mortgage), interest expense, net income and earnings per share (basic and diluted), were misstated due to Defendants' errors in estimating the amortization rates of premiums, discounts, and deferred price adjustments on securities and loans in violation of SFAS 91;

d.    The Company's balance sheet accounts for mortgage related securities, non-mortgage related securities, total assets, accumulated other comprehensive income and total stockholders' equity were misstated as a result of Defendants' misapplication of SFAS 115 in classifying debt and equity securities as "held-to-maturity;"

e.    The Company's income statement line items for interest income, interest expense, net income, and earnings per share (basic and diluted) were misstated to the extent any misclassified debt and equity securities are reclassified to "trading" in the restated financials as a result of misapplications of SFAS 115;

f.    The Company's balance sheet accounts for mortgage related securities and total assets, and the Company's income statement line items for guaranty fee income, fee and other income (expense), net income and earnings per share (basic and diluted) were misstated due to Defendants' failure to record asset impairments on "buy-up" guaranty fees in violation of SFAS 115;

g.    The Company's balance sheet accounts for mortgage-related securities, total assets, accumulated other comprehensive income and total stockholders' equity, and its income statement figures for net income and earnings per share (basic and diluted) were misstated due to Defendants' improper accounting for dollar-roll repurchase agreements in violation of SFAS 140;

h.    The Company's balance sheet accounts for accrued interest receivable, total assets, accrued interest payable, other liabilities and total liabilities, and the Company's income statement line items for interest income (non mortgage related), interest expense (short term), administrative expenses, net income, and earnings per share (basic and diluted) were misstated as a result of the improper timing of income and expense recognition;

i.    Defendants failed to consolidate the results of its QSPEs on its own financial statements, as required by GAAP;

121

j.   Defendants incorrectly accounted for the Company's LIHTC investments;

k.   Defendants had not established an adequate internal control system to ensure (a) that accounting policies were appropriately developed, implemented, and reviewed, or (b) that the Company's financial statements were materially accurate;

l.   Defendants had established and maintained a corporate culture that emphasized stable earnings at the expense of accurate financial disclosures and compliance with GAAP;

m.   Fannie Mae's organizational structure did not provide an effective segregation of duties and responsibilities; and

n.   Fannie Mae's internal Office of Auditing was completely ineffective and lacked independence.

349.   In addition, each of the statements relating to the time period after January 1, 2001 identified in the foregoing Section VII, Defendants' False and Misleading Statements, was materially false and misleading because:

a.   Defendants applied accounting methods and practices that did not comply with SFAS 133 to the Company's derivative transactions and hedging activities;

b.   The Company did not properly document its hedging activity as required by SFAS 133; and

c.   The Company's balance sheet accounts for derivatives in gain positions, total assets, senior debt, derivatives in loss positions, total liabilities, accumulated other comprehensive income, and total stockholders' equity; the Company's income statement line items for interest income (mortgage portfolio), interest expense, purchased options expenses, net income and earnings per share (basic and diluted); and the line items on the Company's statement of cash flows for net income, purchased options expense within net cash provided by operating activities and net payments to purchase or settle hedge instruments within net cash provided by financing activities, were misstated as a result of Defendants' misapplication of hedge accounting under SFAS 133.

350.   Further, the following statements identified in the foregoing Section VII, Defendants' False and Misleading Statements, were materially false and misleading because the Company's balance sheet accounts for other assets and total assets, and the Company's income

statement line items for provision for losses or fee and other income (expense), net income, and earnings per share (basic and diluted) were misstated as a result of Defendants' improper accounting for transactions that failed to qualify as insurance under SFAS 5:

    a.    The April 15, 2002 Press Release;

    b.    The July 15, 2002 Press Release;

    c.    The October 15, 2002 Press Release;

    d.    The April 15, 2003 8-K;

    e.    The May 2003 10-Q;

    f.    The July 15, 2003 8-K;

    g.    The August 2003 10-Q;

    h.    The October 16, 2003 8-K;

    i.    The November 2003 10-Q;

    j.    The January 21, 2004 8-K;

    k.    The 2003 10-K;

    l.    The April 19, 2004 Press Release; and

    m.    The July 21, 2004 Press Release.

351.    Further, the following statements identified in the foregoing Section VII, Defendants' False and Misleading Statements, were materially false and misleading because the Company's balance sheet accounts for loans (held for investment), mortgage related securities, total assets, accumulated other comprehensive income and total stockholders' equity; the Company's income statement line items for interest income (mortgage portfolio), net income, and earnings per share (basic and diluted); and the line items on the Company's statement of cash flows for net income, purchased options expense within net cash provided by operating activities, and net payments to purchase or settle hedge instruments within net cash provided by

financing activities were misstated due to Defendants' misapplication of cash flow hedge accounting criteria for the Company's mortgage commitments under SFAS 149:

<blockquote>

a.   The October 16, 2003 8-K;

b.   The November 2003 10-Q;

c.   The January 21, 2004 8-K;

d.   The 2003 10-K;

e.   The April 19, 2004 Press Release; and

f.   The July 21, 2004 Press Release.

</blockquote>

## IX.   PLAINTIFFS' RELIANCE ON DEFENDANTS' FALSE STATEMENTS

352.   Plaintiffs' representatives participated in the Company's quarterly conference calls, and read the Company's press releases and Form 10-Q and 10-K filings (including the financial statements and notes thereto) promptly following their publication. Plaintiffs read and relied on the Company's financial statements, and relied on the accuracy and completeness of all of the Defendants' public disclosures, when making their investment decisions.

353.   Plaintiffs' investment decisions regarding Fannie Mae were based, in significant part, upon Plaintiffs' financial analysis of various line items from the Company's reported financial statements, including but not limited to: revenue, net income, interest income, guaranty fee income, fee and other income, purchased options expense, interest expense, administrative expense, loans held for investment, mortgage related securities, and stockholders' equity. Each of these items in the Company's financial statements were materially false, as alleged herein.

354.   Plaintiffs also relied on Defendants' statements throughout the Loss Period regarding the size of Fannie Mae's hedging portfolio, the nature of its derivative transactions, and the propriety of Defendants' accounting for those transactions. In the wake of the derivative accounting scandal at Freddie Mac, Plaintiffs relied heavily on Defendants' assurances that

Fannie Mae did not engage in the same types of transactions or have the same problems with derivative accounting as Freddie Mac.

355.    Because they (unlike the Individual Defendants) had no access to Fannie Mae's internal or non-public information, Plaintiffs did not know and had no way of knowing that the financial information upon which they were relying was materially false.  Nor did they have any reason to know that the Officer Defendants were untrustworthy, that the Defendants were improperly accounting for derivatives, or that the Company's revenues and other financial metrics were significantly weaker than what the financial statements indicated.  Had Plaintiffs known the truth, they either would not have purchased Fannie Mae securities at all, or would have done so only at substantially lower prices.

## X.    THE TRUTH BEGINS TO EMERGE, CAUSING PLAINTIFFS TO INCUR LOSSES

356.    OFHEO began investigating Fannie Mae in July 2003, after it uncovered an accounting scandal at Freddie Mac in mid-2003 that resulted in the ouster of Freddie Mac's CEO and the imposition of a $125 million civil fine.

357.    OFHEO investigated Fannie Mae for more than fifteen months before issuing its blistering 198 page report dated September 17, 2004, detailing widespread accounting fraud at Fannie Mae.  Before that date, Plaintiffs and other investors had no inkling that such fraud was occurring.  Indeed, all of Defendants' public statements had denied the existence of any problems at Fannie Mae like those at Freddie Mac.

358.    Falcon, the Director of OFHEO, sent a draft copy of the OFHEO Report to Fannie Mae's Board of Directors on September 20, 2004.  In his cover letter, Falcon stated:

> I am transmitting to you a report I have received on our findings to date.  *The findings raise such serious safety and soundness concerns that immediate action is warranted, rather than waiting until the completion of the full special examination.*

\*      \*      \*

[T]he report documents how Fannie Mae 1) applied accounting methods and practices that do not comply with GAAP in accounting for the enterprise's derivative transactions and hedging activities, 2) employed an improper 'cookie jar' reserve in accounting for amortization of deferred price adjustments under GAAP, 3) tolerated related internal control deficiencies, 4) in at least one instance deferred expenses apparently to achieve bonus compensation targets, and 5) maintained a corporate culture that emphasized stable earnings at the expense of accurate financial disclosures.

*These findings cannot be explained by mere differences in interpretation of accounting principles, but clear instances in which management sought to misapply and ignore accounting principles for the purposes of meeting investment analyst expectations; reducing volatility in reported earnings; and enabling fragmented processes and systems, and an ineffective controls environment to exist.*

(emphasis added).

359.    OFHEO released its damning *Report of Findings to Date: Special Examination of Fannie Mae* to the public on September 22, 2004.

360.    As detailed in the Report, OFHEO found that Fannie Mae had misapplied GAAP (specifically, SFAS 91 and SFAS 133) in all of its financial statements from January 2001 through the second quarter of 2004.  The OFHEO Report slammed Fannie Mae's accounting policies, noting:

The misapplications of GAAP are not limited occurrences, but are pervasive and reinforced by management. **The matters detailed in this report are serious and raise concerns regarding the validity of previously reported financial results, the adequacy of regulatory capital, the quality of management supervision, and the overall safety and soundness of the Enterprise.**

OFHEO Report at i (emphasis in original).

361.    OFHEO found that Fannie Mae management violated SFAS 91 by:

- deliberately developing and adopting accounting policies to spread estimated income or expense that exceeded predetermined thresholds over multiple reporting periods;

- establishing a materiality threshold for estimated income and expense, within which management could avoid making adjustments that would otherwise be required under SFAS 91;

- making discretionary adjustments to the financial statements, for the sole purpose of minimizing volatility and achieving financial results;

- forecasting and managing the future unrecognized income associated with misapplied GAAP;

- capitalizing reconciliation differences as "phantom" assets or liabilities and amortizing them at the same speeds as 30-year-fixed-rate mortgages;

- developing estimation methods that were inconsistently applied to retrospective and prospective amortization required by SFAS 91 for current and future periods;

- developing and implementing processes to generate multiple estimates of amortization with varying assumptions in order to select estimates that provided optimal accounting results;

- failing to properly investigate an employee's concerns regarding illogical or anomalous amortization results, along with that employee's further allegation of an intent to misstate reported income;

- tolerating significant weaknesses in internal controls surrounding the amortization process; and

- inappropriately deferring $200 million of estimated amortization expense in 1998, which had significant effects on executive compensation.

OFHEO Report at ii-iii.

362.  In addition, OFHEO found that Fannie Mae management had "implemented SFAS 133 in a manner that placed minimizing earning volatility and maintaining simplicity of operations above compliance with GAAP."  OFHEO Report at v.  Moreover, OFHEO "found that in many cases Fannie Mae [did] not assess and record hedge ineffectiveness as required by SFAS 133, and applie[d] hedge accounting to hedging relationships that [did] not qualify."  OFHEO Report at v.  As a consequence, OFHEO found that Fannie Mae's earnings were misstated.

363.  Further, OFHEO found that "Fannie Mae ha[d] applied the 'short cut' method, or the 'matched terms' method, for a broad range of hedge relationships where these methods [were] inappropriate."  OFHEO Report at v.  Accordingly, Fannie Mae's "accounting for offsetting derivatives was inappropriate through the end of 2003, because Fannie Mae incorrectly treated the original swap and the offsetting swap as perfect cash flow hedges and recorded changes in their fair value in accumulated other comprehensive income (AOCI), instead of earnings."  OFHEO Report at vi.  Again, OFHEO found that Fannie Mae's misapplication of SFAS 133 had caused its earnings to be misstated.

364.  In addition, "OFHEO identified a number of problems with Fannie Mae's hedge documentation."  OFHEO Report at vi.  OFHEO found that "[t]his lack of documentation and the ability to create such documentation retroactively is not only a[n] SFAS 133 violation, but is evidence of a poor control framework and is a significant safety and soundness problem."  OFHEO Report at vi.

365.  OFHEO also noted that Fannie Mae's efforts to correct "an error made in its accounting for changes in the time value and intrinsic value components of purchased interest rate caps" were ineffective because "Fannie Mae has incorrectly accounted for and reported this

error in its financial statements" and indicated that "[f]urther analysis is necessary to make a precise determination of the complete financial statement impact on all periods affected." OFHEO Report at vi.

366.    OFHEO noted that "[f]or derivatives not qualifying for hedge accounting, fair value changes should be reflected in earnings in the period in which the value change occurred . . . **The possible reclassification of such amounts into retained earnings could have a significant effect on Fannie Mae's regulatory capital.**"  OFHEO Report at vii (emphasis in original).

367.    Even more troubling than the accounting violations themselves, OFHEO found that Fannie Mae's management had created a corporate culture that enabled these serious and widespread accounting problems to go unchecked, noting:

> The problems relating to these accounting areas differ in their specifics, but they have emerged from a culture and environment that made these problems possible.  Characteristics of this culture include:
>
> - management's desire to portray Fannie Mae as a consistent generator of stable and growing earnings;
>
> - a dysfunctional and ineffective process for developing accounting policies;
>
> - an operating environment that tolerated weak or non-existent controls;
>
> - key person dependencies and poor segregation of duties;
>
> - incomplete and ineffective reviews by the Office of Auditing;
>
> - an inordinate concentration of responsibility vested with the Chief Financial Officer; and

- an executive compensation structure that rewarded management for meeting goals tied to earnings-per-share, a metric subject to manipulation by management.

OFHEO Report at i.

368.    OFHEO found that Fannie Mae management, far from being innocent bystanders, "intentionally developed accounting policies and selected and applied accounting methods to inappropriately reduce earnings volatility and to provide themselves with inordinate flexibility in determining the amount of income and expense recognized in any accounting period." OFHEO Report at ii.

369.    OFHEO also found that Fannie Mae management "failed to establish an internal control system to ensure that accounting policies [were] appropriately developed and reviewed." OFHEO Report at vii.   This failure made the accounting scandal at Fannie Mae virtually inevitable.

