UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| In Re Fannie Mae Securities Litigation | ) ) ) | Consolidated Civil Action No. 1:04-cv-1639 (RJL) |
| Evergreen Equity Trust, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | No. 1:06-cv-00082 (RJL) |
| v. | ) ) | |
| Federal National Mortgage Association, *et al.*, | ) ) | |
| Defendants. | ) ) | |
| Franklin Managed Trust, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | No. 1:06-cv-00139 (RJL) |
| v. | ) ) | |
| Federal National Mortgage Association, *et al.*, | ) ) | |
| Defendants. | ) ) | |

**THE EVERGREEN PLAINTIFFS' AND FRANKLIN PLAINTIFFS'
SUPPLEMENTAL SUBMISSION IN OPPOSITION TO THE
MOTIONS TO DISMISS BY FANNIE MAE, THE DIRECTOR DEFENDANTS,
RADIAN GUARANTY, AND DEFENDANTS HOWARD, RAINES, AND SPENCER**

GRANT & EISENHOFER P.A.
Stuart M. Grant (DC Bar ID #450895)
Megan D. McIntyre
Christine M. Mackintosh
Chase Manhattan Centre
1201 N. Market Street
Wilmington, DE  19801
Tel: (302) 622-7000
Fax: (302) 622-7100
*Counsel for Plaintiffs Evergreen Equity Trust, et al.
 and Plaintiffs Franklin Managed Trust, et al.*

Dated:  March 15, 2007

## TABLE OF CONTENTS

I.    THERE IS NO LEGAL BASIS TO "CONFORM" PLAINTIFFS' COMPLAINTS WITH THE CLASS ACTION COMPLAINT ...........................................1

II.   PLAINTIFFS' STATE LAW CLAIMS ARE NOT PREEMPTED BY SLUSA.......................................................................................................................3

III.  PLAINTIFFS' SECTION 18 CLAIMS ARE NOT TIME-BARRED ...............................6

IV.   PLAINTIFFS HAVE ADEQUATELY ALLEGED THE AUDIT COMMITTEE DEFENDANTS' SCIENTER ...................................................10

      A.    Plaintiffs Have Not, But Could Have, Relied Solely On OFHEO's Conclusions To Plead Scienter ............................................................10

      B.    Plaintiffs' Allegations Are Sufficient To Raise A Strong Inference Of The Audit Committee Defendants' Scienter.....................................13

V.    PLAINTIFFS HAVE ALLEGED THE DIRECTOR DEFENDANTS' "CONTROL" FOR PURPOSES OF SECTION 20(a) .......................................19

VI.   PLAINTIFFS HAVE STATED A SECTION 10(b) CLAIM AGAINST RADIAN ..........................................................................................................21

      A.    Radian's Issuance of a Sham Insurance Policy Was a Primary Violation of Section 10(b) ......................................................................21

      B.    Plaintiffs Have Pleaded Radian's Scienter ...........................................22

      C.    Plaintiffs Have Alleged Causation.........................................................25

VII.  PLAINTIFFS HAVE STATED A STATE LAW CLAIM AGAINST RADIAN FOR AIDING AND ABETTING FRAUD......................................26

VIII. PLAINTIFFS' SECTION 20A CLAIMS ARE NOT LIMITED TO PURCHASES MADE ON THE SAME DAY AS DEFENDANTS' SALES .................................................................................................................29

CONCLUSION..............................................................................................................30

## TABLE OF AUTHORITIES

### CASES

*Adams Public Sch. District v. Asbestos Corp., Ltd.,*
    7 F.3d 717 (8th Cir. 1993) ...................................................................................9

*Adelphia Commc'ns Corp. Sec. & Deriv. Litig.,*
    No. 03-MD-1529 (LMM), 2005 WL 1981566 (S.D.N.Y. Aug. 16, 2005) ..…………8

*American Pipe & Const. Co. v. Utah,*
    414 U.S. 538 (1974)...........................................................................7, 8, 9, 10

*In re Baan Co. Sec. Litig.,*
    103 F. Supp. 2d 1 (D.D.C. 2000) ................................................................23

*Barnebey v. E.F. Hutton & Co.,*
    715 F. Supp. 1512 (M.D. Fla. 1989)...............................................................8

*In re Chambers Dev. Sec. Litig.,*
    848 F. Supp. 602 (W.D. Pa. 1994).................................................................19

*Crown, Cork & Seal Co., Inc. v. Parker,*
    462 U.S. 345 (1985)...............................................................................7, 8, 9

*Cullen v. Margiotta,*
    811 F.2d 698 (2d Cir.), *cert. denied*, 483 U.S. 1021 (1987).........................7

*Department of Econ. Dev. v. Arthur Andersen & Co.,*
    739 F. Supp. 804 (S.D.N.Y. 1990)................................................................20

*In re Enron Corp. Securities, Derivative & ERISA Litigation,*
    2006 WL 3716669 (S.D. Tex. Dec. 12, 2006)..............................................4

*Fidel v. Farley,*
    392 F.3d 220 (6th Cir. 2004) ........................................................................19

*Group Life & Health Ins. Co. v. Royal Drug Co.,*
    440 U.S. 205 (1979)........................................................................................22

*In re Independent Serv. Orgs. Antitrust Litig.,*
    Civ. No. MDL-1021, 1997 WL 161940 (D. Kan. Mar. 12, 1997)................7

*In re JWP Inc. Sec. Litig.,*
    928 F. Supp. 1239 (S.D.N.Y. 1996)..............................................................18

*Joseph v. Wiles,*
    223 F.3d 1155 (10th Cir. 2000) ...............................................................................9

*Lehman v. United Parcel Serv., Inc.,*
    No. 06-4020-CV-C-NKL, 2006 WL 2280186 (W.D. Mo. Aug. 9, 2006)....................9

*Lindner Dividend Fund, Inc. v. Ernst & Young,*
    880 F. Supp. 49 (D. Mass. 1995) ...............................................................................8

*Makor Issues & Rights, Ltd. v. Tellabs, Inc.,*
    437 F.3d 588 (7th Cir. 2006), *cert. granted*, 127 S.Ct. 853 (2007) ...........................19

*In re McKesson HBOC, Inc. Sec. Litig.,*
    126 F. Supp. 2d 1248 (N.D. Cal. 2000) ....................................................................13

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit,*
    547 U.S. 71, 126 S. Ct. 1503 (2006)......................................................................6, 29

*Musick, Peeler & Garrett v. Employers Ins. of Wausau,*
    508 U.S. 286 (1993)....................................................................................................7

*In re Nextcard, Inc. Sec. Litig.,*
    No. C 01-21029 JF (RS), 2006 WL 708663 (N.D. Cal. Mar. 20, 2006) ...................19

*In re Parmalat Sec. Litig.,*
    376 F. Supp. 2d 472 (S.D.N.Y. 2005)..................................................................22, 23

*Reno Hilton Resorts v. N.L.R.B.,*
    196 F.3d 1275 (D.C. Cir. 1999) .................................................................................2

*S.E.C. v. Bonastia,*
    614 F.2d 908 (3d Cir. 1980).....................................................................................19

*S.E.C. v. Life Partners, Inc.,*
    898 F. Supp. 14 (D.D.C. 1995) ................................................................................22

*S.E.C. v. Softpoint, Inc.,*
    958 F. Supp. 846 (S.D.N.Y. 1997)............................................................................19

*S.E.C. v. Yuen*,
    No. CV 03-4376MRP(PLAX), 2006 WL 1390828 (C.D. Cal. Mar. 16, 2006)...........18

*Schimmer v. State Farm Mutual Auto. Ins. Co.,*
    Civ. A. No. 05-CV-02513-MSK, 2006 WL 2361810 (D. Colo. Aug. 15, 2006) ..........9

*Shapiro v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    495 F.2d 228 (2d Cir. 1974)....................................................................29, 30

*Sovereign Bank v. Valentino*,
    914 A.2d 415 (Pa. Super. Ct. 2007) ....................................................27, 28, 29

*Stewart v. Nat. Educ. Assoc.*,
    471 F.3d 169 (D.C. Cir. 2006) ...................................................................13

*Tosti v. City of Los Angeles*,
    754 F.2d 1485 (9th Cir. 1985) ....................................................................7

*Tracinda Corp. v. DaimlerChrysler AG*,
    197 F. Supp. 2d 42 (D. Del. 2002).............................................................13

*Wachovia Bank & Trust Co., N.A. v. Nat. Student Mktg. Corp.*,
    650 F.2d 342 (D.C. Cir. 1980) ....................................................................8

*In re WorldCom Inc. Sec. Litig.*,
    294 F. Supp. 2d 431 (S.D.N.Y. 2003)............................................9, 21, 22

*In re WorldCom, Inc. Sec. Litig.*,
    308 F. Supp. 2d 236 (S.D.N.Y. 2004).........................................................4

*In re WorldCom, Inc. Sec. Litig.*,
    2004 WL 692746 (S.D.N.Y. Apr. 2, 2004)..................................................4

## STATUTES

15 U.S.C. § 77p(d)(2) ..........................................................................................5

15 U.S.C. § 77p(f)(2)(A)(ii)..................................................................................3

15 U.S.C. § 78r ....................................................................................................6

28 U.S.C. § 1658(b) ............................................................................................6

The Evergreen Plaintiffs and the Franklin Plaintiffs (collectively, "Plaintiffs") respectfully submit this supplemental brief to address certain arguments and issues that arose during the course of the hearing on the motions to dismiss filed by Fannie Mae, the Director Defendants, Radian Guaranty, and defendants Howard, Raines, and Spencer.  Specifically, this submission addresses:  (1) the suggestion that Plaintiffs' complaints should be "conformed" to the class complaint; (2)  Defendants' arguments regarding the Securities Litigation Uniform Standards Act ("SLUSA"), including the legislative history-based arguments which were made at the hearing; (3) the timeliness of Plaintiffs' Section 18 claim and the applicability of tolling under the *American Pipe* doctrine; (4) the sufficiency of Plaintiffs' allegations of the Audit Committee Defendants' scienter, including the Court's query whether Plaintiffs have relied improperly on OFHEO's conclusions; (5) Plaintiffs' allegations of the Director Defendants' "control" for purposes of Section 20(a) liability; (6) Plaintiffs' Section 10(b) claim against Radian; (7) Radian's contention that Plaintiffs' aiding and abetting claim is not recognized under Pennsylvania law; and (8) Defendants' argument for a same-day trading requirement under Section 20A.  For the reasons discussed herein, in Plaintiffs' prior submission, and at oral argument, Defendants' motions to dismiss Plaintiffs' claims should be denied in their entirety.

