64Kbwaiga (2).txt

20      MR. KRAMER: It can't be. Right.
21      The last two items that they're claiming, 9 and 10,
22 fall outside the class period they've alleged here. They
23 allege the class period ends March 30, and it's our view and we
24 cited law in our complaints that you can't get recovery or
25 damages for events that occur after the class period. And so 9
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                51
64Kbwaig                        Oral Argument
1 and 10, which are after the class period in this case, also
2 have to fall out.
3       THE COURT: What are they?
4       MR. KRAMER: What they allege, 9 and 10?
5       THE COURT: What is it?
6       MR. KRAMER: In 9, they're trying to get an extra day
7 on AIG's disclosure that it's going to restate its financial
8 statements. That disclosure was made in the morning of March
9 30. The stock reacted. They end their class period on March
10 30, and then they say, you know what, March 31, we think
11 there's a continuation of the reaction. It's more than 24
12 hours after the event. This is the most efficient market.
13      THE COURT: It's an evidentiary matter. Anything
14 else?
15      MR. KRAMER: Since it's outside of the class period, I
16 think as a matter of law.
17      THE COURT: If your argument is that it's evidence of
18 what the loss was as of the class period, I do not think I can
19 resolve that on a motion.
20      MR. KRAMER: I think if it's clearly outside the class
21 period --
22      THE COURT: If it was six months outside the class
23 period, then I would agree with you, but whether or not to
24 permit an inference of an earlier date, as of a day earlier, it
25 may be an evidentiary question.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300

                                                                52
64Kbwaig                        Oral Argument
1       MR. KRAMER: I'm not arguing that it can't be an
2 evidentiary matter. What I'm arguing to the Court is when they
3 say they're entitled to the stock drop, the stock drop
4 occurring outside of the class period as a matter of law is not
5 recoverable.
6       THE COURT: The point is that if that stock drop
7 occurred the next day, it may be part of the stock drop that
8 occurred the day before.
9       MR. KRAMER: If it's after the class period --
10      THE COURT: I'm not so sure you can draw the line that
11 thin, on a motions, anyway.
12      MR. KRAMER: Okay, and then April 1 is an allegation
13 based on a press report that Mr. Greenberg, your Honor --
14      THE COURT: You can't be here all afternoon because I
15 have another case after this one.
16      MR. KRAMER: I think I have less than five minutes,
17 your Honor, if I may.
18      THE COURT: All right.
19      MR. KRAMER: This is based on a news report that
20 Mr. Greenberg took documents away from AIG. So the notion that
21 that's damage as against AIG is just nonsensical so, again,
22 it's our view that this drops out and essentially based on what
23 remains, they have three items that they've alleged attempted
24 to allege loss causation, the disclosure of bid rigging, finite
                            Page 25

64Kbwaiga (2).txt
25   insurance transactions and the restatement, and, your Honor,
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

53

64Kbwaig                    Oral Argument
1    it's our view that that's what this case, if it proceeds at
2    all, should be limited to, and that's what would make sense
3    here, and that's all they've even attempted to plead.
4           So it's our view, your Honor, that we would like a
5    ruling based on the loss causation allegations that makes it
6    clear that these are the three events that they've attempted to
7    allege loss for.
8           THE COURT:  What do you mean by a ruling?
9           MR. KRAMER:  That their 10b claim is overbroad.  To
10   the extent they're attempting to allege 10b based on other
11   transactions, they've not alleged loss causation as to those
12   transactions.
13          THE COURT:  I don't think I could rule on that issue.
14          MR. KRAMER:  It's a ruling that would guide the
15   litigation.
16          THE COURT:  Well, I do not think it's the right time
17   for it.
18          MR. KRAMER:  Well, I'm hoping that your Honor would,
19   so that we can have --
20          THE COURT:  It's may not be the right time for it.
21          MR. KRAMER:  -- a more efficient litigation.
22          THE COURT:  Anybody else want to say something in
23   response?  We have to expedite this case a little bit.
24          MR. DUBBS:  Very quickly, your Honor, as to the first
25   drop, we claim the press release itself was false.  The press
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

54

64Kbwaig                    Oral Argument
1    release was about PNC, but we claim the press release itself is
2    false.
3           As to the disclosures at the end of the class period,
4    they are the sequela of what happened in the class period, but
5    we would like permission to amend to extend the class period
6    two or three days, if that's what's necessary.
7           Finally, on Dura and market manipulation, your Honor's
8    analysis has been adopted by Judge Sweet in New York Stock
9    Exchange Specialists which is 2005 West Law 3411776, as well as
10   by Judge Scheindlin in the IPO cases, 383 F. Supp. 2d, 566.
11   Both hold specifically that Dura does not apply to market
12   manipulation cases, notwithstanding those two or three words
13   that appear in Dura which we all know was a misrepresentation
14   case.  Thank you.
15          THE COURT:  Who else wants to be heard now, which
16   individual defendant other than Mr. Greenberg while you're
17   here?
18          MR. FROOT:  Yes, your Honor.
19          THE COURT:  Is there an argument you want to make?
20          MR. FROOT:  Yes.
21
22          THE COURT:  Like what?
23          MR. FROOT:  They relate to some of the same counts,
24   but they're just different points.  I'm just going to address
25   three points that were not covered by Mr. Kramer.  I know there
                    SOUTHERN DISTRICT REPORTERS, P.C.
                              (212) 805-0300

55

64Kbwaig                    Oral Argument
                              Page 26

64Kbwaiga (2).txt

1  are other colleagues who will cover points specific to Mr.
2  Greenberg.
3       Count 10 was mentioned by Mr. Kramer, and that's a
4  count that's denominated market manipulation. It's broad as a
5  general market manipulation claim under Section 10b and Rule
6  10b(a) and Rule 10b(c), and to the extent that Count 10 is just
7  a general market manipulation claim, it can't be made out by
8  plaintiff's allegation of misstatements and omissions.
9       The leading case in this circuit, Lentel, which is 396
10 F3d 161 at 177, held that the courts routinely dismiss a market
11 manipulation claim when it's nothing more than a repackage,
12 restatement or omission. That's not to say that there are not
13 other claims in the complaint that deal with the underlying
14 conduct,  but this claim, Count 10, at least as it's alleged
15 against Mr. Greenberg and other former directors and officers,
16 is really not a legitimate use of 10b(a) and 10b(c), which are
17 schemes, artifices, particular methods of fraud.
18       In response to our motion, neither of the plaintiffs,
19 either in Florida State Board or in the In Re:  AIG Securities
20 case, argue that a misstatement under 10b5 is sufficient to
21 make out a market manipulation claim.  So it may not be a
22 disputed issue, but there are a lot of issues in this case, and
23 I just wanted to mention that.
24       I also want to move on to address other issues having
25 to do with Count 9, which was sometimes called the open market

56

64Kbwaig                Oral Argument

1  manipulation. This, your Honor, has to do with allegations
2  that Mr. Greenberg in 2001 and 2002 made contacts with the New
3  York Stock Exchange, as well as with specialist firms.  He
4  wrote an article about it.  He sent a letter to Grasso with the
5  idea that they should do more to keep the price of AIG up.
6  These were not purchases that he made or made through an AIG
7  employee.
8       The other underlying facts in the count in what I call
9  the open market manipulation, is that in February, 2005, are
10 four dates in the complaint where Mr. Greenberg is alleged to
11 have directed trades to be made by AIG trade traitors.  Those
12 are people who are in-house.
13      Now, the Florida State Board plaintiffs concede they
14 are not bringing this claim.  Just to keep things straight,
15 this is just about the In Re: AIG claims.  I will pass by the
16 Dura argument that Mr. Kramer made, but I will note there that
17 plaintiff alleges the specific dates and details for the
18 manipulation, but there is absolutely no allegation that there
19 were purchases or sales of AIG stock at the time, and I know
20 your Honor has said someone must have purchased it in the class
21 period, but as I say, there are no allegations at this point.
22      Now, more importantly for Mr. Greenberg, because this
23 claim is alleged against Greenberg and AIG exclusively, so this
24 is not something that washes on other defendants.  Trades of
25 this kind are protected under 10b 18 which is referred to as a

57

64Kbwaig                Oral Argument

1  safe harbor for repurchases of stock on behalf of a company.
2  To be clear, these are repurchases made on behalf of AIG of
3  their stock.  Their 10Ks every year set limits.  They set
4  ceilings for how many repurchases, how many shares can be
5  repurchased.  There are rules if you're going to come within

