UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

JAN 7 - 2008

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| In re Federal National Mortgage Association Securities, Derivative, and "ERISA" Litigation | MDL No. 1668 |
| In re Fannie Mae Securities Litigation | Consolidated Civil Action No. 04-1639 (RJL) |

MEMORANDUM OPINION
(January 7, 2008) [#163]

This is a federal securities fraud action against Federal National Mortgage

Association ("Fannie Mae"), Franklin D. Raines, former Chairman of the Board and

Chief Executive Officer ("Raines"), Timothy J. Howard, former Vice Chairman of the

Board and Chief Financial Officer ("Howard"), Leanne G. Spencer, former Vice

President and Controller ("Spencer")[1] and KPMG LLP, Fannie Mae's former accountant

("KPMG") brought by plaintiffs Ohio Public Employees Retirement System ("OPERS")

and State Teachers Retirement System of Ohio ("STRS") (collectively "Lead Plaintiffs").

Lead Plaintiffs now move this Court to certify this action as a class action, to designate

Lead Plaintiffs as the representatives of a plaintiff class, and to enter an order appointing

Waite, Schneider, Bayless & Chesley Co., L.P.A. as Lead Class Counsel and Bernstein

Liebhard & Lifshitz, LLP as Co-Lead Class Counsel.  Defendants oppose Lead Plaintiffs'

motion, challenging, in particular, the duration of the class period and the identity of the

class members.  Upon consideration of the pleadings, oral

---

[1]  Raines, Howard and Spencer are collectively referred to as the "Individual Defendants."

argument and the entire record herein, the Court GRANTS in part and DENIES in part Lead Plaintiffs' motion.

## BACKGROUND

This case is a consolidated action arising from several federal securities class action suits filed against defendants alleging that Fannie Mae and several of its corporate officers intentionally manipulated earnings and violated Generally Accepted Accounting Principles ("GAAP"), causing losses to investors.[2]  The first of these actions was filed on September 24, 2004, by Vincent Vinci; the separately-filed cases were consolidated on December 16, 2004, through a Stipulated Order of Consolidation.  Shortly thereafter, on January 13, 2005, the Court appointed OPERS and STRS as Lead Plaintiffs in this action.

On March 4, 2005, Lead Plaintiffs filed a Consolidated Class Action Complaint for Violations of Federal Securities Laws on behalf of purchasers of Fannie Mae common stock during the period from April 17, 2001, through September 21, 2004.  On August 14, 2006, Lead Plaintiffs filed a Second Amended Consolidated Class Action Complaint for Violations of Federal Securities Laws ("SAC").  In addition to naming KPMG as a defendant, the SAC enlarged the proposed class period by extending its end date from September 21, 2004, to September 27, 2005.  (SAC ¶ 1.)

Fannie Mae is one of two (the other being Freddie Mac) federally-chartered government-sponsored enterprises that serve the public policy of expanding home ownership to moderate and low-income families, in part, by supplying capital and

---

[2]  See the Court's Memorandum Opinion in *In re Fannie Mae Securities Litigation*, 503 F. Supp. 2d 25, 29-30 (D.D.C. 2007), for a background discussion of the Fannie Mae securities litigation.

liquidity for residential mortgages.  It is a private shareholder-owned company, and its common stock is publicly traded on the New York Stock Exchange ("NYSE").

Fannie Mae is regulated by various governmental agencies, including the Office of Federal Housing Enterprise Oversight ("OFHEO") and the United States Department of Housing and Urban Development.  OFHEO's "mission" is ensuring the safety and soundness of Fannie Mae.  *In re Fannie Mae Sec. Litig.*, 503 F. Supp. 2d 25, 29 (D.D.C. 2007).  OFHEO's oversight involves reviewing the company's internal controls, corporate structure, financial solvency, capital reserves, and accounting policies.  *Id.* OFHEO then reports annually to Congress on its findings.  *Id.*

In June 2003, OFHEO responded to accounting discrepancies at Freddie Mac by commencing a special examination into Fannie Mae's accounting policies and controls. (SAC ¶ 36.)  After the market closed on September 22, 2004, OFHEO released an interim report (the "OFHEO interim report") concluding that Fannie Mae had misapplied FAS 91 and FAS 133, which are generally accepted accounting principles ("GAAP"), that Fannie Mae had inadequate internal controls, and that OFHEO no longer had confidence in certain members of Fannie Mae's management.  (SAC ¶¶ 38-44.)  Five days later, Fannie Mae announced that it had entered into an agreement with OFHEO to take steps to remedy the problems identified.  (SAC ¶ 47.)  It also announced that the Board had formed a special committee of independent directors to analyze the issues raised by OFHEO's interim report.  In addition, it retained former Senator Warren Rudman and his law firm, Paul, Weiss, Rifkind, Wharton & Garrison LLP ("Paul Weiss"), to serve as outside counsel to the special committee.  (*See* Filing on Form 8-K, Federal National