370.    During testimony before the Congressional Subcommittee on Capital Markets, Insurance, and Government Sponsored Enterprises on October 6, 2004, Falcon made clear just how seriously OFHEO was treating Fannie Mae's incorrect accounting:

> *Let me state plainly that Fannie Mae's accounting was just wrong,* and must be fixed properly.  The stakes are too high to just forgive past sins.  *If any company, especially a government sponsored enterprise, is allowed to get away with this type of accounting misconduct, then no regulator can do its job and no investor is safe.*  A regulator and an investor must be able to trust the books and records of a company.

(emphasis added).

371.    Further, Falcon condemned Fannie Mae for standing behind what OFHEO deemed clear violations of straightforward accounting principles:

| Congressman Castle: | . . . Could this be another example of just a difference of opinion as to the application of GAAP . . . [o]r is it something else? |
|---|---|
| Mr. Falcon: | We feel strongly that these are black and white accounting issues. These are not issues of interpretation. They are not issues where reasonable people can disagree. We have taken prompt, strong action in trying to deal with this because *we do think they were clear violations of accounting principles.* |

(emphasis added).

372.    Finally, Falcon unequivocally stated that OFHEO believed Fannie Mae had engaged in willful violations of GAAP:

| Congressman Oxley: | . . . Is it your understanding that Fannie was aware of the fact that their accounting was not GAAP compliant, but they chose not to comply because, to do so, would be too burdensome and costly? Or is it your opinion that Fannie Mae made a material misapplication of the GAAP rules? |
|---|---|
| Mr. Falcon: | I think it is both, Mr. Chairman. One, they wanted to maintain the accounting principles that they thought were best suited to the company. At the same time, they willfully did not apply accounting rules properly. This is an important point because it was not just a matter of these rules being too complex for this large, sophisticated company. *They understood the rules. They chose not to follow them.* |

(emphasis added).

373.    Immediately following the release of the OFHEO Report, the price of Fannie Mae's stock began to plummet. By the close of trading on September 22, 2004, the day the OFHEO Report was released to the public, Fannie Mae stock had dropped to $70.69 per share

(on a trading volume of 17,700,500 shares), down from $75.65 per share (on a trading volume of 2,643,300 shares) the day before the announcement.

374.    Fannie Mae stock continued to fall throughout the month of September 2004, closing at $63.40 a share (on a trading volume of 16,314,500 shares) on September 30, 2004. This stock drop translated into an $11.8 billion loss in market capitalization within the first eight days of the release of the OFHEO Report (dropping from approximately $73.2 billion as of September 21, 2004 down to $61.4 billion as of September 30, 2004).

375.    In addition to losing $11.8 billion in market capitalization, Fannie Mae came under attack from a variety of government entities in the weeks following the release of the OFHEO Report.

376.    On October 6, 2004, the U.S. Attorney's Office for the District of Columbia opened a criminal investigation against Fannie Mae and directed it to preserve certain documents, including documents relating to the matters discussed in the OFHEO Report.

377.    On October 12, 2004, Fannie Mae reported in a Form 8-K filed with the SEC that it had been informed of eight lawsuits that were either being prepared or had already been filed against it, Raines, Howard, and various of its other officers alleging violations of the federal securities laws in connection with the accounting policies and practices discussed in the OFHEO Report.  Further, Fannie Mae reported that the Attorney General of Ohio had announced a preliminary inquiry into the matters set forth in the OFHEO Report on behalf of Ohio's public pension funds.

378.    On October 19, 2004 the SEC informed Fannie Mae that it had opened a formal investigation relating to the matter sets forth in the OFHEO report.

379.    The Company announced on November 15, 2004 that it would not file the required 2004 third quarter financial report with the SEC by the November 15, 2004 deadline because KPMG was unable to complete its review of Fannie Mae's interim unaudited financial statements for that quarter.

380.    On December 15, 2004, Donald T. Nicolaisen, Chief Accountant for the SEC, announced the results of the SEC's review of Fannie Mae's accounting practices. The SEC found that Fannie Mae's accounting practices from 2001 through the second quarter of 2004 did not comply with SFAS 91 and SFAS 133, stating:

> Regarding [SFAS] No. 91 ... Fannie Mae failed to record timely adjustments to the recorded amount of its loans based on changes in the estimated speed with which those loans would be prepaid....
>
> It also appears that, contrary to [SFAS] 91, Fannie Mae recognized adjustments to the carrying amount of its loans only if they exceeded a self-defined materiality limit, referred to as a "precision threshold."
>
> Regarding [SFAS] 133, one of the principles underlying the statements is that derivative instruments are to be recorded at their fair value with changes in fair value reported in earnings. If certain hedge criteria are met, however, [SFAS] 133 affords special accounting for the hedge relationship. If the specific hedging requirements are not met, then the special hedge accounting is not appropriate.
>
> Fannie Mae internally developed its own unique methodology to assess whether hedge accounting was appropriate. Fannie Mae's methodology, however, did not qualify for hedge accounting because of deficiencies in its application of [SFAS] 133. Among other things, Fannie Mae's methodology of assessing, measuring, and documenting hedge ineffectiveness was inadequate and was not supported by [SFAS 133].

381.    Based on its findings, the Office of the Chief Accountant of the SEC ordered the Company to restate its financial statements filed with the SEC to eliminate the use of hedge

accounting, and to correct any material misstatements that resulted from non-compliance with SFAS 91.

382.    Faced with the reality that the Company's accounting improprieties had been discovered, Fannie Mae's Audit Committee announced on December 17, 2004 that all of the Company's financial statements for fiscal years 2001, 2002, 2003 and the first two quarters of 2004 were prepared applying accounting practices that did not comply with GAAP and should no longer be relied upon. Fannie Mae subsequently announced on December 22, 2004 that it would restate its financial results for 2001, 2002, 2003 and the first two quarters of 2004.

383.    Fannie Mae's announcement that it plans to restate its financial results for 2001, 2002, 2003 and the first two quarters of 2004 constitutes an admission that the representations made in the original financial statements and other financial information contained in the Company's SEC filings concerning the compliance of those financial statements with GAAP were materially false and misleading when made. Under GAAP, financial statements are to be restated *only* when the facts that necessitate the restatement were material and known or knowable at the time the financial statements were originally issued.

384.    At the time of its December 22, 2004 announcement, Fannie Mae estimated that a loss of hedge accounting under SFAS 133 for all derivatives could result in its recording into earnings of a net cumulative loss on derivative transactions of approximately $9 billion as of September 30, 2004. Further, Fannie Mae stated that there would be a corresponding decrease in retained earnings and, accordingly, regulatory capital. Finally, Fannie Mae stated that it expected that the impact of these restatements would be material to its reported financial and core business results for many, if not all, of the periods at issue.

385.    In the wake of the scandal, on December 21, 2004, Raines announced his retirement.  Raines acknowledged that his early retirement was motivated by the accounting fraud, stating: "I previously stated that I would hold myself accountable if the SEC determined that significant mistakes were made in the Company's accounting . . . By my early retirement, I have held myself accountable."

386.    The same day, Howard announced his resignation and the Board's Audit Committee announced that it had dismissed KPMG as the Company's independent auditor.

387.    Spencer announced her resignation on January 17, 2005.

388.    On January 19, 2005, Fannie Mae announced that it would cut its quarterly dividend in half to save $1 billion a year to help it amass a required additional $12.5 billion of capital.  Fannie Mae's stock dropped $3.50 a share in response to this announcement, declining from its close at $69.70 the day before the announcement to a close at $66.20 the day after the announcement.

389.    On February 9, 2005, SEC Chief Accountant Donald Nicolaisen testified before the Congressional Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises concerning the SEC's findings regarding Fannie Mae's accounting practices.  He made clear that it was the SEC's view that Fannie Mae's accounting errors could not merely be "chalked up" to differences of opinion regarding the application of unduly complex regulations:

| Chairman Baker: | In your finding, it appears that the accounting methodology was not just an aberrant act.  It wasn't with regard to a single transaction.  It wasn't with regard to a single quarter.  It wasn't with regard to an annual statement.  It was year-over-year practice, is that correct? |
| --- | --- |
| Mr. Nicolaisen: | With respect to the two issues that we looked at [namely, SFAS 91 and SFAS |

| | |
|---|---|
| | 133], they were across all of the years that I referred to 2001 through 2004. |
| Chairman Baker: | Some have suggested that this could have been what is discussed as an interpretive judgment: Two artists looking at the same picture would see two different things. In your view of the findings and the determinations made, was this just a matter of interpretive judgment where two people could have come to varying conclusions, or was this clearly outside professional accounting standards? |
| Mr. Nicolaisen: | *In my view, it was outside professional* accounting standards. |
| Chairman Baker: | Is it so difficult for a public operating company to comply with [SFAS] 91 and 133 that it is pattern and practice within the rest of the public operating company world that companies just don't get it right? Or are there other companies out there who, in your view, do find appropriate manner in which to comply with the rules as you see them? |
| Mr. Nicolaisen: | Well, I believe that other companies are complying with Statements 91 and 133. I have reason to believe that the standards are workable and are being followed. |
| Chairman Baker: | It may be difficult, but as a matter of customary practice, accountants and CPAs in public operating companies across the country do conform with your rules on a day-to-day basis? |
| Mr. Nicolaisen: | Yes. |

(emphasis added).

390.    Further, Mr. Nicolaisen testified that, while SFAS 91 and 133 may contain areas of complexity, Fannie Mae had violated "very crystal-clear rules" with respect to its hedging activities:

136

| | |
|---|---|
| Congresswoman Biggert: | Some have said that [SFAS] 91 and [SFAS] 133 are overly complex accounting standards. Do you think that is a fair statement? |
| Mr. Nicolaisen: | Well, I tried to address that a bit with Mr. Kanjorski. The statements are long. They do have a lot of attendant and interpretive guidance that is provided with it. The reasons for that, I don't think, are because the statement is particularly complex. I think it is because the business world has reasonably complex transactions and iterative developments of different products sometimes require new interpretations. The basic principle is pretty straightforward. As I described, [derivative instruments] are recorded at fair-- in the financial statements, derivative instruments that bear value with adjustments running through the income statement. The exception to that is for hedging. *And where hedging is required, the hedging rules are straightforward, clear. Each company will have some interpretive aspects, no doubt, that they would have to deal with to various degrees as they apply, but I think they are very crystal-clear rules.* |

(emphasis added).

391. On February 23, 2005, Fannie Mae announced and reported on a Form 8-K that OFHEO had notified its Board of Directors and management of additional accounting and internal control issues that had arisen during its ongoing investigation. Specifically, OFHEO identified issues relating to Fannie Mae's application of the following accounting standards:

- SFAS 115, *Accounting for Certain Investments in Debt and Equity Securities;*

- SFAS 65, *Accounting for Certain Mortgage Banking Activities;*

- SFAS 140, *Accounting for Transfers and Servicing of Financial Assets and Extinguishment of Liabilities;*

- SFAS 46, *Consolidation of Variable Interest Entities, an Interpretation of Accounting Research Bulletin No. 51;*

- SFAS 149, *Amendment of Statement 133 on Derivative Instruments and Hedging Activities;* and

- SFAS 91, *Accounting for Nonrefundable Fees and Costs Associated with Originating or Acquiring Loans and Initial Direct Costs of Leases.*

392.    Fannie Mae disclosed that the proper application of SFAS 149 alone could cause it to record an estimated net cumulative after-tax loss of $2.4 billion as of December 31, 2004. Fannie Mae's stock dropped by almost $1 per share in response to this announcement, down from its close at $57.80 the day before the announcement to its close at $56.95 the day after the announcement.

393.    In light of these additional problems, Fannie Mae announced on March 17, 2005 that it would not be able to file its Form 10-K for the year ended December 31, 2004. The March 17, 2005 announcement had an immediate negative affect on Fannie Mae's stock price, which dropped from its close on March 16, 2005 at $56.95 a share (on a trading volume of 5,257,500 shares) to its close on March 17, 2005 at $54.50 (on a trading volume of 16,207,400 shares).

394.    On April 6, 2005, Falcon again testified before the Subcommittee on Capital Markets, Insurance and Government Sponsored Enterprises, this time to address the additional accounting errors OFHEO had identified during its ongoing investigation as disclosed by Fannie Mae on February 23, 2005. Falcon testified that the additional accounting errors, like those initially uncovered by OFHEO, were not mere mistakes but, rather, willful violations of accounting rules. Moreover, to the extent Fannie Mae's accounting policies were GAAP-compliant, the Company's personnel simply disobeyed the rules:

> OFHEO's special examination of Fannie Mae has revealed a significant number of new accounting problems at the enterprise. As with previous accounting problems, they reflect Fannie Mae's tendency towards overly aggressive interpretation of GAAP, or, in

> certain instances, *a willful disregard of accounting rules. They
> also reflect situations where Fannie Mae's accounting policies
> actually comply with GAAP, but enterprise personnel have failed
> to follow those policies.*

(emphasis added).

395.    Falcon reinforced the role poor internal controls played in permitting Defendants

to perpetrate the fraud described herein and cautioned of the significance of these deficiencies.

In response to a question from Congressman Kanjorksi concerning the significance of these

defects, Falcon testified:

> I view the weaknesses in internal controls as very significant. As
> you know, there are many examples in history where lapses in
> internal controls have brought down large old financial institutions
> almost overnight. Barings Bank is one example of how internal
> controls can bring down a company, even a well-capitalized
> company. So lapses in internal controls, even though we often
> speak of them after the accounting issues, I think, are just as, if not
> more, serious than the accounting problems.

396.    To demonstrate just how deep the failures ran, Falcon testified that OFHEO had

uncovered an instance in which Fannie Mae's "internal controls," or lack thereof, had permitted

an employee to make a change in an accounting formula that resulted in the improper reporting

of one billion dollars on Defendants' watch:

> I think [the internal control weaknesses] were substantial. I do
> think they were because there were almost no controls in some
> instances. There was one example where one employee was
> allowed, through the lack of internal controls, to make a change in
> an accounting formula on the spreadsheet that resulted in an
> improper reporting of a billion dollars. It is that type of lack of
> controls that concern me. With proper internal controls, one
> employee could not go and make those changes without a couple
> of layers of verification before changes like that are made.