## I.    THERE IS NO LEGAL BASIS TO "CONFORM" PLAINTIFFS' COMPLAINTS WITH THE CLASS ACTION COMPLAINT

Defendants' counsel have made no secret of the fact that their goal on these motions to dismiss is to "get an order that essentially conforms [Plaintiffs'] opt-out complaints to the claims that are made in the lead class action complaint."  Tr. at 7; *see also* Tr. at 91 ("we would urge . . . that the state law claims, Section 18, be removed to conform the case to the Federal class action pleading").  While that is an understandable desire on their part, it is not one that provides a basis for dismissal of any of Plaintiffs' claims.  Plaintiffs have an absolute, unqualified right pursuant

to Rule 23(c)(2)(B) of the Federal Rules of Civil Procedure to opt out of the class action and pursue their own claims, represented by their own counsel. The importance of that right lies, in significant part, in the fact that an individual plaintiff may disagree with the class plaintiffs' strategic decisions, or may wish to assert claims that the class plaintiffs have not asserted or are unable to assert. Plaintiffs' opt-out rights would be rendered meaningless if their opt-out cases could be "conformed" to the class action against their will.

Plaintiffs and the class plaintiffs are the masters of their own complaints, and each of them made independent decisions regarding which claims to assert and which defendants to name. *See generally* 6 J. Moore et al., Moore's Federal Practice § 107.14[2][c], p. 107-67 (3d ed. 2005) ("In general, the plaintiff is the master of the complaint and has the option of naming only those parties the plaintiff chooses to sue, subject only to the rules of joinder [of] necessary parties."). The fact that those decisions may differ says nothing of the merits of any plaintiff's claims, because there could be a whole host of reasons – unrelated to the merits – why a plaintiff elects not to bring a particular claim. *See Reno Hilton Resorts v. N.L.R.B.*, 196 F.3d 1275, 1281 (D.C. Cir. 1999) ("A decision not to prosecute is made for many reasons, sometimes for reasons unrelated to the merits of the charge."). For example, the class plaintiffs *could not* assert fraud-based state law claims because they are precluded from doing so by SLUSA. That bar does not apply to Plaintiffs' opt-out cases. Additionally, the class plaintiffs initially did not name KPMG as a defendant, but then did so after the Franklin Plaintiffs had filed their opt-out case naming KPMG. The Court recently denied KPMG's motions to dismiss as to all of the claims against it. Clearly, the class plaintiffs' initial decision not to sue KPMG was not a concession of any lack of culpability by KPMG. Nor can the defendants legitimately argue that the class plaintiffs' failure to name the Audit Committee Defendants means that those defendants are not culpable. The class plaintiffs' litigation strategy has no bearing on—and should not be considered by this Court

in evaluating—the merits of Plaintiffs' claims.

## II.    PLAINTIFFS' STATE LAW CLAIMS ARE NOT PREEMPTED BY SLUSA

During the November 20, 2006 hearing on KPMG's motion to dismiss the Franklin

Plaintiffs' claims, the Court heard argument regarding KPMG's contention – which is the very

same contention advanced by the other defendants – that Plaintiffs' state law claims are barred

by SLUSA.  After considering those arguments and the parties' written submissions on that

issue, the Court denied KPMG's motion to dismiss.  In doing so, the Court necessarily rejected

KPMG's argument that SLUSA preempts Plaintiffs' state law claims.  Plaintiffs respectfully

submit that the Court came to the correct conclusion the first time it considered these arguments,

and that it should decline the defendants' invitation to revisit the issue.

During the March 1 hearing, defense counsel advanced no new arguments or theories that

had not already been advanced by KPMG concerning SLUSA.  The sole basis for all of the

defendants' preemption arguments is that Plaintiffs' two cases, though not filed as a class action,

constitute a "covered class action" under SLUSA because they have been consolidated with the

class action and therefore the three cases constitute a "group of lawsuits filed in or pending in the

same court and involving common questions of law or fact, in which—(I) damages are sought on

behalf of more than 50 persons; and (II) the lawsuits are joined, consolidated, or otherwise

proceed as a single action for any purpose."  15 U.S.C. § 77p(f)(2)(A)(ii).  However, the

legislative history which defense counsel handed up to the Court at the hearing demonstrates that

Congress did not intend that definition to extend to cases like this, where Plaintiffs made a good

faith decision to opt out of the class and pursue legitimate individual claims on behalf of *fewer

than 50 plaintiffs*, and where the consolidation of their cases with the *class* action – which

Plaintiffs opposed – is the sole basis for the claim of preemption.  Rather, that provision was

intended to prevent plaintiffs from doing what the plaintiffs attempted to do in the *WorldCom*

case upon which Defendants rely[1] -- *i.e.*, to make an end-run around SLUSA by filing *multiple individual cases on behalf of more than 50 plaintiffs* and then *voluntarily* consolidating them and prosecuting them as a single action.  *See* S. Rep. No. 105-182, at 7 ("Section 2(f)(1)(A)(ii) is a definition of class action that is intended to prevent evasion of the bill through the use of so-called 'mass actions' [which] . . . may function very much like traditional class actions and . . . may be abused by lawyers who seek to evade the provisions of [SLUSA] in order [to] bring coercive strike suits.").

Here there has been no attempt to evade SLUSA.  Because there are fewer than fifty individual Plaintiffs, Plaintiffs' cases (unlike the individual *WorldCom* cases) would not constitute a "covered class action" even if they had been filed together as one case.  Indeed, the only way Plaintiffs' cases could be considered a "covered class action" is if they are grouped together with the *class* action for purposes of counting the number of plaintiffs.  However, the class action and Plaintiffs' individual actions do not constitute the type of "mass action" that Congress intended to include within the definition of a "covered class action," because they were not voluntarily consolidated, involve different claims and defendants, and are not being litigated as a single action.[2]

There is nothing in the legislative history to suggest that Congress ever anticipated, much less intended, that SLUSA's triggering threshold of fifty plaintiffs could be reached by grouping

---

[1] *In re WorldCom, Inc. Sec. Litig.*, 308 F. Supp. 2d 236 (S.D.N.Y. 2004); *In re WorldCom, Inc. Sec. Litig.*, 2004 WL 692746, *5 (S.D.N.Y. Apr. 2, 2004).

[2] A recent decision in *In re Enron Corp. Securities, Derivative & ERISA Litigation*, 2006 WL 3716669 (S.D. Tex. Dec. 12, 2006) is distinguishable for the same reasons as *WorldCom*.  There, the SLUSA preemption argument and decision centered around the fact that a single law firm had filed ten lawsuits on behalf of over 200 plaintiffs, then voluntarily consolidated them and prosecuted them as a single action in an attempt to evade SLUSA.  *See id.*; Financial Institutions' Opposition to Fleming & Associates, LLP's Motion for Leave to File Amended Complaints, *In re Enron Corp. Sec. Litig.*, MDL Dkt. No. 1446 (S.D. Tex.), at 5-7, 11-14 & nn.3 & 17 (attached as Exhibit A to the accompanying Declaration of Megan D. McIntyre ("McIntyre Decl.")).

individual opt-out plaintiffs together with the class members in the very class action from which they have opted out.[3] Such a result would prevent plaintiffs from *ever* opting out of class actions to file legitimate individual claims unless they bring those claims in state court and avoid removal to federal court.[4] To interpret SLUSA in this way would promote inefficiency by requiring duplicative litigation in multiple jurisdictions, and would deprive individual plaintiffs of their rights to pursue claims under Section 10(b) and other provisions of the Securities Exchange Act of 1934 as to which the federal courts have exclusive jurisdiction. Accordingly, the term "group of lawsuits" in SLUSA's definition of "covered class action" should not be construed to include both a class action and related opt-out cases, since such an interpretation would be contrary to Congressional intent and would lead to absurd results.

Additionally, the Court should reject Defendants' argument – just as it rejected the same argument by KPMG – that application of SLUSA in these cases is necessary to further Congress's purpose of having cases decided under uniform federal standards. SLUSA was never intended to impose federal requirements on *every* claim based on securities-related fraud. That much is clear from the fact that SLUSA expressly permits the assertion of both state and federal claims in individual actions, and even in class actions on behalf of state pension funds. *See* 15 U.S.C. § 77p(d)(2). Moreover, the Supreme Court has expressly recognized that the preference for national standards for securities class actions does not preempt legitimate individual state law

---

[3] Even the dissenting views which defense counsel cited at the hearing did not contemplate that legitimate individual actions could be grouped with a class action to trigger SLUSA. *See* S. Rep. No. 105-182, at 19-20. Therefore, it cannot be said that Congress considered this issue and decided that SLUSA should apply in this situation.