Page 27

64Kbwaiga (2).txt

6   the safe harbor. One broker per day, no trades within the last
7   ten minutes, the purchase price can't be higher than the
8   highest bid for the last for the last transaction and total
9   volume can't exceed 25 percent.
10          Now, the only allegation in the complaint that would
11  take you out of the safe harbor is with respect to two trades
12  that are alleged to have occurred, or at least directions to
13  trade, on February 14 and February 18. So on this basis, every
14  trade alleged here, other than the February 14 and 18th trades,
15  are out.
16          Now, most importantly, there are no actual trades that
17  are alleged in this complaint to have occurred on February 14
18  and February 18, which is that those are the only allegations
19  of that trading in the last ten minutes. So what you've got
20  here, at most, is a claim for attempted open market
21  manipulation. And we would submit that there is no case law on
22  that. There is no claim for attempted open market
23  manipulation.
24          So the other point under the safe harbor is that these
25  trades, at least these directions to trade, had they taken
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

59

64Kbwaig              Oral Argument
1   place --
2           THE COURT: But you're familiar with Massachusetts v.
3   Hilden, the statement that you did what you intended to do.
4           MR. FROOT: But they still have not alleged that it
5   happened. In fact --
6           THE COURT: But they have the records.
7           MR. FROOT: They have the records. Some of this is
8   based on newspaper articles of investigations having been
9   opened and that's not sufficient.
10          THE COURT: It's not a fair inference to infer that
11  those trades were carried out.
12          MR. FOO: A perfect example is that there are
13  allegations in the complaint that Mr. Greenberg said buy as
14  much as you can, buy up to 250,000. I'm just reporting what's
15  in the complaint.
16          THE COURT: His people worked with it, right?
17          MR. FROOT: I'm sorry, yes. And the trader came back
18  and said I bought 25,000. That's the only evidence in the
19  complaint that any of these trades were ever made. In fact,
20  one of Mr. Greenberg's apparent frustrations was that he had a
21  right to effectuate a repurchase under the 10K and the board's
22  allegations of limits on this and it wasn't effective. He had
23  complaints about specialist firms. He had complaints about the
24  stock exchange and he had complaints about his own employees.
25  Let me move on here, also that aside, from the safe harbor
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300

59

64Kbwaig              Oral Argument
1   provision, which, as I say, would take all these claims out
2   including the claims for the last ten minutes.
3           THE COURT: Is the safe harbor provision designed to
4   say that say that even if you purchase your own stock in an
5   effort to manipulate the price, it still has a safe harbor? I
6   doubt it.
7           MR. FROOT: They have to plead that there was a reason
8   for this, and I'll get to that right now. They have to plead
9   that the only reason for this was to pump up the stock so there
10  could be a gain.

Page 28

64Kbwaiga (2).txt

11      THE COURT:  I thought that was pretty clear.
12      MR. FROOT:  There was really no sales of stock here.
13  I'm sorry, your Honor?
14      THE COURT:  I'm sure there's no safe harbor for a
15  stock manipulation scheme.  I do not think that's what the
16  commission intends to provide a safe harbor for.
17      MR. FROOT:  There isn't even an allegation that there
18  was a scheme, which is actually one of the primary defects.
19  There was no plan or scheme when what you cite is an instance
20  in 2001 of a phone call to Dick Grasso, an instance in 2002 --
21      THE COURT:  That's a pretty highly placed phone call.
22      MR. FROOT:  Well, it happens all the time.  In fact,
23  Mr. Grasso disclosed I think that's there is a complaint in the
24  newspaper article that they cite and attach, Mr. Grasso
25  disclosed this is something that happened all the time.  This
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            60

64Kbwaig              Oral Argument
1  is not unique.  That's simply not adequate to plead this claim.
2      THE COURT:  Just because it's a practice doesn't make
3  it legal.
4      MR. FROOT:  We live in a different world if it were.
5  The standard against which this claim should be judged is the
6  Mullharen standard and that case set forth very briefly, your
7  Honor, because it's in our brief, you have to have an
8  allegation of profit or personal gain, and here there's
9  absolutely no allegation this is alleged against
10  Mr. Greenberg --
11      THE COURT:  They say that that standard is all wet.
12      MR. FROOT:  That's right, but they haven't explained
13  why a single district court case which researched the academic
14  literature and decided there wasn't any reason to have a
15  different standard should be binding on this court.  I wasn't
16  persuaded, with all due respect, by reading Judge Scheindlin's
17  decision.  I wasn't persuaded at all by the statement quoted in
18  the Mullharen case.
19      THE COURT:  What are you relying on?
20      MR. FROOT:  The fact that the Mullharen case had dealt
21  with --
22      THE COURT:  Who decided that case?
23      MR. FROOT:  Mullharen was a case from the Second
24  Circuit.  That was a case at the Second Circuit level.
25      The second factor, very briefly, is there's no
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                            61

64Kbwaig              Oral Argument
1  allegation of deceptive intent, and again here, there's no
2  allegation that the attempt to effect these purchases was
3  solely to raise AIG stock prices.  The 10Ks that we've attached
4  to the declaration make clear that there are various reasons
5  for this stock purchase program.
6      THE COURT:  This is a fact for the jury.
7      MR. FROOT:  I'm sorry?
8      THE COURT:  These sound like they're a fact for the
9  jury.
10      MR. FROOT:  It's a pleading that alleges it's the sole
11  purpose to raise the price.
12      THE COURT:  I think that calls for a codefendant.
13      MR. FROOT:  Well, there's no allegation in the
14  complaint that there is any concealment in this.  As I said,
15  Mr. Greenberg published an op-ed piece in the Financial Times
                        Page 29

64Kbwaiga (2).txt

16  saying he was upset that there was not more effort to keep up
17  the stock price.
18          THE COURT:  He was upset because his manipulation
19  scheme had not been carried out?
20          MR. FROOT:  No, your Honor, he didn't.
21          THE COURT:  I dare say he didn't.
22          MR. FROOT:  He didn't have to.  He didn't have to to
23  overcome this pleading.
24          THE COURT:  That's a half-truth again, isn't it?  It's
25  another argument of false press release.
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                              62
    64Kbwaig            Oral Argument
1           MR. FROOT:  Well, Mr. Green was very open about his
2  dissatisfaction.  There was absolutely no evidence --
3           THE COURT:  I'm sure he was.
4           MR. FROOT:  There was no --
5           THE COURT:  He didn't say was why he was dissatisfied,
6  not the true reason.
7           MR. FROOT:  Your Honor, whether you're under the
8  scienter standard of the IPO case that the plaintiffs cite in
9  their papers or you're under the four factor test of Mullharen
10  if you can't prove deceptive intent that you are trying to hide
11  what you're doing, then you lose at the pleading stage, and
12  that is our position.
13          THE COURT:  This is the whole point.  It doesn't
14  follow because he gave a press release that he was not being
15  deceptive.  If he did that in that statement, disclosed his
16  true reasons for being upset, to wit, that he was frustrated
17  with the manipulation scheme.  That's arguably a false
18  statement.
19          MR. FROOT:  If the fact of the actions are not
20  prohibited by law, then a state of mind will never be.  That's
21  just a fundamental principal, right?  You could have an idea,
22  but if you don't take action, you're not alleged to have
23  conspired.
24          THE COURT:  But he did take action.
25          MR. FROOT:  There's no allegation in the complaint
              SOUTHERN DISTRICT REPORTERS, P.C.
                      (212) 805-0300

                                                              63
    64Kbwaig            Oral Argument
1  that any of these purchases that he directed were made, and, in
2  fact, if you read the complaint --
3           THE COURT:  You must have read a very different
4  complaint, because I gather the allegation -- I won't respond
5  to that.  All right.
6           MR. FROOT:  There's also no allegation that there was
7  market domination.  The trades that are alleged in the
8  complaint, at least the attempted trades or directions to
9  trade, they don't come close to the levels of the cases in this
10  area which are 22 percent, 28 percent, 50 percent of trading on
11  a particular day.  These are diminimus and well under the
12  ceiling in a 10K for this company.
13          There's also no allegation of economic
14  unreasonableness, so at base whether it's under the Mullharen
15  factors or --
16          THE COURT:  These a bunch of phony of red herrings.
17          MR. FROOT:  I'm sorry?
18          THE COURT:  These are all a bunch of phony red
19  herrings.  They have nothing to do with the case.
20          MR. FROOT:  These are the only standards that apply to
                      Page 30