Mortgage Association at 99.1, dated Sept. 22, 2004, at Decl. of Robert M. Stern in Supp.

of Def. Fannie Mae's Mem. of Law in Opp'n to Pls.' Mot. for Class Certification ("Stern

Decl."), Ex. 24.)  On September 22, 2004, Fannie Mae's stock price closed down $4.17

(5.51%).  (Decl. of Michael J. Barclay in Supp. of the Lead Pls.' Mot. for Class

Certification ("Barclay Decl.") ¶ 23.)  Between September 22 and September 30, Fannie

Mae's stock declined by over 13%, closing at $63.40 per share.  (SAC ¶ 37, 45; *see also*

Barclay Decl. ¶¶ 24-32.)

On October 12, 2004, Fannie Mae publicly disclosed that the U.S. Attorneys'

Office for the District of Columbia was conducting a criminal investigation into its

accounting irregularities.  Seven days later it announced that the Securities and Exchange

Commission ("SEC") had also initiated a formal investigation into the same.  (SAC ¶¶

48-50.)  Notwithstanding these developments, Fannie Mae disputed throughout the Fall

of that year that its cooperation with these investigations amounted to an admission of

wrongdoing.  (SAC ¶ 53.)

Fannie Mae's tune changed, however, in December 2004.  On December fifteenth,

the SEC's Office of the Chief Accountant ("OCA") confirmed that "Fannie Mae's

accounting practices did not comply in material respects with the accounting

requirements in Statement Nos. 91 and 133."  (SAC ¶ 54.)  The OCA advised Fannie

Mae that it should restate its financial statements from 2001 through mid-2004 to

eliminate the use of hedge accounting, re-evaluate its accounting under FAS 91, and

restate its financial statements filed with the SEC.  (SAC ¶ 55.)  The stock price, which

closed at $70.69 on December 15, fell to $69.30 the following day.  Subsequently, on

4

December twenty-first, CEO Raines announced his retirement and CFO Howard resigned. (SAC ¶ 59.)

On December 22, 2004, Fannie Mae announced that it would restate its financial statements from 2001 through mid-2004. It predicted an approximately $9 billion restatement, and disavowed the accuracy of its earlier financial statements for this period. (SAC ¶ 61.) More specifically, in its Form 8-K filing with the SEC, Fannie Mae announced that its "previously filed interim and audited financial statements . . . for the periods from January 2001 through the second quarter of 2004 *should no longer be relied upon* because such financial statements were prepared applying accounting practices that did not comply with generally accepted accounting principles, or GAAP." (Filing on Form 8-K, dated Dec. 22, 2004, at Stern Decl., Ex. 38 (emphasis added).) Fannie Mae cautioned, however, that the magnitude of the restatement could change depending on the investigation conducted by Paul Weiss and OFHEO. Fannie Mae's stock closed at $72.40 on December 22. The following day, Fannie Mae's stock closed at $69.62, down $2.33 (3.24%). (Barclay Decl. ¶ 34.) In addition to disavowing its past financial statements, Fannie Mae discharged KPMG. (SAC ¶ 63.) On January 17, 2005, Fannie Mae announced that its Controller, Leanne Spencer, would resign as well. (SAC ¶ 21(d).)

Throughout 2005, Fannie Mae's stock price continued its downward slide and additional information about the state of its financial situation was publicly reported. For example, on January 18, 2005, after the markets closed, Fannie Mae announced that it would cut its common stock dividend by 50% for the first quarter of 2005, in an effort

towards building its capital to a 30% surplus to cover its minimum capital requirement.

(SAC ¶ 66.)  While the stock closed at $69.70 per share, it opened on January nineteenth

at $67.43 per share.  In a further effort to increase its surplus capital, Fannie Mae

announced on February twenty-third that it would reduce the size of its mortgage

portfolio (SAC ¶ 70); its stock closed down $.64 per share, to $57.16.