397.    Falcon also testified that OFHEO had uncovered numerous problems involving

the Company's procedures for preparing, reviewing, validating, authorizing, and recording

journal entries, including falsification of signatures on journal entries; failure to require that

preparers of journal entries understand the purpose of the entries; failure to require supporting documentation for journal entries; lack of independent review of journal entries; and the absence of written policies concerning journal entry procedures. According to Falcon, one Fannie Mae employee had revealed that from 1999 through 2002, his/her signature had been forged on post-closing journal entries relating to amortization.

398.    On May 11, 2005, Fannie Mae announced that it would be unable to file its Form 10-Q for the quarter ended March 31, 2005.

399.    On August 9, 2005, Fannie Mae announced that it similarly would be unable to file its Form 10-Q for the quarter ended June 30, 2005. Further, Fannie Mae announced that it would not complete its restatement of billions of dollars in previously reported earnings until the second half of 2006. Fannie Mae stock dropped following the August 9, 2005 announcement from its close at $54.83 (on a trading volume of 2,774,700 shares) on August 9, 2005 to its close at $52.64 (on a trading volume of 8,485,200 shares) on August 10, 2005.

400.    On September 28, 2005, Fannie Mae's stock price fell to an eight-year low of $41.71 – a 44.8% decrease from its $75.65 closing on September 21, 2004 – after Dow Jones reported that the Company's internal investigation (headed by former U.S. Senator Warren Rudman) had revealed "new and pervasive accounting violations," in addition to those previously reported. Dow Jones reported that persons "close to, or who have been involved" in the investigation had indicated that Company executives had inflated Fannie Mae's earnings by overvaluing assets, underreporting credit losses, and misusing tax credits, including by purchasing "finite insurance policies" to hide earnings losses after they were incurred.

401.   On November 10, 2005, Fannie Mae filed a Form 12b-25 with the SEC confirming the discovery of the additional accounting violations referenced in the September 28, 2005 Dow Jones report.

## XI.    THE OFFICER DEFENDANTS' SCIENTER

402.   Throughout the Loss Period, the Officer Defendants intentionally, or at the very least recklessly, made materially false and misleading statements regarding Fannie Mae's financial condition, as alleged herein.

403.   The Officer Defendants had actual knowledge of serious misconduct and internal control deficiencies in the Company's Controller's division – which had responsibility for the Company's accounting and financial reporting.  For example, in September 2002, Barnes sent Raines and Howard an inter-office memorandum, which Spencer also received, advising them of the following accounting problems, which Barnes stated would affect the Company's reported financials:

- Reconciliation differences from systems were being input as future deferrals instead of the current period's income and expenses;

- The Controller's division was intentionally limiting the AIMS system capabilities so that it would not provide audit trails for modeling;

- The Controller's division had a practice of using negative factors in amortization and allowed amortization to exceed 100%;

- The Controller's division routinely understated and overstated income;

- The Controller's division managed income to meet the Company's desired objectives;

- The Controller's division used "on-top" entries in order to manage income and margin calculations;

- The Company was using a miscellaneous balance sheet account in order to manage reporting of income in periods other than when it was received; and

- There were serious problems with the amortization of purchase discounts and premiums, and that "the possible impact reaches hundreds of millions of dollars and possibly affects the integrity of the current financial statements, and those [the Company] will issue after beginning compliance with SEC reporting in 2003."

404.    Barnes urged Raines and Howard to investigate these prophetic deficiencies, but they and Spencer simply ignored them.

405.    Howard's intentional misconduct also included, *inter alia*: (a) authoring and enforcing improper accounting practices and demanding that Fannie Mae's employees misapply GAAP in order to mask the effect of market volatility on the Company's financials; (b) assuming tight controls over Fannie Mae's accounting policies and procedures when his decisions should have been vetted with others at Fannie Mae; and (c) failing to establish adequate internal controls which he admitted was his responsibility to do.

406.    During the Loss Period, Raines and Howard signed each of Fannie Mae's Annual Reports, Forms 10-K, and Forms 10-Q with knowledge that they falsely represented Fannie Mae's financial results, or with reckless disregard for their truth or falsity. Additionally, their conduct in signing certifications in the Company's Form 10-K and 10-Q filings, thereby personally attesting to the accuracy of the financial statements and in particular that they conformed with GAAP and that Fannie Mae's internal controls were effective, was intentional or at least reckless since they knew that these things were false.

407.    Raines and Howard had a motive to commit the fraud alleged herein, because their receipt of lucrative bonuses was dependent upon the Company's achievement of certain financial targets. By manipulating the Company's accounting to create the illusion that those targets had been achieved, Raines and Howard created an entitlement to bonuses they would not have received if the Company's financial results were accurately reported.

408.   As CEO, CFO, and Controller of Fannie Mae during the Loss Period, Raines, Howard, and Spencer also had the opportunity to commit fraud. Raines and Howard were the public voices of Fannie Mae and were therefore in a position to communicate, as they did during conference calls and in press releases and other public documents, false and misleading statements concerning the Company's financial condition, its compliance with GAAP, the soundness of its internal controls, and the veracity of its financials. Raines signed or authorized all of the Company's SEC filings, Annual Reports, and press releases during the Loss Period. Howard and Spencer signed many of the Company's SEC filings and Annual Reports, as alleged herein. Further, Howard and Spencer oversaw the Company's accounting and financial reporting, were responsible for creating and approving accounting policies and procedures, and were directly involved in the preparation of the Company's financial statements. Thus, Raines, Howard and Spencer all had the ability to control the Company's accounting as well as the contents of its financial statements and disclosures. All of them had the motive and the opportunity, which they took, to commit fraud.

409.   The Officer Defendants' scienter is also established by their insider trading during the Loss Period. Since Fannie Mae did not register with the SEC until 2002, the Officer Defendants were not required to publicly disclose their stock trades and there is no publicly available data about their stock trades prior to 2002. However, from the time the Officer Defendants began publicly reporting their stock sales in April 2002 through October 2004, Raines, Howard and Spencer all sold substantial amounts of stock at artificially inflated prices while in possession of materially adverse inside information, as evidenced by (a) the chart attached hereto as Schedule A, and (b) the narratives below.

410.    On January 15, 2003, the Company publicly announced its fourth quarter and 2002 year-end results in a press release wherein Raines stated that Fannie Mae's operating results in 2002 were among the best in the Company's history. The Officer Defendants all knew this statement to be false, and that the Company's reported financial condition was a house of cards built on fraud. On that same day, Howard sold over 470 shares of Fannie Mae stock for proceeds of $32,564. Shortly thereafter, on January 21, 2003, Raines sold 20,908 shares for proceeds of $1.45 million, Howard sold another 5,019 shares for proceeds of approximately $350,000, and Spencer sold 1,044 shares for proceeds of over $72,000, thereby benefiting from the inflated stock price which the false statements had created and maintained.

411.    On January 21, 2004, Fannie Mae issued a press release announcing, *inter alia*, that net income for the year ended December 31, 2003 was up 71.1 % and diluted EPS were up 75% from the prior year. Two days later, on January 23, 2004, Howard sold 7,825 shares of stock for proceeds of $612,815, Raines sold 24,874 shares for proceeds of $1,984,007, and Spencer sold 1,230 shares for proceeds of $96,327. Four days later, on January 27, 2004, Spencer sold an additional 3,000 shares for $237,000. Three weeks later, when the stock was still selling at artificially inflated prices of over $79 per share, Spencer sold an additional 6,800 shares for proceeds of $541,730. These trades occurred during the height of Fannie Mae's fraud, while the Officer Defendants were in possession of materially adverse information, including that the Company's stock price was artificially inflated.

412.    Between November 2003 and September 21, 2004, while the OFHEO investigation was ongoing and the Officer Defendants were in the possession of undisclosed, materially adverse information (*i.e.*, that the Company's stock price was inflated by fraudulent accounting practices which were likely to be uncovered by OFHEO), Howard sold 124,854

144

shares of Fannie Mae stock, reaping $8,983,369 in proceeds; Raines sold 54,538 shares for proceeds of $4,157,827; and Spencer sold 6,994 shares for proceeds of $555,038. The shares sold by Howard and Raines during this period represented 67% and 41%, respectively, of the shares of Fannie Mae stock beneficially owned by each as of April 1, 2003. By selling these shares based on inside information before the results of the OFHEO investigation were disclosed, the Officer Defendants received profits while Plaintiffs purchased shares at inflated prices not knowing the truth.

## XII. THE AUDIT COMMITTEE DEFENDANTS' SCIENTER

413. For the 2000 audit year, the Audit Committee was composed of Gerrity (as Chairman), and non-defendants Vincent Mai, Garry Mauro and Eli J. Segal. For the 2001 audit year, it was composed of Gerrity (as Chairman), Harvey, Mulcahy, Segue, and non-defendant Vincent Mai. For the 2002 audit year, it was composed of Gerrity (as Chairman), Harvey, Mulcahy, Segue, and Malek. For the 2003 audit year, it was composed of Gerrity (as Chairman), Harvey, Mulcahy, Segue, Malek, and Pickett.

414. The Audit Committee was responsible for overseeing the Company's financial reporting and accounting, the integrity of the Company's financial statements, the Company's internal controls, and the performance of the Company's internal and outside auditors. In other words, it was the Audit Committee's job to detect and prevent precisely the type of fraud which was allowed to run rampant at Fannie Mae.

415. The members of the Audit Committee had actual knowledge of serious problems with the Company's accounting and internal controls, yet did nothing to correct them. For example, KPMG informed the Audit Committee in early 1999 that it disagreed with the Officer Defendants' deferral of $200 million in expenses from 1998 to subsequent years. KPMG informed the Audit Committee that it had recommended that the expenses not be deferred, but

145

that management had persisted in deferring them. The deferral of these expenses enabled the Officer Defendants to achieve their financial targets and receive bonuses they would not have received if the expenses had been recorded in 1998. Thus, the Audit Committee (which included Gerrity in 1999) had knowledge of management's willingness to bend the rules in order to achieve desired financial results. This should have caused the Audit Committee to keep a particularly watchful eye on management, and to question KPMG and management closely about the aggressiveness and propriety of the Company's other accounting practices, but they failed to do so.

416.    On August 14, 2003, the director of the Company's internal audit department met with the Audit Committee and told them of Barnes' concerns regarding serious accounting improprieties, GAAP violations, and internal control deficiencies. This report should have raised red flags to the Audit Committee Defendants and caused them to speak directly with Barnes, and to investigate his allegations thoroughly. In reckless disregard for their responsibility to the Company's shareholders and the investing public, they did neither. Instead, they voted that very day to approve the Company's financial statements and Form 10-Q filing for the quarter ended June 30, 2003.

417.    Throughout the Loss Period, the Audit Committee Defendants were well aware that derivatives were one of the most significant items on the Company's financial statements. They were also well aware that GAAP with respect to accounting for derivatives changed dramatically in January 2001, when the Company adopted SFAS 133. Further, they were aware (as any reasonably sophisticated businessperson would have been) that a number of other entities, such as Orange County, California, Proctor & Gamble and Gibson Greetings had found themselves in dire financial straits during the late 1990s due to the improper use of derivatives.

And certainly, by 2003 the Audit Committee Defendants knew that Freddie Mac, an entity closely aligned with and in the same industry as Fannie Mae, had been caught materially misstating its financial results due (in large part) to improper accounting for derivatives. Given these facts, and the Audit Committee Defendants' responsibility for overseeing the Company's financial reporting and accounting, it was incumbent upon the Audit Committee Defendants to scrutinize the Company's accounting for derivatives very closely. Either they failed to do so (which would be grossly reckless under the circumstances), or they did so but failed to see the blatant violations of SFAS 133 which OFHEO and the SEC later found (which would also be grossly reckless), or they were actually aware of the SFAS 133 violations but did nothing to correct them (which would constitute intentional fraud).

418.    The Audit Committee Defendants were also grossly reckless in adopting and/or failing to correct severely deficient internal controls. For example, the Audit Committee Defendants allowed the following clearly inappropriate structural problems – which should have been readily obvious to them -- to persist at Fannie Mae:

a.    Howard's maintenance of overlapping responsibilities and job functions (including both CFO and Chief Risk Officer) which impaired his independence and allowed him to act without independent checks on his behavior;

b.    A reporting structure whereby the head of the internal audit department reported to Howard instead of reporting directly to the Audit Committee;

c.    A compensation system whereby Howard had input into the compensation of the head of the internal audit department;

d.    Lack of technical accounting expertise and shortage of resources within the Controller's department;

e.    Development and approval of accounting policies by the same small group of individuals;

f.    Janet Pennewell's overlapping responsibilities for financial reporting and for income forecasting, which created a conflict of interest and undermined the integrity of the financial reporting process;

g.    Jeff Juliane's overlapping responsibilities for modeling, reporting, and accounting for amortization of deferred price adjustments;

h.    Allowing the Company's former Controller to serve as head of the internal audit department;

i.    Absence of formally documented accounting policy development procedures; and

j.    Absence of a centralized database of Company accounting policies.

419.    The foregoing internal control problems are in addition to the numerous system-related problems and other internal control deficiencies alleged herein which it was the Audit Committee's job to know about, but which they either recklessly failed to discover, or discovered but recklessly failed to address and correct.

420.    Review of the charters which were adopted by the Board to govern the Audit Committee confirms the broad scope of the Audit Committee's responsibilities, which they utterly failed to fulfill.

421.    At the beginning of the Loss Period, the operative charter for the Audit Committee was one that had been adopted in April 2000 and attached to the Company's proxy statement dated April 2, 2001 (the "2000 Charter"). It stated that the, Audit Committee "shall through regular or special meetings with management, internal auditors, and the corporation's

outside auditor, develop in depth and specialized knowledge on matters relating to the Committee's responsibilities, including monitoring the integrity of the corporation's financial statements and the independence and performance of its internal and outside auditors ..."

422.    The 2000 Charter required the Audit Committee to receive periodic reports from management, the internal audit department, and the outside auditors, and to meet privately with the outside auditors, and separately in private with the internal auditors, at least once a year.