[4] Under defendants' broad view of SLUSA, an individual plaintiff could not even file suit in a different federal district from the one where the class action is pending, because the cases would likely be transferred to the same district by the Judicial Panel on Multidistrict Litigation, and then defendants would argue that they should be grouped together to constitute a covered class action.

claims: "SLUSA does not actually pre-empt any state cause of action.  It simply denies plaintiffs the right to use the class action device to vindicate certain claims.  The Act does not deny any individual plaintiff, or indeed any group of fewer than 50 plaintiffs, the right to enforce any state-law cause of action that may exist." *Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Dabit*, 547 U.S. 71, 126 S.Ct. 1503, 1514 (2006) (citation omitted).

Defendants acknowledge, as they must, that Plaintiffs' state law claims would be viable if they were pending in another court.  Defendants should not be permitted to use Plaintiffs' choice of this forum as a basis to deny Plaintiffs their substantive rights under state law, particularly when Plaintiffs have not attempted to evade SLUSA or the PSLRA (and indeed acknowledge the PSLRA's applicability to their federal claims) and when their decision to file in this Court furthered the interests of judicial economy.

## III.    PLAINTIFFS' SECTION 18 CLAIMS ARE NOT TIME-BARRED

Like Defendants' SLUSA argument, their claim that Plaintiffs' Section 18 claim is time-barred was considered and rejected by this Court in connection with KPMG's motion to dismiss, and there is no reason to reach a different result as to these Defendants.

As Plaintiffs argued in response to KPMG's motion, their Section 18 claim is subject to the Sarbanes-Oxley Act's two-year statute of limitations.  The Sarbanes-Oxley Act states that a "private right of action that involves a claim of fraud, deceit, manipulation, or contrivance in contravention of a regulatory requirement concerning the securities laws . . ." may be brought up to "2 years after discovery of the facts constituting the violation."  28 U.S.C. § 1658(b).  There is a split of authority as to whether this two-year period applies to Section 18 claims, but Plaintiffs submit that the better-reasoned approach is to find that it applies.

Section 18 requires proof that the defendants made false or misleading statements in SEC filings, and provides an affirmative defense to those who can prove that they acted in good faith

and without knowledge of the statements' false or misleading nature. 15 U.S.C. § 78r. The fact

that Plaintiffs are not required to prove Defendants' scienter as part of their *prima facie* case does

not mean Section 18 is not a claim of fraud, deceit, or manipulation, and in fact the Supreme

Court has recognized that the purpose of Section 18 is "to deter fraud and manipulative practices

in the securities markets . . ." *Musick, Peeler & Garrett v. Employers Ins. of Wausau*, 508 U.S.

286, 296 (1993) (internal citation omitted). Moreover, the purpose behind the extension of the

statute of limitations to two years was to "protect victims of fraud" by "remov[ing] the reward

for those fraud artists who are especially gifted at concealing what they've done for lengthy

periods of time." 148 Cong. Rec. S6436-01, S6347 (July 9, 2002). That purpose, and

Congress's purpose of deterring fraud through Section 18, would be frustrated if the two-year

period were not applied to such claims.

      With respect to defendants Fannie Mae, Raines, Howard, and Spencer, Plaintiffs' Section

18 claims are timely for the additional reason that the statute of limitations on those claims was

tolled by the filing of the class action in September 2004. The Supreme Court has held that the

filing of a class action suspends the statute of limitations as to all class members who make

timely motions to intervene and/or opt out to pursue individual claims. *American Pipe & Constr.*

*Co. v. Utah*, 414 U.S. 538 (1974) (as to intervenors); *Crown, Cork & Seal Co., Inc. v. Parker*,

462 U.S. 345 (1985) (as to opt-outs). Where the class action claims arise from the same

underlying facts as the later-filed individual claims, they are sufficient to put the defendants on

notice of the individual claims, even if based on a different statute or legal theory. *See Cullen v.*

*Margiotta*, 811 F.2d 698, 721 (2d Cir.), *cert. denied*, 483 U.S. 1021 (1987); *Tosti v. City of Los*

*Angeles*, 754 F.2d 1485, 1489 (9th Cir. 1985); *In re Indep. Serv. Orgs. Antitrust Litig.*, Civ. No.

MDL-1021, 1997 WL 161940, at **3-6 (D. Kan. Mar. 12, 1997). While Plaintiffs are unaware

of any cases holding that a class action Section 10(b) claim tolls the statute of limitations for

individual Section 18 claims, at least one court has reached an analogous conclusion: that the assertion of class-wide federal securities claims tolls the statute of limitations for opt-out plaintiffs' similar state law securities claims because they involve the same evidence, memories, and witnesses. *Barnebey v. E.F. Hutton & Co.*, 715 F. Supp. 1512, 1528 (M.D. Fla. 1989).[5] Similarly, Section 18 claims have been found to "relate back" for statute of limitations purposes to earlier-filed claims alleging violations of the securities laws in connection with "the very same SEC filings." *Adelphia Commc'ns Corp. Sec. & Deriv. Litig.*, No. 03-MD-1529 (LMM), 2005 WL 1981566, at *5 (S.D.N.Y. Aug. 16, 2005) (citation omitted).

At oral argument, Defendants argued that the *American Pipe* tolling doctrine is unavailable to Plaintiffs because they did not await a class certification decision before opting out. Defendants contend that the D.C. Circuit's opinion in *Wachovia Bank & Trust Co., N.A. v. National Student Marketing Corp.*, 650 F.2d 342, 336 n.7 (D.C. Cir. 1980) establishes that an opt-out plaintiff who "fires early with its individual complaint doesn't get the benefit of the [tolling] doctrine . . ." Tr. at 93. However, *Wachovia Bank* was decided *before* the Supreme Court's decision in *Crown, Cork & Seal – i.e.*, at a time when the *American Pipe* tolling doctrine was available only to plaintiffs who moved to intervene after a denial of class certification. Noting that "no intervention was ever attempted," the D.C. Circuit found *American Pipe*

---

[5] Defendants correctly note that the district court in *Lindner Dividend Fund, Inc. v. Ernst & Young*, 880 F. Supp. 49 (D. Mass. 1995) declined to find that a class action Section 10(b) claim tolled the statute of limitations for individual Section 18 claims. However, the basis for that decision – that the facts underlying the two claims are significantly different – is simply wrong. Although the burden of proof as to the defendant's state of mind is different, the underlying nucleus of facts – the making of a false statement with a culpable state of mind, upon which investors relied to their detriment – is the same. Applying *American Pipe* tolling in these circumstances would not result in any unfair surprise to the defendants who were already subject to class-wide Section 10(b) claims based on the same conduct.

inapplicable. 650 F.2d at 346 n.7. Five years later, the Supreme Court held in *Crown, Cork & Seal* that the tolling doctrine extends to plaintiffs who opt out and file individual suits:

> [T]he commencement of a class action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the suit been permitted to continue as a class action. Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied.

462 U.S. at 353-354. In light of this holding – which says nothing about limiting tolling to plaintiffs who opt out before class certification – the earlier *Wachovia Bank* decision cannot be read to say the D.C. Circuit would, if faced with the issue today, find tolling inapplicable to plaintiffs who opt out and file individual actions prior to class certification. At least two other Circuits and a number of district courts have applied *American Pipe* tolling to such plaintiffs.[6]

In fact, the circumstances of this case demonstrate why courts should *not* reflexively find that *American Pipe* tolling is unavailable to plaintiffs who opt-out prior to class certification. Those courts that have declined to apply tolling to such plaintiffs have done so based on the premise that *American Pipe* was intended to discourage unnecessary and duplicative litigation. *See, e.g.*, *In re WorldCom Inc. Sec. Litig.*, 294 F. Supp. 2d 431, 451 (S.D.N.Y. 2003). However, in light of the class plaintiffs' decision not to include (or inability to include) certain claims and defendants in their complaint, Plaintiffs would have filed their actions whether the class was certified or not; the only question was when.

Having decided to pursue claims that were not asserted by the class plaintiffs, Plaintiffs could not realistically have waited to file suit until after class certification. First, they would

---

[6] *See, e.g., Joseph v. Wiles*, 223 F.3d 1155, 1167 n.9 & 1168 (10th Cir. 2000); *Adams Public Sch. Dist. v. Asbestos Corp., Ltd.*, 7 F.3d 717, 718 n.1 (8th Cir. 1993); *Schimmer v. State Farm Mut. Auto. Ins. Co.*, Civ. A. No. 05-CV-02513-MSK, 2006 WL 2361810, at *6 (D. Colo. Aug. 15, 2006); *Lehman v. United Parcel Serv., Inc.*, No. 06-4020-CV-C-NKL, 2006 WL 2280186, at *4 (W.D. Mo. Aug. 9, 2006).

have risked having the statute of limitations expire as to those unique claims that may not be subject to *American Pipe* tolling (*e.g.*, Section 20A claims or certain state law claims). Plaintiffs should not be put to a Hobson's choice of either (a) suing prior to class certification to preserve their unique claims but losing the benefit of *American Pipe* tolling for other claims, or (b) waiting until after class certification so as to get the benefit of *American Pipe* tolling, but having the statute of limitations expire as to their unique claims. Second, significant inefficiencies would have resulted if Plaintiffs had waited until after class certification is decided – which has not yet occurred – before filing suit. Among other things, Plaintiffs would have been unable to participate in the upcoming coordinated depositions. Where, as here, opting out prior to class certification does not result in unnecessary litigation and actually enhances efficiency and judicial economy, Plaintiffs should not be penalized for filing suit before class certification.