64Kbwaiga (2).txt
```
21   open market manipulation.
22            THE COURT:  They haven't had a case like this one yet.
23            MR. FROOT:  Directions to trade for the company's
24   account.
25            THE COURT:  All these arguments are wonderful, but
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```
                                                                    64
```
     64Kbwaig                    Oral Argument
1    they don't represent the factual ones here.
2             MR. FROOT:  Well, the only thing I would say, your
3    Honor, about Count 9 is it has very little to do with the rest
4    of the complaint.
5             THE COURT:  Your arguments have nothing to do with the
6    complaint, either.
7             MR. FROOT:  I hope they have a lot to do with the part
8    of the complaint that alleges open market manipulation.
9             THE COURT:  I'll hear from your adversary.
10            MR. FROOT:  Can I hit one last point?
11            THE COURT:  Make it quick.
12            MR. FROOT:  As far as the argument that parties have
13   made, not just Mr. Greenberg, that the misstatements alleged in
14   this case are not material, I'll be very brief.  The plaintiffs
15   add up all of the adjustments to income in the restatement,
16   which covers about 30 transactions and they say that there is a
17   3.9 million effect on income over five years and during this
18   period, AIG.
19            MR. LABATON:  Billion.
20            MR. FROOT:  I'm sorry?
21            MR. LABATON:  Billion.
22            MR. FROOT:  Excuse me.  And that during this period
23   there was 39 billion and change --
24            THE COURT:  Materiality --
25            MR. FROOT:  -- of income.
                  SOUTHERN DISTRICT REPORTERS, P.C.
                         (212) 805-0300
```
                                                                    65
```
     64Kbwaig                    Oral Argument
1             THE COURT:  -- is not going to be challenged on a
2    motion.
3             MR. FROOT:  Often it is.
4             THE COURT:  Not often it is.
5             MR. LABATON:  Again, it may be a matter of which cases
6    are reported.
7             THE COURT:  Maybe we have different experiences.
8    There are few cases where courts dismiss complaints on
9    materiality grounds as a matter of law and even fewer where
10   they would not be reversed for doing so.
11            MR. FROOT:  Your Honor only did so in one case that
12   came up in LaRun, which is in the in re: --
13            THE COURT:  Which case?
14            MR. FROOT:  That was the in re: CIT Group, Inc.,
15   securities litigation from 2004 where as an alternative holding
16   you found that --
17            THE COURT:  That was an alternative holding?
18            MR. FROOT:  Right.
19            THE COURT:  What was the name of it?
20            MR. FROOT:  That was one of the main holdings.  That
21   was one prong of the holding.
22            THE COURT:  What was the first holding?
23            MR. FROOT:  The other holding that I believe you
24   found that there wasn't sufficient pleading of fraud as to the
25   estimates of loss reserves, and the second part of the holding
                             Page 31
```

64Kbwaiga (2).txt
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

66

64Kbwaig                    Oral Argument
1   was that it amounted to 240 million out of 27 billion.  In this
2   case --
3           THE COURT:  Very different case than this one.
4           MR. LABATON:  Very different.
5           MR. FROOT:  Not really, your Honor.  That's what I was
6   going to mention briefly.  If you take only the transactions
7   that are alleged to be illegal or unlawful in this complaint,
8   okay, not the restatement, which deals with all kinds of
9   discretionary revisiting of various accounting concepts but if
10  you just take Gen Re, Richmond, Union Excess, life settlements,
11  and top level adjustments as well as Capco and Nan Shan, you
12  get an amount which is in the neighborhood of $720 million and
13  that $720 million over five years when compared to the net
14  income for those five years comes out to approximately 1.6 or
15  1.6 percent, and that 1.6 or .37 percent is deemed immaterial
16  in a whole host of cases that are cited in Mr. Smith's brief,
17  footnote nine of his brief, the Paun's case.
18          THE COURT:  I got your point.  I'll hear from your
19  adversary.  Mr. Labaton, do you have anything you want to say?
20          MR. LABATON:  Yes, your Honor.  First, on the
21  materiality question, I do not think there's any question in
22  this case that we met every materiality standard that I heard.
23          THE COURT:  He says it's one percent.  How does he
24  arrive at the one percent figure?
25          MR. LABATON:  He says it affected the $3.9 billion is
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

67

64Kbwaig                    Oral Argument
1   not related to the specific misrepresentations we have.  It's
2   other kinds of accounting adjustments.  I think he's
3   understated the numbers, but the total adjustments were 3.9
4   billion of improper accounting, and that was I think about a
5   ten percent drop in the income over that period of time.
6           And as to the specific misstatements, the specific
7   misstatements, to try to quantify those in terms of dollars and
8   what effect they had on the market is totally misleading.
9   We've had a lot of cases indicating that materiality does not
10  depend on a percentage.  SEC accounting release 99 is critical
11  in that.  The fact of the matter is --
12          THE COURT:  The materiality is whether or not it
13  mattered to a reasonable investor.
14          MR. LABATON:  We know what happened when it was
15  announced.
16          THE COURT:  That's why I think it's so much hogwash.
17          MR. LABATON:  The market reacted.  In one case it was
18  one that was 6 percent one day.
19          THE COURT:  Mr. Labaton, my first experience with
20  securities law when I went to Curtis Mallet, having had no
21  experience with law, I was having a meeting with my corporate
22  partners.  We were arguing the question of how difficult
23  materiality was.  If it's that difficult, why don't you just
24  disclose it?  And they said to affect the price of the stock.
25  I said this is a very complicated question after all, isn't it?
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

68

64Kbwaig                    Oral Argument
1   That's where we're at.

Page 32

64Kbwaiga (2).txt

2      This is something that a reasonable, prudent investor
3  would love to know as part of the overall factual mix, and on
4  the facts of this case, as I see, I don't have any doubt about
5  the materiality here, and certainly I do not think I could
6  dismiss it on the lack of materiality as a matter of law, not
7  unless I want to live dangerously.
8      MR. LABATON:  Yes, your Honor, and specifically in
9  some of these, the materiality isn't determined by the income,
10 but other accounting factors that the market took into
11 consideration.
12     THE COURT:  We didn't have that type of disclosure.
13 It's kind of hard to argue, immateriality.
14     MR. LABATON:  And for example, in General Re, it
15 wasn't the earnings.  Earnings were not effected, but the
16 market took the amount of reserves very, very, very seriously,
17 and Mr. Greenberg knew it.  Our complaint is loaded --
18     THE COURT:  You went to an awful amount of trouble to
19 do it.  Hard to think someone took all that trouble doing
20 something and then say it didn't matter.  If it didn't matter,
21 why did you do it.
22     MR. LABATON:  And he pleaded the Fifth, so we can take
23 every inference of that.
24     THE COURT:  You're entitled.
25     MR. LABATON:  And the two people on the other side are
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

64Kbwaig                    Oral Argument
1  going to jail because of that, the General Re people.  I don't
2  want to spend any more time with everybody in the courtroom.
3      THE COURT:  I think the complaint is sufficient as to
4  Greenberg and the company.
5      MR. LABATON:  On the manipulation, we heard that those
6  kinds of conversations occurred every single day.  Well, there
7  was in our complaint we refer to the fact that the U.S.
8  attorney --
9      THE COURT:  What about the Second Circuit cases?
10     MR. LABATON:  Those don't affect, that case doesn't
11 affect conduct where the party deliberately determines to
12 manipulate the price in terms of -- not in terms of amount and
13 not in terms of anything like that, but in terms of the market
14 timing of the particular transactions.  In this case, he wanted
15 this stock to be boosted to a specific price because that was
16 very important for a merger, and he took a number of steps in
17 order to manipulate it.
18     THE COURT:  The fact deals with a situation where the
19 manipulation is for the purpose of effectuating the proffer of
20 the stock.
21     MR. LABATON:  Yes.
22     THE COURT:  In other words, you develop the benefits
23 the other way.
24     MR. LABATON:  Yes, in this case, he wanted the stock
25 to be -- there was a merger with another company going on at
              SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

64Kbwaig                    Oral Argument
1  the same time.  It was important to keep the price of the stock
2  up so that the company, it was American General, and he did a
3  number of things.
4      THE COURT:  I'm not satisfied that these are going to
5  be resolved at this stage.  As a matter of law, I think we have
6  to have a trial on those issues.
                        Page 33

64Kbwaiga (2).txt