Moreover, in February 2005, Fannie Mae announced that OFHEO had identified

additional violations of GAAP.  (SAC ¶ 70.)  Indeed, Fannie Mae announced the

following month that it would not be filing its Form 10-K for the 2004 fiscal year.  (*Id.* at

72.)  On April 4, 2005, *The Wall Street Journal* reported that OFHEO was investigating

whether Fannie Mae improperly accounted for trusts it set up to issue mortgage-backed

securities.  (SAC ¶ 73.)  After the close of trading on April 9, 2005, Fannie Mae's

President and Chief Executive Officer disclosed that Fannie Mae's restatement would not

be completed until the second half of 2006.  (*Id.*)  Fannie Mae also disclosed that it was

in violation of New York Stock Exchange rules requiring the filing of an annual financial

report with the SEC, and was facing the possibility of delisting.  On September 27, 2005,

additional accounting violations at Fannie Mae were reported in a *Dow Jones* report.

(SAC ¶ 75.)  Fannie Mae's stock hit rock bottom on September 28, 2005, closing at

$41.71 per share.

On February 22, 2006, Senator Rudman issued his report (the "Paul Weiss

Report"), which confirmed many of OFHEO's prior findings and unveiled several

accounting issues that had not been previously detailed.  (SAC ¶¶ 78, 82.)  For example,

it noted irregularities in the accounting for short-term investment securities, the

documentation of the business justification for individual debt repurchases, the allowance

for loan losses, and the use of an internal model for other-than-temporary-impairment

accounting. (*See* Fannie Mae's Opp'n at 7-8.) OFHEO released its final report three

months later. (*See Report of the Special Examination of Fannie Mae*, OFHEO, May 23,

2006 ("Final Report"); at Stern. Decl., Ex. 84) Additionally, OFHEO raised concerns for

the first time about two Real Estate Mortgage Income Conduit ("REMIC") transactions.

(SAC ¶ 91.) Fannie Mae ultimately filed a Form 10-K for the year ending 2004 on

December 6, 2006. The restatement reduced earnings by approximately $6.3 billion,

after taxes.

In light of this continuous series of developments, Lead Plaintiffs request this

Court to certify the following class:

> All purchasers of the publicly traded common stock and call
> options of Federal National Mortgage Association ("Fannie
> Mae"), and sellers of Fannie Mae publicly traded put options
> during the period from April 17, 2001, through September 27,
> 2005 (the "Class Period") who suffered damages thereby.
> Excluded from the Class are (i) the Defendants, (ii) any
> person who was an officer or director of Fannie Mae or any
> of its parents or subsidiaries during the Class Period, (iii) the
> members of the immediate family of each of the Individual
> Defendants, (iv) any entity in which any Defendant had a
> controlling interest during the Class Period, (v) any parent or
> subsidiary of Fannie Mae, (vi) any incentive, retirement,
> stock or other benefit plan that benefited solely the Individual
> Defendants; and (vii) the legal representatives, heirs,
> predecessors, successors or assigns of any of the foregoing
> excluded persons and entities.

(Lead Pls.' Mot. for Class Cert. at 1.) While the parties agree that certifying a class is

appropriate, they disagree on how that class should be defined. Although all parties

(except KPMG) agree that April 17, 2001 is the proper start date for the proposed class period, the defendants disagree that the class period should run until September 27, 2005. Fannie Mae and the Individual Defendants request an end date of December 22, 2004 (or alternatively December 6, 2006, the date of Fannie Mae's restatement) and KPMG requests an end date of September 22, 2004. Additionally, the parties dispute whether the class should encompass "in-and-out" traders and purchasers of call options and sellers of put options. (Fannie Mae's Mem. of Law in Opp'n to Pls.' Mot. for Class Certification ("Fannie Mae's Opp'n") at 39-41; Leanne G. Spencer's Mem. of Law in Opp'n to Lead Pls.' Mot. for Class Certification ("Spencer Opp'n") at 7.)

## DISCUSSION

### I.    Standard of Review

To obtain class certification, Lead Plaintiffs have the burden of demonstrating that the requirements of Federal Rule of Civil Procedure 23(a) are met and that the class is maintainable pursuant to one of Rule 23(b)'s subdivisions. *See* Fed. R. Civ. P. 23; *Richards v. Delta Air Lines, Inc.*, 453 F.3d 525, 529 (D.C. Cir. 2006); *see also Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 613 (1997). Here, Lead Plaintiffs seek certification of a class pursuant to Rule 23(b)(3).