423.    The 2000 Charter also required the Audit Committee to review, among other things:

      a.    the annual audit plans of the internal and outside auditors;

      b.    the results of the internal and outside auditors' activities;

      c.    the Company's financial reporting practices including the significant issues and judgments made in connection with the preparation of the audited financial statements included in its annual report to shareholders;

      d.    all matters that Statement on Auditing Standards No. 61 requires to be discussed with the outside auditors;

      e.    the status of compliance with accounting, legal, regulatory, tax, and other developments of major significance to the corporation;

      f.    the Company's Code of Business Conduct and the activities of management's Business Conduct Committee; and

      g.    the Company's major risks and risk management process including the quality and effectiveness of internal controls, and compliance with established limits on derivatives risk.

424.   In 2002, the Board adopted a new charter (the "2002 Charter") for the Audit Committee.  The 2002 Charter, which was attached to the Company's proxy statement dated April 17, 2003, states that the purpose of the Audit Committee was to oversee:

a.      the accounting, reporting, and financial practices of Fannie Mae including the integrity of Fannie Mae's financial statements;

b.      the creation and administration of financial controls;

c.      Fannie Mae's compliance with legal and regulatory requirements;

d.      the outside auditors' qualifications and independence; and

e.      the performance of Fannie Mae's internal audit function and Fannie Mae's outside auditors.

425.   The 2002 Charter provides that, among its duties and responsibilities, the Audit Committee "shall":

a.      be directly responsible for the appointment, compensation, retention, and oversight of the work of the outside auditor;

b.      at least annually, consider the independence of the outside auditor, including whether the outside auditor's performance of non-audit services is compatible with its independence;

c.      at least annually, obtain and review a report by the outside auditor describing the outside auditor's internal quality-control procedures;

d.      review and evaluate the lead partner of the outside auditor team;

e.      approve in advance all audit engagement fees

f.      review and discuss with the outside auditor:  the scope of the audit; the result of the annual audit; any difficulties the auditor encountered; any restrictions on the scope

of the auditor's activities or on access to requested information; any significant disagreements with management; the scope and resources of the internal audit function; and any reports of the outside auditor for interim periods;

       g.     review and discuss with management and the outside auditor the annual audited and quarterly unaudited financial statements of the Company, including:  the outside auditor's judgment as to the quality of the Company's accounting principles; significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including any significant changes in the Company's selection or application of accounting principles and financial statement presentations; and the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations;"

       h.     receive, review and discuss reports from the outside auditors on all critical accounting policies and practices to be used; all alternative treatments of financial information within GAAP that have been discussed with management (including the ramifications of their use, and the treatment preferred by the outside auditor); and other material written communications between the outside auditor and management, such as management letters or schedules of unadjusted differences;

       i.     review earnings releases, and review and discuss generally the types of information to be disclosed and the type of presentations to be made;

       j.     review and discuss with management, the head of the internal audit department, and the outside auditor the adequacy and effectiveness of the Company's internal controls and disclosure controls;

k.    review and discuss with the CEO and CFO the basis for the certifications provided in the Company's Form 10-K and 10-Q filings;

l.    review and discuss with management and the outside auditor any correspondence with regulators or governmental agencies which raises material issues regarding the Company's financial statements, financial disclosures or accounting policies;

m.    review and discuss with management the Company's major risk exposures, management's policies on risk management and risk assessment, and the Company's compliance with those policies;

n.    oversee and discuss the internal auditing activities and performance;

o.    obtain periodic reports from the head of the internal audit department regarding internal audit findings and the Company's progress in remedying material control deficiencies;

p.    review and discuss the status of compliance with accounting, legal, regulatory, tax, and other developments of major significance to the Company;

q.    review and discuss the Company's Code of Business Conduct and the activities of management's Business Conduct Committee; and

r.    establish procedures for the receipt, retention and treatment of complaints regarding accounting, internal accounting controls or audit matters.

426.    The Audit Committee members were intimately involved with and controlled the Company's accounting and its financial reporting, and knew facts or had access to information suggesting that the Company's financial statements, and public statements, were false. For example, the Audit Committee members knew, or should have known, that the Company's internal controls were severely deficient or non-existent, that an inordinate concentration of

responsibility was vested in the CFO, that the Company's internal audit reviews were incomplete and/or ineffective, that the Company's compensation structure created an incentive for management to manipulate earnings-per-share, that the Company's corporate culture emphasized the stability of earnings over accuracy in financial reporting, that (as OFHEO found) "the desire by management to minimize earnings volatility was a central organizing principle in the development of key accounting policies," and that the Company's accounting violated GAAP in numerous respects – violations which the OFHEO Report characterizes as "pervasive and … reinforced by management."

427.    If the Audit Committee members had not been reckless, they would have detected the deficiencies in the Company's internal controls and the accounting improprieties that led to the material misstatement of the Company's financial statements, and should have acted to ensure that the Company's financial condition was accurately reported.

428.    During each quarterly and annual period relevant to this action, the Audit Committee recommended that the Board of Directors approve the Company's financial statements for inclusion in the Company's annual and quarterly reports.

## XIII.    INAPPLICABILITY OF THE STATUTORY SAFE HARBOR

429.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements complained of concern Fannie Mae's financial statements and historical and/or current conditions affecting the Company.  Many of the statements pleaded herein were not specifically identified as "forward-looking statements" when made.  To the extent any forward-looking statements were identified as such, there were no meaningful cautionary statements identifying the important then-present factors that could and did cause actual results to differ materially from those in the purportedly forward-looking statements.  Any warnings contained in

the press releases and the financial statements quoted herein were generic statements of the kind of risks that affect any company and misleadingly contained no specific factual disclosure of any of Fannie Mae's accounting irregularities.

430.    Alternatively, to the extent that the statutory safe harbor would otherwise apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those statements was made, the speaker(s) knew the statement was false or misleading, lacked a reasonable or good faith basis for believing the statement to be accurate, knew and failed to disclose adverse information relating to the statement, and/or the statement was authorized and/or approved by an executive officer of Fannie Mae who knew that the statement was materially false and misleading when made.

## XIV.   APPLICABILITY OF PRESUMPTION OF RELIANCE: FRAUD ON THE MARKET

431.    At all relevant times, the market for Fannie Mae securities was an efficient market for, *inter alia*, the following reasons:

a.    Fannie Mae's common stock met the requirements for and was listed on the New York Stock Exchange;

b.    Fannie Mae's trading volume was substantial;

c.    While Fannie Mae's common stock is exempt from SEC registration requirements, Fannie Mae began to file its results with the SEC on December 31, 2002 as part of a voluntary initiative, and even before that, the Company's Annual Reports containing its annual financial statements were widely disseminated and were published on Fannie Mae's website;

d.    Fannie Mae regularly communicated with public investors via established market communication mechanisms, including regular dissemination of press releases on the

national circuits of major news wire services and other wide-ranging public disclosures, such as communication with the financial press and other similar reporting services;

   e. The market reacted swiftly to public information disseminated regarding Fannie Mae; and

   f. Fannie Mae was followed by numerous national securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and customers of their respective brokerage firms. Each of these reports was publicly available and entered the public marketplace.

  432. As a result of the foregoing, the market for Fannie Mae securities promptly digested current information regarding Fannie Mae from all publicly available sources and reflected such information in Fannie Mae's securities prices at all relevant times. Under these circumstances, Plaintiffs, as purchasers or acquirers of Fannie Mae securities, suffered injury through their purchase or acquisition of Fannie Mae's securities at artificially inflated prices and a presumption of reliance applies.

  433. In addition to the foregoing, Plaintiffs are entitled to a presumption of reliance because, as more fully alleged above, Defendants failed to disclose material information regarding Fannie Mae's business, financial results and business prospects.

## XV. LOSS CAUSATION

  434. Throughout the Loss Period, Fannie Mae's stock price was massively inflated as the result of the Defendants' long-standing, comprehensive scheme to misrepresent Fannie Mae's financial results. Not only did Defendants publish materially false statements of Fannie Mae's financial results, but they also publicly misrepresented that Fannie Mae's accounting policies and practices complied with GAAP and that the Company maintained adequate internal financial controls.

435.    Fannie Mae's financial results and purported compliance with GAAP were material information to Plaintiffs. Had Plaintiffs known the truth – that the Company's reported financial results were materially false and painted a rosier picture of the Company's results and stability than the true facts warranted – Plaintiffs either would not have purchased Fannie Mae stock at all, or would have done so only at substantially lower prices than the artificially inflated prices which they actually paid.

436.    The Defendants' fraudulent scheme was gradually revealed to the market through announcements concerning SEC and OFHEO investigations, earnings releases, and SEC filings, and other public statements. As alleged herein, the receipt of this information caused progressive declines in the price of Fannie Mae's stock, causing Plaintiffs to suffer significant losses.

437.    In total, the Company's stock price fell 43.4% -- from $76.65 on September 21, 2004 to $43.39 on September 28, 2005. These declines are directly attributable to the market's reaction to revelations of accounting fraud at Fannie Mae, and to its adjustment of the stock price to reflect the newly emerging truth about Fannie Mae's financial condition and results. Thus, these price declines were directly caused by the misstatements alleged herein, and by the market's response to the subsequent partial corrective disclosures.

438.    The fraud perpetrated by the Defendants described in this Complaint proximately caused foreseeable losses to the Plaintiffs.

## XVI.  TOLLING OF THE STATUTE OF LIMITATIONS

439.    Plaintiffs did not know, and could not reasonably have discovered, the falsity of Fannie Mae's financial statements and Defendants' other public statements regarding the Company's financial condition before September 22, 2004, when the Company first disclosed OFHEO's finding that Fannie Mae's financial results had been intentionally distorted. Prior to that date, the statutes of limitations on Plaintiffs' claims were tolled by Defendants' active and

continuing concealment of the falsity of their statements. Even after September 22, 2004, Defendants have continued to conceal the full extent of their fraud, and the Company has yet to publish restated financial statements.

440.    Further, the statutes of limitations on Plaintiffs' claims have been tolled since September 23, 2004, due to the filing of a securities class action complaint on that date in *Vinci v. Federal National Mortgage Association, et al.* (now pending as *In re Fannie Mae Securities Litigation*), No. 1:04-cv-01639-RJL in the United States District Court for the District of Columbia. Plaintiffs were members of the putative class in that action, which asserts claims against Fannie Mae, Raines, Howard, and Spencer pursuant to Section 10(b), Rule 10b-5 and Section 20(a) of the Exchange Act. Those claims arise out of the same facts and circumstances as the claims in this Complaint.

441.    All of Plaintiffs' claims have been brought within the applicable statutes of limitations, after giving effect to tolling and the relation-back doctrine.

## COUNT I

**Violations of Section 10(b) of the Exchange Act and Subsections (a), (b), and (c) of Rule 10b-5 Promulgated Thereunder**
**(Against Defendants Fannie Mae, the Officer Defendants, and the Audit Committee Defendants (the "10b-5 Defendants"))**

442.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

443.    As described above, the 10b-5 Defendants made and disseminated numerous false and misleading statements that were directly attributable to them. The 10b-5 Defendants were provided with or had unlimited access to copies of the Company's financial statements, internal reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading

prior to and/or shortly after these statements were issued and had the ability to, but did not, prevent the issuance of the statements or cause the statements to be corrected.

444.   As described above, the 10b-5 Defendants carried out a fraudulent scheme and course of conduct and/or business which was intended to and did, as alleged herein: (i) deceive Plaintiffs; (ii) artificially inflate and maintain the market price of Fannie Mae securities; and (iii) cause Plaintiffs to purchase Fannie Mae securities at inflated prices.   In furtherance of this unlawful scheme, plan and course of conduct, the 10b-5 Defendants took the actions set forth herein, which operated as fraud and deceit upon Plaintiffs as purchasers of Fannie Mae securities.

445.   As alleged above, the 10b-5 Defendants acted with scienter in that they knew or were reckless in not knowing that Fannie Mae's press releases, public statements, Annual Reports, Forms 10-K, Forms 10-Q, Forms 8-K, Registration Statement, and Proxy Statements during the periods referenced above, as well as the 10b-5 Defendants' own public statements set forth herein, were materially false and misleading as detailed above; knew that such statements or documents would be issued or disseminated to Plaintiffs; and knowingly or recklessly participated in a fraudulent scheme and course of conduct or business as primary violators of federal securities laws.

446.   As a direct and proximate result of the 10b-5 Defendants' wrongful conduct in violation of Section 10(b) and Rule 10b-5, the market prices of Fannie Mae stock purchased by Plaintiffs were artificially inflated.   In ignorance of this artificial inflation, and relying directly or indirectly on the false and misleading statements made by the 10b-5 Defendants, or upon the integrity of the market, Plaintiffs purchased Fannie Mae securities at artificially inflated prices.

447.   Had Plaintiffs known the truth concerning the misrepresented and omitted facts described above, they either would not have purchased or otherwise acquired their Fannie Mae securities at all, or would not have done so at substantially lower prices.

448.   Plaintiffs were substantially damaged as a result of their purchases of Fannie Mae securities at artificially inflated prices and the subsequent decline in price of those securities when the fraud was disclosed.

## COUNT II

**(Violation of Section 10(b) of the Exchange Act and Subsections (a) and (c) of Rule 10b-5 Promulgated Thereunder) (Against Defendant Doe)**

449.   Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

450.   As described above, Doe carried out a fraudulent scheme and course of conduct and/or business which was intended to and did: (i) deceive Plaintiffs; (ii) artificially inflate and maintain the market price of Fannie Mae securities; and (iii) cause Plaintiffs to purchase Fannie Mae securities at inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Doe took the actions set forth herein, which operated as fraud and deceit upon Plaintiffs as purchasers of Fannie Mae securities.

451.   Doe's actions in furtherance of the fraudulent scheme included the sale of a finite insurance policy to Fannie Mae which Doe knew or recklessly disregarded would be improperly accounted for by Fannie Mae as a means of manipulating its reported financial results.