Finally, even if a one-year statute of limitations were applicable to Plaintiffs' Section 18 claims, and even if that period was not tolled by the filing of the class action, Plaintiffs' Section 18 claims should not be dismissed because Defendants have not shown conclusively, from the face of the Complaints, that Plaintiffs knew or had inquiry notice of the facts necessary to assert those claims before January 2005. As of that point in time, only the tip of the iceberg of Fannie Mae's fraud had been publicly disclosed. *See* Plaintiffs' Memorandum in Opposition to Defendants' Motions to Dismiss, at 16-18.

## IV. PLAINTIFFS HAVE ADEQUATELY ALLEGED THE AUDIT COMMITTEE DEFENDANTS' SCIENTER

### A. Plaintiffs Have Not, But Could Have, Relied Solely On OFHEO's Conclusions To Plead Scienter

During oral argument, the Court inquired whether Plaintiffs could meet their burden of pleading the Audit Committee Defendants' scienter by relying on the conclusions OFHEO had reached in its reports. Tr. at 61-62. As Plaintiffs' counsel responded at the hearing, Plaintiffs are

not relying solely on OFHEO's conclusions, but have also alleged detailed facts which form the

bases for those conclusions.  Additionally, Plaintiffs have alleged other particularized facts

which further support a finding of the Audit Committee Defendants' scienter.  However, even if

Plaintiffs had simply recited OFHEO's conclusions, that would be sufficient to satisfy Plaintiffs'

pleading burden, particularly in light of the detailed factual investigation that formed the basis

for OFHEO's conclusions.

OFHEO's Final Report concluded that Fannie Mae's Board of Directors and Audit

Committee had fallen short in many respects, and that Fannie Mae's internal controls – which the

Audit Committee Defendants were responsible for overseeing – were "grossly inadequate."  *See*

Evergreen ¶ 399; Franklin ¶ 429.[7]  As Plaintiffs noted in their Complaints, OFHEO's

conclusions were based on its review of 6.9 million pages of documents from Fannie Mae and

the Special Review Committee, more than 700,000 pages of work papers and other documents

from KPMG and Ernst & Young, documents provided to it by Paul Weiss, memoranda

documenting 241 interviews conducted by Paul Weiss, transcripts of 47 interviews of current and

former Fannie Mae and KPMG employees conducted by the SEC, as well as OFHEO's own

interviews of current and former Fannie Mae employees, Fannie Mae Board members, and

current and former KPMG employees.  Evergreen ¶ 10; Franklin ¶ 10.

OFHEO's Interim and Final Reports total more than 500 pages, and outline the basis for

OFHEO's conclusions in great detail.  The section of the Final Report entitled "Failures of the

Audit Committee" spans more than fourteen single-spaced pages, with subsections addressing

the Audit Committee's "Failure to Oversee the Office of Auditing and the Head of the Office of

Auditing," "Failure to Make Adequate Inquiries," "Failure to Oversee the Development and

---

[7] Citations herein to "Evergreen ¶ __" and "Franklin ¶ __" are to the Second Amended
Complaints filed by the Evergreen Plaintiffs and the Franklin Plaintiffs, respectively.

Implementation of Critical Accounting Policies," "Failure to Investigate Allegations Made by Roger Barnes," "Failure to Question the Assignment of Both Chief Financial Officer and Risk Policy Functions to Mr. Howard," "Failure to Adequately Oversee Sarbanes-Oxley Section 404 Compliance Implementation," and "Oversight of the Independent Auditor." *See* Report of the Special Examination of Fannie Mae, dated May 2006, at 287-301 (McIntyre Decl. Ex. B). A separate section entitled "Failures of the Full Board of Directors" spans another fourteen pages of the report. *See id.* at 307-321. Although it was not feasible for Plaintiffs to include *all* of the detail surrounding these many failures in their Complaints, Plaintiffs did plead many of the specific factual bases for OFHEO's conclusions. *See, e.g.,* Evergreen ¶¶ 398-402, 417-418, 420-422, 429-430; Franklin ¶¶ 431-435, 450-451, 453-455, 461-462 (bases for OFHEO's conclusions that Fannie Mae's defective internal controls facilitated the fraud); Evergreen ¶¶ 720, 722-725, 727-730; Franklin ¶¶ 815, 817-820, 822-825 (bases for OFHEO's conclusion that the Audit Committee Defendants failed to properly discharge their duties); Evergreen ¶¶ 735-743, 745-749, 751-752, 758-762; Franklin ¶¶ 820-845, 838-842, 851-858 (bases for OFHEO's conclusion that the Director Defendants failed to properly discharge their duties).

Moreover, Plaintiffs' pleading of OFHEO's conclusions and the bases therefor are supplemented by separate allegations of the Audit Committee Defendants' specific responsibilities under their charter -- including reviewing the effectiveness of internal controls and the performance and independence of the internal audit department -- and of specific examples of the severe deficiencies within those areas of responsibility. *See, e.g.*, Evergreen ¶¶ 425, 707-712; Franklin ¶¶ 457, 799-804 (the Audit Committee Defendants' responsibilities); Evergreen ¶¶ 403-408; Franklin ¶¶ 433-438 (allegations of internal control deficiencies in the Controller's Office); Evergreen ¶¶ 409-416, 721; Franklin ¶¶ 439-446, 813 (allegations of deficiencies and/or lack of independence in Fannie Mae's internal audit department).

The foregoing allegations do not amount to "conclusory allegations," but rather are rife with factual details that support a strong inference of the Audit Committee Defendants' scienter. However, even if Plaintiffs had done no more than allege OFHEO's conclusions, Plaintiffs submit that under the circumstances of this case, those allegations would have been sufficient to plead scienter. Where, as here, an investigative body's conclusions are based on an extensive investigative effort involving numerous witness interviews and review of millions of pages of documents, allegations of those conclusions carry a heightened degree of credibility not present with "conclusory allegations" whose basis is not apparent. Although Plaintiffs have found no case law addressing this issue in the context of an investigative body like OFHEO, several courts has found that plaintiffs can rely on the contents of newspaper articles to plead scienter when the articles include factual particulars and are the product of an independent investigative effort. *See Tracinda Corp. v. DaimlerChrysler AG*, 197 F. Supp. 2d 42, 80 (D. Del. 2002); *In re McKesson HBOC, Inc. Sec. Litig.,* 126 F. Supp. 2d 1248, 1272 (N.D. Cal. 2000). The same result is appropriate here, where OFHEO's report was based on a far more extensive investigation than any newspaper article, and contains particularized facts supporting its conclusions. [8]

### B.  Plaintiffs' Allegations Are Sufficient To Raise A Strong Inference Of The Audit Committee Defendants' Scienter

The totality of Plaintiffs' allegations against the Audit Committee Defendants, including the magnitude and pervasiveness of the fraud at Fannie Mae, the fact that the fraud resulted from breakdowns in the very business functions which the Audit Committee Defendants were

_____

[8] Additionally, to the extent Plaintiffs did not include all of the factual findings underlying OFHEO's conclusions in the Complaints, Defendants themselves have argued that "[r]eports of federal agencies are public documents of which courts routinely take judicial notice." *See* Fannie Mae's and the Director Defendants' Joint Request for Judicial Notice in Support of Motions to Dismiss the Evergreen and Franklin Second Amended Complaints, at 3. "In determining whether a complaint states a claim, the court may consider the facts alleged in the complaint, documents attached thereto or incorporated therein, and matters of which it may take judicial notice." *See Stewart v. Nat'l Educ. Ass'n,* 471 F.3d 169, 173 (D.C. Cir. 2006).

responsible for monitoring and which investors trusted them to oversee, and the numerous examples of problems in those functions which would have been obvious to the Audit Committee Defendants had they not been reckless, raise a strong inference of the Audit Committee Defendants' scienter.  Indeed, it is difficult to fathom how a non-reckless audit committee could allow such serious internal control deficiencies and other "red flags" of fraud to exist as:

- a "corporate climate . . . in which employees actually joked about improper income management because it was such a regular occurrence," and where greater emphasis was placed on achieving specific numbers than on reporting accurate results (Evergreen ¶¶ 391, 398; Franklin ¶¶ 421, 428);

- a Controller (defendant Spencer) who was not a C.P.A. yet was responsible for highly technical accounting issues, including approval of accounting policies (Evergreen ¶¶ 401, 403, 405; Franklin ¶¶ 431, 433, 435);

- inadequate staffing and expertise in the Controller's Office and internal audit department (Evergreen ¶¶ 404-405, 413-416; Franklin ¶¶ 434-435, 443-446);

- an internal audit department whose department head reported directly to the CFO (defendant Howard) instead of to the Audit Committee, and whose leadership viewed itself as accountable to senior management rather than the Audit Committee (Evergreen ¶¶ 401, 411; Franklin ¶¶ 431, 441);

- a directive by Howard that the head of the internal audit department could not respond to inquiries from the Audit Committee Defendants without vetting it with Howard first (Evergreen ¶ 411; Franklin ¶ 441);[9]

- internal auditors whose bonus compensation was tied to earnings targets, thus creating an incentive to refrain from blowing the whistle on earnings manipulation (Evergreen ¶ 412; Franklin ¶ 442);

---

[9] Though the Audit Committee Defendants' counsel argued that this fact tends to negate scienter, Plaintiffs have alleged—and indeed it is common sense—that the Audit Committee Defendants should have been aware of this limitation and should have taken proactive measures to ensure open lines of communication between the internal auditors and themselves.  (Franklin ¶ 411; Evergreen ¶ 441).