```
 7              MR. LABATON:  I have nothing else.
 8              THE COURT:  We will have a trial and let the jury
 9     decide those issues.  Who else wants to speak?  Which
10     defendants?  I'll give you five minutes each.
11              MR. TAMBE:  Jayant Tambe on behalf of Union Excess.
12     There is a single count in the complaint that pertains to my
13     client, the reinsurance company, and Mr. Kramer addressed it as
14     a conspiracy count.  He said there were other allegations
15     against AIG.  I'm not here to carry AIG's water.  I'm here to
16     test the sufficiency of what's been said about Union Excess.
17              The allegation in the 11th cause of action is that
18     Union Excess conspired with AIG and other defendants to enter
19     into these reinsurance transactions to not disclose the fact
20     that AIG allegedly controlled Union Excess.
21              If you look at the plaintiff's own allegations about
22     what Union Excess knew, there's no allegation that Union Excess
23     knew how AIG was going to account for these transactions.
24     There's no allegation that Union Excess said anything to any
25     one.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

71

64Kbwaig            Oral Argument

```
 1              THE COURT:  What are you alleged to have done?
 2              MR. TAMBE:  We are alleged to have been the
 3     counterparty to the transactions.  So when AIG decided to
 4     structure these transactions, we are alleged to be the party
 5     with whom they did the transaction.
 6              THE COURT:  Why would you enter into a transaction?
 7              MR. TAMBE:  Well, if it's a profitable transaction for
 8     us, we would enter into the transaction.  We are not the
 9     issuers of securities.
10              THE COURT:  That's not a good argument.
11              MR. TAMBE:  We are --
12              THE COURT:  That's like saying if you want drugs, I'll
13     sell you drugs.
14              MR. TAMBE:  It's not whether it's a bad transaction or
15     a good transaction.  Does it violate the securities laws and
16     does it violate the laws with respect to AIG securities.
17     Different issue.  If we had our own securities, if we had
18     actually traded AIG securities, we didn't do that stuff.
19              The question here is is there a violation of the
20     federal securities law by this conduct.  If they want to call
21     it a sham insurance transaction, they don't say that with
22     respect to insurance.  They say a lot of things about other
23     defendants that they don't say with respect to Union Excess.
24     What they say with respect to Union Excess, this was an
25     accounting treatment.  This was a transaction designed to be
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

72

64Kbwaig            Oral Argument

```
 1     implement by other defendants to which Union Excess was a
 2     participant.  They don't claim we knew about the accounting
 3     treatment.  They don't say we advocated a particular accounting
 4     treatment.  We just did the transaction.
 5     We offense
 6              THE COURT:  What did you do?
 7              MR. TAMBE:  We entered into a reinsurance transaction
 8     with affiliates of AIG, the net result which was we got a
 9     profit.
10              THE COURT:  Who is buying reinsurance for whom?
11              MR. TAMBE:  One of AIG's affiliates was buying
```

Page 34

64Kbwaiga (2).txt

```
12   reinsurance for Union Excess.
13              THE COURT:  What did you do?  You assumed the risk?
14              MR. TAMBE:  We assumed the risk and another affiliate
15   of AIG entered into a stock transaction with us.
16              THE COURT:  They absolved the risk.
17              MR. TAMBE:  They absolved the risk.
18              THE COURT:  Then you knew.
19              MR. TAMBE:  That's not what is alleged with respect to
20   us.  We're speculating as to what Union Excess may have known.
21              THE COURT:  I'm asking what you did.
22              MR. TAMBE:  I'm telling you what we did.  We entered
23   into the transactions.  Yes, your Honor.
24              THE COURT:  You assumed the risk but this was passed
25   back to a subsidiary person.
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

73

64Kbwaig                    Oral Argument

```
1              MR. TAMBE:  Okay, but where's the violation?
2              THE COURT:  It's a sham insurance contract.
3              MR. TAMBE:  But where's the violation of the federal
4   security law?  If I violated some insurance code somewhere,
5   that's a different issue.  That's not an issue for this
6   complaint or for this litigation.
7              Let's go back to what these investors are complaining
8   about.  What they're complaining about is they were mislead
9   about how AIG accounted for these kinds of transactions.  The
10  accounting decision was not ours.  AIG could have accounted for
11  these transactions in a very different way, and they wouldn't
12  have to complain.  In fact, about a year ago that's what AIG
13  did.  They restated their financials and did accounting for
14  these transaction.
15              THE COURT:  They say you bear the burden for these
16  transactions?
17              MR. TAMBE:  They do not allege that, your Honor, and
18  that is different with respect to us, and I need to make that
19  point because we can't simply be swept up in allegations that
20  are made with respect to other defendants.
21              THE COURT:  I'll ask them.  Who wants to respond to
22  that argument?  Besides that you don't allege they knew what
23  the purpose of the transaction was and if they did, it knew of
24  a conspiracy.
25              MR. DUBBS:  Well, it was a sham.  It was always
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

74

64Kbwaig                    Oral Argument