Rule 23(a) requires that Lead Plaintiffs show the following in order to certify a class: (1) that the class is so numerous that joinder of all members is impracticable (numerosity), (2) that there are questions of law or fact common to the class (commonality), (3) that the claims or defenses of the representative parties are typical of the claims or defenses of the class (typicality), and (4) that the representative parties will

fairly and adequately protect the interests of the class (adequacy of representation). If

Lead Plaintiffs satisfy all four requirements of Rule 23(a), then they must satisfy the two

additional requirements under Rule 23(b)(3): (1) common questions must "predominate

over any questions affecting only individual members" (predominance); and (2) class

resolution must be "superior to other available methods for the fair and efficient

adjudication of the controversy" (superiority). *See Amchem*, 521 U.S. at 615; *see also*

Fed. R. Civ. P. 23(b)(3).[3]

## II.    Rule 23(a) Requirements

The requirements of Rule 23(a) are so clearly met in this case that the defendants

raise no opposition to this requirement being satisfied. In that regard, Lead Plaintiffs

point out, of course, that: (1) Fannie Mae had approximately 967,903,726 shares of

common stock issued and outstanding as of July 31, 2004, and its securities actively

traded on the New York Stock Exchange, therefore making joinder impracticable; (2)

allegations of securities fraud are common to the class; (3) each potential class member's

claim arises from the purchase of Fannie Mae securities and the alleged damage due to

defendants' alleged material misrepresentations and omissions; and (4) that Lead

Plaintiffs can adequately represent the interests of the proposed class. In light of the size

of the proposed class and the nature of the plaintiffs claims (alleging securities fraud), the

---

[3] Four factors to be considered in the Court's determination of predominance and superiority are "(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; (D) the difficulties likely to be encountered in the management of a class action." Fed. R. Civ. P. 23(b).

Court easily concludes that the requirements of Rule 23(a) have been satisfied. *See In re Newbridge Networks Sec. Litig.*, 926 F. Supp. 1163, 1176 (D.D.C. 1996) (recognizing that federal securities actions are particularly suitable for class certification). However, whether the Rule 23(b) requirements have been satisfied by the Lead Plaintiffs is a very different question.

## III.    Rule 23(b)(3) Requirements

Defendants challenge to the Lead Plaintiffs' proposed class certification is limited to the duration of the class period. Indeed, defendants concede that the superiority requirement of Rule 23(b)(3) is satisfied. Moreover, with the exception of KPMG[4], defendants agree with Lead Plaintiffs that April 17, 2001, the day Fannie Mae issued a press release containing certain financial results from earlier in 2001, is the date the class period should commence. The Court agrees.

The duration dispute, by comparison, concerns the date proposed by the Lead Plaintiffs for the close of the class period. Lead Plaintiffs contend that the closing date should be September 27, 2005, while defendants, except KPMG[5], believe it should be

---

[4] KPMG revives one of its arguments from its motion to dismiss and argues that the class period should not start as to it until April 1, 2002, the date Fannie Mae released its 2001 financial statements, which contained KPMG's audit opinion in the Information Statement, since Fannie Mae's prior announcements did not contain any misrepresentations by KPMG. (Mem. of Def. KPMG LLP in Opp'n to Lead Pls.' Mot. for Class Certification ("KPMG Opp'n") at 17-18.) Given that courts should err on the side of certification, this Court will not establish a separate class period for KPMG, although if discovery yields evidence such that KPMG cannot be found liable prior to April 1, 2002, I reserve the right to create a separate subclass at that point in time. *See Lerch v. Citizens First Bancorp., Inc.*, 144 F.R.D. 247, 256 (D.N.J. 1992) (declining to establish separate subclass for auditor at class certification stage).

[5] KPMG is the only party to argue for the class period to end on September 22, 2004, the date on which Fannie Mae announced that OFHEO had released its interim report unearthing accounting irregularities. (KPMG Opp'n at 7-12.) Even though the OFHEO interim report questioned the

December 22, 2004. Defendants contend, in essence, that this earlier date complies with the predominance requirement of Rule 23(b) because thereafter it was unreasonable, as a matter of law, for any investor to rely on Fannie Mae's financial statements as a basis to allege that they were a victim under a fraud on the market theory. Lead Plaintiffs disagree, vigorously contending that it was not until September 27, 2005, that the entire scope of the fraud was revealed to the market, such that it would be unreasonable thereafter to rely on Fannie Mae's financial statements as a basis for alleging fraud. For the following reasons, I agree with the defendants.

To prevail on a securities fraud claim, a plaintiff must establish the following elements: (1) a false representation of (2) a material fact, (3) the defendant's knowledge of its falsity and his intention that the plaintiff rely on it, (4) the plaintiff's reasonable reliance on the representation, and (5) the plaintiff's resulting loss. *See Kowal v. MCI Communications Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Thus, plaintiffs must prove, *inter alia*, that they relied on the defendants' alleged misrepresentations and omissions in purchasing Fannie Mae securities during the class period to prevail on their claims.