452.   As alleged above, Doe acted with scienter in that it knew or was reckless in not knowing that Fannie Mae's Annual Reports, Forms 10-K, Forms 10-Q, Forms 8-K, Registration Statement, and Proxy Statements during the periods referenced above were materially false and misleading as detailed above; knew that such statements or documents would be issued or

disseminated to Plaintiffs; and knowingly or recklessly participated in a fraudulent scheme and course of conduct or business as a primary violator of federal securities laws.

453.    During the Loss Period, Doe knew or recklessly disregarded that it was merely loaning money to Fannie Mae but that Fannie Mae was fraudulently recording its transactions with Doe in the Company's financials as "insurance" premium payments to Doe in violation of GAAP.

454.    As a direct and proximate result of Doe's wrongful conduct in violation of subsections (a) and (c) of Rule 10b-5, the market prices of Fannie Mae stock purchased by Plaintiffs were artificially inflated.  In ignorance of this artificial inflation, and relying directly or indirectly on the false and misleading statements made by Doe, or upon the integrity of the market, Plaintiffs purchased Fannie Mae securities at artificially inflated prices.

455.    Had Plaintiffs known the truth concerning the misrepresented and omitted facts described above, they either would not have purchased or otherwise acquired their Fannie Mae securities at all, or would not have done so at substantially lower prices.

456.    Plaintiffs were substantially damaged as a result of their purchases of Fannie Mae securities at artificially inflated prices and the subsequent decline in price of those securities when Doe's fraud was disclosed.

### COUNT III

**Violation of Section 18 of the Exchange Act**
**(Against All Defendants Except Doe)**

457.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

458.    This claim is brought by all Plaintiffs pursuant to Section 18 of the Exchange Act, against Defendants Fannie Mae, Raines, Howard, Spencer, Mudd, Gerrity, Mulcahy, Malek,

Pickett, Segue, Harvey, Ashe, Ashley, Bordonaro, Duberstein, Gorelick, Justiz, Korologos, Marron, Swygert, and Rahl.

459.     As set forth above, these Defendants made or caused to be made statements which were, at the time and in light of the circumstances under which they were made, false or misleading with respect to material facts, in documents filed with the SEC by Fannie Mae, including its Form 10-K filings for the years 2002 and 2003.

460.     In connection with the purchase of securities, Plaintiffs specifically read and relied upon the Company's SEC filings, including its Forms 10-K for the years 2002 and 2003 and the financial statements contained therein.  Plaintiffs relied on those statements as being materially complete, and as not omitting material information.  In particular, Plaintiffs read and relied on the line items in the Company's financial statements for revenue, net income, interest income, guaranty fee income, fee and other income, purchased options expense, interest expense, administrative expense, loans held for investment, mortgage related securities, and stockholders' equity.  Plaintiffs' decisions to purchase Fannie Mae stock were based, in significant part, on Plaintiffs' analysis of these financial metrics as set forth in the Company's financial statements.

461.     Plaintiffs reasonably relied on these statements not knowing that they were false and misleading.

462.     Defendants Raines, Howard, Mudd, Gerrity, Mulcahy, Malek, Pickett, Segue, Harvey, Ashe, Ashley, Bordonaro, Duberstein, Gorelick, Justiz, Korologos, Marron, and Swygert signed the Company's Form 10-K for the year ended 2002.  Spencer signed the Report of Management in the 2002 Form 10-K.

463.     Defendants Raines, Howard, Mudd, Gerrity, Mulcahy,, Malek, Pickett, Segue, Harvey, Ashe, Ashley, Bordonaro, Duberstein, Gorelick, Justiz, Korologos, Marron, Rahl and

Swygert signed the Company's Form 10-K for the year ended 2003. Spencer signed the Report of Management in the 2003 Form 10-K.

464. In connection with the purchase of the Company's shares, Plaintiffs specifically read and relied upon the financial statements contained in Fannie Mae's Form 10-K filings, not knowing that they were false and misleading.

465. If Plaintiffs had known the true facts, they either would not have purchased Fannie Mae's securities or would have done so only at substantially lower prices.

466. When the truth began to emerge about the false and misleading statements and omissions in the Company's documents and reports filed with the SEC, Plaintiffs were significantly damaged by the resulting drop in the value of Fannie Mae's stock.

467. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs suffered damage in connection with their purchases of shares.

468. By virtue of the foregoing, Defendants have violated Section 18 of the Exchange Act.

## COUNT IV

### For Violations of Section 20(a) of the Exchange Act
### (Against the Individual Defendants)

469. Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

470. The Officer Defendants, by reason of their executive positions; their direct involvement in the day-to-day operations of Fannie Mae including its financial reporting and accounting functions; their signatures on and participation in the preparation and dissemination of Fannie Mae's false financial statements; their false and misleading press releases and other public statements; and their direction of the Company's employees to engage in fraudulent

accounting practices which caused the Company's financial statements to be false and misleading, were controlling persons of Fannie Mae. As such, the Officer Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Fannie Mae, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.

471.    The Audit Committee Defendants, by reason of their responsibility for overseeing Fannie Mae's financial reporting, accounting, and internal controls; their responsibility for overseeing the activities of Fannie Mae's outside auditors; their responsibility for meeting with and making recommendations to the Officer Defendants and the Director Defendants concerning the foregoing activities; and their signatures on the false and misleading financial statements and/or other public statements as referenced herein, were controlling persons of Fannie Mae. As such, the Audit Committee Defendants had the power and influence, and exercised such power and influence, to cause Fannie Mae to engage in the violations of law complained of herein.

472.    The Director Defendants, by reason of their positions as directors of Fannie Mae, with authority to oversee all business and affairs of the Company, and by virtue of their signatures on Fannie Mae's false and misleading financial statements referenced herein, were controlling persons of Fannie Mae. As such, the Director Defendants had the power and influence, and exercised such power and influence, to cause Fannie Mae to engage in the violations of law complained of herein.

473.    As set forth above, Fannie Mae participated in a fraudulent scheme and course of business or conduct, and issued false and misleading statements as a primary violator of Section 10(b) and subsections (a), (b), and (c) of Rule 10b-5. Additionally, Fannie Mae violated Section 18 of the Exchange Act by filing materially false statements with the SEC, as set forth above.

By virtue of their positions as controlling persons of Fannie Mae and their culpable participation in the Company's fraud, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act to the same extent as Fannie Mae for its primary violations of Sections 10(b) and 18 and Rule 10b-5.

474.    As a direct and proximate result of Fannie Mae's primary violations of the Exchange Act, for which the Individual Defendants are liable pursuant to Section 20(a), Plaintiffs suffered substantial damages in connection with their purchases of the Company's securities during the Loss Period.

## COUNT V

**Violation Of Section 11 Of The Securities Act**
**(Against Fannie Mae, Raines, Ashe, Ashley, Bordonaro, Duberstein,**
**Gerrity, Gorelick, Harvey, Justiz, Korologos, Malek, Marron, Mudd, Mulcahy,**
**Pickett, Segue, and Swygert ("the Section 11 Defendants"))**

475.    The Plaintiffs repeat and re-allege each of the allegations set forth above as if fully set forth herein, except to the extent such allegations could be construed to charge the Defendants named in this Count with intentional or reckless misconduct as related to this claim.

476.    This Count is brought against the Section 11 Defendants by the Plaintiffs who purchased or otherwise acquired Fannie Mae stock traceable to the Company's Registration Statement which was filed with the SEC on March 31, 2003. This Count is based on Section 11 of the Securities Act, 15 U.S.C. § 77k.

477.    Fannie Mae's 2002 Form 10-K was attached as Exhibit 99 to, and incorporated by reference in, the March 31, 2003 Registration Statement. As alleged herein, the 2002 Form 10-K, and therefore the March 31, 2003 Registration Statement, contained untrue statements of material fact, or omitted material facts required to be stated therein or necessary to make the

statements therein not misleading. These untrue statements of material fact included the financial statements in the 2002 Form 10-K.

478.    Fannie Mae was the issuer of stock pursuant to the Registration Statement, and as such is strictly liable pursuant to Section 11 of the Securities Act for Plaintiffs' damages resulting from their purchase of securities registered pursuant to the false Registration Statement.

479.    Raines is liable pursuant to Section 11 of the Securities Act because he signed the false Registration Statement when he did not believe, and had no reasonable basis to believe, that the statements included and incorporated therein were materially accurate.

480.    Defendants Ashe, Ashley, Bordonaro, Duberstein, Gerrity, Gorelick, Harvey, Justiz, Korologos, Malek, Marron, Mudd, Mulcahy, Pickett, Segue, and Swygert were directors of Fannie Mae when the Registration Statement became effective. They are liable pursuant to Section 11 of the Securities Act because they either did not believe, or had no reasonable basis to believe, in the truth of the statements included and incorporated therein.

481.    Plaintiffs purchased their shares of Fannie Mae without knowledge of the misstatements and omissions alleged herein, and have been damaged through their purchases of Fannie Mae stock.

## COUNT VI

### Control Person Liability Pursuant to Section 15 Of The Securities Act
**(Against Raines, Howard, Spencer, Gerrity, Harvey, Mulcahy, Segue, and Malek (the "Section 15 Defendants"))**

482.    Plaintiffs repeat and reallege each of the allegations contained above as if fully set forth herein, except to the extent such allegations could be construed to charge the Defendants named in this Count with intentional or reckless misconduct as related to this claim.

483.    This Count is brought against the Section 15 Defendants by the Plaintiffs that purchased or otherwise acquired Fannie Mae stock issued pursuant to, or traceable to, the March 31, 2003 Registration Statement.

484.    The Officer Defendants, by reason of their executive positions; their direct involvement in the day-to-day operations of Fannie Mae including its financial reporting and accounting functions; their signatures on and participation in the preparation and dissemination of Fannie Mae's false financial statements; their false and misleading press releases and other public statements; and their direction of the Company's employees to engage in fraudulent accounting practices which caused the Company's financial statements to be false and misleading, were controlling persons of Fannie Mae.  As such, the Officer Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of Fannie Mae, including the content and dissemination of the various statements which Plaintiffs contend are false and misleading.

485.    Defendants Gerrity, Harvey, Mulcahy, Segue, and Malek, were controlling persons of Fannie Mae by reason of their service on the Audit Committee; their responsibility for overseeing Fannie Mae's financial reporting, accounting, and internal controls; their responsibility for overseeing the activities of Fannie Mae's outside auditors; their responsibility for meeting with and making recommendations to the Officer Defendants and the Director Defendants concerning the foregoing activities; and their signatures on the false and misleading financial statements and/or other public statements as referenced herein.  As such, these defendants had the power and influence, and exercised such power and influence, to cause Fannie Mae to engage in the violations of law complained of herein.

486.    As a direct and proximate result of Fannie Mae's violation of Section 11, Plaintiffs suffered damages in connection with their purchase or acquisition of Fannie Mae securities.

487.    The Section 15 Defendants are liable to Plaintiffs under Section 15 of the Securities Act as controlling persons of Fannie Mae to the same extent as Fannie Mae for its primary violations of Section 11.

## COUNT VII

### Violation Of Section 20A Of The Exchange Act
### (Against The Officer Defendants)

488.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

489.    This Claim is asserted against the Officer Defendants, and is based upon Section 20A of the Exchange Act, 15 U.S.C. § 78t-1 in connection with their insider trading in Fannie Mae common stock.

490.    The Officer Defendants collectively sold more than 270,000 shares of Fannie Mae common stock between the time they began reporting such sales in 2002 and September 21, 2004, reaping total proceeds of over $20 million.  During the period from November 2003 to September 21, 2004 alone, Raines and Howard sold 41% and 67%, respectively, of the number of shares beneficially owned by each as of April 1, 2003.

491.    The Officer Defendants knowingly or with deliberate recklessness sold their Fannie Mae common stock during this period while in possession of material, adverse, non-public information indicating that the market price of the stock was materially inflated.  As set forth in Schedule A, attached hereto, Plaintiffs purchased Fannie Mae common stock contemporaneously with sales of Fannie Mae stock by these defendants.

492.    By reason of Plaintiffs' purchases of Fannie Mae stock contemporaneously with sales of stock by the Officer Defendants, Plaintiffs have suffered recoverable damages.  Under Section 20A of the Exchange Act, the Officer Defendants are liable to Plaintiffs for all profits gained and losses avoided by them as a result of these contemporaneous transactions.

## COUNT VIII

### Common Law Fraud
### (Against Defendants Fannie Mae, the Officer Defendants, and the Audit Committee Defendants)

493.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

494.    Plaintiffs assert this cause of action based on common law principles of fraud.

495.    As alleged herein, each of the Defendants made material misrepresentations, or failed to disclose material facts, to Plaintiffs regarding Fannie Mae's financial condition.

496.    The Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth above, or acted with reckless disregard for the truth of those representations in that they failed to ascertain and to disclose such facts, even though such facts were available to them.   Such material misrepresentations and/or omissions were made knowingly or recklessly and for the purpose and effect of concealing Fannie Mae's true financial condition and future business prospects from Plaintiffs and supporting the artificially inflated price of the Company's securities.   As demonstrated by Defendants' overstatements and misstatements of Fannie Mae's revenues during the Loss Period, the Defendants, if they did not have actual knowledge of the misrepresentations and omissions set forth above, were reckless in failing to obtain such information by deliberately refraining from taking those steps necessary to discover whether those statements were materially false or misleading.

497.    The aforesaid misrepresentations and omissions were made intentionally, or at a minimum recklessly, to induce reliance thereon by Plaintiffs when making investment decisions.

498.    The aforesaid misrepresentations and omissions constitute fraud and deceit under applicable law.

499.    Plaintiffs reasonably relied upon the Defendants' representations when deciding to purchase and refrain from selling Fannie Mae's securities.  Plaintiffs participated in the Company's quarterly conference calls and read the Company's press releases and Form 10-K and 10-Q filings, including the financial statements contained therein.  Plaintiffs relied on those statements as being materially complete, and as not omitting material information.  In particular, Plaintiffs read and relied on the line items in the Company's financial statements for revenue, net income, interest income, guaranty fee income, fee and other income, purchased options expense, interest expense, administrative expense, loans held for investment, mortgage related securities, and stockholders' equity.  Plaintiffs' decisions to purchase and hold Fannie Mae stock were based, in significant part, on Plaintiffs' analysis of these financial metrics as set forth in the Company's financial statements.