- an internal audit department head who lacked auditing experience and whose compensation was influenced by the CFO whose activities he was supposed to be auditing (Evergreen ¶¶ 401, 410; Franklin ¶¶ 431, 440);

- an internal audit department head who had conflicts of interest due to his former role as Controller (which left him auditing his own work) and his simultaneous role as Senior Vice President-Operations Risk (*id.*);

- the absence of formal written policies and procedures to support the closing process, analytical review, journal entries, or account reconciliations (Evergreen ¶¶ 406-407; Franklin ¶¶ 436-437);

- insufficient controls over database modifications, which led to a widespread practice of low-level employees overwriting and changing database records at the direction of management with no documentation or independent approvals (Evergreen ¶ 420; Franklin ¶ 450);

- the lack of formally documented accounting policy development procedures, or of a centralized database of Fannie Mae's accounting policies (*id.*); and

- Howard's broad and overlapping responsibilities, which minimized opportunities for independent checks and balances to prevent fraud (Evergreen ¶¶ 417-418; Franklin ¶¶ 447-448).

As discussed in Plaintiffs' prior submission and at oral argument, Plaintiffs' scienter allegations also include specific facts of which the Audit Committee Defendants had actual knowledge, which should have alerted them to the fraud but which the Audit Committee Defendants recklessly disregarded. These include Roger Barnes' allegations – which later proved to be well-founded – of rampant earnings manipulation and accounting fraud at Fannie Mae. Despite the seriousness of those allegations, the Audit Committee Defendants undertook no investigation of their own, and never even took the rudimentary step of speaking directly with Barnes or KPMG about the allegations. *See* Evergreen ¶ 715; Franklin ¶ 807. Instead, they accepted the representation of the Company's internal auditors that the allegations had been investigated and presented no problem, and then signed off on the Company's quarterly financial statements two days later. *See* Evergreen ¶¶ 389, 715; Franklin ¶¶ 419, 807.

During the hearing, the Court inquired whether OFHEO had identified anything specific about the investigation of Barnes' allegations that should have alerted the Audit Committee Defendants to the fraud. Tr. at 58. OFHEO's reports do not address that issue, although they do identify facts surrounding the Company's later settlement of Barnes' threatened lawsuit which should have alerted the Audit Committee Defendants to the fraud:

> [I]n October 2003 Roger Barnes . . . approached Fannie Mae through his lawyer to pursue a settlement of claims of discrimination resulting from allegations he had previously raised regarding Fannie Mae's amortization policies and earnings management. Fannie Mae entered into a settlement agreement with Mr. Barnes on November 3, 2003 . . . The allegations, and the subsequent settlement agreement, should have raised the concern of every member of the Audit Committee, especially when considered against the background of the recently released Baker Botts report on Freddie Mac's internal investigation and the initiation of the OFHEO special examination.
>
> The Audit Committee failed to make further inquiries or convene a special investigation after being informed at the November 17, 2003 Audit Committee meeting that Fannie Mae had reached a settlement with Mr. Barnes. The news of the settlement was received by the Audit Committee just three days after the Committee had been convened in order to discuss certification of the third quarter financial statements. Fannie Mae settled the case without bringing the matter to the Audit Committee and elected to postpone discussion of the matter until after the financial statements had been certified. Given that OFHEO had just announced a special examination of Fannie Mae's accounting practices, the Audit Committee was on notice that such allegations warranted further investigation. At a minimum, the Audit Committee had an obligation to ensure that the matter be disclosed to OFHEO. Instead, the matter was ignored until February 2004, when it was reviewed as part of the special examination.

McIntyre Decl. Ex. B, at 297-298.

In any event, the Audit Committee Defendants' scienter does not turn on whether facts were brought to their attention that should have alerted them to the insufficiency of the Barnes investigation, but also on whether the Audit Committee Defendants – whose job it was to

monitor the integrity of Fannie Mae's financial reporting – had *made sufficient inquiry* to satisfy themselves that Barnes' allegations were unfounded.  It is clear that they did not.  Instead, they blindly relied on internal auditors who—as the Audit Committee Defendants would have known had they bothered to inquire—had found no documentation to support a manual factor change that led to a $6.5 million transfer of amortization expense, had reached no conclusion regarding the validity of that factor change, and had not finished their investigation due to the modeling group's failure to respond to inquiries.  Evergreen ¶¶ 385, 388; Franklin ¶¶ 415, 418.  Even the most basic of inquiries by the Audit Committee Defendants would have revealed the gross insufficiency of the "investigation" into Barnes' allegations.

At oral argument, counsel for the Audit Committee Defendants argued that Plaintiffs' allegations amount to mere negligence, and that there are "competing inferences" suggesting that the Audit Committee Defendants were "kept in the dark" about the fraud, such as KPMG's issuance of unqualified audit opinions and management's efforts to conceal the fraud.  That argument ignores that the Audit Committee Defendants had an *affirmative responsibility*, which investors relied on them to fulfill, to make independent inquiries and satisfy themselves that the Company's internal controls were effective and adequate, that its accounting was appropriate, and that its financial reporting was accurate in all material respects.  As OFHEO stated in its Final Report:

> [T]he Audit Committee is charged with the specific responsibility of overseeing "the accounting, reporting, and financial practices of the corporation and its subsidiaries, including the integrity of the corporation's financial statements …"  Gaining knowledge and making the appropriate inquiries are critical components of any oversight function. . . .   Despite that directive, Mr. Gerrity was aware of neither how Fannie Mae formulated its accounting policies, nor who was responsible for them.  Also, as described herein, the Audit Committee failed to exhibit an appropriate level of knowledge about several of Fannie Mae's significant accounting policies . . . .  Furthermore, Mr. Gerrity stated that he "would count

> on management and/or Internal Audit and/or KPMG to raise [FAS
> 91, FAS 133, or other FAS issues with the committee].  That's the
> only way in which we would know."  *This passive approach to
> gaining knowledge of critical accounting policies contravenes all
> applicable governance standards.*

McIntyre Decl. Ex. B, at 292-93 (emphasis added) (internal footnotes and citations omitted).

      Having held themselves out as overseers of functions that are critical to the reliability of Fannie Mae's financial statements, the Audit Committee Defendants cannot avoid liability simply by claiming that they relied on other people (such as management, KPMG, or the internal auditors) to tell them if something was amiss.  The Audit Committee Defendants remain subject to Section 10(b) liability if they acted recklessly and/or had no reasonable basis for such reliance. *See In re JWP Inc. Sec. Litig.*, 928 F. Supp. 1239, 1257-58 (S.D.N.Y. 1996) (a jury could find that defendant audit committee members acted with scienter, even though the outside auditors "repeatedly assured the audit committee defendants that JWP's financial affairs were in order and that JWP was, if anything, conservative in its accounting practices . . .," where the plaintiffs had presented other evidence that supported a finding of the audit committee defendants' recklessness); *S.E.C. v. Yuen*, No. CV 03-4376MRP(PLAX), 2006 WL 1390828, **39-40 (C.D. Cal. Mar. 16, 2006) ("defendants who claim good faith based upon reliance upon a professional must show they . . . relied in good faith on that advice," and even then "reliance on a professional is not an affirmative defense but merely one factor that a court may consider, along with the rest of the evidence presented, when evaluating whether a defendant acted with scienter").[10]

---

[10] *See also S.E.C. v. Bonastia*, 614 F.2d 908, 914 (3d Cir. 1980) (claim of reliance on opinions of others did not preclude finding of scienter); *In re Nextcard, Inc. Sec. Litig.*, No. C 01-21029 JF (RS), 2006 WL 708663, *5 (N.D. Cal. Mar. 20, 2006) (rejecting defendants' argument that auditor's certifications of financial statements negated or weakened the inference of their scienter, where allegations did not establish that defendants were entitled to rely on those certifications); *S.E.C. v. Softpoint, Inc.*, 958 F. Supp. 846, 864 (S.D.N.Y. 1997) (where defendant had a "well-defined obligation to ensure the accuracy of the information filed with the SEC," his claim of reliance on the company's auditor did not negate his scienter).

Because Plaintiffs' allegations raise a strong inference of the Audit Committee Defendants' recklessness—including their reckless failure to ask obvious questions of, or monitor the independence of, the very people upon whom they claim to have relied[11]—the Audit Committee Defendants' purported "competing inferences" do not warrant dismissal.  Rather, the strong inference from the totality of Plaintiffs' allegations is that the Audit Committee Defendants acted with scienter.[12]  Their arguments to the contrary simply raise issues of fact that should be resolved by a jury and not on a motion to dismiss.  *See In re Chambers Dev. Sec. Litig.*, 848 F. Supp. 602, 620 (W.D. Pa. 1994) (court declined to dismiss complaint based on argument that a "consistent string of unqualified audit opinions from a major accounting firm" negated the defendants' scienter, because other allegations supported inference of scienter); *Dep't of Econ. Dev. v. Arthur Andersen & Co.*, 739 F. Supp. 804, 809 n.6 (S.D.N.Y. 1990) (denying motion to dismiss because "the fact that [a party] may have concealed [its] fraud does not necessarily mean that the [defendants] could have no knowledge of it.").

## V.    PLAINTIFFS HAVE ALLEGED THE DIRECTOR DEFENDANTS' "CONTROL" FOR PURPOSES OF SECTION 20(a)

The Director Defendants contend that Plaintiffs' Section 20(a) claims must be dismissed for failure to plead the Director Defendants' "power to control … the technical accounting determinations that allegedly led to the primary violations."  Tr. at 27.  However, they cite no

---

[11] *See*, *e.g.*, Franklin ¶¶ 807, 812, 814, 917, 819, 822; Evergreen ¶¶ 715, 720, 722, 725, 727, 730.