```
1   controlled by AIG.  It essentially gave the appearance to the
2   marketplace that it was a legitimate reinsurance entity, and,
3   so therefore, when it entered into reinsurance with respect to
4   the Capco scheme and so on, what it was really doing was
5   creating a false impression that it was independent.
6              THE COURT:  Who are the others involved?
7              MR. DUBBS:  We haven't sued them but basically the
8   whole show was controlled by Mr. Greenberg and his tenants.  It
9   was created by AIG and it was created by AIG and there is
10  testimony of this by Mr. Umansky.
11              THE COURT:  Do you allege that these transactions were
12  directed by Greenberg?
13              MR. DUBBS:  I'm sorry.
14              THE COURT:  Do you allege that these transactions were
15  directed by Greenberg?
16              MR. DUBBS:  We allege that they were directed by AIG
```

Page 35

64Kbwaiga (2).txt
```
17   and that the Union Excess is itself a scheme and the
18   transactions that they entered into are a scheme because had no
19   litigate business purpose other than to create the impression
20   that it was an independent company that was legitimately
21   issuing reinsurance treaties which it was not.
22            THE COURT:  I'm sorry.  That's alleged in your
23   complaints?
24            MR. DUBBS:  Yes, sir.
25            MR. TAMBE:  Can I --
```
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                           75
64Kbwaig               Oral Argument
```
 1            THE COURT:  Don't interrupt.
 2            MR. DUBBS:  May I finish, sir?  Union Excess was set
 3   up after the SEC shut down Coral Re when the SEC found out in
 4   the '90s that Coral Re was not a bona fide independent.
 5            THE COURT:  That law firm run by the.
 6            MR. DUBBS:  That's a different one.
 7            THE COURT:  A different one.  All right.
 8            MR. DUBBS:  Excuse me.  It was shut down by the
 9   department of insurance.  What they did then was they used
10   Coral Re as a model to set up Union Excess, and, indeed, it's
11   alleged in the complaint that the person who set it up,
12   Mr. Umansky and others, used the Coral Re transaction and the
13   Coral Re structure as a model for the Union Excess structure.
14   So this is a classic case of just putting the old wine in a new
15   bottle.
16            THE COURT:  But the argument is they're not construed
17   as aiders and abettors because they're the same person.
18            MR. DUBBS:  They're not aiders and abettors.  They're
19   primary violators.
20            THE COURT:  This is all part of the AIG group.
21            MR. DUBBS:  Ultimately they got consolidated, but for
22   purposes of this complaint, they are primary violators.  They
23   did act --
24            THE COURT:  They're primary violators because they're
25   not conspirators.
```
            SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300

                                                           76
64Kbwaig               Oral Argument
```
 1            MR. DUBBS:  That's correct, and they're primary
 2   violators because the whole thing was a sham and gave a
 3   misleading impression to the marketplace.
 4            THE COURT:  It could be a sham.  You could be an aider
 5   and abettor or a conspirator.  What makes them not a
 6   conspirator or aider and abettor, in effect, they're an alter
 7   ego of AIG.  Even on the antitrust laws, you can't conspire
 8   against yourself.
 9            MR. DUBBS:  They are a primary violator because
10   although they were secretly controlled by AIG, they gave the
11   market place the impression they were independent.
12            THE COURT:  But the fact is the basis to say they're
13   not an aider and abettor or a conspirator.  Do you have
14   something you want to say?
15            MR. TAMBE:  Sure.  They said a lot of stuff that's not
16   in the complaint.  There's no allegation that mirrors what they
17   just said.
18            THE COURT:  I have to look at complaint.
19            MR. TAMBE:  Well, your Honor, with respect to Union
20   Excess --
21            THE COURT:  What paragraph are they in?
```
                        Page 36

64Kbwaiga (2).txt
```
22          MR. TAMBE:  It's Count 11, Judge.  That's paragraph
23  1173 through 1178.  It's not there, Judge.  Those statements
24  are not there.
25          MR. DUBBS:  Defendant Union Excess and Richmond
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                    77
64Kbwaig              Oral Argument
```
 1  provided billions of dollars of reinsurance coverage to AIG
 2  while knowing that the company was, in fact, controlled by
 3  them.  By their complicity with AIG's concealment of the nature
 4  of the three entities through relationships, Union Excess and
 5  Richmond allowed AIG to falsely inflate its financials by more
 6  than a billion dollars, etc, etc.
 7          THE COURT:  It's there.
 8          MR. TAMBE:  What's there?  We're not the ones making
 9  the disclosures.  They're claiming that AIG is misrepresenting
10  the relationship.  That's not our statement.  We don't have any
11  control over that statement.
12          THE COURT:  They are you and you are them.
13          MR. TAMBE:  That's not what AIG has said.
14          THE COURT:  That's what it says.  I got to hear the
15  benefit of every inference.
16          MR. TAMBE:  He hasn't elected alter egos, either.
17          THE COURT:  I think that's enough for me.
18          MR. TAMBE:  It's not in the complaint.
19          THE COURT:  I think a fair reading of the alleges
20  exactly what he says it alleges.  All right.  Who's next?
21          MR. RAFFERTY:  Tom Rafferty.
22          THE COURT:  Who?
23          MR. RAFFERTY:  Tom Rafferty on behalf of PNC.  We had
24  agreed to an order.  Mr. Kramer is keeping a list of everyone
25  who wanted to speak.  I'm pretty late in the day for people who
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

                                                    78
64Kbwaig              Oral Argument
```
 1  want to speak.  I do want to be heard on at least one issue.
 2          THE COURT:  On behalf of whom?
 3          MR. FISCHER:  I'll be heard.
 4          MR. GARVEY:  Pardon me.  I believe I'm up next.  Maybe
 5  we should ask your Honor your preference.  Would you prefer to
 6  hear from counsel for the AIG directors and officers first or
 7  from General Re?
 8          THE COURT:  They are outside directors?  Inside
 9  directors?
10          MR. FISCHER:  I represent Evan Greenberg, the former
11  director of AIG.
12          THE COURT:  As a former director?
13          MR. FISCHER:  Yes.
14          THE COURT:  Go over the best statute of limitations
15  argument.
16          MR. FISCHER:  Yes.  With a lead-in like that, how can
17  I refuse?  My name is Howard Fischer.
18          THE COURT:  You were out of this business as of 2000?
19          MR. FISCHER:  Right.  Mr. Evan Greenberg resigned from
20  the company on September 19, 2000.
21          THE COURT:  Which Greenberg are you representing?
22          MR. FISCHER:  Evan Greenberg.  I'll refer to him as
23  Evan Greenberg, not to confuse him with the other Greenbergs.
24  This was five years before the complaint against him was filed
25  on September 27, 2005.  The complaints alleges four different
```
                SOUTHERN DISTRICT REPORTERS, P.C.
                        Page 37

64Kbwaiga (2).txt
(212) 805-0300

64Kbwaig                    Oral Argument
1   kinds of claims against him, Section 11 claims, Section 15
2   control claims, Section Rule 10b5 claims and Section 20 claims
3   for control.  For the exchange act claims the outer limit is
4   five years.
5           The time frame between the time he left and the time
6   they brought the complaint is more than five years.  For the
7   securities act claims, the outer limit is three years.
8   Simply put, everything that Evan Greenberg is alleged to have
9   done --
10          THE COURT:  When you say five years, the first claim
11  is 2004.
12          MR. FISCHER:  But the first complaint does not relate
13  back to Evan Greenberg.
14          THE COURT:  There's no allegation he was not joined by
15  mistake, Evan Greenberg.
16          MR. FISCHER:  Exactly.  Rule 15(c)(3) of Federal Rules
17  of Civil Procedure says that in order for a complaint to relate
18  back to a defendant who is not named, the only excuse has to
19  that it's a mistake that it was not made.
20          In 477 U.S. 21, the Supreme Court said, and I quote,
21  Rule 15 requirement that a new defendant knew he was not named
22  due to a mistake concerning identity presupposes that, in fact,
23  the reason for his not being named was a mistake in identity.
24          Now, what's interesting about Mr. Evan Greenberg is
25  after we made a motion to dismiss, there was not a response by
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

64Kbwaig                    Oral Argument
1   the plaintiffs to Mr. Evan Greenberg's motion.  They said
2   nothing in response to it, and, frankly, there is nothing they
3   could say.  There's no way that it could relate back Evan
4   Greenberg.
5           THE COURT:  I'll hear from them about that because you
6   have the best argument.  Why shouldn't he be cut out?
7           MR. BOTTLIEB:  Lou Bottlieb for the plaintiffs.  We're
8   going to address just the Section 11 claim against Evan
9   Greenberg.  The 2.85 percent notes, he signed a registration
10  statement for them on November, the offering date of November
11  27.
12          THE COURT:  What year?
13          MR. BOTTLIEB:  2002.  That is because after he signed
14  registration statement, they were later --
15          THE COURT:  When did he leave the company?
16          MR. BOTTLIEB:  He left the company in 2000.
17          THE COURT:  That's awfully hard to hold him to
18  something that happened in 2003.
19          MR. BOTTLIEB:  But the self-registration matter, your
20  Honor, he understood that those bonds would be taken off the
21  shelf and offered to the public later, and they were offered in
22  2002, and it was timely, and the statute of limitations doesn't
23  begin to run until effective amendments have been published,
24  and that's when it happened in November 2002.
25          THE COURT:  That's very thin.
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

64Kbwaig                    Oral Argument
1           MR. BOTTLIEB:  Well, your Honor, I think that's what
2   the law requires.  I think that the Second Circuit has ruled
Page 38

64Kbwaiga (2).txt

3  that's when the statute of limitations begins to run.
4          THE COURT: I know that, but I doubt it very much that
5  the statute of limitations thinking of a situation that refers
6  to a person who signs something two years earlier and it gets
7  used two years later.
8          MR. BOTTLIEB: But your Honor, in this particular case
9  on Section 11 claims, if a party like Mr. Evan Greenberg does
10 not want to have his name count, he can do one of two things.
11 He can inform the public that he is no longer with the company,
12 and, therefore, his name shouldn't be counted for statute of
13 limitations purposes for a later --
14         THE COURT: He did not file?