In order for issues relating to the reliance element to predominate, as required by Rule 23(b)(3), Lead Plaintiffs need to invoke the fraud-on-the-market presumption

---

veracity of Fannie Mae's financial statements and its internal accounting controls, the substantive extent of these discoveries was not revealed at this time and Fannie Mae officials continued to defend Fannie Mae's accounting practices. (SAC ¶ 53.) Therefore, the information neither cured the market nor made it unreasonable for an investor to continue to rely on Fannie Mae's past financial statements. *See In re Corel Corp. Inc. Sec. Litig.*, 206 F.R.D. 533, 543-44 (E.D. Pa. 2002) (extending class period beyond first announcement of expected losses since announcement improperly attributed those losses to other events and company officials continued to express optimism about the health of the company).

established by the Supreme Court in *Basic v. Levinson*, 485 U.S. 224 (1988). The fraud-on-the-market doctrine allows investors to prove reliance on misrepresentations or omissions by presuming that the market price at which investors purchased was influenced by those misrepresentations and omissions. *See Basic*, 485 U.S. at 241-42. This presumption, however, is rebuttable. The influx of curative information into the market rebuts this presumption because the fraud underlying the complaint is disclosed. "Any showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." *Basic*, 485 U.S. at 248. Examples include a lack of market response to the alleged misrepresentations, that the market was aware that the misrepresentations were false, or that investors would have purchased or sold the securities even with full knowledge of the misrepresentation. *Id.* Thus, whether the fraud-on-the-market presumption applies as a matter of law is essential for determining the duration of the class period.

Lead Plaintiffs' and Fannie Mae's dispute boils down, in essence, to when sufficient corrective information entered the market, making reliance thereafter unreasonable as a matter of law, and thereby rebutting the fraud-on-the-market presumption. Here, defendants (except KPMG) acknowledge that plaintiffs who purchased their stock prior to Fannie Mae's December 22, 2004, announcement disavowing its earlier financial statements may rely on the fraud-on-the-market presumption and need not individually demonstrate reliance. Naturally, the defendants also claim in turn that any purchasers who acquired stock *after* December 22, 2004,

cannot rely on that presumption because Fannie Mae's corrective disclosure cured the

fraud on the market and thus rebutted the presumption of reliance, leaving only individual

issues of reliance to predominate thereafter. *See In re Initial Pub. Offerings Sec. Litig.*,

471 F.3d 24, 42-43 (2d Cir. 2006) ("Without the *Basic* presumption, individual questions

of reliance would predominate over common questions."). Lead Plaintiffs, on the other

hand, disagree vigorously, contending that the December twenty-second announcement

was merely a partial corrective disclosure. They argue that since additional information

regarding the extent of Fannie Mae's alleged fraud continued to be released throughout

2005, the full impact of the information was not absorbed by the market until September

27, 2005. I disagree.

      In determining the duration of a securities fraud class based on a fraud-on-the-

market theory, the Court must determine whether "a curative disclosure had been made

so as to render it unreasonable for an investor, or the market, to continue to be mislead by

the defendants' alleged misrepresentations." *In re Resource America Sec. Litig.*, 202

F.R.D. 177, 183 (E.D. Pa. 2001); *see also In re LTV Sec. Litig.*, 88 F.R.D. 134, 147 (N.D.

Tex. 1980); *cf. Semerenko v. Cendant Corp.*, 223 F.3d 165, 180 & n.8 (3d Cir. 2000)

("[A] defendant may defeat the presumption of reliance by showing that the plaintiff's

reliance on the market price was actually unreasonable," such as by showing that "the

investor knew, or had reason to know, that the misrepresentations were in fact false").

Where companies disclose accounting irregularities, courts generally find it unreasonable

as a matter of law for investors to rely thereafter on the company's prior financial

statements. *See Semerenko*, 223 F.3d at 181 (holding on motion to dismiss that

company's announcement warning investors to not rely on prior financial statements and auditor's reports after discovery of accounting irregularities and immediate decline in stock price made any future reliance on prior financial statements or audit reports unreasonable as a matter of law); *In re Resource Am.*, 202 F.R.D. at 184 (finding curative disclosures particularly forceful when emanate from the company itself); *see also Alaska Electrical Pension Fund v. Pharmacia Corp.*, No. 03-1519, 2007 WL 276150, *3-4 (D.N.J. Jan. 25, 2007) (ending class period on date regulatory agency released report since company's subsequent challenges to the report did not outweigh the significance of the curative disclosure).

Here, however, Lead Plaintiffs contend that the December twenty-second corrective disclosure did not cure the fraud on the market because additional information concerning *other* accounting irregularities and failed internal controls came to light thereafter, such that the entire scope of the fraud was not revealed to the market until September 27, 2005.  This argument misses the mark!