500.    At the time Fannie Mae's securities were purchased and held by Plaintiffs, Plaintiffs did not know of the false and/or misleading statements and omissions.  If Plaintiffs had known the true facts, they either would not have purchased Fannie Mae's securities or would have done so only at substantially lower prices.

501.    As a direct and proximate result of the Defendants' fraud and deceit, Plaintiffs suffered damages in connection with their purchases and holding of Fannie Mae's securities.

## COUNT IX

**Negligent Misrepresentation**
**(Against All Defendants Except Doe)**

502.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

503.    This Count is brought by all Plaintiffs against all Defendants except Doe, under common law principles of negligence.

504.    The Defendants made materially false and misleading statements, as set forth above, regarding, *inter alia*, the financial condition and the accounting policies and practices of the Company.

505.    The Defendants knew, or should have known in the exercise of reasonable care, that their statements regarding the Company's financial statements, accounting policies and practices, and internal financial controls during the Loss Period were materially false and misleading.

506.    The Defendants owed Plaintiffs a duty of reasonable care in connection with the provision of information concerning the financial condition of Fannie Mae. Fannie Mae and the Individual Defendants breached this duty by including in Fannie Mae's financial statements untrue statements of material facts and/or omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

507.    Plaintiffs, as investors, were entitled to rely upon, and were justified in relying upon, the representations made by the Defendants, set forth above, regarding the Company's financial statements, accounting policies and practices, internal financial controls, and compliance with GAAP. Plaintiffs relied upon the superior knowledge and expertise of

Defendants and justifiably relied to their detriment on Defendants' representations when deciding to purchase and refrain from selling Fannie Mae's securities.

508.   As alleged above, Defendants materially misrepresented Fannie Mae's financial results and their compliance with GAAP throughout the Loss Period.

509.   Plaintiffs had no knowledge of the false and misleading nature of the Defendants' statements when purchasing and refraining from selling Fannie Mae's securities, and believed them to be true.   Had Plaintiffs been aware of the true facts, they would either not have purchased Fannie Mae's shares, or would not have purchased the shares at inflated prices.

510.   As a direct and proximate result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Fannie Mae's securities was artificially inflated and Plaintiffs sustained damages in connection with their purchases and holding of Fannie Mae's securities when the price of the securities declined.

511.   Defendants' conduct constitutes the making of negligent misrepresentations (including negligent omissions to state facts in connection with statements that were made) under applicable state law.

### COUNT X

### (Aiding and Abetting Common Law Fraud)
### (Against Doe)

512.   Plaintiffs repeat and reallege the allegations contained above as if fully set forth herein.

513.   This claim is brought against Doe for aiding and abetting common law fraud.   As set forth herein, Fannie Mae and the Individual Defendants committed common law fraud by making materially false and misleading representations of fact, or omitting to state material facts

which Fannie Mae had a duty to disclose, to Plaintiffs concerning its purchase of at least one illegally structured, GAAP-violative "finite insurance policy" from Doe. This "insurance policy" was actually a loan from Doe to Fannie Mae, since no risk was transferred from Fannie Mae to Doe. However, Fannie Mae and the Individual Defendants represented that it was insurance, and accounted for it as such, in Fannie Mae's financial statements for 2002, 2003 and 2004. The Company has announced that it will restate its previously issued financials as a result of this improper accounting.

514. Plaintiffs relied upon Fannie Mae's financial results for 2002, 2003 and 2004 in making investment decisions with respect to the securities of Fannie Mae, without knowledge of the falsity of that information. As a direct and proximate result of the fraudulent conduct of Fannie Mae and the Individual Defendants, Plaintiffs were injured.

515. Doe had a duty not to knowingly assist in the perpetration of fraud upon Plaintiffs.

516. Doe knowingly and/or recklessly aided and abetted the fraud committed by Fannie Mae and the Individual Defendants by substantially assisting in the fraud with knowledge that fraud was being committed and that Doe's actions were part of an overall fraudulent plan or scheme.

517. Doe's assistance in the fraud at Fannie Mae included, among other things, purporting to sell Fannie Mae a "finite insurance policy" when Doe knew and/or recklessly disregarded that the Company had purchased and would use it for fraudulent purposes.

518. Doe's assistance in the fraud at Fannie Mae was a substantial factor in causing harm to Plaintiffs.

## COUNT XI

### Claim Pursuant To Mass. Gen. Laws Ch. 93A § 11 for
### Violation of Mass. Gen. Laws Ch. 93A § 2
### (Against All Defendants Except Doe)

519.    Plaintiffs repeat and reallege each of the allegations set forth above as if fully set forth herein.

520.    This cause of action is brought pursuant to Massachusetts General Laws Chapter 93A § 11 against all Defendants except Doe for violation of Massachusetts General Laws Chapter 93A § 2.

521.    Defendants employed unfair and deceptive practices by disseminating numerous false and misleading statements regarding Fannie Mae's financial condition to Plaintiffs, as set forth at length above.

522.    Defendants engaged in these unfair and deceptive practices in connection with the sale of Fannie Mae securities, which constitutes "trade" or "commerce" pursuant to Massachusetts General Laws Chapter 93A § 1(b).

523.    Defendants made such false and misleading statements, as set forth above, for the purpose of convincing Plaintiffs and the investing public that Fannie Mae was a conservative, safe and stable investment.

524.    Defendants' dissemination of numerous false and misleading statements to Plaintiffs, as set forth at length above, caused Plaintiffs to purchase Fannie Mae securities at artificially inflated prices.   Plaintiffs, accordingly, have been harmed by Defendants' unfair and deceptive practices.

525.    The actions constituting Defendants' unfair and deceptive practices occurred primarily and substantially in Massachusetts.   Plaintiffs received Defendants' false and

misleading statements in Massachusetts; relied upon Defendants' false and misleading statements in Massachusetts; and felt the harm of this reliance in Massachusetts.

526.    Defendants, as set forth at length above, acted willfully and knowingly in disseminating statements that they knew to be false to Plaintiffs and the investing public.

## JURY DEMAND

527.    Plaintiffs demand a trial by jury on all issues so triable.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiffs pray for judgment as follows:

A.    Awarding compensatory damages in favor of Plaintiffs and against all Defendants, jointly and severally, for the damages sustained as a result of the wrongdoings of Defendants, together with interest thereon;

B.    Finding that Defendants willfully or knowingly violated Section 2 of Chapter 93A of the Massachusetts General Laws, and awarding treble damages (or, at a minimum, double damages) and attorneys' fees and costs in favor of Plaintiffs and against Defendants in accordance with Section 11 of Chapter 93A of the Massachusetts General Laws and any other law providing for such damages;

C.    Awarding punitive or exemplary damages in favor of Plaintiffs and against all Defendants on the common law fraud count asserted above and any other counts for which such damages are available, in an amount appropriate to accomplish the purposes and aims of such damages;

D.    Awarding prejudgment interest and/or opportunity cost damages to Plaintiffs and against all Defendants;

E.    Awarding Plaintiffs the fees and expenses incurred in this action, including allowance of fees for Plaintiffs' attorneys and experts; and

F.    Granting such other and further relief as the Court may deem just and proper.


Dated:  January 17, 2006

Stuart M. Grant (D.C. Bar # 450895)
GRANT & EISENHOFER P.A.
Chase Manhattan Centre
1201 N. Market St.
Wilmington, DE 19801
(302) 622-7000
(302) 622-7100 (facsimile)
Attorneys for Plaintiffs

# A

Schedule A
Contemporaneous Trading Chart

| | Defendant Sales | | | | Contemporaneous Plaintiff Purchases | | | |
|---|---|---|---|---|---|---|---|---|
| Defendant | Transaction Date | Shares | Unit Price | Proceeds | Plaintiff | Transaction Date | Shares | Unit Price |
| Howard | 1/15/2003 | 470 | $69.29 | $32,564 | | | | |
| | 1/16/2003 | | | | Evergreen Equity Trust | 1/16/2003 | 6,503 | $69.09 |
| | 1/16/2003 | | | | Evergreen Variable Annuity Trust | 1/16/2003 | 510 | $69.09 |
| | 1/16/2003 | | | | Evergreen Variable Annuity Trust | 1/16/2003 | 1,300 | $69.26 |
| | 1/16/2003 | | | | Evergreen Select Equity Trust | 1/16/2003 | 22,494 | $69.54 |
| | 1/16/2003 | | | | Evergreen Select Equity Trust | 1/16/2003 | 9,126 | $68.91 |
| | 1/16/2003 | | | | Evergreen Equity Trust | 1/16/2003 | 68 | $68.94 |
| | 1/16/2003 | | | | Evergreen Equity Trust | 1/16/2003 | 14,455 | $69.09 |
| | 1/16/2003 | | | | Evergreen Variable Annuity Trust | 1/16/2003 | 1,160 | $69.09 |
| | 1/16/2003 | | | | Evergreen Variable Annuity Trust | 1/16/2003 | 1,300 | $69.21 |
| | 1/16/2003 | | | | Evergreen Equity Trust | 1/16/2003 | 1,426 | $69.59 |
| | 1/16/2003 | | | | Evergreen Equity Trust | 1/16/2003 | 1,426 | $69.54 |
| | 1/16/2003 | | | | Evergreen Equity Trust | 1/16/2003 | 1,426 | $69.59 |
| | 1/17/2003 | | | | Evergreen Variable Annuity Trust | 1/17/2003 | 100 | $69.10 |
| | 1/17/2003 | | | | Evergreen Variable Annuity Trust | 1/17/2003 | 100 | $69.15 |
| Howard | 1/21/2003 | 5,019 | $69.43 | $348,469 | | | | |
| Spencer | 1/21/2003 | 1,044 | $69.43 | $72,485 | | | | |
| Raines | 1/21/2003 | 20,908 | $69.43 | $1,451,642 | | | | |
| | 1/21/2003 | | | | Evergreen Select Equity Trust | 1/21/2003 | 6,500 | $69.30 |
| | 1/24/2003 | | | | Evergreen Select Equity Trust | 1/24/2003 | 2,725 | $65.96 |
| | | | | | | | | |
| | 11/5/2003 | | | | Evergreen Select Equity Trust | 11/5/2003 | 1,010 | $70.63 |
| | 11/5/2003 | | | | Evergreen Equity Trust | 11/5/2003 | 500 | $70.91 |
| Howard | 11/13/2003 | 300 | $69.57 | $20,871 | | | | |
| Howard | 11/13/2003 | 4,400 | $69.55 | $306,020 | | | | |
| Howard | 11/13/2003 | 200 | $69.54 | $13,908 | | | | |
| Howard | 11/13/2003 | 500 | $69.46 | $34,730 | | | | |
| Howard | 11/13/2003 | 7,700 | $69.45 | $534,765 | | | | |
| Howard | 11/13/2003 | 1,000 | $69.43 | $69,430 | | | | |
| Howard | 11/13/2003 | 500 | $69.42 | $34,710 | | | | |
| Howard | 11/13/2003 | 2,400 | $69.41 | $166,584 | | | | |
| Howard | 11/13/2003 | 4,900 | $69.40 | $340,060 | | | | |
| Howard | 11/13/2003 | 700 | $69.39 | $48,573 | | | | |
| Howard | 11/13/2003 | 400 | $69.38 | $27,752 | | | | |
| Howard | 11/13/2003 | 3,200 | $69.37 | $221,984 | | | | |
| | | | | | | | | |
| | | | | | | | | |
| Howard | 1/5/2004 | 6,829 | $74.50 | $508,726 | | | | |
| Raines | 1/5/2004 | 29,664 | $74.50 | $2,209,820 | | | | |
| Spencer | 1/5/2004 | 1,452 | $74.50 | $108,167 | | | | |
| | 1/9/2004 | | | | Evergreen Equity Trust | 1/9/2004 | 3,800 | $72.95 |
| Howard | 1/23/2004 | 7,825 | $78.32 | $612,815 | | | | |
| Raines | 1/23/2004 | 24,874 | $78.32 | $1,948,007 | | | | |
| Spencer | 1/23/2004 | 1,230 | $78.32 | $96,327 | | | | |
| Spencer | 1/27/2004 | 3,000 | $79.00 | $237,000 | | | | |
| | 2/6/2004 | | | | Evergreen Equity Trust | 2/6/2004 | 1,000 | $77.86 |
| | 2/13/2004 | | | | Evergreen Equity Trust | 2/13/2004 | 100 | $79.08 |
| | 2/13/2004 | | | | Evergreen Equity Trust | 2/13/2004 | 300 | $79.07 |
| Spencer | 2/19/2004 | 6,200 | $79.66 | $493,892 | | | | |
| Spencer | 2/19/2004 | 600 | $79.73 | $47,838 | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | 3/29/2004 | | | | Evergreen Equity Trust | 3/29/2004 | 100 | $74.73 |
| Howard | 3/31/2004 | 100 | $74.64 | $7,464 | | | | |
| Howard | 3/31/2004 | 100 | $74.60 | $7,460 | | | | |
| Howard | 3/31/2004 | 100 | $74.66 | $7,466 | | | | |
| Howard | 3/31/2004 | 100 | $74.70 | $7,470 | | | | |
| Howard | 3/31/2004 | 100 | $74.77 | $7,477 | | | | |