[12] There is a split of authority, which is now before the Supreme Court on a writ of *certiorari*, as to whether the PSLRA requires courts to choose "the most plausible of competing inferences," *Fidel v. Farley*, 392 F.3d 220, 227 (6th Cir. 2004), or whether a court should "allow the complaint to survive if it alleges facts from which, if true, a reasonable person could infer that the defendant acted with the required intent," *Makor Issues & Rights, Ltd. v. Tellabs, Inc.*, 437 F.3d 588, 602 (7th Cir. 2006), *cert. granted*, 127 S.Ct. 853 (2007).  Plaintiffs' claims should survive under either approach, because the most plausible inference from the Complaints is that the Audit Committee Defendants were reckless in the fulfillment of their own duties, and thus acted with reckless disregard for the accuracy of Fannie Mae's financial statements.

case in which such allegations were required.  Instead, they cite case law for the proposition that a plaintiff must plead the defendant's power to control the specific activity upon which the primary violation is predicated.  Fannie Mae's primary violations are not predicated on its improper accounting determinations, but on its dissemination of false and misleading statements regarding its financial condition.  As reflected in Plaintiffs' prior submission, numerous courts have found it sufficient – particularly in light of the applicability of Rule 8 – to allege that a defendant signed or otherwise had the ability to influence the content of the false statements.

The Director Defendants contend that "[i]f what Plaintiff advocates is all that's required, then directors would always be deemed to have control, and any outside director would be subject to litigation beyond the pleadings stage under 20(a), and this is especially true if this proposition is coupled with the proposition that no culpable participation need [sic] to be pled." Tr. at 26.  That very argument was squarely rejected in *In re WorldCom, Inc. Securities Litigation*, where the Court aptly explained:

> The Director Defendants urge that the signatures on SEC filings should not be sufficient to allege control since they are required by virtue of their status to sign annual reports and registration statements. They protest that if a signature that is required by law is sufficient to plead control then "every director will automatically be deemed to have control based solely on his or her status."
>
> There are several responses to this protest. First, what is at issue here is the sufficiency of pleadings under Rule 8.  In that regard, it is important to remember that Section 20(a) contains a good faith defense.  Second, the allegation that a Director signed a Form 10-K or a registration statement may not be sufficient to allege control ... when the misrepresentation or omission at issue … does not appear in those documents ...  Third, the ruling here reflects the scheme established by Congress.  It has imposed a heightened pleading standard for a Section 10(b) claim but not for a Section 20(a) claim.  If a plaintiff succeeds in pleading a Section 10(b) violation, then Congress has determined that those who control that violator may be sued too….

294 F. Supp. 2d at 419-20 (internal footnotes omitted).  The *WorldCom* court also followed the majority view that the plaintiffs were not required to plead culpable participation.  *Id.* at 415.

Furthermore, even if Fannie Mae's "technical accounting determinations" were the relevant activity for purposes of "control," Plaintiffs have alleged the Audit Committee Defendants' power to control those determinations, as their charter required them to "review the status of compliance with significant accounting developments" and to "receive, review, and discuss reports from the outside auditor on all critical accounting policies and practices to be used [and] all alternative treatments that have been discussed with management." Evergreen ¶¶ 709(e), 712(h), 712(p); Franklin ¶¶ 801(e), 804(h), 804(p)).  Plaintiffs have also pleaded the other Director Defendants' power to control the Company's accounting determinations, based on OFHEO's regulatory requirement that they "hav[e] in place adequate policies and procedures to assure [their] oversight of . . . [the] [i]ntegrity of accounting and financial reporting systems of the Enterprise …"  Evergreen ¶ 736; Franklin ¶ 829.  Accordingly, Plaintiffs have adequately alleged the Director Defendants' "control."

## VI.  PLAINTIFFS HAVE STATED A SECTION 10(b) CLAIM AGAINST RADIAN

### A.  Radian's Issuance of a Sham Insurance Policy Was a Primary Violation of Section 10(b)

Radian's sale of a sham insurance policy to Fannie Mae is sufficient to warrant liability under Rule 10b-5(a) and (c).  Radian structured a sham insurance policy which it sold to Fannie Mae at the end of January 2002 for the express purpose of enabling the Company to spread its losses in order to manage earnings.  Evergreen ¶¶ 247-49, 789; Franklin ¶¶ 276-78, 882.  The sham policy itself—regardless of how Fannie Mae accounted for it—was inherently deceptive because it depended on the fiction that risk was being transferred from Fannie Mae to Radian.  OFHEO, Paul Weiss, and Fannie Mae all concur that the policy did not transfer sufficient risk to

qualify as insurance.  *See* Evergreen ¶ 236; Franklin ¶ 165.[13]

In a case involving very similar allegations, Judge Sprizzo of the Southern District of New York denied a motion to dismiss Rule 10b-5(a) and (c) claims against Gen Re, a reinsurance company which was alleged to have structured sham finite risk insurance transactions with knowledge that the purpose of the transactions was to manipulate its counterparty's financial results.  *See In re AIG, Inc. Sec. Litig.*, No. 04 CV 8141 (JES), Oral Argument Tr. at 89-95 (S.D.N.Y. Apr. 20, 2006) (McIntyre Decl. Ex. C).  This Court should likewise find that Radian's sale of a sham policy to Fannie Mae gives rise to primary Section 10(b) liability.  *See also In re Parmalat Sec. Litig.*, 376 F. Supp. 2d 472, 504 (S.D.N.Y. 2005) (bank that factored and securitized worthless invoices which Parmalat, in turn, used to falsity its financial statements was liable as a primary violator because the "transactions in which the defendants engaged were by nature deceptive" to the extent that "[t]hey depended on a fiction, namely, that the invoices had value").

## B.     <u>Plaintiffs Have Pleaded Radian's Scienter</u>

During oral argument, the Court inquired as to Radian's motive to enter into a deceptive transaction with Fannie Mae, especially in light of the fact that Radian is a publicly-traded company and would expose its own shareholders to losses if its misconduct were revealed.  Tr. at 76-77.  Further, Radian's counsel represented that his client had actually sustained a loss on the sham policy (Tr. at 41), prompting the Court to inquire as to why "Radian would take a $4 million loss willingly and knowingly."  Tr. at 75.  As an initial matter, Plaintiffs note that they

---

[13] *See also generally Group Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 211 (1979) (a product that did not spread risk was not insurance because the "primary elements of an insurance contract are the spreading and underwriting of a policyholder's risk"); *S.E.C. v. Life Partners, Inc.,* 898 F. Supp. 14, 18 (D.D.C. 1995) (viatical settlements that did not transfer risk were not "insurance" because the "hallmark of 'insurance' is the spreading and underwriting of a policyholder's risk").

are not required to allege Radian's motive in order to plead its scienter.  While motive *can* support a strong inference of scienter, that inference can also be established by allegations of knowing or reckless conduct.  *See In re Baan Co. Sec. Litig.,* 103 F. Supp. 2d 1, 19 (D.D.C. 2000).  Thus, Plaintiffs can plead their Section 10(b) claim against Radian by alleging – as they have – that Radian knew the policy was not legitimate insurance and that its only purpose was to facilitate Fannie Mae's shifting of income from 2002 to future years in order to conceal volatility.  *See Parmalat,* 376 F. Supp. 2d at 507 (allegations that CSFB structured and participated in transactions so Parmalat could manipulate its financial results were sufficient to plead scienter); *id.* at 506-07 (plaintiffs adequately pleaded scienter against BNL and Ifitalia based on allegations that these defendants' very participation in the transaction indicated that they understood the lack of economic substance).

In any event, Plaintiffs *have* pleaded that Radian had a motive to violate Section 10(b). Plaintiffs expressly allege that Radian sold the sham policy to Fannie Mae because it finds these types of finite risk insurance policies to be more profitable than ordinary insurance.  Evergreen ¶ 249; Franklin ¶ 281.  Plaintiffs' allegation that the policy did not transfer sufficient risk to qualify as insurance – which Radian had to know given its expertise in the insurance industry – also supports the conclusion that Radian did not take on any appreciable risk and therefore did not expect to suffer any losses under the policy.  *See* Evergreen ¶ 236; Franklin ¶ 265. Moreover, the suggestion that Radian *ultimately* sustained a loss on Fannie Mae's "policy" (which is beyond the four corners of the Complaints), and the fact that Radian was to receive $35 million and pay out up to $39 million, do not undercut Plaintiffs' contention that Radian *expected*, given the time value of money, to turn a profit on the transaction.  Plaintiffs allege that Fannie Mae paid Radian a lump sum of $35 million in January 2002 and that Radian—*over the course of the next three years*—was to pay out up to $39 million in claims.  Evergreen ¶ 247;

Franklin ¶ 279.  Insurance companies are willing to enter into such deals because they expect that with a lump sum up front to reinvest immediately, they will be able to earn a sufficient return on that money to pay out the slightly higher amount due under the "policy" over time and still make a profit on the transaction.  *See, e.g.,* Gregory Zuckerman, *Investors Worry Insurance Probes May Snare Berkshire,* WALL ST. J., Nov. 12, 2004, at C1 (noting that in Berkshire Hathaway's 2003 Annual Report Warren Buffett described its insurance subsidiary's sale of retroactive insurance policies "'that are likely to produce underwriting losses . . .  but also provide unusually large amounts of float,' or money for Berkshire to invest").