15         MR. BOTTLIEB: He did not do that.
16         THE COURT: Has he filed with the company now?
17         MR. BOTTLIEB: I'm sorry.
18         THE COURT: The public filing?
19         MR. BOTTLIEB: There are public filing.
20         THE COURT: List of the officers and all that?
21         MR. BOTTLIEB: Yes, there are.
22         THE COURT: Was his name removed as of a certain date?
23         MR. BOTTLIEB: I'm sure it was.
24         THE COURT: Then the public was informed.
25         MR. BOTTLIEB: He didn't do that. The statute
                      SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

82

64Kbwaig                Oral Argument
1  requires that he take a certain step.
2          THE COURT: Why are you hanging on to this one?
3          MR. BOTTLIEB: Evan Greenberg was the COO. He knew
4  for a long period of time. He was with the company for 25
5  years. He was there when these frauds were taking place.
6          THE COURT: This is a massive fraud case, both of
7  which involve conduct occurring long after he left. And the
8  statute of limitations doesn't bother the claim. It would
9  certainly be prejudicial if he were to be tried along with the
10 rest of the people in this case. I frankly think you ought to
11 cut him out. If you don't, I might, but for the purposes of
12 assuring an appeal for whatever we can do as of now, I am
13 entering an order severing it from this case.
14         MR. FISCHER: Thank you, your Honor.
15         THE COURT: I do not think he belongs in this case. I
16 think a joinder would be prejudicial. I think it would also be
17 wildly inefficient to keep him in. My advice is to cut him
18 out.
19         MR. BOTTLIEB: We'll take it under advisement.
20         THE COURT: If you don't want to cut him out, I may
21 cut him out, and let you test that in the Court of Appeals.
22         Once the public is told he's no longer in the company,
23 I doubt the public has a right to rely upon the fact that his
24 name is on the registration slip filed in 2002.
25         MR. BOTTLIEB: Give us two weeks to consider your
                      SOUTHERN DISTRICT REPORTERS, P.C.
                             (212) 805-0300

83

64Kbwaig                Oral Argument
1  advice.
2          THE COURT: There's no rush on it.
3          MR. BOTTLIEB: Thank you, your Honor.
4          MR. FISCHER: Just to be sure, am I understanding the
5  plaintiff's opposition on the Count 1 Section 11 claims
6  relating to the 2.85 notes, that the concession that with
7  respect to all of the other counts against him, those are
                             Page 39

64Kbwaiga (2).txt

8  untimely?
9          MR. BOTTLIEB: If we decide that he needs to be kept
10 in the case, he will kept in the case. It will only be --
11         THE COURT: I think we have enough here.
12         MR. FISCHER: Thank you very much.
13         THE COURT: -- to be part of the trial in this case.
14         MR. FISCHER: We agree completely.
15         THE COURT: Because you obviously took part in a very
16 small part of it and there's a lot to be totally prejudicial of
17 the trial. So even for the Court of Appeals, if I'm going to
18 cut you out, I'll cut you out on the statute of limitations
19 grounds. I would prefer the Court of Appeals to and I can't do
20 that unless I severe it.
21         MR. FISCHER: Just to make sure my understanding is
22 that severance is only to Count 1, they're voluntarily
23 dismissing with prejudice the other claims, as well.
24         THE COURT: I will settle all the claims against you.
25 I do not think you should be in this trial.
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300
                                                          84
   64Kbwaig            Oral Argument
1          MR. FISCHER: We would obviously be happy with
2  severance, but we want it dismissed.
3          THE COURT: The clearer argument, why he is on the
4  other claims?
5          MR. FISCHER: We agree there is no argument.
6          THE COURT: All right. That's settles that. Who's
7  next?
8          MR. GAMBLE: James Gamble from Simpson, Thacher &
9  Bartlett. I represent the only outside director whose name is
10 in the securities complaint, Frank Hoenemeyer, who was the
11 chairman of the audit committee for a period during the class
12 period.
13         THE COURT: He's an outside director?
14         MR. GAMBLE: He is an outside director.
15         THE COURT: Oh, he doesn't get the benefit of the
16 interest of the scienter as he would if he was an inside
17 director.
18         MR. GAMBLE: That certainly is right.
19         THE COURT: Why are you being held up?
20         MR. GAMBLE: I have the same question.
21         THE COURT: Because you supervise the committee, I
22 take it?
23         MR. GAMBLE: The only allegation that I think is
24 realistically there is that he was chairman of the audit
25 committee and he therefore has liability, and the law is clear
              SOUTHERN DISTRICT REPORTERS, P.C.
                    (212) 805-0300
                                                          85
   64Kbwaig            Oral Argument
1  that's not enough. On reply, all the plaintiffs have said is
2  they pointed to the 2000 and 2001 proxy statements, and they
3  quoted little portions of it. And what they say is, well, if
4  you just read the little portions of that report, it indicates
5  that the audit committee had questions about PwC's independence
6  in the audit.
7          THE COURT: They controlled it.
8          MR. GAMBLE: Sort of that's what they say. All I want
9  to point out to the Court if you read those two proxy
10 statements in 2000/2001, it's extremely clear that all the
11 audit committee is saying is we're the audit committee, we're
12 not a separate group of independent auditors. We're not
                    Page 40

64Kbwaiga (2).txt

13  qualified CPAs who go back and reaudit everything the auditors
14  do. That's all they're saying. It's identical language in
15  both. If the court won't mind I'll hand up the proxy
16  statements in its entirety.
17          THE COURT: Let me hear from them one of the stronger
18  cases but we will hear from them. What's your basis for saying
19  he's a primary violator?
20          MR. BOTTLIEB: I think he identified for the most
21  part, your Honor, the primary reason. At the same time that
22  Mr. Hoenemeyer is a member of the audit committee was telling
23  the world that it couldn't vouch for the company's following
24  GAAP. It couldn't vouch for the company's auditors being
25  independent. It couldn't vouch for the company's auditors
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

86

64Kbwaig                Oral Argument
1   following GAAS.
2           THE COURT: Those are not false statements.
3           MR. BOTTLIEB: Yes, but at the same time,
4   Mr. Hoenemeyer is signing 10Ks saying yes, everything is done
5   according to GAAP, no problem, yes, my auditors are
6   independent.
7           THE COURT: At the time he is signing the 10Ks?
8           MR. BOTTLIEB: Exactly.
9           THE COURT: Knowing that they were false?
10          MR. BOTTLIEB: Exactly, your Honor.
11          THE COURT: That seems to be a good basis for holding
12  you in.
13          MR. BOTTLIEB: In addition, there's a Section 11 claim
14  that there's no dispute about.
15          MR. GAMBLE: Your Honor, I do not think there's a
16  Section 11 claim.
17          THE COURT: He's got an argument. If he got a 10K
18  which contradicts the earlier statements that are false, that
19  makes you a primary violator.
20          MR. GAMBLE: It doesn't say, we, the audit committee,
21  certify on our own investigation.
22          THE COURT: It doesn't make any difference. The
23  statement is a basis of fact, you're still liable.
24          MR. GAMBLE: That's not true. That's why I wanted to
25  hand up the proxy statements because the proxy statements
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

87

64Kbwaig                Oral Argument
1   absolutely do not say that the audit committee doesn't believe
2   in the independence of the PwC or they don't believe they are
3   probably working under GAAP. I can read it to the Court if the
4   Court would like, but it's a little long. I'll be happy to
5   hand it up.
6           THE COURT: Is it long?
7           SPEAKER: It's fairly long. Basically what they say
8   is in performance of the oversight function, the committee has
9   considered and discussed the audited financial statements with
10  management and the independent auditors. The committee has
11  also discussed with the independent auditors the matters
12  required to be discussed arguments by statement of auditing
13  standards number 61, communication with other committees
14  currently in effect.
15          Finally, the committee has received written
16  disclosures and the letter from the independent auditors
17  required by independent standard, number one, independent
                        Page 41

64Kbwaiga (2).txt
18  discussion with committees in effect, has considered whether
19  the provision of non-audited services by the independent
20  auditors to AIG is compatible with maintaining the auditors'
21  independence and has discussed with the auditors the auditors
22  independent.
23          Then it goes on to say the members of the auditing
24  committee are not professional engaged in the practice of
25  auditing or accounting, are not experts in the fields of
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

88

64Kbwaig              Oral Argument
1   accounting or auditing, including in respect of offering
2   independence.  The members of the committee rely without
3   independent verification on the information provided to them
4   and on the representations made by management and the
5   independent accountants.
6           Accordingly, the audit committee does not provide an
7   independent basis to determine that management has maintained
8   appropriate accounting and financial reporting principals or
9   appropriate internal controls and procedures with accounting
10  procedures.
11          THE COURT:  What do you say the 10K says?
12          MR. GAMBLE:  What's that?
13          THE COURT:  What do you say. the 10K says?·
14          MR. GAMBLE:  In the 10K it says the auditors performed
15  what they are required to perform as a matter of law.  It
16  doesn't say we've independently verified that these things
17  comply with GAAP.
18          THE COURT:  Do you say they comply with GAAP?
19          MR. GAMBLE:  No.  They say they've done what they're
20  required to do.
21          MR. BOTTLIEB:  It says the accompanying financial
22  statements have been prepared on the basis of GAAP.  That's
23  what it says.
24          MR. GAMBLE:  And, your Honor, in making whatever
25  statements they made, they're absolutely entitled to rely --
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

89

64Kbwaig              Oral Argument
1           THE COURT:  I think it's a jury question now.
2           MR. GAMBLE:  I do not think they are, your Honor.
3           THE COURT:  The statement is arguably false or at
4   least made with no basis in fact.
5           MR. GAMBLE:  Your Honor, that's absolutely not what
6   this statement says.