Whether a particular announcement (*i.e.*, "release") actually cured a prior misrepresentation is, of course, a sensitive issue to rule on at this early stage of the proceedings, because it comes so close to assessing the ultimate merits in the case.  *See Eisen v. Carlisle & Jacquelin*, 417 U.S. 156, 177-78 (1974).  Thus, to avoid doing so, courts have often limited their analysis to a determination of whether there is "a substantial question of fact as to whether the release cured the market or was itself misleading."  *Friedlander v. Barnes*, 104 F.R.D. 417, 421 (S.D.N.Y. 1984).  If there is

14

"no substantial doubt as to the curative effect" of the announcement they will simply define the class period accordingly. *Id.*

Here, there is no "substantial doubt" that the December 22, 2004, announcement severed the link between the alleged misrepresentations and the stock price, even though additional information regarding the accounting irregularities came to light. *See Lerch v. Citizens First Bancorp, Inc.*, 144 F.R.D. 247, 254-55 (D.N.J. 1992) (ending class period on date that the allegedly fraudulent statements were widely disseminated, even though it was not until later that the complete financial situation became clear to investors since the announcements after the date did not change the nature of the reliance); *In re LTV Sec. Litig.*, 88 F.R.D. 134, 147-48 (N.D. Tex. 1980) (ending class period on day company requested suspension of trading and reported that adjustments would have a "materially adverse impact" on the company's results, even though the exact amount of the restatement was not known until later). Unlike the cases Lead Plaintiffs rely upon, this is not a situation where the December twenty-second disclosure merely hinted at the existence of the problems and that the market barely reacted to a half-hearted disclosure. *Cf. In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 536-47, 540 (E.D. Va. 2006) (ending class period when company announced that its financial statements were unreliable, that it needed to issue an goodwill impairment restatement and that it was subject to investigations as opposed to the date of an earlier statement that the company's internals controls were not effective and that the concerns *could* impact the company's financial condition); *In re WorldCom, Inc. Sec. Litig.*, 219 F.R.D. 267, 307 (S.D.N.Y. 2003) (selecting date on which company announced first announced need for restatement

as end of class period over defendants' request to shorten the period since questions

remained about when and how the market was informed about the conduct at issue prior

to that date).

Simply stated, there was nothing equivocal about Fannie Mae's December twenty-

second disavowal of its financial statements.  The company explicitly warned investors to

discount its prior financial statements and that it anticipated a restatement of around $9

*billion* as a result of a top-to-bottom review of its books.  This announcement put

investors on notice that Fannie Mae's financial future was, at best, uncertain.  (Form 8-K,

Dec. 22, 2004, Stern Decl., Ex. 38 (noting that restatement estimate could change

depending on the outcome of the ongoing investigations).)  Not surprisingly, the market

reacted immediately, with a statistically significant $2.33 (3.24%) drop in stock price.

(Decl. of Frederick C. Dunbar in Supp. of Fannie Mae's Opp'n to Lead Pls.' Mot. for

Class Certification ("Dunbar Decl.") ¶ 34.)  While additional information did enter the

market after December 22, 2004, those additional disclosures did not render the

December twenty-second statement either misleading or any less corrective.  *Cf. In re*

*Interpublic Sec. Litig.*, No. 02-6527, 2003 WL 22509414 (S.D.N.Y. Nov. 6, 2003)

(extending class period beyond date on which company announced its "final" restatement

when the company came back a few months later with a revised restatement that was

detrimentally different, rendering the initial "final" restatement potentially actionable

itself).

Thus, investors who purchased Fannie Mae stock after December 22, 2004, stand

in a different posture than those who purchased beforehand, and should not be able to

claim a reasonable reliance on Fannie Mae's financial statements. Lead Plaintiffs'
assertion that analysts continued to use the historical financial statements with
appropriate supplemental valuation methodologies does not justify extending the class
period. *See In re Data Access Sys. Sec. Litig.*, 103 F.R.D. 130, 144 (D.N.J. 1984)
(closing class period on day company announced its financial statements appeared to be
materially misstated even though some investors continued to purchase stock in hopes
that the company would return to its original value since gravaman of the complaint was
the misrepresentations in the *disavowed* financial statements); *see also Basic*, 485 U.S. at
248 (noting that can rebut presumption by showing that "individual plaintiff traded or
would have traded despite his knowing the statement was false"). Indeed, Lead Plaintiffs
point to nothing in the record indicating that any investor concluded it was *reasonable* to
rely on Fannie Mae's financial statements after December 22, 2004. To the contrary,
Lead Plaintiffs' own expert acknowledges that investors understood that those financial
statements contained errors. (Dunbar Decl. ¶2(d).) And while the subsequent disclosures
in 2005 might have provided additional information as to the extent of the alleged fraud,
investors were already proceeding with full knowledge that substantial errors and
irregularities existed with the earlier financial statements. Indeed, even the original
complaints filed in the Fall of 2004 contained allegations beyond those explicitly known
at the time. *See* OPERS/STRS Class Action Complaint, No. 2:04-cv-1106, S.D. Oh.
(Nov. 22, 2004) ¶ 76. Not surprisingly, the vast majority, if not all, of the lawsuits
arising from this accounting debacle were filed between September and December 2004,