| Howard | 3/31/2004 | 200 | $74.48 | $14,896 | | | | |
|--------|-----------|-----|--------|---------|--|--|--|--|
| Howard | 3/31/2004 | 200 | $74.49 | $14,898 | | | | |
| Howard | 3/31/2004 | 300 | $74.40 | $22,320 | | | | |
| Howard | 3/31/2004 | 100 | $74.46 | $7,446 | | | | |
| Howard | 3/31/2004 | 100 | $74.47 | $7,447 | | | | |
| Howard | 3/31/2004 | 100 | $74.56 | $7,456 | | | | |
| Howard | 3/31/2004 | 200 | $74.50 | $14,900 | | | | |
| Howard | 3/31/2004 | 200 | $74.53 | $14,906 | | | | |
| Howard | 3/31/2004 | 100 | $74.55 | $7,455 | | | | |
| Howard | 3/31/2004 | 100 | $75.23 | $7,523 | | | | |
| Howard | 3/31/2004 | 200 | $74.36 | $14,872 | | | | |
| Howard | 3/31/2004 | 400 | $74.39 | $29,756 | | | | |
| Howard | 3/31/2004 | 200 | $74.34 | $14,868 | | | | |
| Howard | 3/31/2004 | 100 | $74.33 | $7,433 | | | | |
| Howard | 3/31/2004 | 100 | $74.31 | $7,431 | | | | |
| Howard | 3/31/2004 | 100 | $75.33 | $7,533 | | | | |
| Howard | 3/31/2004 | 100 | $74.85 | $7,485 | | | | |
| Howard | 3/31/2004 | 100 | $75.14 | $7,514 | | | | |
| Howard | 3/31/2004 | 100 | $75.10 | $7,510 | | | | |
| Howard | 4/1/2004 | 200 | $74.68 | $14,936 | | | | |
| Howard | 4/1/2004 | 100 | $74.64 | $7,464 | | | | |
| Howard | 4/1/2004 | 100 | $74.62 | $7,462 | | | | |
| Howard | 4/1/2004 | 100 | $74.47 | $7,447 | | | | |
| Howard | 4/1/2004 | 200 | $74.49 | $14,898 | | | | |
| Howard | 4/1/2004 | 100 | $74.45 | $7,445 | | | | |
| Howard | 4/1/2004 | 100 | $74.42 | $7,442 | | | | |
| Howard | 4/1/2004 | 100 | $74.43 | $7,443 | | | | |
| Howard | 4/1/2004 | 100 | $74.40 | $7,440 | | | | |
| Howard | 4/1/2004 | 100 | $74.57 | $7,457 | | | | |
| Howard | 4/1/2004 | 200 | $74.20 | $14,840 | | | | |
| Howard | 4/1/2004 | 100 | $74.39 | $7,439 | | | | |
| Howard | 4/1/2004 | 200 | $74.34 | $14,868 | | | | |
| Howard | 4/1/2004 | 100 | $74.30 | $7,430 | | | | |
| Howard | 4/1/2004 | 100 | $74.07 | $7,407 | | | | |
| Howard | 4/1/2004 | 300 | $74.17 | $22,251 | | | | |
| Howard | 4/1/2004 | 300 | $74.14 | $22,242 | | | | |
| Howard | 4/1/2004 | 100 | $74.12 | $7,412 | | | | |
| Howard | 4/1/2004 | 600 | $74.15 | $44,490 | | | | |
| Howard | 4/1/2004 | 300 | $74.10 | $22,230 | | | | |
| | 4/5/2004 | | | | Evergreen Equity Trust | 4/5/2004 | 800 | $74.90 |
| | | | | | | | | |
| Howard | 4/28/2004 | 100 | $68.62 | $6,862 | | | | |
| Howard | 4/28/2004 | 100 | $68.42 | $6,842 | | | | |
| Howard | 4/28/2004 | 100 | $68.48 | $6,848 | | | | |
| Howard | 4/28/2004 | 100 | $68.47 | $6,847 | | | | |
| Howard | 4/28/2004 | 100 | $68.49 | $6,849 | | | | |
| Howard | 4/28/2004 | 100 | $68.50 | $6,850 | | | | |
| Howard | 4/28/2004 | 100 | $68.55 | $6,855 | | | | |
| Howard | 4/28/2004 | 100 | $68.58 | $6,858 | | | | |
| Howard | 4/28/2004 | 100 | $68.59 | $6,859 | | | | |
| Howard | 4/28/2004 | 100 | $68.57 | $6,857 | | | | |
| Howard | 4/28/2004 | 200 | $68.20 | $13,640 | | | | |
| Howard | 4/28/2004 | 100 | $68.29 | $6,829 | | | | |
| Howard | 4/28/2004 | 200 | $68.31 | $13,662 | | | | |
| Howard | 4/28/2004 | 100 | $68.33 | $6,833 | | | | |
| Howard | 4/28/2004 | 300 | $68.30 | $20,490 | | | | |
| Howard | 4/28/2004 | 100 | $68.35 | $6,835 | | | | |
| Howard | 4/28/2004 | 200 | $69.35 | $13,870 | | | | |
| Howard | 4/28/2004 | 200 | $68.08 | $13,616 | | | | |
| Howard | 4/28/2004 | 100 | $68.05 | $6,805 | | | | |
| Howard | 4/28/2004 | 100 | $68.88 | $6,888 | | | | |
| Howard | 4/28/2004 | 100 | $67.95 | $6,795 | | | | |
| Howard | 4/28/2004 | 200 | $68.15 | $13,630 | | | | |
| Howard | 4/28/2004 | 100 | $68.18 | $6,818 | | | | |
| Howard | 4/28/2004 | 100 | $68.17 | $6,817 | | | | |
| Howard | 4/28/2004 | 100 | $68.12 | $6,812 | | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Howard | 4/28/2004 | 100 | $68.14 | $6,814 | | | |
| Howard | 4/28/2004 | 100 | $68.10 | $6,810 | | | |
| Howard | 4/28/2004 | 100 | $68.90 | $6,890 | | | |
| Howard | 4/29/2004 | 200 | $68.76 | $13,752 | | | |
| Howard | 4/29/2004 | 100 | $68.75 | $6,875 | | | |
| Howard | 4/29/2004 | 200 | $68.70 | $13,740 | | | |
| Howard | 4/29/2004 | 100 | $68.46 | $6,846 | | | |
| Howard | 4/29/2004 | 100 | $68.45 | $6,845 | | | |
| Howard | 4/29/2004 | 100 | $68.40 | $6,840 | | | |
| Howard | 4/29/2004 | 100 | $68.54 | $6,854 | | | |
| Howard | 4/29/2004 | 100 | $69.22 | $6,922 | | | |
| Howard | 4/29/2004 | 100 | $68.20 | $6,820 | | | |
| Howard | 4/29/2004 | 100 | $68.23 | $6,823 | | | |
| Howard | 4/29/2004 | 100 | $68.32 | $6,832 | | | |
| Howard | 4/29/2004 | 200 | $68.35 | $13,670 | | | |
| Howard | 4/29/2004 | 100 | $69.00 | $6,900 | | | |
| Howard | 4/29/2004 | 100 | $69.08 | $6,908 | | | |
| Howard | 4/29/2004 | 100 | $69.02 | $6,902 | | | |
| Howard | 4/29/2004 | 100 | $68.88 | $6,888 | | | |
| Howard | 4/29/2004 | 100 | $68.86 | $6,886 | | | |
| Howard | 4/29/2004 | 200 | $68.80 | $13,760 | | | |
| Howard | 4/29/2004 | 100 | $68.83 | $6,883 | | | |
| Howard | 4/29/2004 | 100 | $68.07 | $6,807 | | | |
| Howard | 4/29/2004 | 100 | $68.06 | $6,806 | | | |
| Howard | 4/29/2004 | 200 | $68.96 | $13,792 | | | |
| Howard | 4/29/2004 | 100 | $69.19 | $6,919 | | | |
| Howard | 4/29/2004 | 100 | $68.94 | $6,894 | | | |
| Howard | 4/29/2004 | 200 | $68.90 | $13,780 | | | |
| Howard | 4/29/2004 | 200 | $68.10 | $13,620 | | | |
| Howard | 4/29/2004 | 200 | $68.15 | $13,630 | | | |
| | 5/6/2004 | | | | Evergreen Equity Trust | 5/6/2004 | 700 | $69.23 |
| | 5/11/2004 | | | | Evergreen Equity Trust | 5/11/2004 | 58,929 | $69.98 |
| | 5/11/2004 | | | | Evergreen Equity Trust | 5/11/2004 | 51,071 | $70.01 |
| Howard | 5/12/2004 | 100 | $68.68 | $6,868 | | | |
| Howard | 5/12/2004 | 100 | $68.65 | $6,865 | | | |
| Howard | 5/12/2004 | 200 | $68.64 | $13,728 | | | |
| Howard | 5/12/2004 | 300 | $68.61 | $20,583 | | | |
| Howard | 5/12/2004 | 100 | $68.71 | $6,871 | | | |
| Howard | 5/12/2004 | 200 | $68.75 | $13,750 | | | |
| Howard | 5/12/2004 | 100 | $68.76 | $6,876 | | | |
| Howard | 5/12/2004 | 200 | $68.56 | $13,712 | | | |
| Howard | 5/12/2004 | 100 | $68.51 | $6,851 | | | |
| Howard | 5/12/2004 | 100 | $68.58 | $6,858 | | | |
| Howard | 5/12/2004 | 100 | $68.52 | $6,852 | | | |
| Howard | 5/12/2004 | 100 | $69.28 | $6,928 | | | |
| Howard | 5/12/2004 | 100 | $69.36 | $6,936 | | | |
| Howard | 5/12/2004 | 200 | $68.88 | $13,776 | | | |
| Howard | 5/12/2004 | 100 | $68.83 | $6,883 | | | |
| Howard | 5/12/2004 | 100 | $69.02 | $6,902 | | | |
| Howard | 5/12/2004 | 100 | $69.04 | $6,904 | | | |
| Howard | 5/12/2004 | 200 | $69.06 | $13,812 | | | |
| Howard | 5/12/2004 | 100 | $69.01 | $6,901 | | | |
| Howard | 5/12/2004 | 100 | $69.00 | $6,900 | | | |
| Howard | 5/12/2004 | 200 | $68.92 | $13,784 | | | |
| Howard | 5/12/2004 | 100 | $68.93 | $6,893 | | | |
| Howard | 5/12/2004 | 100 | $68.98 | $6,898 | | | |
| Howard | 5/12/2004 | 100 | $69.10 | $6,910 | | | |
| Howard | 5/12/2004 | 300 | $69.15 | $20,745 | | | |
| Howard | 5/13/2004 | 100 | $69.77 | $6,977 | | | |
| Howard | 5/13/2004 | 100 | $69.71 | $6,971 | | | |
| Howard | 5/13/2004 | 100 | $70.45 | $7,045 | | | |
| Howard | 5/13/2004 | 100 | $70.42 | $7,042 | | | |
| Howard | 5/13/2004 | 200 | $69.48 | $13,896 | | | |
| Howard | 5/13/2004 | 100 | $70.50 | $7,050 | | | |
| Howard | 5/13/2004 | 100 | $69.52 | $6,952 | | | |
| Howard | 5/13/2004 | 100 | $70.28 | $7,028 | | | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Howard | 5/13/2004 | 400 | $70.20 | $28,080 | | | |
| Howard | 5/13/2004 | 100 | $70.33 | $7,033 | | | |
| Howard | 5/13/2004 | 100 | $70.30 | $7,030 | | | |
| Howard | 5/13/2004 | 100 | $70.35 | $7,035 | | | |
| Howard | 5/13/2004 | 100 | $70.01 | $7,001 | | | |
| Howard | 5/13/2004 | 200 | $70.00 | $14,000 | | | |
| Howard | 5/13/2004 | 100 | $70.09 | $7,009 | | | |
| Howard | 5/13/2004 | 300 | $69.80 | $20,940 | | | |
| Howard | 5/13/2004 | 200 | $70.10 | $14,020 | | | |
| Howard | 5/13/2004 | 200 | $69.99 | $13,998 | | | |
| Howard | 5/13/2004 | 100 | $70.17 | $7,017 | | | |
| Howard | 5/13/2004 | 100 | $69.91 | $6,991 | | | |
| Howard | 5/13/2004 | 200 | $69.90 | $13,980 | | | |
| Howard | 5/13/2004 | 300 | $69.95 | $20,985 | | | |
| Howard | 5/13/2004 | 100 | $69.96 | $6,996 | | | |
| | 5/17/2004 | | | | Evergreen Equity Trust | 5/17/2004 | 200 | $69.05 |
| Spencer | 5/18/2004 | 194 | $68.60 | $13,308 | | | |
| Howard | 5/26/2004 | 100 | $67.79 | $6,779 | | | |
| Howard | 5/26/2004 | 100 | $67.73 | $6,773 | | | |
| Howard | 5/26/2004 | 100 | $68.21 | $6,821 | | | |
| Howard | 5/26/2004 | 100 | $68.30 | $6,830 | | | |
| Howard | 5/26/2004 | 200 | $68.02 | $13,604 | | | |
| Howard | 5/26/2004 | 400 | $68.07 | $27,228 | | | |
| Howard | 5/26/2004 | 300 | $68.05 | $20,415 | | | |
| Howard | 5/26/2004 | 500 | $68.01 | $34,005 | | | |
| Howard | 5/26/2004 | 200 | $68.08 | $13,616 | | | |
| Howard | 5/26/2004 | 300 | $68.06 | $20,418 | | | |
| Howard | 5/26/2004 | 100 | $67.85 | $6,785 | | | |
| Howard | 5/26/2004 | 100 | $68.00 | $6,800 | | | |
| Howard | 5/26/2004 | 100 | $68.03 | $6,803 | | | |
| Howard | 5/26/2004 | 200 | $67.99 | $13,598 | | | |
| Howard | 5/26/2004 | 100 | $68.11 | $6,811 | | | |
| Howard | 5/26/2004 | 300 | $68.10 | $20,430 | | | |
| Howard | 5/26/2004 | 200 | $67.97 | $13,594 | | | |
| Howard | 5/26/2004 | 100 | $67.94 | $6,794 | | | |
| Howard | 5/27/2004 | 100 | $68.75 | $6,875 | | | |
| Howard | 5/27/2004 | 300 | $69.23 | $20,769 | | | |