Furthermore, as Plaintiffs note in their Complaints, the finite risk policy between Radian and Fannie Mae is exactly like those that the SEC and New York Attorney General Eliot Spitzer have been investigating to determine whether they are true insurance or are simply being sold to companies to help them smooth earnings or hide losses.  Evergreen ¶ 236; Franklin ¶ 268.  The suggestion that a publicly-traded company would not knowingly sell "sham" insurance policies is belied by the fact that a number of highly profitable publicly traded companies stand accused of this very conduct—and in some cases have paid substantial fines to settle such accusations. *See, e.g.,* Judy Greenwald, *Report slams Fannie Mae on finite: Agency to pay $400 million fine over accounting*, BUSINESS INSURANCE, Vol. 40, Issue 22, May 29, 2006 (noting that the Fannie Mae situation was "not the first time companies that are not property/casualty insurers have come under scrutiny for their use of finite insurance," and that AIG had paid $126 million to settle charges over its involvement in such transactions with PNC Financial Services and Brightpoint Inc.); *RenaissanceRe Settles S.E.C. Case*, N.Y. TIMES, Feb. 7, 2007 ("The insurance company RenaissanceRe Holdings agreed . . . to pay a $15 million fine to settle civil charges of securities fraud over what federal regulators said was a sham transaction created to burnish the company's earnings by smoothing their volatility."); *MBIA to settle probes by paying $75*

*million*, WALL ST. J., Jan. 29, 2007 (MBIA agreed to pay $75 million to settle civil inquiries into

its finite risk insurance practices); *Insurance Company Settles Case on Bids,* N.Y. TIMES, Apr.

27, 2006, at C7 (Ace Ltd. agreed to pay $80 million to settle claims that it improperly rigged bids

and conducted improper finite risk insurance transactions).

The fact that OFHEO and Paul Weiss did not reach any conclusions regarding Radian's

state of mind is of no moment, because they had no reason to do so.  OFHEO, as Fannie Mae's

regulator, was investigating Fannie Mae's compliance with generally accepted accounting

principles and safety and soundness requirements.  Likewise, Paul Weiss was engaged to

conduct an independent investigation of the issues raised in OFHEO's report, and it states in its

report that its "factual findings and conclusions focus on management's intent and motive with

respect to the transactions [it] reviewed" and that its "mandate did not include . . . whether the

Company may properly assert legal claims against any individuals or entities."  *See* Report to the

Special Review Committee of the Board of Directors of Fannie Mae, dated Feb. 23, 2006, at 2

(McIntyre Decl. Ex. D).   The motivations and intent of Radian, an outsider to Fannie Mae, were

simply beyond the scope of these reports.

### C.    <u>Plaintiffs Have Alleged Causation</u>

During oral argument, Radian's counsel incorrectly asserted that Plaintiffs' Complaints

"[did] not allege what impact, if any, [the Radian sham insurance policy] had on the financial

statements of Fannie Mae" and that the policy "may or may not have affected the numbers."  Tr.

at 36.  *See also* Tr. at 43.  The Franklin and Evergreen  Complaints, however, plainly plead what

impact the Company's fraudulent accounting for the Radian transaction had on the Company's

financial statements.  *See* Evergreen ¶ 248; Franklin ¶ 280  (noting that "[t]he Company's

balance sheet accounts for other assets and total assets, and the Company's income statement

line items for provision for losses or fee and other income (expense), net income, and earnings

per share (basic and diluted), were misstated after January 2002 as a result of Defendants' improper accounting for the Radian Transaction as insurance under SFAS 5" *and* that "the restatement relating to accounting for this policy will impact reported earnings for 2002, 2003 and 2004"). While Radian's proportionate fault for Plaintiffs' losses may be the subject of future debate, Plaintiffs have alleged that Radian's conduct contributed to the misstatement of Fannie Mae's financial statements, that Plaintiffs paid artificially inflated prices as a result of the misstatement of those financial statements, and that Fannie Mae's stock price dropped upon the disclosure of the sham transaction with Radian. Evergreen ¶¶ 248, 674, 785, 789, 791; Franklin ¶¶ 277, 711, 878, 882, 884. These allegations suffice to allege causation as against Radian.[14]

## VII.   PLAINTIFFS HAVE STATED A STATE LAW CLAIM AGAINST RADIAN FOR AIDING AND ABETTING FRAUD

For the reasons set forth in Plaintiffs' prior submission, California and Massachusetts law should apply, respectively, to the state law claims of the Franklin and Evergreen Plaintiffs. Both of these states as well as the District of Columbia recognize a cause of action for aiding and abetting fraud. Radian, however, contends that Pennsylvania law—which purportedly does not recognize this cause of action—applies to Plaintiffs' claims.

Even if Pennsylvania law were applicable, which it is not, Radian is not entitled to dismissal because a recent decision – which Plaintiffs provided to Radian's counsel before the hearing – holds that Pennsylvania law *does* recognize a claim for aiding and abetting fraud. In *Sovereign Bank v. Valentino,* 914 A.2d 415 (Pa. Super. Ct. 2007), defendant Ganter appealed a bench verdict finding him liable for, *inter alia,* "aiding and abetting" defendant Valentino's fraud

---

[14] *See AIG, Inc. Sec. Litig.*, Tr. at 95-97 (denying Gen Re's motion to dismiss for failure to allege causation, where plaintiffs pleaded that Gen Re's finite risk transaction affected AIG's financial statements, and where AIG's stock price fell when the sham nature of the transaction was revealed) (McIntyre Decl. Ex. B). *See also* cases cited at pp. 57-58 of Plaintiffs' Opposition Brief.

by "actively, knowingly, and intentionally facilitat[ing] Mr. Valentino's fraudulent scheme . . . ."
*Id.* at 417.  On appeal, defendant Ganter argued that the judgment against him should be
overturned because "there is no civil cause of action for the tort of civil aiding and abetting in
Pennsylvania."  *Id.* at 420.  The Pennsylvania Superior Court rejected Ganter's argument,
holding that "concerted tortious action, as defined in Section 876 of the Restatement (Second) of
Torts, is a recognized civil cause of action under Pennsylvania law."  *Id.* at 427.

Section 876 of the Restatement (Second) of Torts expressly recognizes three
"subspecies" of "concerted tortious conduct":

> **§ 876.  Persons Acting in Concert.**
>
> For harm resulting to a third person from the tortious conduct of
> another, one is subject to liability if he:
>
> (a) does a tortious act in concert with the other or pursuant to a
> common design with him, or
>
> (b) knows that the other's conduct constitutes a breach of duty and
> gives substantial assistance or encouragement to the other so to
> conduct himself, or
>
> (c) gives substantial assistance to the other in accomplishing a
> tortious result and his own conduct, separately considered,
> constitutes a breach of duty to the third person.

Counsel for Radian asserted during oral argument that *Sovereign Bank* "involve[d] Restatement
of Torts (Second) Section 876(a)," that it "[did] not involve aiding and abetting or fraud," and
that "876(b), which is the aiding and abetting portion of the Restatement, has expressly been
rejected by the Pennsylvania Supreme Court in the [*Morrow*] case . . . ."  Tr. at 43.  All three
points are incorrect.

First, the court's holding in *Sovereign Bank* was not limited to Section 876(a), but
extended to the whole of Section 876.  914 A.2d at 427 ("concerted tortious action, as defined in
Section 876 of the Restatement (Second) of Torts, is a recognized civil cause of action under
Pennsylvania law").  Radian's contention that *Sovereign Bank* involved only Section 876(a) is

not only wholly refuted by the plain language of the court's holding but is also belied by the fact that the court quoted at length from the Comments to Section 876(b) in analyzing the defendant's claims. *Id.* at 421 (quoting "Comment on Clause (b)").

Second, *Sovereign Bank* involved a claim of aiding and abetting fraud. 419 A.2d at 417 ("Sovereign alleged one count of aiding and abetting against Mr. Ganter, claiming that he 'actively, knowingly, and intentionally facilitated Mr. Valentino's fraudulent scheme . . .'").

Third, the 1920 *Morrow* decision predated the first Restatement of Torts by nineteen years, and therefore it could not have rejected Section 876(b) of the Restatement. Nor did *Morrow* hold that claims for aiding and abetting are unavailable in Pennsylvania. In *Morrow*, the plaintiffs claimed that a mortgage company which allowed its offices to be used for the closing of a fraudulent transaction "participated in the fraud by permitting settlements to be made through its offices without informing plaintiffs that they were being defrauded." 266 Pa. at 396. The plaintiffs' theory of liability was not that the defendant had actively participated in the fraud, but rather that it had failed to disclose the fraud. The court held that "*failure . . . to disclose the fact that a fraud was being perpetrated gave rise to no action* against the company on the part of the plaintiffs, unless a legal relation appeared between the company and plaintiffs, whereby a duty was imposed upon its employes [sic] to inform plaintiffs of the fraud. *In other words, silence is a fraud only when there exists a duty to speak*." *Id.* at 398 (emphasis added). That holding is inapposite here, where Radian is alleged to have actively participated in the fraud.

Therefore, Pennsylvania Superior Court is the highest court in Pennsylvania to have considered the viability of an aiding and abetting claim, and its decision in *Sovereign Bank* establishes that aiding and abetting fraud is a recognized cause of action under Pennsylvania law. As a result, even if Pennsylvania law were applicable to Plaintiffs' aiding and abetting claim as Radian contends, there would be no basis for dismissal.