7           THE COURT:  I think it's a jury decision.  All right.
8   Go ahead.  Who's next?
9           MR. GARVEY:  George Garvey representing Gen Re.
10          THE COURT:  You have a tough row to hoe.
11          MR. GARVEY:  Pardon me?
12          THE COURT:  You have a tough row to hoe.
13          MR. GARVEY:  I've heard that in a couple of the
14  Court's earlier remarks.  I'd like to take a crack at it.  I'm
15  hopeful that your Honor will perhaps take an unexpected turn.
16          Not a single point that I will be making here requires
17  us at all to argue that scienter hasn't adequately been alleged
18  or that a wrong hasn't been committed or that the statements --
19          THE COURT:  What are we doing?
20          MR. GARVEY:  Your Honor, our central argument here,
21  one of our three central points that I'll make actually, let me
22  start with this one, the aiding and abetting point, is not
                        Page 42

64Kbwaiga (2).txt

23    whether or not a wrong was committed or even whether or not Gen
24    Re individuals associated with it ought to be punished.  The
25    government is all over that, as the plaintiff's papers have
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                    90
      64Kbwaig                    Oral Argument
1     demonstrated.
2            The question here is whether or not the plaintiffs
3     have pleaded circumstances that would allow a private right of
4     action on behalf of shareholders of the company that made the
5     misrepresentations against the company that is alleged to have
6     entered into a transaction that knowingly alleged taking the
7     benefit of the doubt for the plaintiffs to have entered into a
8     transaction knowing that the plaintiffs' company was going to
9     misrepresent it.
10           THE COURT:  It's alleged in the complaint.  You knew
11    exactly what the purpose of this transaction was.
12           MR. GARVEY:  Assuming all that to be true, your Honor,
13    a secondary defendant, an aider, abetter or conspirator is
14    not --
15           THE COURT:  You're not an aider and abettor if your
16    conduct was essential to the carry out the scheme.
17           MR. GARVEY:  That's not --
18           THE COURT:  Did you see the case involving an
19    accounting firm recently, where the accounting firm gave advice
20    as to how to structure the transaction and they were well
21    beyond just the auditing.  They were active participants in the
22    scheme.  They were held as primary violators.  Your situation
23    is somewhat the same.
24           MR. GARVEY:  It's not because we didn't do the
25    accounting.  Your Honor may be referring to Global Crossing.
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                                                    91
      64Kbwaig                    Oral Argument
1     There it was alleged that the accounting firm was intimately
2     involved not just in structuring the transactions, but also in
3     accounting for it and in certifying the financial statements.
4            THE COURT:  Structuring the transactions for the
5     purposes of inflating, if you will, the income shown and your
6     reserve as it was shown on the company's balance sheet.  You
7     knew that.
8            MR. GARVEY:  Assuming that to be true --
9            THE COURT:  See no evil.
10           MR. GARVEY:  The Court may be making a terrific
11    argument on behalf of the government in a prosecution, but the
12    Supreme Court has said and the Second Circuit has said and just
13    last week on case on all fours with this, another circuit in
14    the first appellate division on all fours of this, Charter
15    Communications has said it's not a question of how high the
16    level of scienter, not even a question of how active the
17    assistance.  It's a question --
18           THE COURT:  It's a question of participation at a
19    level beyond that of an aider and abetter, at a participation
20    at a level of equal culpability of Mr. Greenberg and AIG.
21           MR. GARVEY:  Not so, your Honor.  It's not a question
22    of relative culpability.  It's a question of how the wrong was
23    allegedly perpetrated.  Here the wrong was allegedly
24    perpetrated through false or misleading financial statements of
25    AIG.  Was our transaction inevitably misleading, as some of the
                    SOUTHERN DISTRICT REPORTERS, P.C.
                            (212) 805-0300
                                Page 43

64Kbwaiga (2).txt

92

64Kbwaig                    Oral Argument
1   district court cases that the plaintiffs's rely on say in the
2   cases they like the best, we submit not and here's why, your
3   Honor.  Perhaps the case that goes most for the plaintiffs is
4   Parmalot.
5          THE COURT:  Have you seen Judge Kaplan's opinion in
6   the Parmalot case where he talks about a sham transaction makes
7   you an aider and abettor?
8          MR. GARVEY:  He doesn't talk about a sham transaction.
9   He says there that the transaction is inseparable from the
10  means by which --
11         THE COURT:  This one was completely inseparable.
12         MR. GARVEY:  Let me point to you several allegations
13  in the complaint, your Honor, that say precisely the contrary.
14  In three different places in this complaint, the plaintiffs
15  have alleged that there was a proper way to account for this
16  transaction and that AIG didn't do it.
17         THE COURT:  You know you can't separate the question
18  of scienter completely.  You knew they weren't going to do it;
19  otherwise, this whole transaction would not be necessary.
20         SPEAKER:  It's not a scienter question.
21         THE COURT:  Scienter is part of it.  It's not
22  something you can separate out.  You say you're not integral to
23  the transaction, you're not part of it, but if you know the
24  purpose for which it's being done, you also know how it's going
25  to be reported and you agreed with it.  Come on.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

93

64Kbwaig                    Oral Argument
1          MR. GARVEY:  Knowing the purpose and knowing --
2          THE COURT:  Then you should say I'm not going to be
3   part of this sham because I know exactly what's happening and I
4   don't want to be sued under the securities law.
5          SPEAKER:
6          MR. GARVEY:  That's an argument that the government
7   has all the power to make, but the Supreme Court has held that
8   is not an argument --
9          THE COURT:  I think if the Supreme Court were to say
10  that you're not a primary violator on the fact of this case,
11  I'll be very surprised.
12         MR. GARVEY:  Your Honor, if I may just make another
13  point on primary violator.  One thing the Supreme Court has
14  unequivocally held is that only a defendant who fits the
15  statutory language use or employ can qualify for the provisions
16  under which the plaintiffs are seeking to sue Gen Re here.
17  Assume Gen Re actively assisted AIG in structuring the
18  transaction and did it with however high a level of scienter
19  the plaintiffs want to be argue, even assuming that, Gen Re's
20  role in this is allegedly structuring, allegedly providing a
21  transaction, not allegedly using it.  Let me use a simple -- an
22  analogy that occurs to me, at least.  If I buy a Ford, Ford
23  designs it, structures it, does everything else about it, I pay
24  Ford for it, but Ford isn't using and employing the automobile,
25  I am.
                SOUTHERN DISTRICT REPORTERS, P.C.
                        (212) 805-0300

94

64Kbwaig                    Oral Argument
1          Now, the distinction I'm drawing may well not be one,
2   there isn't one, that I could argue against the SEC.  The SEC
3   has power to go against those who provide the
                        Page 44

64Kbwaiga (2).txt

 4   instrumentalities, those who participate and assist.
 5        THE COURT: How do you define structure or use?
 6        MR. GARVEY:  Structure implies make or design.  Use
 7   implies get the use out of it.  Gen Re is alleged to have been
 8   the one who assisted AIG, not the other way around.
 9        THE COURT:  And you used it and if you had not used
10   it, if you had not used this structure, the whole scheme would
11   not have succeeded.
12        MR. GARVEY:  All of have which well may be a great
13   argument for scienter.  Pardon me, your Honor?
14        THE COURT:  A fee?
15        SPEAKER:  They did, yes.  They did, your Honor, just
16   as Ford gets the price, I buy the car.  Ford is still not the
17   user of the car.  AIG is the user of the transaction and
18   without based on the allegation -- taking the allegations to
19   the complaint as true --
20        THE COURT:  I do not think you can pars the statutory
21   language in so unique a fashion.
22        MR. GARVEY:  Your Honor, I'm not the first Rabbi here.
23   The Supreme Court did it in Central Bank.
24        THE COURT:  We're only dealing with this.
25        SPEAKER:  Charter communications is on all forms with
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                 95
     64Kbwaig                Oral Argument
 1   this case right down to the allegations about all the bad
 2   scienter facts and active participation and alleged cooperation
 3   in developing a paper trail and all of that.
 4        THE COURT:  This case is exactly like Global Crossing.
 5   Everything there is structuring the transactions, too.
 6        MR. GARVEY:  The key distinction with Global Crossing
 7   is the defendant who was kept in there, the accounting firm,
 8   was alleged to have made the representations, to have certified
 9   the financial statements, to have actually done the accounting.
10        THE COURT:  That's not the reason why they were found
11   to be primary violators.  That might have made them aiders and
12   abettors.
13        MR. GARVEY:  Judge Kaplan went out of his way to point
14   out that if they have not played both roles, they could not
15   have been a primary violator.
16        THE COURT:  But they didn't use it, either.
17        MR. GARVEY:  No, your Honor.
18        THE COURT:  The company used it.
19        MR. GARVEY:  Once they did the accounting and
20   certified the financial statement, they were a maker --
21        THE COURT:  Good try.  You're in this case.  You're
22   staying here.
23        MR. GARVEY:  Let me move on, then, to point two,
24   another one that has nothing to do with scienter.
25        We heard a lot about from the plaintiffs both in their
                    SOUTHERN DISTRICT REPORTERS, P.C.
                           (212) 805-0300

                                                                 96
     64Kbwaig                Oral Argument
 1   papers and some in this argument here about why the
 2   transaction, the reserves that AIG booked relating to the Gen
 3   Re transactions allegedly mattered to the market in late 200
 4   and early 2001.
 5        We heard not a word nor is there a word in the
 6   complaint about why those reserves or even whether those
 7   reserves mattered to the market in 2005.  Under Dura and Glen
 8   Pell, they have to prove both, not just materiality at the time
                             Page 45

64Kbwaiga (2).txt