suggesting that most investors already suspected significant fraud due to Fannie Mae's accounting practices. *See Lerch*, 144 F.R.D. at 254.

Accordingly, for all of these reasons, the Court finds that based on the record for class certification, it was unreasonable, as a matter of law, for investors to rely on Fannie Mae's financial statements after December 22, 2004. Lead Plaintiffs, therefore, cannot rely in this litigation on the fraud-on-the-market presumption after that date.[6] Moreover, class certification is inappropriate after this date because individual, not common, issues would predominate for subsequent purchasers who would need to prove what Fannie Mae conduct after December twenty-second continued to mislead the market and inflate the stock price. *See Data Access*, 103 F.R.D. at 144. Thus, the class period will run from April 17, 2001, to December 22, 2004.

## IV.    Class Members

The parties also dispute who are proper members of the class.[7] In particular, Fannie Mae contends that the following types of plaintiffs should be excluded: (1) the so-called "in-and-out" traders who sold their shares before the first corrective disclosure on

---

[6] Because it was unreasonable as a matter of law to rely on Fannie Mae's financial statements after December 22, 2004, Howard's argument that the Court reserve judgment on class certification at this juncture is to no avail. (*See also* Lead Pls.' Rep. Mem. of Law to the Opp'ns to Class Certification Filed By Defs. Fannie Mae, Timothy Howard and Leanne Spencer ("Pls. Rep. to Fannie Mae") at 3-4.) Simply stated, there is sufficient information at this stage of the proceedings to make this determination without delving too far into the merits. *Cf. Freeland v. Iridium World Communications*, 233 F.R.D. 40, 43-44 (D.D.C. 2006) (finding insufficient information to conclusively determine whether press release cured fraud on the market).

[7] These objections are not styled as deficiencies in Lead Plaintiffs' ability to meet any of Rule 23's requirements. As such, the Court addresses them separately.

September 22, 2004[8]; and (2) the purchasers of call options and sellers of put options. For the following reasons, I agree with Lead Plaintiffs that both in-and-out traders and options traders should be included, for now, in the proposed class.

As explained above, securities fraud suits are particularly amenable to class certification. *See In re Newbridge Networks Sec. Litig.*, 926 F. Supp. 1163, 1176 (D.D.C. 1996) (recognizing that federal securities actions are particularly suitable for class certification). Given the importance of class action procedures to securities fraud actions, the Rule 23 requirements generally have been "construed liberally." *See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 179 (2d Cir. 1990). Therefore, courts tend to resolve any doubts about certification in favor of certification. *See In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 538 (E.D. Va. 2006). This is particularly prudent since certification decisions may be revisited as additional evidence comes to light during the course of discovery.

Fannie Mae's request to exclude from the class those traders who sold their stock prior to the OFHEO interim report in September 2004 because they cannot prove loss causation as a matter of law under *Dura Pharmaceuticals, Inc. v. Broudo*, 544 U.S. 336 (2005), is premature. In *Dura Pharmaceuticals*, the Supreme Court held that whether a private plaintiff has adequately plead loss causation depends on whether the "the purchaser [sold] the shares quickly before the relevant truth begins to leak out, the

---

[8] "In-and-out" transactions are purchases and sales of shares occurring during the class period but prior to the corporation making a corrective disclosure. *See In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 543 (E.D. Va. 2006); *Roth v. Aon Corp.*, 238 F.R.D. 603, 607 (N.D. Ill. 2006).