| Howard | 5/27/2004 | 100 | $68.83 | $6,883 | | | |
| Howard | 5/27/2004 | 100 | $68.84 | $6,884 | | | |
| Howard | 5/27/2004 | 200 | $69.05 | $13,810 | | | |
| Howard | 5/27/2004 | 300 | $69.06 | $20,718 | | | |
| Howard | 5/27/2004 | 200 | $69.07 | $13,814 | | | |
| Howard | 5/27/2004 | 100 | $69.04 | $6,904 | | | |
| Howard | 5/27/2004 | 100 | $69.02 | $6,902 | | | |
| Howard | 5/27/2004 | 100 | $69.03 | $6,903 | | | |
| Howard | 5/27/2004 | 100 | $69.08 | $6,908 | | | |
| Howard | 5/27/2004 | 600 | $69.00 | $41,400 | | | |
| Howard | 5/27/2004 | 200 | $69.01 | $13,802 | | | |
| Howard | 5/27/2004 | 100 | $68.87 | $6,887 | | | |
| Howard | 5/27/2004 | 200 | $68.94 | $13,788 | | | |
| Howard | 5/27/2004 | 200 | $69.18 | $13,836 | | | |
| Howard | 5/27/2004 | 100 | $68.98 | $6,898 | | | |
| Howard | 5/27/2004 | 100 | $69.13 | $6,913 | | | |
| Howard | 5/27/2004 | 100 | $68.93 | $6,893 | | | |
| Howard | 5/27/2004 | 100 | $69.11 | $6,911 | | | |
| Howard | 5/27/2004 | 100 | $68.95 | $6,895 | | | |
| | 6/8/2004 | | | | Evergreen Equity Trust | 6/8/2004 | 800 | $69.28 |
| Howard | 6/9/2004 | 200 | $69.60 | $13,920 | | | |
| Howard | 6/9/2004 | 100 | $69.61 | $6,961 | | | |
| Howard | 6/9/2004 | 100 | $69.64 | $6,964 | | | |
| Howard | 6/9/2004 | 200 | $69.63 | $13,926 | | | |
| Howard | 6/9/2004 | 100 | $69.65 | $6,965 | | | |
| Howard | 6/9/2004 | 100 | $69.62 | $6,962 | | | |
| Howard | 6/9/2004 | 100 | $69.48 | $6,948 | | | |
| Howard | 6/9/2004 | 100 | $69.45 | $6,945 | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Howard | 6/9/2004 | 100 | $69.57 | $6,957 | | | | |
| Howard | 6/9/2004 | 300 | $69.55 | $20,865 | | | | |
| Howard | 6/9/2004 | 200 | $69.52 | $13,904 | | | | |
| Howard | 6/9/2004 | 100 | $69.54 | $6,954 | | | | |
| Howard | 6/9/2004 | 500 | $69.50 | $34,750 | | | | |
| Howard | 6/9/2004 | 300 | $69.51 | $20,853 | | | | |
| Howard | 6/9/2004 | 100 | $69.53 | $6,953 | | | | |
| Howard | 6/9/2004 | 100 | $69.58 | $6,958 | | | | |
| Howard | 6/9/2004 | 100 | $69.25 | $6,925 | | | | |
| Howard | 6/9/2004 | 100 | $69.29 | $6,929 | | | | |
| Howard | 6/9/2004 | 100 | $69.28 | $6,928 | | | | |
| Howard | 6/9/2004 | 100 | $69.20 | $6,920 | | | | |
| Howard | 6/9/2004 | 200 | $69.38 | $13,876 | | | | |
| Howard | 6/9/2004 | 100 | $69.18 | $6,918 | | | | |
| Howard | 6/9/2004 | 100 | $69.10 | $6,910 | | | | |
| | 6/10/2004 | | | | Evergreen Equity Trust | 6/10/2004 | 100 | $70.04 |
| Howard | 6/10/2004 | 200 | $69.65 | $13,930 | | | | |
| Howard | 6/10/2004 | 100 | $69.61 | $6,961 | | | | |
| Howard | 6/10/2004 | 200 | $69.62 | $13,924 | | | | |
| Howard | 6/10/2004 | 100 | $69.63 | $6,963 | | | | |
| Howard | 6/10/2004 | 200 | $69.78 | $13,956 | | | | |
| Howard | 6/10/2004 | 100 | $69.77 | $6,977 | | | | |
| Howard | 6/10/2004 | 100 | $69.74 | $6,974 | | | | |
| Howard | 6/10/2004 | 300 | $69.75 | $20,925 | | | | |
| Howard | 6/10/2004 | 100 | $69.72 | $6,972 | | | | |
| Howard | 6/10/2004 | 100 | $69.71 | $6,971 | | | | |
| Howard | 6/10/2004 | 100 | $69.79 | $6,979 | | | | |
| Howard | 6/10/2004 | 200 | $69.76 | $13,952 | | | | |
| Howard | 6/10/2004 | 100 | $69.47 | $6,947 | | | | |
| Howard | 6/10/2004 | 100 | $69.50 | $6,950 | | | | |
| Howard | 6/10/2004 | 100 | $69.55 | $6,955 | | | | |
| Howard | 6/10/2004 | 100 | $69.52 | $6,952 | | | | |
| Howard | 6/10/2004 | 300 | $69.88 | $20,964 | | | | |
| Howard | 6/10/2004 | 100 | $69.87 | $6,987 | | | | |
| Howard | 6/10/2004 | 100 | $69.86 | $6,986 | | | | |
| Howard | 6/10/2004 | 100 | $69.83 | $6,983 | | | | |
| Howard | 6/10/2004 | 100 | $69.80 | $6,980 | | | | |
| Howard | 6/10/2004 | 100 | $69.84 | $6,984 | | | | |
| Howard | 6/10/2004 | 100 | $69.81 | $6,981 | | | | |
| Howard | 6/10/2004 | 100 | $69.98 | $6,998 | | | | |
| Howard | 6/10/2004 | 100 | $69.94 | $6,994 | | | | |
| Howard | 6/10/2004 | 100 | $69.90 | $6,990 | | | | |
| Howard | 6/10/2004 | 100 | $69.91 | $6,991 | | | | |
| | | | | | | | | |
| Howard | 7/7/2004 | 100 | $71.65 | $7,165 | | | | |
| Howard | 7/7/2004 | 100 | $71.69 | $7,169 | | | | |
| Howard | 7/7/2004 | 100 | $71.64 | $7,164 | | | | |
| Howard | 7/7/2004 | 400 | $71.61 | $28,644 | | | | |
| Howard | 7/7/2004 | 100 | $71.62 | $7,162 | | | | |
| Howard | 7/7/2004 | 100 | $71.73 | $7,173 | | | | |
| Howard | 7/7/2004 | 200 | $71.72 | $14,344 | | | | |
| Howard | 7/7/2004 | 200 | $71.70 | $14,340 | | | | |
| Howard | 7/7/2004 | 100 | $71.43 | $7,143 | | | | |
| Howard | 7/7/2004 | 100 | $71.40 | $7,140 | | | | |
| Howard | 7/7/2004 | 100 | $71.41 | $7,141 | | | | |
| Howard | 7/7/2004 | 100 | $71.47 | $7,147 | | | | |
| Howard | 7/7/2004 | 100 | $70.45 | $7,045 | | | | |
| Howard | 7/7/2004 | 200 | $71.57 | $14,314 | | | | |
| Howard | 7/7/2004 | 100 | $71.50 | $7,150 | | | | |
| Howard | 7/7/2004 | 200 | $71.58 | $14,316 | | | | |
| Howard | 7/7/2004 | 200 | $71.55 | $14,310 | | | | |
| Howard | 7/7/2004 | 100 | $71.59 | $7,159 | | | | |
| Howard | 7/7/2004 | 100 | $70.56 | $7,056 | | | | |
| Howard | 7/7/2004 | 100 | $70.54 | $7,054 | | | | |
| Howard | 7/7/2004 | 100 | $71.20 | $7,120 | | | | |
| Howard | 7/7/2004 | 100 | $71.06 | $7,106 | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Howard | 7/7/2004 | 100 | $71.09 | $7,109 | | | | |
| Howard | 7/7/2004 | 200 | $71.05 | $14,210 | | | | |
| Howard | 7/7/2004 | 100 | $71.01 | $7,101 | | | | |
| Howard | 7/7/2004 | 100 | $71.10 | $7,110 | | | | |
| Howard | 7/8/2004 | 100 | $71.65 | $7,165 | | | | |
| Howard | 7/8/2004 | 200 | $71.45 | $14,290 | | | | |
| Howard | 7/8/2004 | 200 | $71.46 | $14,292 | | | | |
| Howard | 7/8/2004 | 100 | $71.48 | $7,148 | | | | |
| Howard | 7/8/2004 | 100 | $71.44 | $7,144 | | | | |
| Howard | 7/8/2004 | 100 | $71.49 | $7,149 | | | | |
| Howard | 7/8/2004 | 100 | $71.47 | $7,147 | | | | |
| Howard | 7/8/2004 | 100 | $71.42 | $7,142 | | | | |
| Howard | 7/8/2004 | 100 | $71.50 | $7,150 | | | | |
| Howard | 7/8/2004 | 200 | $71.52 | $14,304 | | | | |
| Howard | 7/8/2004 | 100 | $71.56 | $7,156 | | | | |
| Howard | 7/8/2004 | 200 | $71.53 | $14,306 | | | | |
| Howard | 7/8/2004 | 400 | $71.29 | $28,516 | | | | |
| Howard | 7/8/2004 | 100 | $71.27 | $7,127 | | | | |
| Howard | 7/8/2004 | 100 | $71.25 | $7,125 | | | | |
| Howard | 7/8/2004 | 200 | $71.23 | $14,246 | | | | |
| Howard | 7/8/2004 | 100 | $71.35 | $7,135 | | | | |
| Howard | 7/8/2004 | 300 | $71.34 | $21,402 | | | | |
| Howard | 7/8/2004 | 100 | $71.31 | $7,131 | | | | |
| Howard | 7/8/2004 | 100 | $71.36 | $7,136 | | | | |
| Howard | 7/8/2004 | 100 | $71.32 | $7,132 | | | | |
| Howard | 7/8/2004 | 100 | $71.30 | $7,130 | | | | |
| Howard | 7/8/2004 | 100 | $71.38 | $7,138 | | | | |
| Howard | 7/8/2004 | 100 | $71.16 | $7,116 | | | | |
| Howard | 7/8/2004 | 100 | $71.12 | $7,112 | | | | |
| | 7/13/2004 | | | | Evergreen Equity Trust | 7/13/2004 | 3,700 | $70.55 |
| | | | | | | | | |
| Howard | 9/15/2004 | 100 | $76.45 | $7,645 | | | | |
| Howard | 9/15/2004 | 100 | $76.42 | $7,642 | | | | |
| Howard | 9/15/2004 | 200 | $76.41 | $15,282 | | | | |
| Howard | 9/15/2004 | 100 | $76.43 | $7,643 | | | | |
| Howard | 9/15/2004 | 100 | $76.40 | $7,640 | | | | |
| Howard | 9/15/2004 | 100 | $76.23 | $7,623 | | | | |
| Howard | 9/15/2004 | 100 | $76.21 | $7,621 | | | | |
| Howard | 9/15/2004 | 200 | $76.27 | $15,254 | | | | |
| Howard | 9/15/2004 | 100 | $76.28 | $7,628 | | | | |
| Howard | 9/15/2004 | 200 | $76.38 | $15,276 | | | | |
| Howard | 9/15/2004 | 100 | $76.31 | $7,631 | | | | |
| Howard | 9/15/2004 | 100 | $76.33 | $7,633 | | | | |
| Howard | 9/15/2004 | 400 | $76.03 | $30,412 | | | | |
| Howard | 9/15/2004 | 300 | $76.00 | $22,800 | | | | |
| Howard | 9/15/2004 | 100 | $76.07 | $7,607 | | | | |
| Howard | 9/15/2004 | 300 | $76.04 | $22,812 | | | | |
| Howard | 9/15/2004 | 100 | $76.06 | $7,606 | | | | |
| Howard | 9/15/2004 | 100 | $75.89 | $7,589 | | | | |
| Howard | 9/15/2004 | 100 | $76.05 | $7,605 | | | | |
| Howard | 9/15/2004 | 100 | $76.02 | $7,602 | | | | |
| Howard | 9/15/2004 | 100 | $76.10 | $7,610 | | | | |
| Howard | 9/15/2004 | 100 | $75.92 | $7,592 | | | | |
| Howard | 9/15/2004 | 100 | $75.98 | $7,598 | | | | |
| Howard | 9/15/2004 | 200 | $75.99 | $15,198 | | | | |
| Howard | 9/16/2004 | 200 | $76.64 | $15,328 | | | | |
| Howard | 9/16/2004 | 300 | $76.60 | $22,980 | | | | |
| Howard | 9/16/2004 | 100 | $76.62 | $7,662 | | | | |
| Howard | 9/16/2004 | 100 | $76.70 | $7,670 | | | | |
| Howard | 9/16/2004 | 200 | $76.49 | $15,298 | | | | |
| Howard | 9/16/2004 | 200 | $76.47 | $15,294 | | | | |
| Howard | 9/16/2004 | 100 | $76.45 | $7,645 | | | | |
| Howard | 9/16/2004 | 100 | $76.48 | $7,648 | | | | |
| Howard | 9/16/2004 | 100 | $76.44 | $7,644 | | | | |
| Howard | 9/16/2004 | 200 | $76.46 | $15,292 | | | | |
| Howard | 9/16/2004 | 100 | $76.41 | $7,641 | | | | |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Howard | 9/16/2004 | 500 | $76.59 | $38,295 | | | | |
| Howard | 9/16/2004 | 500 | $76.56 | $38,280 | | | | |
| Howard | 9/16/2004 | 100 | $76.55 | $7,655 | | | | |
| Howard | 9/16/2004 | 100 | $76.52 | $7,652 | | | | |
| Howard | 9/16/2004 | 400 | $76.50 | $30,600 | | | | |
| Howard | 9/16/2004 | 100 | $76.54 | $7,654 | | | | |
| Howard | 9/16/2004 | 100 | $76.29 | $7,629 | | | | |
| | 9/17/2004 | | | | Evergreen Select Equity Trust | 9/17/2004 | 47 | $77.19 |
| | 9/17/2004 | | | | Evergreen Equity Trust | 9/17/2004 | 32 | $77.19 |
| | | | | | | | | |