## VIII.   PLAINTIFFS' SECTION 20A CLAIMS ARE NOT LIMITED TO PURCHASES MADE ON THE SAME DAY AS DEFENDANTS' SALES

There is no dispute that Plaintiffs have stated a Section 20A claim against each of

defendants Raines, Howard, and Spencer as to at least one sale of stock by each defendant.  As to

these defendants' other sales, they contend that no Section 20A claim can lie because the sales

were not effected on the same day as purchases by Plaintiffs, even though the sales occurred

while the defendants were in the possession of material, non-public information indicating that

the stock was trading at inflated prices, and even though Plaintiffs purchased stock at inflated

prices within a week (and often within a day or two) after each of those sales.  Defendants'

interpretation of Section 20A is unduly restrictive and, if adopted, would thwart Congressional

intent to create a broad, flexible remedy to deter insider trading and to protect the integrity of the

capital markets.  *See* 1988 U.S.C.C.A.N. 6043, 6044 (Section 20A was designed to "augment

enforcement of the securities laws . . .  through a variety of measures designed to provide greater

deterrence, detection and punishment of violations of insider trading").

As Plaintiffs noted in their Opposition and during oral argument, Congress cited several

cases that permitted trades up to a week apart to qualify as "contemporaneous" in the legislative

history for 20A.  The court in one of these cases—*Shapiro v. Merrill Lynch, Pierce, Fenner &*

*Smith, Inc.,* 495 F.2d 228, 235-37 (2d Cir. 1974)—explained the rationale for allowing trades

several days apart to serve as the basis for imposition of liability for insider trading under 10(b):

> [I]n applying the antifraud provisions of the securities laws to the
> facts of this case, it is important to bear in mind that 'Congress
> intended securities legislation enacted for the purpose of avoiding
> frauds to be construed 'not technically and restrictively, but
> flexibly to effectuate its remedial purposes.' . . .
>
> *To hold that Section 10(b) and Rule 10b-5 impose a duty to*
> *disclose material inside information only in face-to-face*
> *transactions or to the actual purchasers or sellers on an*
> *anonymous public stock exchange, would be to frustrate a major*

> *purpose of the antifraud provisions of the securities laws: to insure the integrity and efficiency of the securities markets.* We decline defendants' invitation to sanction a result which Section 10(b) and Rule 10b-5 clearly were intended to foreclose. *We hold that defendants owed a duty*—for breach of which they may be held liable in this private action for damages—*not only to the purchasers of the actual shares sold by defendants (in the unlikely event they can be identified) but to all persons who during the same period purchased [the issuer's] stock in the open market without knowledge of the material inside information which was in the possession of defendants.*

(emphasis added) (internal citations and quotations omitted). Given Congress' express intent to create a broad remedy to protect the integrity of the securities markets—and its citation with approval of cases permitting trades up to a week apart to qualify as "contemporaneous"—this Court should decline to adopt the "same day" trading rule.

## CONCLUSION

WHEREFORE, for all of the foregoing reasons as well as those set forth in Plaintiffs' brief in opposition to the Defendants' motions to dismiss and at oral argument, the Evergreen Plaintiffs and the Franklin Plaintiffs respectfully request that the Court deny the Defendants' motions to dismiss in their entirety.

Dated: March 15, 2007

*/s/ Stuart M. Grant*
Stuart M. Grant (D.C. Bar # 450895)
Megan D. McIntyre
Christine M. Mackintosh
GRANT & EISENHOFER P.A.
Chase Manhattan Centre
1201 N. Market St.
Wilmington, DE 19801
(302) 622-7000
(302) 622-7100 (facsimile)
*Attorneys for the Evergreen Plaintiffs and the Franklin Plaintiffs*

## CERTIFICATE OF SERVICE

I certify that on March 15, 2007, The Evergreen Plaintiffs' and Franklin Plaintiffs' Supplemental Submission In Opposition To The Motions To Dismiss By Fannie Mae, The Director Defendants, Radian Guaranty, and Defendants Howard, Raines, and Spencer and Declaration of Megan D. McIntyre were electronically filed using the CM/ECF system, which will send notification of such filing to the counsel of record in this matter who are registered on the CM/ECF. Service was accomplished on counsel not registered through the CM/ECF system via First Class U.S. Mail, as indicated below.

## VIA U.S. MAIL:

Fred F. Fielding
Barbara Van Gelder
WILEY REIN & FIELDING LLP
1776 K Street, N.W.
Washington, D.C. 20006
*Counsel for Defendants Frederic V. Malek and Anne Mulcahy and for Defendant Tom Gerrity in the Evergreen Action (Civil Action No. 06-CV-0082)*

Rachelle M. Barstow, Esquire
Robert M. Romano, Esquire
MORGAN LEWIS & BOCKIUS LLP
101 Park Avenue
New York, NY 10178
*Counsel for Tom Gerrity in Civil Action No. 04-CV-1639, 06-CV-0139, MDL 1668 and 04-CV-1783*

John H. Doyle, III
Rhonda D. Orin
ANDERSON KILL & OLICK, LLP
2100 M Street, NW, Suite 650
Washington, DC 20037
*Counsel for Leslie Rahl*

## VIA CM/ECF NOTIFICATION:

Jeffrey C. Block
Kathleen M. Donovan-Maher
Julie A. Richmond
Joseph C. Merschman
BERMAN DEVALERIO PEASE TABACCO
BURT & PUCILLO
One Liberty Square
Boston, MA 02169
*Counsel for State Teachers Retirement System of Ohio and Ohio Public Employees Retirement Systems*

James R. Cummins
Melanie S. Corwin
Jean M. Geoppinger
WAITE, SCHNEIDER, BAYLESS
& CHESLEY CO., L.P.A.
1513 Fourth & Vine Tower
One West Fourth Street
Cincinnati, OH 45202
*Counsel for State Teachers Retirement System of Ohio and Ohio Public Employees Retirement Systems*

James D. Wareham
PAUL, HASTINGS, JANOFSKY &
WALKER LLP
875 15th Street, N.W.
Washington, D.C. 20005
*Counsel for Daniel Mudd*

Jeffrey William Kilduff
Seth Aronson
Michael J. Walsh, Jr.
O'MELVENY & MYERS L.L.P.
1625 I Street, N.W.
Washington, D.C. 20006
*Counsel for Fannie Mae, Taylor Segue,*
*William Harvey, Kenneth Duberstein, Manuel*
*Justiz, and H. Patrick Swygert*

William H. Jeffress
Julia E. Guttman
Nicholas A. Brady
BAKER BOTTS L.L.P.
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2400
*Counsel for Jamie Gorelick*

Steven Mark Salky
Eric R. Delinsky
Ellen D. Marcus
Holly Ann Pal
Tammy Gershoni
Miles Clark
ZUCKERMAN SPAEDER, LLP
1800 M Street, NW Suite 1000
Washington, DC 20036
*Counsel for Timothy Howard*

Francis J. Warin
Andrew S. Tulumello
Melanie L. Katsur
Henry Charles Whitaker
Claudia M. Osorio
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036
*Counsel for KPMG LLP*

Alex Giscard Romain
2842 S. Columbus St
Arlington, VA 22206
*Counsel for Franklin Raines*

William H. Jeffress
Julia E. Guttman
Nicholas A. Brady
BAKER BOTTS L.L.P.
The Warner
1299 Pennsylvania Avenue, N.W.
Washington, D.C. 20004-2400
*Counsel for Jamie Gorelick*

David S. Krakoff
Eldad Zvi Malamuth
Christopher F. Regan
Adam B. Miller
MAYER, BROWN, ROWE & MAW LLP
1909 K Street, NW
Washington, DC 20006
*Counsel for Leanne Spencer*

Kevin M. Downey
Michelle D. Schwartz
Joseph Marshall Terry, Jr.
Daniel N. Marx
Matthew L. Fore
John E. Clabby
Ilana T. Buschkin
WILLIAMS & CONNOLLY, LLP
725 12th Street, NW
Washington, DC 20005
*Counsel for Franklin Raines*

Cristen Sikes Rose
DLA PIPER RUDNICK, GRAY CARY US
LLP
1200 19th Street, NW, Suite 700
Washington, DC 20036
*Counsel for Stephen Ashley, Donald Marron,*
*and Ann Korologos*

Jonathan M. Stern
SCHNADER HARRISON SEGAL & LEWIS
LLP
2001 Pennsylvania Avenue, NW, Suite 300
Washington, DC 20006-1825
*Counsel for Radian Guaranty Inc.*

James Hamilton
David I. Ackerman
BINGHAM MCCUTCHEN LLP
2020 K Street, NW
Washington, DC 20006
*Counsel for Joe Pickett*

Daryl A. Libow
SULLIVAN & CROMWELL LLP
1701 Pennsylvania Avenue, N.W.
Washington, DC 20006
*Counsel to Goldman, Sachs & Co*

Aaron Futch
1615 L. Street, NW, Suite 1300
Washington, DC 20036-5694
*Counsel to Paul, Weiss, Rifkind, Wharton &*
*Garrison LLP*

John C. Truong
U.S. Attorney's Office
for the District of Columbia
Civil Division
555 Fourth Street, NW, E4206
Washington, DC 20530
*Counsel for Interested Party*
*OFHEO*

Jonathan S. Liss
Dionna K. Litvin
David Smith
SCHNADER HARRISON SEGAL & LEWIS
LLP
1600 Market Street, 36th Floor
Philadelphia, PA 19103
*Counsel for Radian Guaranty Inc.*

Richard H. Klapper
Michael T. Tomaino, Jr.
Daniel H. R. Laguardia
Jeremy C. Bates
Patrice A. Rouse
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
*Counsel to Goldman, Sachs & Co.*

Patrick D. Connor
MORGAN LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
*Counsel for Tom Gerrity in Civil Action No.*
*04-CV-1639, 06-CV-0139, MDL 1668 and 04-*
*CV-1783*

*/s/ Megan D. McIntyre*
Megan D. McIntyre