```
 9   of the alleged wrong, but also loss causation at a time of the
10   revelation of the true facts.  In this case, they've only
11   attempted to satisfy that one prong.
12              THE COURT:  When was the sham nature of these
13   transactions disclosed?
14              MR. GARVEY:  The complaint never puts a date on that.
15              THE COURT:  When was it?
16              MR. GARVEY:  Your Honor, it was in February and March
17   of 2005.
18              THE COURT:  And what happened to the stock right
19   after?
20              MR. GARVEY:  A whole lot else was going on at that
21   time, your Honor.
22              THE COURT:  It's a jury question.
23              MR. GARVEY:  But it has to be alleged first, your
24   Honor.
25              THE COURT:  Did it go up or down?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

97

64Kbwaig                    Oral Argument

```
 1              MR. GARVEY:  The stock when up and down on various
 2   dates, your Honor.
 3              THE COURT:  Did it go down after the disclosure?
 4              MR. GARVEY:  And up again, yes.
 5              THE COURT:  Down and up.  Sorry.  You're in.
 6              MR. GARVEY:  The plaintiffs have not alleged a date
 7   when information about our transaction came out.  Your Honor,
 8   and --
 9              THE COURT:  You guys keep taking me back to Bleak
10   House, and I'm not going there.
11              MR. GARVEY:  I'm not at all suggesting Bleak House.
12              THE COURT:  Your motion is denied, all right?  Keep
13   you quiet for a while.  Otherwise, you'll be arguing forever.
14   All right.  Who else is next?
15              MR. PORET:  Your Honor, my name is Charles Poret,
16   Dechert.
17              THE COURT:  Who are you representing?
18              MR. PORET:  Michael Castelli.
19              THE COURT:  Who is he?
20              MR. PORET:  You might not recognize him because in the
21   complaint, he was virtually never mentioned.  He was the
22   controller at AIG.  All the complaint says is that he was
23   controller, that was fired for not cooperating in internal
24   investigations, that he signed 10Ks and --
25              THE COURT:  Pray tell, why did he not cooperate?
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

98

64Kbwaig                    Oral Argument

```
 1              MR. PORET:  That is not alleged in the complaint.
 2   This was after --
 3              THE COURT:  Wasn't there something about he destroyed
 4   some records?
 5              MR. PORET:  There are no allegations in the complaint
 6   recent, your Honor, that he had any participation, anything to
 7   do with any of the alleged wrongdoing.
 8              THE COURT:  He's a principal.  He's part of the
 9   internal management group, therefore there was some inferences
10   of scienter to go along with that.  All right?  He's a
11   controller of the company.  Talk about Skilling, another guy --
12              MR. PORET:  He was not a director.  He was not a
13   senior officer.  He wasn't a boss at the company.
```

Page 46

64Kbwaiga (2).txt

```
14          THE COURT:  He was in control.  The man was privy to
15     the financial situation of the company.
16          MR. PORET:  He was the guy who was at the holding
17     company level, and there is no allegation that he was involved
18     in any of the insurance units or that he was involved in any of
19     the conduct that was claimed to be wrongful or that he had any
20     reason to know that the financial reports that were passed up
21     from the units there might have been anything wrong with them.
22     He's not even alleged to have been involved --
23          THE COURT:  He was in control.  What is control if
24     it's not that?
25          MR. PORET:  He's not -- it's analogous to General
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

                                                                    99
```
       64Kbwaig          Oral Argument
1      Electric in Chill v. General Electric.  There it says General
2      Electric should have scienter because the Peabody unit of GE
3      Capital Services had false financial reporting and inadequate
4      controls.
5           THE COURT:  It is fair that he knew whatever the
6      management group knew.
7           MR. PORET:  Group pleading doesn't apply to scienter.
8           THE COURT:  It's not a question of pleading.  We're
9      talking now about it's a fair inference with respect to an
10     insider, Second Circuit has held that.  It's a fair inference
11     with respect to an insider or an officer of the company or
12     internal management, that they -- you can infer that they have
13     knowledge of the financial condition of the company.  That's
14     not group pleading.  It's just an inference.
15          MR. PORET:  If -- after all these years of
16     investigation, SEC --
17          THE COURT:  On top of that, you have a guy that's a
18     corroborator obviously with something to hide, and he gets
19     fired for it.  First, to leave rather than cooperate seems to
20     indicate some guilty knowledge, some consciousness of guilt,
21     all of which makes it a true case.
22          MR. BOTTLIEB:  I wanted to add one thing, your Honor.
23     Mr. Castelli was at a specific meeting in November 2000, where
24     all of the other participants in the Gen Re fraud were there
25     and they were discussing, among other things, the fact that Gen
                   SOUTHERN DISTRICT REPORTERS, P.C.
                          (212) 805-0300
```

                                                                    100
```
       64Kbwaig          Oral Argument
1      Re would account for the transaction one way and AIG would
2      account for it another way, and, after that, Mr. Castelli was
3      happy to sign the 10Ks.
4           MR. PORET:  They say he was at one preliminary
5      meeting.
6           THE COURT:  Your motion is denied.
7           MR. PORET:  Your Honor, a control --
8           THE COURT:  Your motion is denied.
9           MR. PORET:  Control person liability?
10          THE COURT:  Your motion is denied.  I'm not going to
11     worry about the control person.  You're in.  Once you're in,
12     you're in.  All right?  So who else is next?
13          MR. ANDREWS:  Good afternoon, your Honor.  Stephen
14     Andrews on behalf of Michael Murphy.
15          THE COURT:  Michael Murphy, he resigned that day, too,
16     or not?
17          MR. ANDREWS:  He is not.  He's a lawyer who lives in
18     Bermuda.
```
                          Page 47

64Kbwaiga (2).txt

```
19              THE COURT:  He lives in Bermuda?  Did he take the 5th
20    Amendment?
21              MR. ANDREWS:  He has not.  In fact, that's what I want
22    to address.
23              THE COURT:  Who is he.?
24              MR. ANDREWS:  He was a lawyer in Bermuda who was
25    alleged to have been involved in certain subsidiaries of AIG
```

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

101

64Kbwaig                    Oral Argument
```
 1    involving offshore reinsurance companies.
 2              THE COURT:  Offshore reinsurance companies?
 3              MR. ANDREWS:  That's the allegation, yes, your Honor.
 4    What I want to do is focus on our first argument which is prior
 5    to all of this that he's not been served properly by either the
 6    securities plaintiff or the Florida Board and the failing --
 7    it's outlined in the papers.  I'll focus on what the plaintiffs
 8    have said in response to that.
 9              THE COURT:  The Hague Convention service?
10              MR. ANDREWS:  Yes, your Honor.  The securities
11    plaintiffs focused on service through the Hague convention.
12    They presented their request to Bermuda through the Hague, but
13    Mr. Murphy himself was not personally served as is required by
14    Bermuda law.  So the securities plaintiffs complied with step
15    one.  They at least utilized the Hague Convention, but they did
16    not obtain personal service on Mr. Murphy, which means it fails
17    step two, and that is the Hague also requires compliance with
18    the law of the jurisdiction where process is served.  It's
19    undisputed that the securities plaintiffs served Mr. Murphy's
20    wife.
21              In the Florida Board case, the reverse is true.  The
22    Florida Board plaintiffs attempted to bypass the Hague and
23    attempted to serve and did serve Mr. Murphy by a private
24    process server in Bermuda.  The problem with that, of course,
25    is it did not go through the central authority and Bermuda has
```
SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

102

64Kbwaig                    Oral Argument
```
 1    objected to Articles 10b and 10c of the Hague Convention which
 2    would otherwise allow that form of service.
 3              So each plaintiff has improperly served Mr. Murphy,
 4    and we ask either your Honor for a dismissal on those grounds
 5    or certainly at least quashing the service of process and
 6    requiring both plaintiffs to comply with the Hague Convention
 7    as it's designed.
 8              THE COURT:  What happens if he evades service in
 9    Bermuda?
10              MR. ANDREWS:  The only case that's been cited so far
11    on evasion was actually supplemental pleadings in the Florida
12    Board case.  When the Florida Board had not attempted to serve
13    Mr. Murphy until about 10 days before the 120-day limit that
14    arguably applies, they asked for the court for an extension of
15    time to serve process and argued in part that our declaration
16    which is attached to the securities case for Mr. Martin showed
17    that Mr. Murphy was evading service because he wasn't home when
18    they tried to serve him.  There's been no allegation in this
19    case there's been any attempt at the evasion.
20              THE COURT:  I would assume that regardless of the
21    Hague Convention the federal rules provide for another means of
22    service other than through the Hague.
23              MR. ANDREWS:  They do but the two countries that are
```
Page 48