misrepresentation will not have led to any loss." *Dura*, 544 U.S. at 342. At this stage of the proceedings, and with discovery still incomplete, it remains an open question as to whether the September 22, 2004 OFHEO interim report was the first corrective disclosure, or the first time damages occurred. (*See* SAC ¶ 36 (noting that OFHEO launched its investigation into Fannie Mae prior to September 22, 2004).) Given that Lead Plaintiffs might be able to prove that the first corrective disclosure occurred prior to September 22, 2004, excluding traders that sold prior to that date is premature at this time. *See In re Flag Telecom Holdings, Ltd. Sec. Litig.*, No. 02-3400, 2007 WL 2596775, at *16-17 (S.D.N.Y. Sept. 4, 2007) (including in-and-out traders where records shows that plaintiffs might be able to demonstrate "leakage" of the truth prior to the most critical corrective disclosure); *In re Tyco Int'l, Ltd.*, 236 F.R.D. 62, 71 (D.N.H. 2006) (recognizing that identification of specific corrective disclosures did not preclude plaintiffs from identifying additional earlier disclosures); *In re BearingPoint, Inc. Sec. Litig.*, 232 F.R.D. 534, 544 (E.D. Va. 2006) (noting that where the are multiple corrective disclosures, in-and-out traders may be able to show loss causation); *In re Priceline.com Inc. Sec. Litig.*, 236 F.R.D. 89, 93-94 (D. Conn. 2006) (including in-and-out traders because allegations that earlier events could be construed as corrective disclosures). *But see In re Scientific-Atlanta, Inc. Sec. Litig.*, No. 01-1950, 2007 WL 2683729, at *6-7 (N.D. Ga. Sept. 7, 2007) (excluding in-and-out traders from proposed class because no allegations that there were prior corrective disclosures).

Similarly, Fannie Mae seeks to exclude options traders from the class definition on the basis that options traders should not benefit from the fraud-on-the-market

presumption since they trade on perceived inefficiencies in the stock price.  Again, I

disagree.  While the Supreme Court, to date, has not weighed in on the issue of whether

options traders are entitled to a rebuttable presumption of reliance, at this stage in the

discovery phase of this vast and complicated factual mosaic, the Court is inclined to

extend that rebuttable presumption to options traders based on the reasoning of those

other courts that have considered the same issue.  In particular, I concur with those courts

who have concluded that trading on the belief that the stock price will fluctuate does not

*necessarily* mean that option traders do not rely on the integrity of the market information

to predict those fluctuations.  *See, e.g., In re Scientific-Atlanta, Inc. Sec. Litig.*, No. 01-

1950, 2007 WL 2683729, *8 (N.D. Ga. Sept. 7, 2007) (finding put options sellers entitled

to rebuttable presumption of reliance because put options sellers bet on the integrity of

the price of the underlying stock as do stock purchasers); *Levie v. Sears Roebuck & Co.*,

496 F. Supp. 2d 944, 949 (N.D. Ill. 2007) (including put and call options traders because

while they might believe there will be fluctuation in the stock price, they also rely on the

integrity of the information disseminated).  To date, Fannie Mae has pointed to no

evidence, let alone substantial evidence, that the options traders in the proposed class did

not rely on the efficiency of the market price of Fannie Mae' stock.  Thus, the Court is

unwilling to exclude options traders from the proposed class at this juncture absent some

evidence that these individuals did not rely on market efficiency.  Let there be no doubt,

however, that this decision to include the pre-September 22, 2004 traders and the options

traders in the proposed class, like all class certification decisions, can be easily revisited

at a later date.  Should Fannie Mae ultimately be able to demonstrate, for example, that

21

the OFHEO interim report was indeed the first corrective disclosure, or that the options

traders did not rely on the integrity of the market information to predict market

fluctuation, this Court will entertain a motion to recertify the class to exclude those

individuals.

## CONCLUSION

Thus, for all of the foregoing reasons, this Court certifies this action as a class

action, designates Lead Plaintiffs as class representatives, and appoints Waite, Schneider,

Bayless & Chesley Co., L.P.A. as Lead Class Counsel and Bernstein Liebhard & Lifshitz,

LLP as Co-Lead Class Counsel, representing a class defined as:

> All purchasers of the publicly traded common stock and call
> options of Federal National Mortgage Association ("Fannie
> Mae"), and sellers of Fannie Mae publicly traded put options
> during the period from April 17, 2001, through December 22,
> 2004 (the "Class Period") who suffered damages thereby.
> Excluded from the Class are (i) the Defendants, (ii) any
> person who was an officer or director of Fannie Mae or any
> of its parents or subsidiaries during the Class Period, (iii) the
> members of the immediate family of each of the Individual
> Defendants, (iv) any entity in which any Defendant had a
> controlling interest during the Class Period, (v) any parent or
> subsidiary of Fannie Mae, (vi) any incentive, retirement,
> stock or other benefit plan that benefited solely the Individual
> Defendants; (vii) the legal representatives, heirs,
> predecessors, successors or assigns of any of the foregoing
> excluded persons and entities.

An appropriate Order will issue with this Memorandum Opinion.

RICHARD J. LEON
United States District Judge